# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

PHYLLIS SCHLAFLY REVOCABLE TRUST,
a Missouri trust by its trustee, John Schlafly,

EAGLE TRUST FUND, an unincorporated
not-for-profit association by its sole members,
Bruce Schlafly and John Schlafly,

                                           **CASE NO.:**

                                           **COMPLAINT & JURY TRIAL DEMAND**

                     Plaintiffs,

v.

ANNE CORI, a Missouri resident,

EUNIE SMITH, an Alabama resident,

CATHIE ADAMS, a Texas resident,

CAROLYN MCLARTY, an Oklahoma resident,

ROSINA KOVAR, a Colorado resident,

SHIRLEY CURRY, a Tennessee resident, and

JANE OR JOHN DOES 1-5, residents of the
several states, wherever situated,

                     Defendants,
**---------------------------------------------------------)**

       NOW COME plaintiffs, the Phyllis Schlafly Revocable Trust ("Schlafly Revocable Trust") and the Eagle Trust Fund ("Eagle Trust"), (collectively, hereinafter "Plaintiffs"), by and through undersigned counsel, and for their Complaint against individual defendants, Anne Cori, Eunie Smith, Cathie Adams, Carolyn McLarty, Rosina Kovar, Shirley Curry, and Jane or John Does 1-5 (collectively, hereinafter "Defendants"), state and allege the following verified facts and allegations:

## PRELIMINARY STATEMENT

1.  This is an action for nationwide injunctive relief and damages to stop the following wrongful acts: (a) continued violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836; (b) trademark infringement, unfair competition, and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); (c) federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1); (d) trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c); (e) misappropriation of trade secrets under the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.455, *et. seq.*; (f) trademark infringement and unfair competition under Missouri common law; (g) violation of rights of publicity under Missouri common law; and (h) to seek declaratory judgment under 28 U.S.C. § 2201.

## THE PARTIES

2.  Plaintiff Schlafly Revocable Trust dated July 18, 1997, as amended, was formed as a Missouri Trust with its original grantor and trustee Mrs. Phyllis Schlafly ("Mrs. Schlafly"), who was a national figure and Missouri resident at the time of formation and at the time of her death on September 5, 2016. In relevant part, her oldest son John Schlafly is the current trustee of the Schlafly Revocable Trust and is authorized to bring this suit on the trust's behalf.

3.  The Schlafly Revocable Trust is the sole owner of the intellectual and other intangible personal property at issue in this case, except where specifically limited below, under an assignment dated August 31, 2016. And, absent written consent from the current trustee, the Schlafly Revocable Trust is the sole authorized user. The Schlafly Revocable Trust contains a Missouri choice of law provision.

4.   Plaintiff Eagle Trust was formed June 2, 1967 by Phyllis Schlafly as the settlor after the national success of Mrs. Schlafly's first bestseller *A Choice Not an Echo*, which sold more than three million copies. The stated purpose was to publish and distribute her unique newsletter, *The Phyllis Schlafly Report*, conduct research in political science and national defense, distribute educational materials, and support other worthy and appropriate goals in the trustees' discretion.

5.   The Eagle Trust has several employees, has filed annual tax returns and operated continuously for 49 years as a custodian of Mrs. Schlafly's intangible personal property to protect Phyllis Schlafly's image, likeness, and related intellectual and personal property. The Eagle Trust was amended on or about May 10, 1996 and June 1, 2016.

6.   The original trustees were Phyllis Schlafly and Mrs. Margaret Gaul; the current successor trustees of the Eagle Trust and its sole members are John Schlafly and Bruce Schlafly, M.D., sons of the late Phyllis Schlafly. For the convenience of Mrs. Schlafly, as the original grantor and settlor, the Eagle Trust managed not only Eagle Trust assets, i.e., *The Phyllis Schlafly Report*, but also Mrs. Schlafly's intangible personal property.

7.   Namely, without limitation, the Eagle Trust also managed—and continues to manage—Mrs. Schlafly's proprietary database (the "Schlafly Database"), which is now owned by the Schlafly Revocable Trust and is defined in specific detail below.

8.   Defendant Anne Cori is an individual living in the State of Missouri. She is Mrs. Schlafly's youngest child. Anne Cori is the former president of Missouri Eagle Forum and served in that role until her term expired and Mrs. Schlafly replaced Anne Cori in favor of Noreen McCann on February 11, 2016.

9.  Upon information and belief, defendant Anne Cori continues to hold herself out as the president of Missouri Eagle Forum and is actively impersonating the entity and using Mrs. Schlafly's image and likeness on websites, in mailings, and in person, without Plaintiffs' authorization or consent. She has willfully committed wrongful acts within this District.

10. Upon information and belief, Defendant Eunie Smith is resident of the State of Alabama and, at all times relevant hereto, has purposefully availed herself of the laws of Missouri and willfully committed wrongful acts within this District.

11. Upon information and belief, Defendant Cathie Adams is a resident of the State of Texas and, at all times relevant hereto, has purposefully availed herself of the laws of Missouri and willfully committed wrongful acts within this District.

12. Upon information and belief, Defendant Carolyn McLarty is an individual who is a resident of the State of Oklahoma and, at all times relevant hereto, has purposefully availed herself of the laws of Missouri and willfully committed wrongful acts within this District.

13. Upon information and belief, Defendant Rosina Kovar is a resident of the State of Colorado and, at all times relevant hereto, has purposefully availed herself of the laws of Missouri and willfully committed wrongful acts within this District.

14. Upon information and belief, Defendant Shirley Curry a resident of the State of Tennessee and, at all times relevant hereto, has purposefully availed herself of the laws of Missouri and willfully committed wrongful acts within this District.

15. Upon information and belief, defendants, John and Jane Does 1-5 are individuals residing in the several states, who have provided financial or other assistance to Anne Cori

and the other defendants to commit or conspire to commit the unlawful acts described herein and who have willfully funding and committed wrongful acts within this District.

## JURISDICTION & VENUE

16. This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 USC §§ 1331 and 1338—under the Lanham Act, 15 U.S.C. §§ 1051 *et. seq*., and the Defend Trade Secrets Act, 18 U.S.C. § 1836.

17. This Court also has subject matter over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because these claims are directly related to the federal claims in this action within this Court's original jurisdiction and intertwined with the same case or controversy.

18. This Court also has subject matter jurisdiction over Plaintiffs' common law trademark, unfair competition, and right of publicity claims, as well as Plaintiffs' Missouri state statutory trade secret claim, under 28 U.S.C. § 1338(a)-(b) because these claims are joined with Plaintiffs' substantially related claims under the Lanham Act and the Defend Trade Secrets Act.

19. Venue is appropriate in the Eastern District of Missouri, pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District.

20. This Court has personal jurisdiction over each and every defendant, including all non-resident defendants, as follows:

(a)     Defendant Anne Cori is a resident of the State of Missouri.

(b)     Upon information and belief, non-resident defendants Eunie Smith, Cathie Adams, Carolyn McLarty, Rosina Kovar, and Shirley Curry, at all times relevant hereto,

have been a Member and Board of Director of the affiliated entity, Eagle Forum 501(c)(4), and has attended in-person annual Board of Directors Meetings in St. Louis, Missouri and one or more Eagle Council events sponsored by plaintiff Eagle Trust, including as recently as September 16-18, 2016 at the St. Louis Airport Marriott. Through their in-person attendance at plaintiff-sponsored events, Board of Directors Meetings in St. Louis, Missouri, and other contacts with this District, defendants Eunie Smith, Cathie Adams, Carolyn McLarty, Rosina Kovar, and Shirley Curry have transacted business within the State of Missouri pursuant to Mo.Rev.Stat. § 506.500.1(1).

(c)     Upon information and belief, the Defendants have also engaged in trademark infringement, among other tortious conduct, pursuant to Mo.Rev.Stat. § 506.500.1(3), either: (i) within the State of Missouri; or (ii) outside of the State of Missouri with the intent of yielding consequences in the State of Missouri.  Defendants, therefore, have sufficient contacts with the State of Missouri having purposefully availed themselves of the privileges of conducting activities within this State, including without limitation, conducting business within this State and invoking the benefits and protections of Missouri's laws. As further demonstrated, Plaintiffs' causes of action arise from Defendants transacting business within the State of Missouri, committing tortious acts within the State of Missouri, or committing extraterritorial acts that have yielded consequences in Missouri.

(d)     Upon information and belief, defendants Jane Doe 1-5 at all times relevant hereto, have engaged in contributory trademark infringement, among other tortious conduct, pursuant to Mo. Rev. Stat. § 506.500.1(3), either: (i) within the State of

Missouri; or (ii) outside of the State of Missouri with the intent of yielding consequences in the State of Missouri.

(e)     As further demonstrated herein, Plaintiffs' causes of action arise from Defendants transacting of business within the State of Missouri, committing tortious acts within the State of Missouri, or committing extraterritorial acts that have yielded consequences in Missouri or both.

21. As demonstrated herein, this Court may exercise personal jurisdiction over every non-resident defendant, namely Eunie Smith, Cathie Adams, Carolyn McLarty, Rosina Kovar, Shirley Curry, and the Jane Does 1-5 because:

(a)     Missouri's long-arm statute, Mo. Rev. Stat. § 506.500.1, which covers extraterritorial acts that yield consequences in Missouri, is satisfied;

(b)     each non-resident defendant has sufficient minimum contacts with the State of Missouri to satisfy due process concerns of the Fourteenth Amendment; and

(c)     the maintenance of this lawsuit against the non-resident Defendants does not offend traditional notions of fair play and substantial justice because Plaintiffs' causes of action arise out of or relate to Defendants' deliberate activities within the State of Missouri or extraterritorial acts that have yielded consequences in Missouri or both.

## STATEMENT OF FACTS

## I.     The Schlafly Database and Its Use for Eagle-related fundraising

22. Mrs. Schlafly first became a public figure as the campaign manager for a successful Republican candidate for Congress in St. Louis in 1946, Claude Bakewell. She then ran for Congress in 1952 and 1970 and served as an elected Delegate to eight Republican National Conventions: 1956, 1964, 1968, 1984, 1988, 1992, 1996, 2004, 2012,

and most recently in July 2016; and as an elected Alternate Delegate to four other Republican National Conventions: 1960, 1980, 2000, and 2008. She has attended and played an active role in every Republican National Convention since 1952. Mrs. Schlafly used these early political connections to develop a personal network of key contacts, influencers, and political donors.

23. Mrs. Schlafly continued to expand her personal network supporting the anti-Communist movement by starting 5,000 study groups on Communism (1950s and 1960s), helping to found the Cardinal Mindszenty Foundation (1958), and publishing five best-selling books on the Soviet missile threat (1964-1976).

24. In 1962, Mrs. Schlafly hired her first secretary and bookkeeper, Margaret Gaul, to help manage her personal network, increasing fame, and influence.

25. Then in 1964, Mrs. Schlafly became a national figure after publishing her first book—*A Choice Not an Echo*—and selling more than 3 million copies.

26. That same year she published her second book—*The Gravediggers*—together, the two books have combined to sell more than 5 million copies. Since then, Mrs. Schlafly has written, co-authored, or edited at least 26 books including her most recent work, *The Conservative Case for Trump*, which was published posthumously on September 6, 2016 and debuted on the NY Times bestseller list.

27. In 1964, faced with the overwhelming demand for *A Choice Not an Echo*, Mrs. Schlafly hired her second full-time employee Mary Ann Schmitzer who was Margaret Gaul's daughter. Together, Gaul and Schmitzer helped Mrs. Schlafly develop a proprietary database using a 3-part carbon paper system: the first part was the invoice for book orders; the second part was the adhesive-backed label to paste on the package; and most importantly, the third

part was an index card with the buyer's information that was stored in a card file as a permanent record.

28. This card file ultimately grew to approximately 30,000 3x5 inch index cards that were sorted by state, then alphabetically. This card file was stored in a wooden cabinet with 30 drawers labeled from Alabama to Wyoming and for many years was kept locked inside Mrs. Schlafly's home. Currently, the Plaintiffs maintain the card file in their locked archives of the affiliated Eagle Forum Education and Legal Defense Fund headquarters in St. Louis, Missouri.

29. In 1967, Mrs. Schlafly was the settlor of the plaintiff Eagle Trust, and its initial co-trustee with Gaul. At all times relevant after its formation, the Eagle Trust managed and developed the card file—which together with Mrs. Schlafly's personal network—forms the basis for the Schlafly Revocable Trust's proprietary database and protectable trade secret ("Schlafly Database"). This unique and personal asset was assigned by Mrs. Schlafly to her Schlafly Revocable Trust before her death and is still managed by the Eagle Trust as she requested.

30. During the late 1960s and early 1970s, Mrs. Schlafly continued to expand her Schlafly Database with the people who subscribed to *The Phyllis Schlafly Report*, bought books, came to local or national meetings, or made other contacts with Mrs. Schlafly.

31. For example, Mrs. Schlafly expanded her Schlafly Database with the advent of national meetings hosted by Mrs. Schlafly and the Eagle Trust beginning in February 1968— and that have continued annually since.

32. To further develop her Eagle brand, Mrs. Schlafly called the first national meeting *The Eagles Are Flying* in February 1968, which was later renamed Eagle Council. The

annual Eagle Council meeting held on September 16-18, 2016 at the St. Louis Airport Marriott was the 45th consecutive annual meeting and the first Mrs. Schlafly was unable to host personally.

33. Mrs. Schlafly continued to expand her Schlafly Database by using it to solicit funds for her Congressional run in 1970, and the new entities and initiatives she founded including, without limitation: Stop ERA (1972), Committee on the Status of Women (1974), Women's Forum (1975), Eagle Forum 501(c)(4) (1975), the Stop ERA PAC (1977), Eagle Forum Education & Legal Defense Fund (1981), Eagle Forum PAC (1982), the Republican National Coalition for Life (1990), the Eagle Forum Education Center (1993), and Eagle Forum Collegians (1993).

34. In a similar way, in 1995 Mrs. Schlafly took responsibility for saving one of the oldest conservative organizations, America's Future, which had been tax-exempt since 1947 by soliciting funds for its support using the Schlafly Database and promoting America's Future on her eagleforum.org, PhyllisSchlafly.com, and other websites.

35. These efforts to expand her Schlafly Database, grow her personal and Eagle brands (as described further below), and contribute to worthy causes continued steadfastly for more than 50 years until Mrs. Schlafly's death on September 5, 2016. By way of illustration, in 2016 alone, Mrs. Schlafly made over fifty public appearances, including but not limited to fifteen media appearances:

      (a)     Phyllis Schlafly on the Alan Nathan Show – Aug. 2, 2016

      (b)     Phyllis Schlafly on "Now" with Scott Spears – Aug. 1, 2016

      (c)     Phyllis Schlafly On The Marc Cox Show: I Don't Think She's Going To Be Elected – July 29, 2016

      (d)     Phyllis Schlafly on The Sean Hannity Radio Show – April 22, 2016

(e)    The Alex Jones Show: Exclusive: Woman Mugged By Cruz Operatives Speaks Out – April 20, 2016

(f)    Stuart Varney/Fox Business: Schlafly: Reagan, Trump both labeled not conservative enough – March 18, 2016

(g)    Laura Ingraham Show: Schlafly: I don't think Cruz can beat Trump, I think we should unite behind Trump for the conservative movement – March 14, 2016

(h)    The Alex Jones Show: Schlafly: Trump Only Hope To Beat The Kingmakers – March 1, 2016

(i)    A Debate on Article V and the Call for a Convention of the States – Friday, Feb. 23, 2016

(j)    The Liberalization of America | Phyllis Schlafly and Stefan Molyneux – Friday, Feb. 18, 2016

(k)    AMERICA'S "LAST CHANCE" and Should Scalia Seat Be Filled This Year? – Bill Martinez and Phyllis Schlafly – Thursday, Feb. 18, 2016

(l)    Phyllis Schlafly On The Marc Cox Show, Jan. 25, 2016

(m)    Laura Ingraham Show: Phyllis Schlafly: "I don't recognize National Review as the authority on Conservatism." – Friday, January 22, 2016

(n)    Jesse Lee Peterson: Phyllis Schlafly on Trump vs. Republican Kingmakers – Thursday, January 21, 2016

(o)    NewsmaxTV: America's Forum | Phyllis Schlafly delivers her take on how Democrats can win back Congress – Jan. 19, 2016

36. At all times relevant, Mrs. Schlafly's Schlafly Database has been stored, maintained, updated, managed, and kept confidential by Mrs. Schlafly personally and as co-trustee of the Eagle Trust.

37. In 1980, Mrs. Schlafly purchased a computer and hired staff to enter the data from the index cards into the Schlafly Database.

38. In 1991, consistent with the confidential and proprietary nature of the Schlafly Database, one of Mrs. Schlafly's sons, Roger Schlafly, a PhD in mathematics and a cryptology specialist, used an early IBM model personal computer running Microsoft DOS to

transfer the Schlafly Database to a more secure digital platform. Specifically, Roger Schlafly wrote the source code and application software to allow Mrs. Schlafly and the Eagle Trust Fund to better manage the Schlafly Database. With only slight modification, this customized proprietary system is how Eagle Trust employees manage and maintain the confidential Database to the present.

39. At all times relevant, Mrs. Schlafly protected her Schlafly Database as her most closely guarded asset. She never rented it, sold it, or disclosed it to third parties despite numerous requests to do so. She never allowed the list to be electronically transferred to anyone.

40. At all times relevant, Mrs. Schlafly, together with original co-trustee, Margaret Gaul, used and were expected to use the same strict precautions. Mrs. Gaul's daughter, Mary Ann Schmitzer, who worked for the Eagle Trust from 1964-2004 and was succeeded in the same job by her own daughter (Margaret Gaul's granddaughter), JoAnn Jouett from 2004 to present, have also been held to these same strict standards.  For example, until digital backup became more reliable, hard-copy backups of the Schlafly Database were kept on dot-matrix printer paper and locked in Mrs. Schlafly's personal safe deposit box.

41. As of the date of this action, the Eagle Trust Fund has five part or full-time employees, all of whom have worked for the trust for 20 years or more.  In contrast, Defendants are volunteer members and directors of the affiliated Eagle Forum (c)(4), had no full-time employees, and had no personal knowledge of the day-to-day operations of the Schlafly Database or Eagle Trust except through conjecture.

42. From the mid-1960s until her death in September 2016, Mrs. Schlafly used the growing Schlafly Database for educational and political solicitations, educational and

political fundraising, and for the distribution of information on the topics of promoting conservative values, increasing citizen knowledge of and participation in representative government.

43. Mrs. Schlafly regularly inserted a fundraising letter or promotional piece (for the various entities and causes she supported) into the same envelope that contained *The Phyllis Schlafly Report*. Specifically, these "ride-along" letters would provide information about the separate entities and ask for donations.

44. Since 1975, when Mrs. Schlafly first founded the Eagle Forum (c)(4) entity, she raised money for that entity by using these "ride-along" letters like she did with all of her other affiliated entities.

45. Over the years, Mrs. Schlafly would send direct mail and fundraising letters using the Schlafly Database and create targeted mailing lists (subsets of data) for benefit of the Schlafly-promoted causes and Eagle-related entities. These in-kind contributions were conducted in-house using Eagle Trust materials and equipment by Mrs. Schlafly personally or using trained, Eagle Trust employees.

46. At no time did Mrs. Schlafly, the Schlafly Revocable Trust (since Mrs. Schlafly's passing), or the Eagle Trust (as custodian) release the secured Schlafly Database to any other entities or third parties, including the Defendants or the affiliated, non-party Eagle Forum (c)(4).

47. All derivative works produced or created using the Schlafly Database for ride-along fundraising are also proprietary and deserving of protection.  For example, the use of hard-copy back-ups, spreadsheets, data subsets, partial mailing lists, or notes or tracking

methods to chart the success of individual solicitations were and at all times the exclusive property of Mrs. Schlafly (and are now the property of the Schlafly Revocable Trust).

**II.** **Phyllis Schlafly's Rights in the EAGLE Marks, the EAGLE LOGO Marks, the PHYLLIS SCHLAFLY Mark, and the Phyllis Schlafly Name, Likeness, and Image**

    **A.** *Mrs. Schlafly's Adoption, Development, and Use of the Marks*

48. After the success of her 1964 best-seller, *A Choice Not an Echo*, in September 1966, Mrs. Schlafly adopted and began using the EAGLE trademark and name (the "EAGLE Mark") in connection with political advocacy and fundraising services, and other goods and services related thereto.

49. From the mid-1960s through the early 1970s, Mrs. Schlafly expanded her use of the EAGLE Mark, adopting other marks containing the EAGLE Mark, including without limitation: EAGLE PIN, EAGLE TRUST FUND, EAGLE TRUST, THE EAGLES ARE FLYING, EAGLE COUNCIL, EAGLE AWARDS, EAGLE FORUM, and EAGLE FORUM EDUCATION AND LEGAL DEFENSE FUND, and EAGLE COUNCIL (collectively, the "EAGLE Marks").

50. From the mid-1960s until her death in September 2016, Mrs. Schlafly used the EAGLE Marks on and in connection with a variety of goods and services, including without limitation, publications (newsletters, books, brochures, manuals, pamphlets, and later, webpages, blogs, and online materials), printed awards, photographs, bumper stickers, badges, banners, and signs; educational services (workshops, classes, seminars, conferences, and later, webinars) on the topics of promoting conservative values, increasing citizen knowledge of and participation in representative government, and political advocacy related thereto; and association services, political advocacy services, political fundraising services, and political solicitation services, all related to the foregoing topics.

51. In September 1966, Mrs. Schlafly developed and began to use an Eagle Logo mark (the "EAGLE LOGO Mark"), and a pin (the "EAGLE PIN", together with the EAGLE LOGO Mark, the "EAGLE LOGO Marks"), also for sale and use for the goods and services described.

52. For example, correspondence from the fall of 1966 shows Mrs. Schlafly making substantial effort to work with jewelers, promoters, and manufacturers to design, manufacturer, and sell and distribute her EAGLE PIN to loyal supporters and affiliates. This was one of Mrs. Schlafly's earliest efforts to create and maximize the Eagle brand writ large, including her Eagle Marks, Eagle Logos, and collective sense of the Eagle entities.

53. Initially, Mrs. Schlafly distributed the EAGLE PIN to her supporters.  Soon thereafter, in late 1966, Mrs. Schlafly began sales of her EAGLE PIN, and either personally or through license to the "Eagle" entities she founded and controlled, she continued such sales until her death in September 2016.

54. In June 1967, Mrs. Schlafly founded and formed the Eagle Trust, which she fully controlled from that date until her death in September 2016.

55. In June 1967, Mrs. Schlafly began use of the EAGLE Marks and the EAGLE LOGO Mark on and in connection with her publication, promotion, and distribution of a monthly (and sometimes twice monthly) newsletter entitled *The Phyllis Schlafly Report*.

56. In June 1967, Mrs. Schlafly also began to use her own name as a trademark (the "PHYLLIS SCHLAFLY Mark"), on and in connection with the publication, promotion, and distribution of *The Phyllis Schlafly Report*.

57. Mrs. Schlafly—either personally or under the auspices of one of the "Eagle" entities she founded and controlled—published, promoted, and distributed *The Phyllis*

*Schlafly Report* monthly from 1967 until her death in September 2016. During that entire period, the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks have appeared prominently on the newsletter's masthead.

58. *The Phyllis Schlafly Report* has been immensely successful, still going strong with 600 consecutive issues and nationwide distribution for almost 50 years.

59. For almost 50 years, Mrs. Schlafly held annual nationwide meetings and awards programs branded under the EAGLE Marks, distributing the Eagle Pin, which she used either personally or through license to the "Eagle" entities she founded and controlled.

60. In February 1968 (and in 1969, 1971, and 1972 thereafter), Mrs. Schlafly held her first nationwide annual meeting under the name and mark THE EAGLES ARE FLYING.

61. In 1973, Mrs. Schlafly rebranded her nationwide annual meetings to EAGLE COUNCIL, and Mrs. Schlafly—personally and through license to the Eagle Trust Fund— held nationwide annual meetings under the EAGLE COUNCIL Mark from that date until 2015. The most recent EAGLE COUNCIL annual nationwide meeting was held by the Eagle Trust on September 16-18, 2016, just a few days after Mrs. Schlafly's death. This was the 49th consecuatve annual meeting hosted by Mrs. Schlafly or her designee under the Eagle brand (either EAGLE COUNCIL OR THE EAGLES ARE FLYING).

62. At the annual EAGLE COUNCIL meetings, Mrs. Schlafly awarded prizes branded under the EAGLE AWARDS Mark to worthy recipients. Dozens of EAGLE AWARDS prizes were given in the early 1970s at the THE EAGLES ARE FLYING meetings; hundreds more have been given at the EAGLE COUNCIL meetings in the decades since then.

63. Having already established the Eagle Pin, in 1967, Mrs. Schlafly then began use of the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks in connection with political fundraising and advocacy activities.

64. Mrs. Schlafly—either personally or through license to the "Eagle" entities she founded and controlled—made continuous use of the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks in connection with nationwide political fundraising and advocacy activities from 1967 until her death in 2016.

65. From the mid-1960s until her death in 2016, Mrs. Schlafly gave thousands of speeches and made thousands of public appearances across the U.S. in support of various political candidates and causes.

66. During that period, Mrs. Schlafly—either personally or through license to the "Eagle" entities she founded and controlled—used the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks in connection with the promotion, advertising, and presentation of her speeches and public appearances.

67. After *A Choice Not an Echo*, Mrs. Schlafly went on to author or edit at least another 27 books, including her most recent work, *The Conservative Case for Trump*, which was published posthumously on September 6, 2016 and debuted on the NY Times bestseller list.

68. From 1964 to present, Mrs. Schlafly—either personally or through license to the "Eagle" entities she founded and controlled—used the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks in connection with the nationwide promotion, advertising, and distribution of her numerous books.

69. From the 1970s through the early 2000s, Mrs. Schlafly produced and broadcast daily radio commentaries on approximately 460 radio stations nationwide, as well as a weekly radio program on at least 45 stations nationwide.

70. Mrs. Schlafly—either personally or through license to the "Eagle" entities she founded and controlled—used the EAGLE, EAGLE LOGO, EAGLE PIN, and PHYLLIS SCHLAFLY Marks in connection with the promotion, advertising, and presentation of her radio commentaries and programs for more than 30 years.

71. In 1975, Mrs. Schlafly founded the "Women's Forum" – a group of women who described themselves as "Eagles", subscribed to *The Phyllis Schlafly Report*, wore the Eagle Pin, attended EAGLE COUNCIL meetings, and often received EAGLE AWARDS prizes.

72. In 1975, Mrs. Schlafly rebranded "Women's Forum" to "Eagle Forum", and formed an Illinois 501(c)(4) Non-Profit Corporation under that same name on October 20, 1975.

73. The foregoing rebranding was done to align the former "Women's Forum" with Mrs. Schlafly's other efforts and initiatives, which she had, by that time, already been branding under the EAGLE, EAGLE PIN, and EAGLE LOGO Marks for nine years.

74. In short, Mrs. Schlafly adopted the EAGLE FORUM Mark to connect in the minds of the public her EAGLE FORUM activities to her other EAGLE activities that she had, by that time, already been providing for almost a decade, and to indicate that all EAGLE services emanated from the same trusted source – her.

75. Mrs. Schlafly served as CEO of the Eagle Forum (c)(4) from her founding of it in 1975 through her death in September 2016, and she maintained full control of that entity

throughout that period until Defendants' misconduct and attempt hostile take-over of the affiliated entity.

76. In May 1996, Mrs. Schlafly registered the "eagleforum.org" domain name through the Eagle Trust.  Soon thereafter, she used Eagle Trust employees to help her create a website for her numerous entities to provide education, political advocacy, endorsements, and information, as well as online publications related to various educational and political topics.

77. From May 1996 until her death in September 2016, Mrs. Schlafly personally controlled the eagleforum.org domain and the website content therein.  In fact, she wrote and edited much of that content herself for 20 years.  In addition, she used the eagleforum.org domain name and website to support the numerous "Eagle" entities she founded and controlled, including without limitation Eagle Forum (c)(3), Eagle Council, Eagle Forum Collegians, and Eagle Forum University.  Approximately 80-90% of the website content is for Eagle Forum (c)(3) and other entities, whereas less than 10% is for the benefit of non-party, Eagle Forum (c)(4) that the Defendants purport to control.

78. From May 1996 until September 2016, Mrs. Schlafly—either personally or through license to the "Eagle" entities she founded and controlled—used the EAGLE, the EAGLE LOGO, and PHYLLIS SCHLAFLY Marks on and in connection with her eagleforum.org website and the provision of services thereupon.

**B.**    ***Mrs. Schlafly's Rights in and to the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks***

79. Mrs. Schlafly—either personally and/or under license to the "Eagle" entities she founded and controlled—made widespread, extensive, nationwide use of the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks for almost 50 years.

80. For almost 50 years, Mrs. Schlafly – either personally or under license to the "Eagle" entities she founded and controlled – used the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks to generate millions of dollars for conservative causes and candidates she supported.

81. These millions of dollars were raised through numerous activities provided under the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks, including without limitation, direct solicitations, Mrs. Schlafly's personal appeals, proceeds from book sales, proceeds from newsletter subscriptions, pin sales, endorsements, and event attendance fees, among others.

82. For almost 50 years, Mrs. Schlafly—either personally or under license to the "Eagle" entities she founded and controlled—expended huge amounts of time, effort, and money to market, promote, and advertise the goods, services, and activities provided under the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks throughout the U.S., including without limitation, in print media, on radio, on television, and on the internet.

83. For almost 50 years, Mrs. Schlafly—either personally or under license to the "Eagle" entities she founded and controlled—used the Eagle Pin, together with the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks to raise enormous amounts of money, *viz.*, tens of millions of dollars for political candidates and causes throughout the U.S.

84. The Eagle Pin, EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks have received a great deal of positive unsolicited media coverage over the decades, including without limitation when Mrs. Schlafly was honored by the U.S. Congress on March 27, 2003 and when she was named one of the "100 Most Important Women of the 20th Century" by *Ladies' Home Journal*, Meredith Books; 1st edition (October 1998).

85. As a result of this extensive and long-term use and promotion of goods, services, and activities with the Eagle Pin and under the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks, these Marks have attained enormous goodwill throughout the U.S., have become distinctive, and have come to designate Mrs. Schlafly's unique goods, services, and activities to consumers.

86. By virtue of the wide renown acquired by the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks, and their enormous goodwill and commercial success, these Marks have become, and continue to be, well-known and famous.

**C.** *Mrs. Schlafly's Registrations for the EAGLE LOGO Marks*

87. On January 7, 2000, as trustee for the Eagle Trust, Mrs. Schlafly filed U.S. Trademark Application Serial No. 75/892,655 to register the EAGLE LOGO Mark  in the U.S. for use with goods in Class 016.

88. The EAGLE LOGO Mark was registered on the Principal Register of the United States Patent & Trademark Office on October 16, 2001, under U.S. Reg. No. 2,497,754. A true and accurate copy of the U.S. Registration Certificate for Reg. No. 2,497,754 is attached hereto as Exhibit A (the "EAGLE LOGO Registration").

89. The EAGLE LOGO Mark, and U.S. Reg. No. 2,497,754 therefor, are valid and subsisting, and have become incontestable through five or more years of continuous use in commerce in the U.S. A "Declaration of Incontestability" pursuant to Section 15 of the Trademark Act, 15 U.S.C. § 1065, for the EAGLE LOGO Mark was filed on October 16, 2007, and was accepted by the U.S. Patent & Trademark Office on November 6, 2007. A true and accurate copy of the Section 15 Declaration of Incontestability is attached hereto as Exhibit B.

90. The EAGLE PIN Mark was registered on the Principal Register of the United States Patent & Trademark Office on January 7, 2003, under U.S. Reg. No. 2,671,224.  A true and accurate copy of the U.S. Registration Certificate for Reg. No. 2,671,224 is attached hereto as Exhibit C (the "EAGLE PIN Registration").

91. Mrs. Schlafly never transferred her trademark rights in or to the EAGLE LOGO Mark to the Defendants.

92. Until this controversy arose in 2016, all use of the EAGLE LOGO Mark made by the Defendants, individually, or as members and directors for the benefit of the affiliated Eagle Forum (c)(4) entity, were made under non-exclusive license from, and with the express permission of Mrs. Schlafly, who exercised quality control over the goods and services provided thereunder and the activities conducted thereunder, including rights to inspect and approve all of the foregoing.

93. In correspondence dated January 12, 2016, Mrs. Schlafly specifically directed defendant Anne Cori "[D]o not send out anything – press release, news item, announcement re endorsements etc. without getting an OK from me." And reminded defendant that Mrs. Schlafly had, "[I] declared this specific policy many months ago."

94. Defendant Anne Cori ignored Mrs. Schlafly's specific admonitions by issuing unauthorized robocalls and political endorsements meant to confuse Mrs. Schlafly's supporters and the supporters of the Eagle entities.

95. In direct response to Anne Cori's repeated failures to abide by Mrs. Schlafly's express demands, Mrs. Schlafly replaced Anne Cori as president of Missouri Eagle Forum in a letter dated February 11, 2016 in favor of a loyal supporter Noreen McCann.

96. Due to this misconduct and other wrongful acts, Mrs. Schlafly demanded Defendants' resignations from the affiliated Eagle Forum (c)(4) board of directors on April 10, 2016.

97. Then, to a wider audience, via a video recording August 16, 2016 and posted on eagleforum.org, and an open letter addressed to her supporters dated August 16, 2016, Mrs. Schlafly formally and expressly revoked any and all existing licenses to use the EAGLE PIN, EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks that she had previously granted to the Defendants.

**D.**   *Mrs. Schlafly's Name, Image, and Likeness*

98. For 50 years, Mrs. Schlafly was a nationally known political figure who gained fame and notoriety as a political advocate and activist, a best-selling author, and through her charismatic personality, as a highly effective spokeswoman for grassroots conservatism.

99. Mrs. Schlafly had attained a high level of fame in the U.S. and was the subject of pervasive political interest for more than five decades.  During that time, she wrote, coauthored, and edited at least 28 books; wrote and published 600 newsletter issues; maintained and provided content for a website for almost 20 years; made thousands of speeches and public appearances; broadcast hundreds of radio programs and commentaries; made numerous television appearances; and participated extensively in education, political advocacy, and fundraising.

100.    Mrs. Schlafly is widely known for her political battles against abortion both before and after the *Roe v. Wade* decision of 1973 and against the Equal Rights Amendment in the late 1970s, and is almost singlehandedly credited with forcing the Republican Party to adopt a pro-life position in its national platform.

101.    Significantly, Mrs. Schlafly received numerous honors for her work, including without limitation, recognition by the U.S. Congress and being chosen as one of the 100 most influential women of the 20th century by *Ladies' Home Journal*.

102.    Mrs. Schlafly has also been featured over the years on numerous television programs and in a number of magazines and publications.

103.    Mrs. Schlafly's name, image, and likeness have come to be associated in the minds of the public with her political positions and philosophy.  As such, endorsements of political candidates that she made using her name, image, and likeness have come to signify to the public that the recipient of such endorsement is a solid conservative who can be trusted to govern in adherence to conservative principles and to support policies in furtherance thereof.

104.    More generally, Mrs. Schlafly's name, image, and likeness have come to be associated in the minds of the public with a high level of honor and integrity, and her endorsements of candidates using her name, image, and likeness has come to signify to the public that such person will operate with integrity and honor in the public arena.

105.    For 50 years, Mrs. Schlafly invested a great deal of money, time, energy, and effort in developing her considerable political and professional image to the public.

106.    For decades, Mrs. Schlafly was highly sought after to endorse political candidates and causes using her name, likeness, and image, and for decades, she selectively did so.

107.    Mrs. Schlafly's name, likeness, and image have become widely known by a substantial portion of the U.S. public, and as such, have become, and remain, valuable commercial assets that symbolize Mrs. Schlafly; the high quality and trustworthiness of her

24

political endorsements and other activities, goods, and services; and the goodwill associated therewith.

108.    For five decades, Mrs. Schlafly maintained strict control over the manner in which her name, likeness, and image were used.  She carefully reviewed, analyzed, selected, and approved the endorsements, activities, goods, and services that she made, conducted, provided, and/or approved using her name, likeness, and image.

109.    To the extent that Mrs. Schlafly allowed the various Eagle entities that she founded and controlled to use her name, likeness, and image, she did so only under non-exclusive license, and only after careful consideration, restricting such uses to endorsements, activities, goods, and services of acceptably high quality and substantively conservative content that she approved.

110.    Mrs. Schlafly, through the Eagle Trust also maintained her image and likeness through websites that she controlled, namely eagleforum.org, PhyllisSchlafly.com, and many others.

111.    Mrs. Schlafly did not, however, permit her image and likeness to be used without her permission.

112.    As emphasized above, in correspondence dated January 12, 2016, Mrs. Schlafly specifically directed defendant Anne Cori "[D]o not send out anything – press release, news item, announcement re endorsements etc. without getting an OK from me." And reminded defendant that Mrs. Schlafly had, "[I] declared this specific policy many months ago."

113.    Defendant Anne Cori repeatedly ignored Mrs. Schlafly's admonitions.

114.     After Anne Cori's repeated failures to abide by Mrs. Schlafly's express demands, Mrs. Schlafly replaced Anne Cori (whose 1-year term had expired) as president of Missouri Eagle Forum in a letter dated February 11, 2016 in favor of a loyal supporter Noreen McCann.

115.     In a similar way, Mrs. Schlafly asked for Anne Cori and the other Defendants' resignations from the affiliated Eagle Forum (c)(4) board of directors on April 10, 2016.

116.     Then, to a wider audience, via a video recording August 16, 2016 and posted on eagleforum.org, and an open letter addressed to her supporters, Mrs. Schlafly formally and expressly revoked any and all existing licenses to use the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks that she had previously granted to the Eagle Forum entity and to all other parties.

### III.     Defendants' Unauthorized and Wrongful Conduct With Respect to the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks; Phyllis Schlafly's Name, Image, and Likeness; and the Schlafly Database

117.     On or around her 90th birthday, Mrs. Schlafly began executing succession planning for her entities, namely, with the appointment of her hand-picked president, Ed Martin, to run the day-to-day operations of Eagle Forum Education and Legal Defense Fund and the Eagle Forum (c)(4). Mrs. Schlafly appointed Mr. Martin on or about January 1, 2015.

118.     Upon information and belief, Defendants were dismissive of Mrs. Schlafly's choice in a new president for her affiliate organizations.

119.     Upon information and belief, further fault-lines began in one of Mrs. Schlafly's organizations, namely, the Eagle Forum (c)(4), when Mrs. Schlafly refused to endorse Senator Ted Cruz for the GOP presidential nominee in late 2015 and early 2016.

120.     Beginning in 2016, Defendants began conspiring to use Plaintiffs' assets, without limitation, the Schlafly Database, the Eagle website, and the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks to further their own political agendas instead of supporting Mrs. Schlafly or her designees.

121.     Specifically, on or about February 1, 2016 defendant Anne Cori orchestrated a robocall for Senator Cruz to help him in the Iowa presidential primary. Upon information and belief, defendant Anne Cori used improperly accessed elements of the Schlafly Database using her position as then president of the Missouri Eagle Forum affiliate and as a board member of the Eagle Forum (c)(3) and Eagle Forum (c)(4) for the call. Not only was the call done without Mrs. Schlafly's consent or permission, but it was likely done inconsistent with federal election laws jeopardizing the Eagle Forum (c)(3)'s tax-exempt status.

122.     Upon information and belief, defendant Anne Cori's misconduct in taking all or part of Schlafly Database and using it without authorization was the first time in Mrs. Schlafly's storied career that anyone had stolen from her with such a brazen act of disloyalty.

123.     In direct response, Mrs. Schlafly quietly replaced defendant Anne Cori from her role as president of Missouri Eagle Forum since Anne Cori's term had already expired and replaced her with an unrelated, but loyal volunteer.

124.     Unfortunately, defendant Anne Cori's misconduct worsened and together with the Defendants and one or more other Jane Doe defendants, on or about April 6, 2016, Cori and others met secretly to stage a hostile take-over of the affiliated Eagle Forum (c)(4)—an entity that Mrs. Schlafly had founded in 1975 and controlled at all times relevant until Defendants' attempted *coup d'état*.

125.     Upon information and belief, from January 2016 to present, Defendants purported to divvy up assets of Mrs. Schlafly (while she was still alive, now belonging to plaintiff Schlafly Trust), and purported to carve up assets managed by the Eagle Trust such as the Schlafly Database, and eagleforum.org and PhyllisSchlafly.com websites despite actual knowledge that neither the Defendants nor the affiliate Eagle Forum (c)(4) owned or maintained these assets.

126.     Other specific wrong acts by the Defendants include:

(a)     Impersonating or misappropriating Mrs. Schlafly's image, likeness, and "legacy" in e-mail letters and solicitations

(b)     Starting a competing website called eagleforumtruth.com using similar Eagle Logo and the Eagle name in an effort to confuse or divert traffic from the plaintiffs' website.

(c)     Starting a competing website called moeagleforum.org using Mrs. Schlafly's image and likeness, similar Eagle Logo and the Eagle name in an effort to confuse or divert traffic from the Plaintiffs' website.

(d)     Confusing or misattributing Mrs. Schlafly's true endorsements or political positions from those of the defendants in an intentional and willful attempt to undermine her reputation, image, likeness, legacy, which interfered with Mrs. Schlafly's effectiveness at the Convention.

(e)     Using Mrs. Schlafly's likeness or legacy to solicit funds in direct opposition of Mrs. Schlafly's stated positions and recent publications.

(f)     Using an attorney to issue press releases disparaging Mrs. Schlafly's likeness or legacy.

(g)     Using an attorney to lobby attendees and disparage Mrs. Schlafly's likeness or legacy at Eagle Council.

(h)     In affidavits or other sworn statements, asserting right, title, or an interest in the Schlafly Database contending that the property was exclusively an Eagle Forum (c)(4) donor list despite actual knowledge that the Schlafly Database was a personal asset of Mrs. Schlafly while she was alive and knowing that the Schlafly Database is managed exclusively by the Eagle Trust for the benefit of many organizations (in the sole and absolute discretion of the trustees).

(i)     In affidavits or other sworn statements, asserting right, title, or an interest in the eagleforum.org website (and more than 50 other websites, including PhyllisSchlafly.com) contending that the property was exclusively an Eagle Forum (c)(4) asset despite actual knowledge that Eagle Forum (c)(4) had no ownership interest in these websites.

127.    Upon information and belief, Defendants have also engaged in coercing, cajoling, and confusing long-term employees of the Eagle Trust to contend in affidavits or other sworn statements that they are not employees of Eagle Trust, but rather employees of affiliate Eagle Forum (c)(4) and implying that their efforts were on behalf of Eagle Forum (c)(4) instead of their true employer, the plaintiff Eagle Trust.

128.    This misconduct is despite actual knowledge that neither Defendants nor affiliate Eagle Forum (c)(4) have any full-time employees and, upon information and belief, only maintained two shared employees, its president Ed Martin and a former D.C. operative, whose salaries were split with another affiliate, the Eagle Forum (c)(3).

129.    Upon information and belief, Defendants further lobbied local officials to prevent Mrs. Schlafly from being named as a delegate to the GOP Convention in July 2016 in an willful attempt to misappropriate EAGLE, EAGLE LOGO, and the PHYLLIS SCHLAFLY brand at the GOP Convention.

130.    Upon information and belief, Defendants used EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY brand to publically defame Mrs. Schlafly's health, fitness, and mental abilities while she was alive including radio interviews disparaging Mrs. Schlafly's decision-making and legacy.

131.    Upon information and belief Defendants used EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY brand to publicly defame Mrs. Schlafly's co-author Ed Martin and directly interfering with the launch of her two most recent books: *The Conservative Case for Trump* and *How the Republican Party Became Pro-Life*.

132.     One or more Defendants attempted to break into the Eagle Trust offices and abscond with assets or intangible property, which were locked and password protected but located at the Eagle Trust offices—requiring the police to be called for the police to remove Anne Cori from the premises.

133.     Defendants are maintaining a competing Missouri Eagle Forum website, moeagleforum.org after Anne Cori being replaced from the position in February 2016 after her term expired. The website misappropriates Mrs. Schlafly's image and likeness without her or her trusts' consent, permission, or authorization.

134.     Defendants are actively impersonating and sending out competing Missouri Eagle Forum solicitations and scheduled an unauthorized event under the guise of Missouri Eagle Forum for October 10, 2016. The postal address for sending payments to this purported Missouri Eagle Forum event was Ms. Cori's home address using the moniker "MO Eagle Forum."

135.     In affidavits or other sworn statements, Defendants have mistakenly or falsely asserted rights, title, or an interest in trademarks or other intellectual property, namely the Eagle Forum name that was used by Mrs. Schlafly and owned by Mrs. Schlafly (now plaintiff Schlafly Revocable Trust) before the formation of the affiliate Eagle Forum (c)(4) entity.

136.     In affidavits or other sworn statements, Defendants have mistakenly or falsely asserted rights, title, or an interest in trademarks or other intellectual property belonging to Plaintiffs, which clouds their title and in an effort to prevent non-party Phyllis Schlafly's American Eagles from using the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks with the Schlafly Revocable Trust's express permission.

137.      Over the objections of Mrs. Schlafly and John Schlafly, Defendants held unauthorized, ultra vires meetings of the Eagle Forum (c)(4) Board of Directors and have since instituted litigation against Eagle Forum (c)(4), John Schlafly and Ed Martin, individually, and are purporting to own or control assets belonging to Plaintiffs.

138.      For the first time in those proceedings (which began as an effort to ratify a certain board meeting in April 2016), Defendants are contending or implying that they own all or a portion of the Schlafly Database, its mailing lists, and are asserting ownership of the Eagle Pin, EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks, and the eagleforum.org and PhyllisSchlafly.com websites (and more than 50 others), which creates an immediate risk and present cloud on Plaintiffs' title and rights.

139.      These unauthorized and false statements by Defendants also demonstrate present intent and harm to Plaintiffs' and further demonstrate a willful interference with Plaintiffs' exclusive ownership rights.

## COUNT I
### (VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836)

140.      Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 139 above as if fully rewritten herein.

141.      Over the course of decades from the 1950s until her death in 2016, Phyllis Schlafly compiled, developed, and created – and later updated and refined whenever necessary - the Schlafly Database.

142.      Mrs. Schlafly's compilation and development of the Schlafly Database involved a selective accumulation of information based upon her decades of experience in

the educational, political, and fundraising realms, and drew upon her own personal knowledge, and social and political networks, gleaned over the course of many years.

143.     Phyllis Schlafly invested a great deal of time, effort, and energy into her compilation and development of the Schlafly Database, and the information contained therein would not be readily ascertainable without such investment.

144.     As such, the Schlafly Database has great value, which is derived from, among other things, not being known or readily ascertainable by others.

145.     The Schlafly Database provides a competitive advantage to Plaintiffs that would not otherwise be available, and such competitive advantage derives directly from Mrs. Schlafly's lifetime investment of time, effort, and energy into compiling and developing it.

146.     During her lifetime, Phyllis Schlafly personally owned the Schlafly Database, maintained custody and control of it at all times, and took appropriate and reasonable steps to maintain its secrecy and confidentiality.

147.     During her lifetime, Mrs. Schlafly made only limited, confidential disclosures of the information contained in the Schlafly Database, and only on a need-to-know basis in order to achieve her goals and purposes and those of her approved organizations.

148.     With an assignment dated August 31, 2016, ownership of the Schlafly Database passed from Mrs. Schlafly personally to the plaintiff Schlafly Revocable Trust.

149.     Plaintiff Schlafly Revocable Trust maintains custody and control of the Schlafly Database at all times or delegates this task to the custodian Eagle Trust, which takes appropriate and reasonable steps to maintain its secrecy and confidentiality as described above.

150.     In order to achieve the stated goals and purposes of Mrs. Schlafly and her approved organizations, Plaintiff Schlafly Trust makes only limited, confidential disclosures of the information contained in the Schlafly Database—and only on a need-to-know basis to the co-plaintiff Eagle Trust and its confidential employees.

151.     As set forth in detail above, Defendants have, without authorization, used improper means to access, use, and disclose to third parties the Schlafly Database and the information contained therein or its derivative works such as notes, mailings lists or data subsets.

152.     As set forth in detail above, for the first time in more than five decades of use for ride-along fundraising and other interstate activity, an outsider has threatened or asserted ownership of the Schlafly Database.

153.     Namely, Defendants have threatened and continue to threaten to, without authorization, use improper means to access, use, and disclose to third parties the Schlafly Database and the information contained therein.

154.     Defendants' conduct as set forth herein constitutes a violation of Anne Cori's common law and statutory duties, as former member and director of affiliates Eagle Forum (c)(3), former president of Missouri Eagle Forum, and all of the Defendants' duties as current (though disputed) directors of Eagle Forum (c)(4), to maintain the secrecy of these organizations' trade secrets and confidential and proprietary information.

155.     Misappropriation and threatened misappropriation of trade secrets by the Defendants may be enjoined under The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, and forbids threatened and actual misappropriation

of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

156.     Defendants' unauthorized conduct regarding the Schlafly Database has caused, is causing, and will continue to cause irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at law. Unless immediately enjoined by this Court pursuant to Defend Trade Secrets Act, Defendants will continue their unauthorized activity with respect to the Schlafly Database, and will continue to breach their obligations with respect to it and Plaintiffs.

157.     Defendants have already or will improperly acquire, disclose, and use Plaintiffs' trade secrets without consent of any kind for Defendants' own financial gain.

158.     Defendants' actions constitute actual and threatened misappropriation in violation of the DTSA.

159.     The immediate issuance of an injunction will prevent irreparable harm to Plaintiffs and will not cause undue inconvenience or loss to Defendants or to the public.

160.     All conditions precedent have been met under the DTSA before filing this action.

161.     Plaintiffs have incurred substantial legal fees and costs and are obligated to pay the undersigned for the prosecution of this action and protection of its rights under the DTSA.

162.     Plaintiffs have suffered and will continue to suffer damages and irreparable harm as a result of Defendants' violations of the DTSA including loss of donors and employees, harm to its goodwill and reputation, and an unfair reduction in its former competitive advantage.

163.    Defendants' unauthorized conduct complained of herein with respect to the Schlafly Database has caused, is causing, and will continue to cause actual money damages to Plaintiffs.  As such, Plaintiffs are entitled, under the DTSA, to an award of money damages from the Defendants, jointly and severally, in the amount of Plaintiffs' actual losses and Defendants' unjust enrichment.

164.    Plaintiffs' damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

165.    Under DTSA, Defendants' unauthorized conduct complained of herein regarding the Schlafly Database is outrageous due to Defendants' position as family member or insiders to affiliated entities, evil motive, and reckless indifference to the rights of Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT II
### (TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN UNDER THE LANHAM ACT, 15 U.S.C. § 1125(A))

166.    Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 139 above as if fully rewritten herein.

167.    Through her long-term, extensive, widespread, and nationwide use and promotion of the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks for almost 50 years as set forth herein, Mrs. Schlafly owned all right, title, and interest therein during her lifetime.

168.    Through assignments and upon Mrs. Schlafly's death on September 5, 2016, all right, title, and interest in and to the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks passed to Plaintiffs.

169.    Plaintiffs own all right, title, and interest in and to the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks, and Phyllis Schlafly's name, image, and likeness.

170.    Defendants' conduct as set forth herein, including without limitation their unauthorized use and misappropriation of (i) the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks; and (ii) Phyllis Schlafly's name, image, and likeness for political fundraising, the arrangement and organization of meetings and forums, and the provision of political endorsements and advertisements, among other unauthorized activities, is likely to cause confusion or mistake among donors, potential donors, and the public, or to deceive donors, potential donors, and the public, as to an ongoing affiliation, association, or connection between Defendants and Plaintiffs when no such ongoing affiliation, association, or connection exists.

171.    Defendants' conduct as set forth herein is likely to cause confusion or mistake among donors, potential donors, and the public, or to deceive donors, potential donors, and the public, into believing that Defendants' goods, services, and activities originate with Plaintiffs, or that they are associated with or sponsored or approved by Plaintiffs, when in fact no such association, approval, or sponsorship exists.

172.    Defendants' conduct as set forth herein constitutes trademark infringement, unfair competition, and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

173.    Plaintiffs have been and continue to be damaged by Defendants' conduct as set forth herein, and Defendants have profited and continue to profit from their unauthorized activities. Unless Defendants are immediately enjoined by this Court,

Defendants will continue their unauthorized conduct, and Plaintiffs' non-profit business, and their goodwill and reputation therein, will suffer irreparable harm.

174.     Plaintiffs have been and continue to be damaged by Defendants' conduct as set forth herein, and Defendants have profited and continue to profit from their unauthorized activities. As such, pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to recover damages including without limitation, their actual damages, Defendants' profits, and the costs of this case.

175.     All conditions precedent have been met before filing this action.

176.     Plaintiffs have incurred substantial legal fees and costs and are obligated to pay the undersigned for the prosecution of this action and protection of their rights.

177.     Defendants' conduct as set forth herein is willful, wanton, intentional, and undertaken in bad faith, making this an exceptional case pursuant to 15 U.S.C. § 1117, and entitling Plaintiffs to recover treble damages and attorneys' fees thereunder.

## **COUNT III**
### **(FEDERAL TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT, 15 U.S.C. § 1114(1))**

178.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 139 above as if fully rewritten herein.

179.     Plaintiffs own all right, title, and interest in and to the EAGLE LOGO Mark, and U.S. Registration No. 2,497,754 therefor.

180.     Defendants' unauthorized use, as set forth herein, of an EAGLE LOGO mark that is substantially indistinguishable from Plaintiff's registered EAGLE LOGO Mark trades upon Plaintiff's goodwill in its registered EAGLE LOGO Mark and misappropriates that goodwill and the reputation which has attached to the Mark and is associated with and symbolized by it.

181.     Defendants' unauthorized use, as set forth herein, of the registered EAGLE LOGO Mark has confused, and will likely continue to confuse donors, potential donors, and the public into erroneously believing that Defendants and their goods, services, and activities are associated or affiliated with, and/or are sponsored by, Plaintiff when indeed they are not.

182.     Defendants' unauthorized use and copying of the registered EAGLE LOGO Mark constitutes use in commerce of a reproduction, counterfeit, copy, and/or colorable imitation of the EAGLE LOGO Mark, as identified in Plaintiff's U.S. Registration No. 2,497,754 (Exhibit A), in connection with the sale, offering for sale, distribution, and advertising of Defendants' goods and services.

183.     Defendants' unauthorized use and copying of the registered EAGLE LOGO Mark is likely to cause confusion and mistake, and/or has already caused consumer confusion or mistake, and is likely to deceive donors, potential donors, and the public.

184.     Defendants' unauthorized use and copying of the registered EAGLE LOGO Mark constitutes trademark infringement and counterfeiting under 15 U.S.C. § 1114(1).

185.     Plaintiffs have been, and continue to be, damaged by Defendants' unauthorized use and copying of the registered EAGLE LOGO Mark as set forth herein. Defendants have profited by such unauthorized use and copying, and unless it is enjoined, Plaintiffs' non-profit businesses, and their goodwill and reputation therein, will suffer irreparable injury.

186.     Plaintiffs are entitled to injunctive relief under 15 U.S.C. §1116(a) as there is no adequate remedy at law to fully redress Defendants' unlawful misconduct.

187.     As a family member or insiders to the affiliate Eagle Forum (c)(4), or both, Defendants' unauthorized use and copying of the registered EAGLE LOGO Mark as set forth herein is willful, wanton, intentional, and undertaken in bad faith, making this an exceptional case pursuant to 15 U.S.C. § 1117 and entitling Plaintiff to recover treble damages, additional damages, and attorneys' fees under 15 U.S.C. § 1117.

### COUNT IV
### (TRADEMARK DILUTION UNDER THE LANHAM ACT, 15 U.S.C. § 1125(C))

188.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 139 above as if fully rewritten herein.

189.     Plaintiffs own all right, title, and interest in and to the EAGLE Marks and the PHYLLIS SCHLAFLY Marks.

190.     The EAGLE Marks and the PHYLLIS SCHLAFLY Marks are "famous" marks within the meaning of 15 U.S.C. §1125(c)(1), and were "famous" marks prior to Defendants' unauthorized conduct complained of herein.

191.     The EAGLE Marks and the PHYLLIS SCHLAFLY Marks are famous both by virtue of their substantial inherent distinctiveness, and as a result of Plaintiffs' extensive use, for decades, of the Marks in advertising, promoting, and garnering publicity for their non-profit organizations and activities.  This has resulted in strong, nationwide recognition of the EAGLE Marks and the PHYLLIS SCHLAFLY Marks among the trade and the general public. .

192.     Defendants' unauthorized use of the EAGLE Marks and the PHYLLIS SCHLAFLY Marks as set forth herein dilutes the strength and distinctive quality of these famous Marks, and lessens their capacity to identify and distinguish Plaintiffs' non-profit business organizations and activities and the goods and services offered thereunder.

193.    Defendants' conduct as set forth herein with respect to the EAGLE Marks and the PHYLLIS SCHLAFLY Marks has caused, or is likely to cause dilution by blurring or dilution by tarnishment of these famous Marks.

194.    Defendants' conduct as set forth herein constitutes willful and deliberate dilution of the EAGLE Marks and the PHYLLIS SCHLAFLY Marks, pursuant to Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

195.    All conditions precedent have been met before filing this action.

196.    Plaintiffs have incurred substantial legal fees and costs and are obligated to pay the undersigned for the prosecution of this action and protection of its rights.

197.    Plaintiffs have been and continue to be damaged by Defendants' conduct as set forth herein, and Defendants have profited and continue to profit from their unauthorized activities. Unless Defendants are immediately enjoined by this Court, Defendants will continue their unauthorized conduct, and Plaintiffs' non-profit business, and their goodwill and reputation therein, will suffer irreparable harm.

198.    Plaintiffs have been and continue to be damaged by Defendants' conduct as set forth herein, and Defendants have profited and continue to profit from their unauthorized activities. As such, pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to recover damages including without limitation, their actual damages, Defendants' profits, and the costs of this case.

199.    As a family member or insiders to the affiliate Eagle Forum (c)(4), or both, Defendants' conduct as set forth herein is willful, wanton, intentional, and undertaken in bad faith, making this an exceptional case pursuant to 15 U.S.C. § 1117, and entitling Plaintiffs to recover treble damages and attorneys' fees thereunder.

## COUNT V
### (MISAPPROPRIATION OF TRADE SECRETS UNDER THE
### MISSOURI UNIFORM TRADE SECRETS ACT, MO.REV.STAT. § 417.455, *ET. SEQ.*)

200.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 139 above as if fully rewritten herein.

201.     Plaintiffs also repeat and re-allege the factual allegations contained in Count I above to the extent that violations of the new federal defense of trade secrets act also constitute violations of Missouri state law, both being based on the uniform protection of trade secrets act.

202.     Over the course of decades from the 1950s until her death in 2016, Phyllis Schlafly compiled, developed, and created – and later updated and refined whenever necessary - the Schlafly Database.

203.     Mrs. Schlafly's compilation and development of the Schlafly Database involved a selective accumulation of information based upon her decades of experience in the political and fundraising realms, and drew upon her own personal knowledge, and social and political networks, gleaned over the course of many years.

204.     Phyllis Schlafly invested a great deal of time, effort, and energy into her compilation and development of the Schlafly Database, and the information contained therein would not be readily ascertainable without such investment.

205.     As such, the Schlafly Database has great value, which is derived from, among other things, not being known or readily ascertainable by others.

206.     The Schlafly Database provides a competitive advantage to Plaintiffs that would not otherwise be available, and such competitive advantage derives directly from Mrs. Schlafly's lifetime investment of time, effort, and energy into compiling and developing it.

207.     During her lifetime, Phyllis Schlafly personally owned the Schlafly Database, maintained custody and control of it at all times, and took appropriate and reasonable steps to maintain its secrecy and confidentiality.

208.     During her lifetime, Mrs. Schlafly made only limited, confidential disclosures of the information contained in the Schlafly Database, and only on a need-to-know basis in order to achieve her goals and purposes and those of her approved organizations.

209.     Ownership of the Schlafly Database passed to the Plaintiffs by assignment and Mrs. Schlafly's death.

210.     Plaintiffs maintained custody and control of the Schlafly Database at all times and take appropriate and reasonable steps to maintain its secrecy and confidentiality.

211.     Plaintiffs make only limited, confidential disclosures of the information contained in the Schlafly Database to their trustees or employees, and only on a need-to-know basis in order to achieve the goals and purposes of Mrs. Schlafly and her approved organizations.

212.     As set forth in detail above, Defendants have, without authorization, used improper means to access, use, and disclose to third parties the Schlafly Database and the information contained therein or derivative works thereof such as mailing lists, partial datasets, or related proprietary information derived from the Schlafly Database through wrongful access or unlawful means.

213.     As set forth in detail above, Defendants have threatened and continue to threaten to, without authorization, use improper means to access, use, and disclose to third parties the Schlafly Database and the information contained therein.

214.    Upon information and belief, Defendants have already wrongfully acquired and misused parts of the Schlafly Database in a fundraiser with payments directed to defendant Anne Cori's home in Missouri.

215.    Defendants' conduct as set forth herein constitutes a violation of Anne Cori's common law and statutory duties, as former member and director of affiliates Eagle Forum (c)(3), former president of Missouri Eagle Forum, and all of the Defendants' duties as current (though disputed) directors of Eagle Forum (c)(4), to maintain the secrecy of these organizations' trade secrets and confidential and proprietary information.

216.    Pursuant to Mo.Rev.Stat. § 417.455, misappropriation and threatened misappropriation of trade secrets may be enjoined.

217.    Defendants' unauthorized conduct complained of herein with respect to the Schlafly Database has caused, is causing, and will continue to cause irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Unless immediately enjoined by this Court pursuant to Mo.Rev.Stat. § 417.455, Defendants will continue their unauthorized activity with respect to the Schlafly Database, and will continue to breach their obligations with respect to it.

218.    The immediate issuance of an injunction will prevent irreparable harm to Plaintiffs and will not cause undue inconvenience or loss to Defendants or to the public.

219.    All conditions precedent have been met under the DTSA before filing this action.

220.    Plaintiffs have incurred substantial legal fees and costs and are obligated to pay the undersigned for the prosecution of this action and protection of its rights under the DTSA.

221.     Defendants' unauthorized conduct complained of herein with respect to the Schlafly Database has caused, is causing, and will continue to cause damage to Plaintiffs. As such, Plaintiffs are entitled, pursuant to Mo.Rev.Stat. § 417.457.1, to an award of damages in the amount of Plaintiffs' actual losses and Defendants' unjust enrichment.

222.     Pursuant to Mo.Rev.Stat. § 417.457.1, Defendants' unauthorized conduct complained of herein with respect to the Schlafly Database is outrageous due to Defendants' evil motive or reckless indifference to the rights of Plaintiffs.   Accordingly, Plaintiffs are entitled to an award of punitive damages.

## COUNT VI
### (VIOLATION OF RIGHTS OF PUBLICITY UNDER MISSOURI COMMON LAW)

223.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 139 above as if fully rewritten herein.

224.     Prior to Phyllis Schlafly's death on September 5, 2016, she owned all right, title, and interest in and to the Phyllis Schlafly Name and Likeness.

225.     All right, title, and interest in and to the Phyllis Schlafly Name and Likeness passed to Plaintiffs by assignment dated August 31, 2016 and by operation of law.

226.     Defendants have made, and continue to make, unauthorized use of the Phyllis Schlafly Name and Likeness for numerous purposes, including without limitation for political fundraising, for the arrangement and organization of meetings and forums, and for the provision of political endorsements and advertisements.

227.     Defendants' unauthorized use of the Phyllis Schlafly Name and Likeness was made both before Mrs. Schlafly's death on September 5, 2016, as well as thereafter.

228.     Defendants' unauthorized use of the Phyllis Schlafly Name and Likeness was made without the consent of Mrs. Schlafly, and in fact, was made against, and in spite of, Mrs. Schlafly's express wishes and directives not to use her name and likeness.

229.     Defendants continue to make unauthorized use of the Phyllis Schlafly Name and Likeness without the consent of the Plaintiffs.

230.     Defendants' unauthorized use of the Phyllis Schlafly Name and Likeness was made with the intent to claim commercial advantage.

231.     Indeed, upon information and belief, Defendants have claimed and obtained commercial advantages by virtue of their unauthorized use of the Phyllis Schlafly Name and Likeness as set forth herein.

232.     Plaintiffs have been and continue to be damaged by Defendants' unauthorized use and exploitation of the Phyllis Schlafly Name and Likeness, and Defendants have profited commercially and otherwise from these activities. Unless Defendants are immediately enjoined by this Court, they will continue their unauthorized activities, and Plaintiffs' non-profit business, and their goodwill and reputation therein, will suffer irreparable harm.

233.     Defendants' unauthorized use and exploitation of the Phyllis Schlafly Name and Likeness has caused, and will continue to cause, commercial loss to Plaintiffs. Further, Defendants' unauthorized use and exploitation of the Phyllis Schlafly Name and Likeness has allowed, and if not enjoined will continue to allow, Defendants to make unjust commercial gains.  As such, Plaintiffs are entitled to recover damages, including without limitation, their actual damages, Defendants' profits, and the costs of this case.

234.     All conditions precedent have been met before filing this action.

235.     Plaintiffs have incurred substantial legal fees and costs and are obligated to pay the undersigned for the prosecution of this action and protection of its rights.

## COUNT VII
### (TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION UNDER MISSOURI COMMON LAW)

236.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 139 above as if fully rewritten herein.

237.     Plaintiffs own or control all right, title, and interest in and to the EAGLE Marks, the PHYLLIS SCHLAFLY Marks, and the Phyllis Schlafly Name and Likeness.

238.     Defendants' conduct as set forth herein, including without limitation their unauthorized use and misappropriation of the EAGLE Marks, the PHYLLIS SCHLAFLY Marks, and the Phyllis Schlafly Name and Likeness for political fundraising, the arrangement and organization of meetings and forums, and the provision of political endorsements and advertisements, is likely to cause confusion or mistake among donors, potential donors, and the public, or to deceive donors, potential donors, and the public, as to an ongoing affiliation, association, or connection between Defendants and Plaintiffs, when no such ongoing affiliation, association, or connection exists.

239.     Defendants' conduct is causing confusion or is likely to cause mistake among donors, potential donors, and the public, or to deceive donors, potential donors, and the public, into believing that Defendants' non-profit organizations and activities, and the goods and services they offered, originate with Plaintiffs, or that Defendants are sponsored or approved by Plaintiffs when in fact no such association, approval, or sponsorship exists.

240.     Defendants' conduct as set forth herein constitutes trademark infringement and unfair competition in violation of Missouri common law.

241.     As a direct result of Defendants' conduct as set forth herein, Plaintiffs have suffered, and will continue to suffer, irreparable harm to their non-profit business, and their goodwill and reputation, unless Defendants' conduct is immediately enjoined by this Court.

242.     Defendants' conduct as set forth herein has caused, and will continue to cause, injury to Plaintiffs, and as such, Plaintiffs are entitled to recover damages, including without limitation, their actual damages, Defendants' profits, and the costs of this case.

243.     As a family member or insiders to the affiliate Eagle entities, Defendants' conduct as set forth herein has been willful, deliberate, wanton, intentional, and undertaken in bad faith for greed or lucre—or at the very least, recklessly indifferent to Plaintiffs' rights—thereby entitling Plaintiffs to punitive damages.

## COUNT VIII
### (Declaratory Judgment, 28 U.S.C. § 2201)

244.     Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 139 above as if fully rewritten herein.

245.     As demonstrated herein, Defendants have engaged in wrongful conduct, including without limitation the following:

(a)     In affidavits or other sworn statements, asserting right, title, or an interest in the Schlafly Database contending that the property is exclusively an Eagle Forum (c)(4) asset, mailing list, or donor list despite actual knowledge that the Schlafly Database was a personal asset of Mrs. Schlafly while alive and managed exclusive by the Eagle Trust for the benefit of many organizations in Mrs. Schlafly sole and absolute discretion. This discretion now belongs exclusively to the Plaintiffs, not Defendants.

(b)      In affidavits or other sworn statements, asserting right, title, or an interest in the eagleforum.org website (and more than 50 others, including PhyllisSchlafly.com) contending that the property was exclusively Eagle Forum (c)(4) assets despite actual knowledge that Eagle Forum (c)(4) had no ownership interest in these websites. This ownership and control now belongs exclusively to the Plaintiffs, not Defendants.

246.      As a result, an actual, present, and justiciable controversy has arisen between Plaintiffs and Defendants concerning Plaintiffs' legal rights, title, or interests in the Schlafly Database, derivative mailing lists, donor list, data subsets, eagleforum.org, PhyllisSchlafly.com, and related websites.

247.      Plaintiffs seek declaratory judgment from this Court that Defendants have no legal rights, title, or interests in the  Schlafly Database, derivative mailing lists, donor list, data subsets, eagleforum.org, or PhyllisSchlafly.com, and related websites.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against all Defendants, jointly and severally:

1.  For Count I: (a): a temporary and permanent injunction enjoining Defendants from accessing, using, or disclosing to third parties the Schlafly Database and information contained therein or any of its derivative mailing lists, donor lists, and data subsets; (b) damages for actual losses and Defendants' unjust enrichment, pursuant to 18 U.S.C. § 1836, in an amount to be proven at trial but in excess of $75,000.00, exclusive of interest; and (c) punitive damages, attorneys' fees, and costs pursuant to 18 U.S.C. § 1836;

2.  For Count II: (a) a temporary and permanent injunction enjoining Defendants from using or otherwise misappropriating the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY Marks; (b) a temporary and permanent injunction enjoining Defendants from

using and/or otherwise misappropriating Phyllis Schlafly's name, image, and likeness; (c) damages for actual losses and Defendants' profits, pursuant to 15 U.S.C. § 1117, in an amount to be proven at trial but in excess of $75,000.00, exclusive of interest; and (d) attorneys' fees, costs, and treble damages pursuant to 15 U.S.C. § 1117;

3.   For Count III: (a) a temporary and permanent injunction enjoining Defendants from further unauthorized use and copying of the registered EAGLE LOGO Mark pursuant to 15 U.S.C. § 1116(a); (b) compensatory damages in an amount to be proven at trial but in excess of $75,000.00, exclusive of interest; and (c) attorneys' fees, costs, and treble damages pursuant to 15 U.S.C. § 1117;

4.   For Count IV: (a) a temporary and permanent injunction enjoining Defendants from further unauthorized use and dilution of the famous EAGLE Marks and PHYLLIS SCHLAFLY Marks; (b) damages for actual losses and Defendants' profits, pursuant to 15 U.S.C. § 1117, in an amount to be proven at trial but in excess of $75,000.00, exclusive of interest; and (c) attorneys' fees, costs, and treble damages pursuant to 15 U.S.C. § 1117;

5.   For Count V: (a) temporary and permanent injunction, pursuant to Mo.Rev.Stat. § 417.455, enjoining Defendants continued and threatened misappropriation of the Schlafly Database, all information contained therein, and the Schlafly Database, including without limitation, derivative mailing lists, donor lists, and data subsets; (b) damages for actual losses, costs, and Defendants' unjust enrichment, pursuant to Mo.Rev.Stat. § 417.457.1, in an amount to be proven at trial but in excess of $75,000.00, exclusive of interest; and (c) punitive damages pursuant to Mo.Rev.Stat. § 417.457.1;

6.   For Count VI: (a) a temporary and permanent injunction enjoining Defendants from making and continuing to make unauthorized use of the Phyllis Schlafly Name and

Likeness; and (b) damages for actual losses, costs, and Defendants' unjust enrichment, in an amount to be proven at trial, but in excess of $75,000.00, exclusive of interest; (c) required tender (or removal) of any and all websites using Phyllis Schlafly's image, likeness, or any of the affiliated Eagle Marks.

7.   For Count VII: (a) a temporary and permanent injunction enjoining Defendants from making and continuing to make unauthorized use and misappropriation of the EAGLE Marks, the PHYLLIS SCHLAFLY Marks, and the Phyllis Schlafly Name and Likeness; and (b) damages for actual losses, costs, and Defendants' unjust enrichment, in an amount to be proven at trial, but in excess of $75,000.00, exclusive of interest; and

8.   For Count VIII, an Order from this Court declaring that Defendants have no legal rights, title, or interests in the Schlafly Database, any derivative mailing lists, donor lists, and data subsets or the eagleforum.org, PhyllisSchlafly.com and related websites.

9.   And, for all counts, such other relief as may be just and proper.

By: /s/ Jennifer E. Hoekel
Jennifer E. Hoekel (45880MO)
Jessica M. Mendez (63094MO)
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
314-621-5070 telephone
jhoekel@armstrongteasdale.com
jmendez@armstrongteasdale.com

**APPLICATION PENDING**
Ian A. Northon (Florida Bar No. 101544)
inorthon@ralaw.com

**PHV APPLICATION PENDING**
James D. Fox (Florida Bar No. 689289)
jfox@ralaw.com
Roetzel & Andress, LPA
850 Park Shore Drive
Trianon Centre
3rd Floor
Naples, FL  34103
Telephone:  239.649.6200
*Attorneys for Plaintiffs,*
*Phyllis Schlafly Revocable Trust and*
*Eagle Trust Fund*