

Discovery Deposition of
# Elizabeth Miller

**Date:** December 11, 2019

**Case:** Anne Schlafly Cori, et al. v. Edward R. Martin, Jr., et al.

**No.** 2016-MR-00111

**Court Reporter:** Valerie A. Lehr, CCR, CSR, RPR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513
www.spreporting.com

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

ANNE SCHLAFLY CORI,      )
et al.,                  )
                         )
        Plaintiffs,      )
                         )
vs.                      )Cause No. 2016-MR-00111
                         )
EDWARD R. MARTIN, JR.,   )
et al.,                  )
                         )
        Defendants.      )

DISCOVERY DEPOSITION OF ELIZABETH MILLER

TAKEN ON BEHALF OF THE DEFENDANTS

DECEMBER 11, 2019

VALERIE A. LEHR, CCR, CSR, RPR

1                      I N D E X

2                    WITNESSES

3  ALL WITNESSES:                          PAGE:

4  For Defendants:

5    Elizabeth Miller:
       Examination by Mr. Skigen           6:13
6      Examination by Mr. Schlafly         124:20
       Examination by Mr. Skigen           138:8

7                      EXHIBITS

8  NO.:     DESCRIPTION:                    PAGE:

9  For Defendants:

10
   130      11/3/16 Mr. Riggan letter:
11          For Identification             17:12

12 131      E. Miller resume:
            For Identification             22:8
13
   132      1993 E. Miller W-2:
14          For Identification             39:18

15 133      2016 E. Miller W-2:
            For Identification             39:18
16
   134      10-24-16 diznutgmail.com email:
17          For Identification             96:23

18 135      E. Miller Affidavit:
            For Identification             104:6
19
   136      11-4-16 A. Cori email:
20          For Identification             139:9

21 137      11-17-16 A. Bensman email:
            For Identification             143:3
22 Original exhibits were retained by the reporter to be
   copied and attached to the Original and copies.
23

24

Page 3

1              IN THE CIRCUIT COURT
             THIRD JUDICIAL CIRCUIT
2            MADISON COUNTY, ILLINOIS

3

ANNE SCHLAFLY CORI,      )
4  et al.,               )
                         )
5        Plaintiffs,     )
                         )
6  vs.                   )Cause No. 2016-MR-00111
                         )
7  EDWARD R. MARTIN, JR.,  )
   et al.,               )
8                        )
         Defendants.     )

9

10        DISCOVERY DEPOSITION OF ELIZABETH MILLER,

11  produced, sworn, and examined on December 11, 2019,

12  between the hours of eight o'clock in the forenoon and

13  six o'clock in the afternoon of that day, at the office

14  of Paszkiewicz Court Reporting, 26 Ginger Creek Parkway,

15  Glen Carbon, Illinois, 62034, before Valerie A. Lehr, a

16  Certified Shorthand Reporter, within and for the State

17  of Illinois, in a certain cause now pending in the

18  Circuit Court of the Third Judicial Circuit, County of

19  Madison, State of Illinois in re:  ANNE SCHLAFLY CORI,

20  et al. vs. EDWARD R. MARTIN, JR., et al.; on behalf of

21  the DEFENDANTS.

22

23

24

1                       APPEARANCES

2

    For the Plaintiffs:

3

            Mr. Arthur D. Gregg, Esq.
4           SPENCER FANE, LLP
            1 North Brentwood Boulevard, Suite 1000
5           St. Louis, Missouri 63105
            314.333-3914
6           agregg@spencerfane.com

7   For the Plaintiff, Eagle Forum:

8           Mr. James P. Sanders, Esq.
            SMITHAMUNDSEN, LLC
9           120 South Central Avenue, Suite 700
            St. Louis, Missouri 63105
10          314/719-3700
            jsanders@salawus.com

11

    For the Defendants, Eagle Trust Fund, Eagle Forum
12  Education and Legal Defense Fund, Kathleen Sullivan,
    Estate of Phyllis M. Schlafly:
13

            Mr. Randall D. Grady, Esq.
14          RIEZMAN BERGER, PC
            7700 Bonhomme Avenue, Suite 700
15          St. Louis, Missouri 63105
            314/727-0101
16          grady@riezmanberger.com

17  For the Defendant, Eagle Trust Fund by and through its
    Co-Trustees:
18

            Mr. Curtis J. Niewald, Esq.
19          FARRELL & MARTIN
            220 Salt Lick Road
20          St. Peters, Missouri 63376
            636/397-2600
21          curtis@farrellandmartin.com

22

23

24

1  For the Defendants, John F. Schlafly and Bruce S.
   Schlafly:

2
        Mr. John D. Stobbs, II, Esq.
3       STOBBS LAW OFFICES
        216 St. Louis Street
4       Edwardsville, Illinois 62025
        618/462-8484
5       stobbsjohn@hotmail.com

6  For the Defendant, Edward R. Martin, Jr.:

7       Mr. Daniel R. Schattnik, Esq.
        UNSELL & SCHATTNIK, ATTORNEYS AT LAW
8       3 South 6th Street
        Wood River, Illinois 62095
9       618/258-1800
        schattnik@gmail.com

10

   For the Defendants, John F. Schlafly and Bruce S.
11 Schlafly:

12      Mr. Wayne D. Skigen, Esq.
        TRESSLER, LLP
13      110 Rottingham Court, Suite B
        Edwardsville, Illinois 62025
14      618/800-1391
        wskigen@tresslerllp.com

15

   Appearing telephonically for the Defendant/Pro Se:
16
        Mr. Andrew L. Schlafly, Esq.
17      939 Old Chester Road
        Far Hills, New Jersey 07931
18      908/719-8608
        aschlafly@aol.com

19

   Reported By:
20
        Ms. Valerie A. Lehr, CCR(MO), CSR(IL), RPR
21      PASZKIEWICZ COURT REPORTING
        26 Ginger Creek Parkway
22      Glen Carbon, Illinois 62034
        618/307-9320
23      valerie@spreporting.com

24 Also Present:  John F. Schlafly

1          IT IS HEREBY STIPULATED AND AGREED by and

2    between counsel for the Plaintiffs and counsel for the

3    Defendants that this deposition may be taken in

4    shorthand by Valerie A. Lehr, CCR, CSR and Illinois

5    notary public, and afterwards transcribed into printing,

6    and signature by the witness is expressly reserved.

7                        *  *  *  *  *

8          (Wherein the deposition began at 9:02 a.m.)

9                    ELIZABETH MILLER,

10    of lawful age, produced, sworn, and examined on behalf

11    of Defendants, deposes and says:

12                        EXAMINATION

13    QUESTIONS BY MR. SKIGEN:

14          Q.     Ma'am, can you please state your full name

15    for the record?

16          **A.     Elizabeth Ann Miller.**

17          Q.     And where do you currently reside?

18          **A.     In Alton.**

19          Q.     What's your address?

20          **A.     414 East 13th Street, Alton, Illinois**

21    **62002.**

22          Q.     And where do you currently work?

23          **A.     Eagle Forum.**

24          Q.     What office address?

1          **A.      200 West Third, Suite 502.**

2          Q.      And that's Eagle Forum (c)(4) that you

3    work for now?

4          **A.      (C)(4) and somewhat (c)(3).  That's**

5    **foundation, Eagle Forum Foundation.**

6          Q.      So you do work for both the (c)(4) and

7    (c)(3) entities; correct?

8          **A.      I don't know about the foundation.  I**

9    **don't know if I'm classified for that.**

10         Q.      All right.  Well, let's -- I want to focus

11   first on the time period from 1990 to October 2016.  Do

12   that you have time period in mind?

13         **A.      Yes.**

14         Q.      You know where you worked during that time

15   period?

16         **A.      Yes.**

17         Q.      Where did you work during the time period?

18         **A.      Eagle Forum.**

19         Q.      I mean graphically, where did you work?

20         **A.      3 -- oh, wow -- what is address?  322**

21   **State Street.**

22         Q.      Okay.  Was that the office in which you

23   worked throughout that time period?

24         **A.      No.  I worked at Phyllis's home for a few**

1  **years until we moved to 322 State Street.**

2       Q.     Is it your belief that during that time

3  frame from 1990 to October 2016 you were employed by

4  Eagle Forum?

5       **A.     Yes.**

6       Q.     We'll get into that in further detail

7  later, but you would agree, would you not, that you now

8  understand you were receiving paychecks from Eagle Trust

9  Fund during that time frame; correct?

10      **A.     It was a bank account.**

11      Q.     I didn't -- do you understand that the

12 checks --

13      **A.     Yes.**

14      Q.     -- you received were from Eagle Trust

15 Fund?

16             MR. SANDERS:  Hold on.  You guys are

17 talking over each.  Let him ask his question --

18             THE WITNESS:  Okay.  Sorry.

19             MR. SANDERS:  -- and then provide the

20 answer.  Make sure you're listening.

21             THE WITNESS:  Okay.

22      Q.     (BY MR. SKIGEN)  I think I may have cut

23 off your answer or vice versa, but you understood you

24 were receiving checks from Eagle Trust Fund; correct?

1      **A.      Yes.**

2      Q.      All right.  Who did you understand to be

3   your bosses or supervisors during that time frame?

4      **A.      Phyllis Schlafly was the main person.**

5      Q.      At some point, did you also regard John

6   Schlafly as one of your bosses?

7      **A.      Yes.**

8      Q.      Can you give us -- strike that.

9           I assume that over time your job duties

10  evolved or expanded or changed in some way; is that

11  fair?

12     **A.      Yes.**

13     Q.      Okay.  Can you take us through a general

14  description of the work you did while working for the

15  organization that was at Phyllis Schlafly's home and

16  then moved to the State Street office?

17          MR. SANDERS:  I'm going to object to form.

18  I think it's compound, but go ahead and answer, if you

19  can.

20     **A.      Okay.  Well, whenever I first started in**

21  **1990, I was seated behind Phyllis Schlafly where she**

22  **sat.  I worked on the Lanier.  Around Christmastime, she**

23  **said, Merry Christmas, Elizabeth or Liz, we got you a**

24  **computer.  So I moved from behind her, sitting behind**

1    the Lanier or -- and around to -- I don't know what you

2    would call it.  It was close to the kitchen.

3         Q.    My question is:  What were your job duties

4    functions.

5         A.    Laying out documents.

6         Q.    What documents?

7         A.    Formatting.  Eagle Council Program, Eagle

8    Council -- everything.

9         Q.    So materials for Eagle Council?

10        A.    Yes.  Yes.

11        Q.    Anything else?

12        A.    The Phyllis Schlafly Report.  I worked and

13   helped sending by modem her column, Phyllis's column.

14        Q.    Anything else?

15        A.    I worked in her home.  I laid out the

16   First Reader book, the first First Reader book, the

17   first edition and various, you know, duties like that,

18   laying out things.

19        Q.    Okay.  Was this all while you were still

20   working at --

21        A.    Phyllis's home, uh-huh.

22        Q.    And when you moved to the State Street

23   office, did your duties expand over time?

24        A.    Yes.

1      Q.    Can you tell us what they expanded to?

2      A.    Yes.  I can't remember exactly what year,

3   but it was in the early '90s or maybe mid '90s, I

4   persuaded Phyllis and John to get on the internet, and

5   eagleforum.org.  I did that.  I laid out the America's

6   Future.  I laid out Education Reporter.  I laid out the

7   Phyllis Schlafly Report.  I helped Phyllis with Word

8   5.1.  I did various maintenance tasks with Paradox,

9   whenever Paradox would be corrupted.  I pulled lists for

10  Phyllis, like a big donor list from Paradox.  Is that

11  enough?

12     Q.    I don't know.

13     A.    I'm sure there's more, but I'm not

14  remembering it.

15     Q.    At some point, is it fair to say that you

16  were the person most involved with the information

17  technology in that State Street office?

18     A.    Oh, yeah.  You mean computers; right?

19     Q.    Yeah, IT, computers.

20     A.    Yes.  Yes.  Yes.

21     Q.    Okay.  Now, do you have schooling in that

22  area?

23     A.    Yes.

24     Q.    What's your schooling?

1      **A.      I have an Associate's degree at Lewis and**

2  **Clark in programming, and then I have another**

3  **Associate's degree in general IT, and then I have worked**

4  **-- I have a BS in geography -- geographical information**

5  **systems, which was on computer.**

6      Q.      Did you have those IT degrees when you

7  started with --

8      **A.      The Associate's, yes.**

9      Q.      You've got to let me finish my question.

10      MR. SANDERS:  It's okay.  Everybody does

11  it.  Okay.  But he's got to ask the question.  You have

12  to then answer.  Okay?

13      Q.      (BY MR. SKIGEN)  At the time you started

14  with one of Phyllis Schlafly's entities, did you have

15  those IT degrees already?

16      **A.      I had the Associate's degrees.**

17      Q.      Okay.  Who published the Education

18  Reporter?

19      **A.      I believe the Eagle Forum Education and**

20  **Legal Defense Fund.**

21      Q.      If we refer to that as EFELD or the (c)(3)

22  -- let's refer to it as EFELD --

23      **A.      EFELD, yeah.**

24      Q.      -- since there's more than (c)(3).  You'll

1  know what I'm talking about?

2      **A.      Uh-huh.**

3      Q.      Yes?

4      **A.      Yes.  Yes.**

5      Q.      So you worked on the Education Reporter

6  over the years; correct?

7      **A.      Not at the beginning whenever we moved in,**

8  **but probably for the last 10, 12 years whenever I**

9  **finished up, yes.**

10      Q.      That was a publication of EFELD; correct?

11      **A.      Yes.**

12      Q.      And did you work -- and you worked on the

13  Phyllis Schlafly Report?

14      **A.      Yes.**

15      Q.      At State Street; right?

16      **A.      Yes.  Yes.**

17      Q.      And that was published by Eagle Trust

18  Fund; correct?

19      **A.      I did not know that.**

20      Q.      Do you know that now?

21      **A.      I guess.  It's been many different things,**

22  **hasn't it?**

23      Q.      Well, have you ever seen published by

24  Eagle Trust Fund or words to that effect?

 1          **A.      Yes, I have.**

 2          Q.      Whenever I go that like this, it means one

 3   at a time.

 4                  MR. SANDERS:  You're doing fine.

 5          Q.      (BY MR. SKIGEN)  Okay.  So I think the

 6   answer was yes, you've seen published by Eagle Trust

 7   Fund?

 8          **A.      Yes, I have.**

 9                  MR. GRADY:  You want to re-ask that,

10   because you never finished that question and she never

11   answered.

12                  MR. SKIGEN:  Thank you, Randy.

13          Q.      (BY MR. SKIGEN)  Let's clarify the record

14   there.  You're aware that the Phyllis Schlafly Report

15   said published by Eagle Trust Fund on it; correct?

16          **A.      Yes, at one time.**

17          Q.      At one time you were -- at one time, what,

18   that it was --

19          **A.      I have seen that.**

20          Q.      Okay.

21          **A.      I have seen that in different forms that**

22   **it was published by Phyllis Schlafly in the early years.**

23          Q.      Okay.  And then you've also seen it

24   published by Eagle Trust Fund?

1       A.      Yes.

2       Q.      Have you ever seen where it says published

3   by Eagle Forum?

4       A.      I don't -- I think so, but I don't know.

5   I don't know.

6       Q.      Okay.  Is there something or some type of

7   publication that's it's known as News and Notes?

8       A.      Yes.  Yeah.

9       Q.      What's that?

10      A.      That is information that is put out once a

11  week by Phyllis or Helen Blackwell, whenever she was

12  alive, or just Eagle Forum to the leaders.

13      Q.      Okay.  Is it your testimony that News and

14  Notes was disseminated by Eagle Forum or by EFELD?

15      A.      I would say Eagle Forum.  I did it for

16  years.

17      Q.      And was there a News and Notes issued by

18  EFELD?

19      A.      Not to my knowledge.

20      Q.      Okay.  America's Future, what is that?

21      A.      Well, it's a collection of stories and

22  there is court cases in it, and it's just a publication

23  that Phyllis took over from -- I guess it's General

24  Singlaub is the something to it.  I don't know what.

1      Q.     Okay.  But Phyllis published materials

2   under the name of America's Future?

3      **A.     Yes.**

4      Q.     And you helped with that?

5      **A.     Yes.**

6      Q.     It had its own publications?

7      **A.     Yeah.  Yes.**

8      Q.     And there's something known as the Phyllis

9   Schlafly Column as well, isn't there, or was?

10     **A.     Yes.**

11     Q.     Did you work on that?

12     **A.     Yes.**

13     Q.     And that was issued under Phyllis's own

14  name?

15     **A.     Yes.  It said by Phyllis Schlafly.**

16     Q.     It didn't say by Eagle Forum or anything

17  to indicate it was published by Eagle Forum; correct?

18     **A.     Correct.**

19     Q.     Same thing, Eagle -- strike that.

20            America's Future's publications didn't say

21  by published by Eagle Forum or anything to that effect,

22  did it?

23     **A.     Correct.**

24     Q.     So is it fair to say that you worked on

1   publications for persons or organizations other than

2   just Eagle Forum; correct?

3       **A.      I guess, yes.**

4       Q.      Okay.  Other than Phyllis, herself, and,

5   to some extent, John Schlafly, did you have anyone else

6   to whom you reported or whom you regarded as your bosses

7   while you were working at the State Street office?

8       **A.      No.**

9               MR. SKIGEN:  We're going to start at

10  Exhibit 130.  I think we ended up at 126 in the last

11  depo taken by defendants, but start with a round number.

12              (Defendants' Exhibit 130 was marked for

13              identification.)

14              MR. SANDERS:  Go ahead and read through.

15  Read this thing.

16              THE WITNESS:  Okay.

17              MR. SANDERS:  It's multiple page.

18      Q.      (BY MR. SKIGEN)  You're free to read the

19  whole thing.  I'm actually going to only ask you about

20  the footnote on Page 1.

21              MR. SANDERS:  Read through as much as you

22  feel you need to.

23      Q.      (BY MR. SKIGEN)  While you're reading,

24  I'll identify the document, for the record.  What we've

1  marked as Exhibit Defendants' 130 is a letter dated

2  November 3, 2016 on the letterhead of the Riggan Law

3  Firm.  It appears to be signed by a Russell Riggan.

4  It's addressed to James Craney and John Schlafly, as the

5  cotrustee of Eagle Trust Fund.

6          My questions are not about the substance

7  of the letter or the events that are described in there.

8  My question goes to the footnote and the sentence

9  leading up to the footnote on the first page.

10         The letter begins, this firm and the

11  undersigned represent Liz Miller and Ann Bensman, two

12  long-time employees of various entities that are

13  owned/controlled by the Schlafly family, including Eagle

14  Trust Fund and Eagle Forum, etc.  Do you see that?

15     **A.    No.**

16         MR. SANDERS:  The first sentence.

17     **A.    I thought he said the footnote.**

18     Q.    (BY MR. SKIGEN)  Okay.  And then you can

19  read the footnote to yourself.  I won't burden the

20  record by reading that out loud.  Did you disagree that

21  you were employed, at least in part, by Eagle Trust Fund

22  at the time this letter was written?

23     **A.    I have no idea where I was employed.**

24  **Okay?**

1      Q.      You don't know where you were employed?

2      **A.      I think -- I thought Phyllis Schlafly**

3  **hired me for Eagle Forum.**

4      Q.      Why did you think that?

5      **A.      Because she was president and she did not**

6  **say anything else on our interview.  She did not**

7  **indicate Eagle Trust Fund, RNC Life.  America's Future**

8  **was purchased or whatever later.  I mean --**

9      Q.      I'll let you finish your answer, please.

10     MR. SANDERS:  Go ahead and answer.

11     **A.      I thought I was employed by Eagle Forum.**

12     Q.      (BY MR. SKIGEN)  Did you do any work or

13 provide any services for an entity known as RNC For

14 Life?

15     **A.      Yeah.  I laid that out too, and I totally**

16 **forgot about that.**

17     Q.      That's okay.  It's a long list of things.

18     **A.      Yeah.**

19     Q.      How about First Reader?  You mentioned

20 First Reader.  You did layout work for First Reader;

21 right?

22     **A.      Oh, yeah.  Yeah.**

23     Q.      What's Turbo Reader?

24     **A.      Turbo Reader is -- really, it is just**

1  **First Reader, but they put more mature graphics so**

2  **grown-ups -- you know, like, you know, grown-ups**

3  **learning to read would be more comfortable with it or**

4  **that's my understanding.**

5       Q.    Did you provide services for Turbo Reader?

6       **A.    I don't know.  I don't think so.  I think**

7  **it's just First Reader with different graphics.**

8       Q.    Okay.  So Mr. Riggan, Russell Riggan, was

9  your attorney for at least a period of time; correct?

10      **A.    Yes.**

11      Q.    I do not want to know any communications

12 between you and Mr. Riggan.  Those are probably

13 privileged, but can you tell me if anybody referred you

14 to Mr. Riggan?

15      **A.    I don't know who.**

16      Q.    Do you recall how you got to Mr. Riggan?

17      **A.    Well, it was through Anne, Anne Cori.**

18      Q.    So Anne Cori recommended Mr. Riggan to

19 you?

20      **A.    I don't know if it came directly from her**

21 **or not.**

22      Q.    How did it come to pass that Anne Cori had

23 some role in directing you to Mr. Riggan?

24           MR. SANDERS:  I'm going to object to form.

1  It either assumes facts not in evidence or misstates

2  prior testimony.

3          Q.      (BY MR. SKIGEN)  Let me re-ask it.  How

4  did it come to pass that Ms. Cori had some involvement

5  in Mr. Riggan becoming your attorney?

6          **A.      She said she felt so bad and she was doing**

7  **it for her mother, that we were treated so badly, and**

8  **she felt it was her responsibility.**

9          Q.      She felt -- she said she was doing it for

10 her mother.  Do you know what the "it" refers to when

11 you used it in that sentence?

12         **A.      Well, unless I'm totally crazy, I believe**

13 **Phyllis Schlafly really liked me, and she did not want**

14 **me to be kicked to the curb like I was treated.**

15         Q.      Okay.

16         **A.      And so that's the "it."**

17         Q.      That's the "it."  Okay.  And did Ms. Cori

18 contribute in any way to your legal expenses?

19         **A.      I have no idea.  I did not pay for it.  I**

20 **don't know who did.**

21         Q.      So you didn't pay Mr. Riggan yourself?

22         **A.      No.**

23         Q.      You don't know if Ms. Cori did?

24         **A.      No, I don't.**

1      Q.      You don't know if anybody else did?

2      **A.      No.**

3      Q.      Were you ever billed by Mr. Riggan?

4      **A.      I don't know.  I don't -- I don't recall**

5  **that I was.**

6      Q.      You can set that exhibit aside.

7              Let's mark this as exhibit 131.

8              (Defendants' Exhibit 131 was marked for

9              identification.)

10      Q.      (BY MR. SKIGEN)  This one is going to be

11  really easy, because I'm not really going to have any

12  questions about it.  What I've marked as 131 -- go

13  ahead, ma'am.  You can look at it to your heart's

14  content.  I'm just going to make a statement about it.

15      **A.      Yeah, I think I know it.**

16      Q.      I would think so.  What I believe is 131

17  is a resume for you; is that correct?

18      **A.      Yes.**

19      Q.      Did you prepare this resume?

20      **A.      Yeah.  It's my standard resume.**

21      Q.      Okay.

22              MR. GREGG:  I have a question.  Was

23  Exhibit 131 produced?  I just don't see Bates numbers on

24  it.

1              MR. SKIGEN:  I believe -- it wasn't

2      produced by us.  I think it came from your side of the

3      V.

4              MR. GREGG:  Okay.

5          Q.    (BY MR. SKIGEN)  Where was I -- there's no

6      date on this.  Do you know how recently this version of

7      your resume was prepared?

8          **A.    I don't.  I mean, I've worked there for**

9      **almost 30 years, and it's employed 1990 to present.  I**

10     **have no idea.**

11         Q.    Okay.  Let me ask you this.

12         **A.    It has the -- can I say something?**

13         Q.    Yeah, please.

14         **A.    It has the 462-5415.  So that means it**

15     **would be later.  I mean, you know --**

16         Q.    Well, that's the phone number for State

17     Street; right?

18         **A.    Uh-huh.**

19         Q.    Yes?

20         **A.    Yes.**

21             MR. SANDERS:  You have to give a "yes" or

22     "no."

23         **A.    Yes.**

24         Q.    (BY MR. SKIGEN)  This was prepared before

1    you went to work at 200 West 3rd Street; correct?

2        **A.**    **Yes.**

3        Q.    Yes.  Do you have a resume that reflects

4    the continuation -- strike that.  Do you have a resume

5    that reflects your employment in your current location

6    for Eagle Forum at Third Street?

7        **A.**    **No.**

8        Q.    If you were to -- you don't have -- you

9    said you don't have a resume that reflects that

10   employment; correct?

11       **A.**    **I don't have the phone number, our phone**

12   **number, 433-8909.**

13       Q.    If you were to update your resume to

14   include your current employment --

15       **A.**    **Yes.**

16       Q.    -- at the Third Street location, would the

17   description of your employment be different in terms of

18   the type of functions you perform, not necessarily the

19   names of publications, but in terms of what you, Liz

20   Miller, do at your job?  Is it different now than it was

21   when you prepared this resume?

22          MR. SANDERS:  Objection.  Form.  I think

23   it's a compound question.  It's also an incomplete

24   hypothetical, but go ahead and answer, if you can.

1          MR. GREGG:  Calls for speculation.

2          MR. SANDERS:  Yeah, join.

3     **A.     Okay.  With that, basically, you know, I**

4 **don't do the Education Reporter anymore and everything**

5 **like that.  There's only a few things that I -- that I**

6 **would add and update, because I certainly wouldn't say I**

7 **know DOS.  Okay?**

8     Q.    (BY MR. SKIGEN)  Okay.  What would you add

9 or update in terms of the type of work you do?

10          MR. SANDERS:  Same objections.

11          MR. SKIGEN:  Okay.

12          MR. SANDERS:  Go ahead.

13     **A.     I would just update it, make it look more**

14 **fresh.**

15     Q.    (BY MR. SKIGEN)  Okay.  Not in terms of

16 style or optics but in terms of the substance of

17 describing the kind of work you do, the job functions

18 you perform, what would a current Liz Miller resume say?

19     **A.     Basically it would be --**

20          MR. SANDERS:  Same objection.  Maybe the

21 easier way, Wayne -- I'm not trying to tell you what to

22 do --

23          MR. SKIGEN:  I know what you're going to

24 say.

1          MR. SANDERS:  -- just ask her what she

2    does.

3          MR. SKIGEN:  Right.  I know.

4          MR. SANDERS:  We don't need a document to

5    do that.

6     **A.     Is that what you want to know?**

7     Q.     (BY MR. SKIGEN)  Well, I want to know --

8    we'll get to that.

9          Is there anything -- was this an accurate

10   reflection of the work that you did when your tenure at

11   the State Street office ended?

12    **A.     Yes.**

13    Q.     What work, if any, did you do with audio

14   files or radio broadcasts?

15    **A.     I updated every Saturday -- I posted**

16   **Phyllis Schlafly's hour-long radio program, and then I**

17   **did her three-minute radio programs once a month.  I**

18   **uploaded it to a FTP site.  So radio stations would have**

19   **a password and they could download that file.**

20    Q.     What were these three-minute items you

21   were just referring to?

22    **A.     That was a weekly thing that she did**

23   **Monday through Friday, but she would do them all one**

24   **month at a time.**

1      Q.      Okay.

2      **A.      And then I would upload, and then the**

3  **radio stations would play one a day.**

4      Q.      Okay.  So she would do a month's worth of

5  three-minute shows at a sitting.  And then how often

6  would you upload?

7      **A.      Well, once a month, those.**

8      Q.      Okay.

9      **A.      But every Saturday, for the hour one,**

10  **because it was different, the Eagle Forum Live was**

11  **different each week.**

12      Q.      Okay.  With respect to the three-minute

13  uploads, did you believe those were a Eagle Forum item

14  or a Phyllis Schlafly item?

15      **A.      I have -- I don't know.**

16      Q.      Okay.  Is it what we've mark as 131 your

17  most current resume that you've prepared, if you can

18  tell?

19      **A.      Well, I don't know.  I would say I don't**

20  **know.**

21      Q.      Okay.  You can set it aside.  Is it your

22  understanding that this litigation involves, at least in

23  part, a dispute between, on one hand, Anne Cori and the

24  other women who are the individual plaintiffs, Eunie

1  Smith, Cathie Adams, Carolyn McLarty, Shirley Curry and

2  Rosina Kovar on the one hand and John Schlafly, Andy

3  Schlafly, Bruce Schlafly, Kathleen Sullivan, among

4  others, on the other hand?

5      **A.      Well, I thought it was the -- this suit is**

6  **the women against John Schlafly and Ed Martin.**

7      Q.      Okay.

8      **A.      I mean, I think.**

9      Q.      Okay.  That's your understanding that

10  there's a dispute between the women whom I listed -- who

11  I listed and John Schlafly and Ed Schlafly --

12      **A.      Ed Martin.**

13      Q.      Ed Martin.  Sorry.

14      **A.      He wants to be a Schlafly, but no, not --**

15  **I can't help it.  I had to say it.**

16      Q.      Well, I kind of set you up.

17              MR. SANDERS:  You have to testify

18  truthfully, but that's okay.

19      Q.      (BY MR. SKIGEN)  So to be clear, so you

20  understood there's a dispute between Anne Cori and the

21  other ladies we mentioned and John Schlafly and Ed

22  Martin on the other hand; correct?

23      **A.      Yes.**

24      Q.      Okay.  When did you first become aware

1  that that dispute existed?

2      **A.     Whenever -- you mean whenever the suit was**

3  **filed.**

4      Q.     No.  I just want to know when you were

5  aware that there was a friction or a dispute brewing,

6  whether or not it had ripened into a lawsuit or not.

7      **A.     Okay.  You mean -- I didn't know the law**

8  **-- okay.  I'm trying to answer this correctly.**

9          MR. GREGG:  I'll object to the extent it

10  calls for speculation.  Go ahead and you answer, if you

11  can.

12      **A.     Okay.  You mean before I knew there was**

13  **something --**

14          MR. SANDERS:  Hold on.  You can't ask him

15  questions.

16      **A.     Oh.**

17      Q.     (BY MR. SKIGEN)  You can ask me for

18  clarification.  I'll be happy to give it to you.

19      **A.     Okay.  Can you ask that again.**

20      Q.     Sure.  When did you first have some

21  information that there was a dispute involving Anne Cori

22  and her brother John and/or Ed Martin?

23      **A.     Anne Cori called the Eagle Forum office on**

24  **the day of the board meeting and said that we fired Ed,**

1  **and I knew something was up from that.**

2  Q.   Okay.  That would have been in April of

3  2016; correct?

4  **A.   Yes.**

5  Q.   Did you know that this so-called board

6  meeting was going to occur before it happened?

7  MR. SANDERS:  Objection to form.  Go ahead

8  and answer.

9  **A.   Yes.**

10  Q.   (BY MR. SKIGEN)  Okay.  And did you speak

11  with Anne Cori when she called the office to say that Ed

12  had been fired?

13  **A.   Yes.  I was the only one in the office at**

14  **the time.**

15  Q.   And what did Ms. Cori tell you?

16  **A.   She said we just had a board meeting and**

17  **we fired Ed Martin.**

18  Q.   Okay.  Did you respond?

19  **A.   Good.**

20  Q.   Okay.  Why did you say good?

21  **A.   Because I feel Ed Martin is nothing but a**

22  **used car salesman.**

23  Q.   What do you mean by that?  You don't mean

24  literally he sells used cars?

1      A.      No.

2      Q.      So what do you mean by it?

3      A.      **It's like -- imagine, you know, you're old**

4   **enough.  Well, I think you're old enough to know what**

5   **used car salesman means.  I mean, it's kind of like --**

6      Q.      I don't know what that means.

7      A.      **Dishonest.**

8      Q.      You thought Ed Martin was dishonest in

9   April of 2016?

10     A.      **Yes.**

11     Q.      What was the basis for your feeling that?

12     A.      **All you've got to do is search on the**

13  **internet.**

14     Q.      So things you read on the internet led you

15  to believe Ed Martin was dishonest?

16     A.      **No, things that he had done and said.**

17     Q.      Can you give me a specific example?

18     A.      **Okay, April 2016.  So Council already**

19  **happened.  Okay.  For example -- and this doesn't show**

20  **dishonesty, but it shows what a jerk he was.  He took**

21  **the Alton -- or Eagle Forum took us out to eat, and he**

22  **made fun of John right at the table, I mean, whenever we**

23  **were eating at Marquette Lodge.  I mean, he was cracking**

24  **jokes about John.  I don't think that was a good thing.**

1      Q.      Did Anne Cori, other than tell you during

2   that phone conversation that Ed Martin had been fired at

3   a meeting, did she say to you -- did she tell you any

4   other action that had been taken at that meeting?

5      **A.      No.**

6      Q.      For example, did she say anything about

7   any resolution or discussion about who had control over

8   the Eagle Forum bank accounts?

9      **A.      No.**

10      Q.      Did she say anything about any discussion

11   with respect to John Schlafly?

12      **A.      No.**

13      Q.      Did she say anything about having any

14   plans to take any action regarding John Schlafly?

15      **A.      No.**

16      Q.      Did she say anything about taking any

17   action regarding Phyllis?

18      **A.      No.**

19      Q.      Did she say anything about Phyllis's role,

20   if any, in that meeting?

21      **A.      No.**

22      Q.      Did you ask her any questions?

23      **A.      I don't -- I don't think so.**

24      Q.      Did you tell -- did you say anything to

```
                                           Page 33
 1   Anne Cori to indicate that you thought the firing of Ed
 2   Schlafly [sic] was good?
 3               MR. GRADY:  Ed Martin.
 4               MR. SKIGEN:  I did it again.
 5               THE WITNESS:  Ed Martin.  Wants to be.
 6               MR. SANDERS:  Ed Martin Schlafly.  We can
 7   just call him Ed Martin Schlafly.
 8               MR. GRADY:  He only wants to be a
 9   Schlafly.  He's not actually a Schlafly.
10       Q.     (BY MR. SKIGEN)  Let me start over.  Sorry
11   about that.
12               Did you say anything to Anne Cori, other
13   than you thought the firing of Ed Martin was good?
14       A.     No, I did not.
15       Q.     Okay.  So it was a short conversation?
16       A.     Pretty short.
17       Q.     Did Ms. Cori indicate to you why she was
18   calling to give that information?
19       A.     She was wanting to talk to John, I think.
20       Q.     Was John there?
21       A.     No.  I was the only one there.
22       Q.     Okay.  So did you tell John she had
23   called?
24       A.     No.  He didn't come back that day.
```

1      Q.     Okay.  So that was your first inkling that

2  there was -- well --

3      **A.     Well, I mean I knew --**

4      Q.     Let me ask a different question.  Did you

5  have any understanding at that point how John Schlafly

6  -- where John Schlafly stood in terms of a dispute with

7  Anne Cori as of April 2016?

8           MR. SANDERS:  Objection to form.  I think

9  it's vague and ambiguous.  Go ahead and answer.

10     **A.     Well, I don't understand what -- what you**

11  **are getting at.**

12     Q.     (BY MR. SKIGEN)  Okay.  I asked you when

13  you had the first inkling of a dispute between Anne Cori

14  and the other plaintiffs and Ed Martin and John

15  Schlafly, and you referred to this phone call from Anne

16  Cori.  Did that indicate to you that there was a dispute

17  between Anne Cori and John Schlafly at that time?

18     **A.     No.**

19     Q.     Okay.

20     **A.     Not until the next day.**

21     Q.     What happened the next day?

22     **A.     The next day, she came.**

23     Q.     To the office?

24     **A.     To the office, uh-huh.**

1      Q.      This meeting that Anne Cori referred to

2   her in her phone call to you in April, did you know it

3   was going to occur before it happened?

4           **A.      Unfortunately, yes.**

5      Q.      How did you know?

6           **A.      Because they made me send out -- well, I**

7   **think it was.  They made me send out a bunch of emails**

8   **to all of our followers about ask the board members to**

9   **all resign or something like that.  I can't remember**

10  **exactly.**

11     Q.      When you say they made me, who is they?

12          **A.      Ed and John.  So I guess that should have**

13  **been my first inkling.  Duh.**

14     Q.      That's what I was just going to ask you.

15          **A.      Come on.  Okay.  Yeah.**

16     Q.      And when you say they made me, was this

17  something you didn't want to do?

18          **A.      No.  I said to John, this is not good a**

19  **way, this is not good.**

20     Q.      What did you think was not good about it?

21          **A.      That's not how we conducted business, to**

22  **-- to say things like the email said.  Do you have a**

23  **copy of the email, because, I mean, it will refresh my**

24  **memory?  It wasn't something Phyllis would have wanted,**

1    **I don't believe.**

2         Q.      That was going to be my next question.

3    Did you have any discussions with Phyllis Schlafly about

4    this --

5         **A.      No.**

6         Q.      -- meeting?

7         **A.      No.**

8         Q.      Okay.

9         **A.      No.**

10            MR. SANDERS:  You're doing fine.  You're

11   okay.

12         Q.      (BY MR. SKIGEN)  Did you have any

13   understanding at or about this time about a difference

14   in opinion between the board members of Eagle Forum as

15   to who should be the Republican presidential nominee?

16         **A.      John told me at one point -- and I don't**

17   **know when it was -- that people were coming to his**

18   **mother's house to have an intervention.**

19         Q.      Is that his word or yours?

20         **A.      No, that's his.  That's not something I**

21   **would use.**

22         Q.      An intervention over what?

23         **A.      I don't know what.  I mean, I -- I -- I**

24   **didn't know.**

1      Q.      Did you learn at some point that Phyllis

2  had endorsed Donald Trump for the presidential

3  nomination?

4      **A.      Yes.  Yes.**

5      Q.      Did you know that Anne Cori and other

6  women on the Eagle Forum board who are now the

7  plaintiffs supported Ted Cruz at that time?

8      **A.      No, I didn't.**

9      Q.      You were unaware of any split over --

10  between Cruz and Trump among these people?

11      **A.      Correct.**

12      Q.      Did you have a preference at that time?

13      **A.      I was -- now this is going to make me**

14  **sound like a racist, but I'll tell you the truth, I was**

15  **for Trump, until he got into all the bathroom stuff and**

16  **men coming into women's bathrooms.  Then I didn't want**

17  **him anymore.**

18      Q.      Okay.  Just so we can put that in time,

19  when did you decide you did not want to see Trump?

20      **A.      Whenever he said -- it probably is on the**

21  **internet.  Whenever he said -- I think the person's name**

22  **is -- the guy used to be a guy but now he's a girl, and**

23  **his last name is Jenner.  He said this Jenner person**

24  **could visit Trump Towers anytime he wanted and go to the**

1    women's bathroom.  Caitlyn Jenner.

2          Q.     Formerly Bruce Jenner?

3          A.     Oh, that's it.  Okay.

4          Q.     All right.  Once Trump said that, you

5    decided he was not for you?

6          A.     Well, I did not like that.

7          Q.     Okay.  Did you have any reaction

8    personally when Phyllis endorsed Trump for the

9    nomination?

10         A.     I told her she was great.  Yes.  I liked

11   it.

12         Q.     So you didn't think Phyllis had any sort

13   of diminished mental capacity when she did that?

14                MR. SANDERS:  I'm going to object to form.

15   Calls for legal conclusion or a medical conclusion or

16   medical opinion.  It's vague.  It's ambiguous.  Assumes

17   facts not in evidence.

18                MR. GREGG:  Join.  And speculation.

19         Q.     (BY MR. SKIGEN)  You can answer.

20         A.     Yeah.  I do think that she was kind of

21   confused at times.  Yes.

22         Q.     Because she endorsed Trump?

23         A.     No.  No.  Huh-uh.  I mean, I don't know

24   why she endorsed Trump.  I don't know but --

1     Q.     Let's go back to who your employer was

2   when you were working at State Street.  Now, I assume

3   you've seen W-2 forms that show Eagle Trust Fund was

4   your employer; correct?

5                 MR. GREGG:  Objection.  Calls for a legal

6   conclusion.

7                 MR. SANDERS:  Go ahead and answer, if you

8   can.

9     **A.     The first time that I seen on my W-2 form**

10  **Eagle Trust Fund, I was confused.  I thought what the**

11  **heck.  I mean, the first year, 1990, I thought what the**

12  **heck.  Isn't this supposed to say Eagle Forum, and then**

13  **I thought, okay, maybe it's just something that they**

14  **named their bank account.  I don't know.  But on -- and**

15  **you can -- I don't know if you can get them or not, but**

16  **on my federal tax forms, I always said I was IT for**

17  **Eagle Forum.  I mean, that's what I thought in 1990.**

18                 **(Defendants' Exhibits 132 and 133 were**

19                 **marked for identification.)**

20                 MR. SANDERS:  Any idea where these came

21  from?

22                 MR. SKIGEN:  They got a stamp on -- 132

23  has a stamp on the side of it.

24                 MR. SANDERS:  Is that one of your Bates

 1  numbers?

 2          MR. GREGG:  Is that a Bates stamp?

 3          MR. SKIGEN:  I have no idea.

 4          MR. SANDERS:  So you don't know?

 5          MR. SKIGEN:  No.

 6          MR. SANDERS:  Okay.

 7      Q.    (BY MR. SKIGEN)  I've marked -- just so

 8  you know, for the record, I have cause to be redacted

 9  from these two exhibits your Social Security number.  So

10  there is a box there where your Social Security number

11  would be.

12      **A.    Okay.  Thank you.**

13      Q.    I've marked that out.  You're welcome.

14            Does Exhibit 132 appeared to be your W-2

15  for 1993?

16      **A.    Yes.**

17      Q.    And Exhibit 133 appears to be your W-2 for

18  2016; correct?

19      **A.    It appears to be.**

20      Q.    And as you sit here today, you don't have

21  any reason to dispute that the W-2s you received for all

22  the years from 1990 to 2016 listed Eagle Trust Fund in

23  the employer box; correct?

24            MR. SANDERS:  I'm going to object to form.

1   Calls for speculation.  Go ahead and answer, if you can.

2          **A.      I guess.  I mean, I guess that's what bank**

3   **account they used or whatever or entity or whatever.**

4          Q.      (BY MR. SKIGEN)  Well, you testified

5   earlier that as early as 1990, you noticed --

6          **A.      Yes.**

7          Q.      -- that it said -- that it said Eagle

8   Trust Fund in the employer box?

9          **A.      Uh-huh.**

10          Q.      And that it confused you; correct?

11          **A.      Right.**

12          Q.      Did you ask anybody about that?

13          **A.      No.**

14          Q.      Never?

15          **A.      No.**

16          Q.      Now, who does your taxes?  Over the years,

17   who has -- have you done your own taxes or do you use a

18   tax preparer?

19          **A.      No.  It's me.**

20          Q.      You've done it.  So you've never had any

21   discussions with any CPA or tax preparer person about

22   who your employer was?

23          **A.      No.**

24          Q.      How were you paid?  Was it -- over the

1  years, was it direct deposit or did you get a physical

2  check?

3       **A.     At first, it was a physical check, and**

4  **then they went to direct deposit.**

5       Q.     As you sit here today, do you recall who

6  was payer of the physical checks you got, whether it was

7  Eagle Trust Fund?

8       **A.     I don't know.**

9       Q.     Okay.

10      **A.     I know it said Phyllis Schlafly, you know,**

11 **the signature.**

12      Q.     Okay.  So when you -- you've testified

13 that you did see Eagle Trust Fund on your W-2s.  And is

14 it your testimony that you thought that was a bank?

15      **A.     A bank account.  That's just something**

16 **that they -- I have three bank accounts and I name them**

17 **all something different.  So that's what I thought.  And**

18 **I don't have very much money.**

19      Q.     Turning your attention to the fall of

20 2016, the September/October 2016 time frame.  Did you

21 have discussions with anybody from the law firm of

22 Spencer Fane?

23      **A.     Yes.**

24      Q.     During those discussions, did the subject

1  of who your employer was come up?

2       **A.**    **I don't know.**

3       Q.    Did anybody from Spencer Fane ever discuss

4  with you the question whether your employer was Eagle

5  Trust Fund or Eagle Forum?

6       **A.**    **I -- I don't know.**

7       Q.    You don't remember one way or the other?

8       **A.**    **Yeah.  I don't remember one way or the**

9  **other.**

10      Q.    Same time frame, did you have any

11  discussions with Anne Cori as to whether or not your

12  employer was Eagle Trust Fund or Eagle Forum?

13      **A.**    **She didn't ask, no.**

14      Q.    Well, whether she asked or not, did you

15  have any discussions about it?

16      **A.**    **No.  No.**

17      Q.    Other than Anne Cori or anybody associated

18  with Spencer Fane, did you discuss with anybody else in

19  September or October of 2016 the question whether your

20  employer had been Eagle Trust Fund or Eagle Forum?

21      **A.**    **I don't think so.**

22      Q.    How did your employment, whoever your

23  employer was, in your mind, how did that employment come

24  to an end, if it did?

1     A.     Phyllis Schlafly always promised I would

2 not have to go to St. Louis and work and the Alton

3 office would be always my workplace.  And then whenever

4 I signed an Affidavit telling the truth, John Schlafly

5 and, I guess, Bruce Schlafly decided that that wasn't

6 good for them, whatever I said, the truth.  They had us

7 go, me and Ann Bensman, the two people that signed the

8 Affidavit, relocate to St. Louis, Missouri.

9     Q.     To the Clayton office?

10     A.     Right.  And John stopped or somebody -- I

11 don't know who -- stopped payment on my insurance.  So

12 what was I to think but I was fired?

13     Q.     Did anybody ever tell you you were fired?

14     A.     No.  Did he --

15     Q.     Did you have any discussion with John

16 Schlafly or Bruce Schlafly or anybody else associated

17 with your employment that you were no longer going to

18 come to work ever again?

19     A.     We met on October 31, 2016 with John, John

20 Schlafly, and a lawyer.

21     Q.     James Craney?

22     A.     Okay.

23     Q.     I'm asking.

24     A.     I -- I don't know.

1      Q.    Okay.

2      **A.    Who --**

3      Q.    A bald guy?

4      **A.    I don't even remember what he looked like**

5            MR. SANDERS:  There's a lot of them.

6      **A.    Yeah.  I don't even remember.  And we**

7  **asked John --**

8      Q.    (BY MR. SKIGEN)  We being you and Ann

9  Bensman?

10     **A.    Right.  Right.  Or if we could have, like,**

11 **some days to think about, you know, what all he was**

12 **wanting, you know, relocation.  Hey, I -- I never did**

13 **anything wrong.  I never -- Phyllis always loved my**

14 **work, and John, as far as I know, did too.  So --**

15     Q.    Well, how did that meeting end?

16     **A.    That's what we said.  The meeting ended is**

17 **that we would need a few days.  And then Russ Riggan was**

18 **brought into it, and then that's it.**

19     Q.    Well, was there any final discussion where

20 somebody told you you may not come to work for us

21 anymore?

22     **A.    John didn't call me.  John Schlafly did**

23 **not call me.  Bruce Schlafly did not call me or tell me**

24 **anything.**

1      Q.      Did you call either of them back?

2      **A.      No, I didn't.  I mean, I couldn't call**

3  **them back.  They didn't call me.**

4      Q.      Well, did you ever call either one of them

5  back or anybody else associated with your employment to

6  say you weren't going to come work at the Clayton

7  office?

8      **A.      No, I did not.**

9      Q.      When did you start to work at the Third

10  Street office?

11      **A.      I don't know the exact date.**

12      Q.      Who has been your -- I'm sorry.

13              Who has been your boss there?

14      **A.      Eunie Smith.**

15      Q.      How often is Eunie Smith in that office?

16      **A.      She's not in the office at all, but I**

17  **mean, just like Phyllis, I mean, there's phone calls and**

18  **stuff like that.**

19      Q.      So you regard Eunie as your boss?

20      **A.      Eunie and Anne.**

21      Q.      Anne Cori?

22      **A.      Yes.**

23      Q.      You work five days a week there?

24      **A.      Yes.**

1       Q.    Eagle Forum is your employer on that job;

2  correct?

3       **A.    Yes.**

4       Q.    Do you have a job title?

5       **A.    IT.**

6       Q.    Okay.  And when did you start that IT

7  position with Eagle Forum underneath -- working for

8  Eunie Smith and Anne Cori?

9       **A.    I don't know the exact day.**

10      Q.    Ballpark?

11      **A.    It's November 2016, I would say.**

12      Q.    How did it come to be that you began to

13  work there?

14      **A.    Anne said that -- well, the board meeting**

15  **or the board members had a meeting and they wanted to**

16  **hire us.**

17      Q.    Is it your understanding that Anne knew

18  you weren't going to be working in your prior position

19  anymore?

20      **A.    Well, yeah.**

21      Q.    How did she know that?

22            MR. GREGG:  Objection.  Calls for

23  speculation.

24      Q.    (BY MR. SKIGEN)  Did you tell her?

Page 48

1          MR. SANDERS:  I'll join that.

2      Q.    (BY MR. SKIGEN)  Did you notify Anne Cori

3  that --

4          MR. SANDERS:  I'm going to object to form.

5  I think it's -- which one of those questions do you want

6  her to answer?  There were two or three of them.

7          MR. SKIGEN:  Well, you objected, so I'm

8  going to change the question.

9          MR. SANDERS:  So noted.

10     Q.    (BY MR. SKIGEN)  Did you notify Anne Cori

11 that you no longer were going to be working where you

12 had been working?

13     **A.    I think I called her and I said I was**

14 **going to file for unemployment.**

15     Q.    Okay.

16     **A.    That would indicate, yeah.**

17     Q.    Okay.  And how did she respond?

18     **A.    I'm sorry.**

19     Q.    Did she offer you a job then?

20     **A.    No.**

21     Q.    When did she offer you a job?

22     **A.    Probably -- I'm thinking it was like two**

23 **or three weeks later.**

24     Q.    So did you ever get unemployment?

1       **A.**     **No.**

2       Q.     Were you -- did you -- strike that.

3              Was it Anne Cori, herself, who offered you

4  the position with Eagle Forum that you are still in as

5  opposed to Eunie Smith who made you the job offer?

6       **A.**     **Anne Cori, under the advice under the**

7  **board members.  They all voted.**

8       Q.     How do you know that?

9       **A.**     **That's what I was told.**

10      Q.     By?

11      **A.**     **Anne and Eunie.**

12             MR. SANDERS:  Wayne, it doesn't need to be

13 now.  Whenever you get to a good stopping point.

14             MR. SKIGEN:  I think it's a good spot

15 right now.

16             MR. SANDERS:  Great.

17             (Wherein a recess was taken.)

18             MR. SKIGEN:  Back on the record.

19      Q.     (BY MR. SKIGEN)  Ms. Miller, was Ed Martin

20 ever your boss?

21      **A.**     **Not to my knowledge.**

22      Q.     Okay.  Now, you have used the term "name

23 list"; correct?

24      **A.**     **Yes.  That's what --**

1      Q.      You've also heard others use the term in

2   this -- in litigation "Schlafly database."   And that's

3   not a term you used; correct?

4           **A.      That's not a term anybody used.**

5      Q.      It's not a term you used, for sure?

6           **A.      Yeah.**

7      Q.      And but you do use the term or have used

8   the term "name list"; right?

9           **A.      And so did everybody else.**

10      Q.      What did you understand "name list" to

11   refer to?

12           **A.      The name list was all of the Eagle Forum**

13   **people.**

14      Q.      When you say the Eagle Forum people, do

15   you mean members of the organization?

16           **A.      Right.   Right.   Not all of them, because**

17   **there was several dead people in there that John refused**

18   **to take off, but --**

19      Q.      So did the name list include anything

20   beyond Eagle Forum members?

21           **A.      A small, tiny portion were RNC Life and a**

22   **small, tiny portion were EFELD for the Education**

23   **Reporter, and there was less than 2,000 people that we**

24   **mailed the Education Reporter to.**

1     Q.    Was the name list a list of members of

2  these organizations, Eagle Forum, RNC Life and EFELD or

3  was it also a list of folks who had donated to one or

4  more of those organizations?

5     **A.    I would say it was a list of people that**

6  **donated to one or more of, you know, those**

7  **organizations.  Yes.**

8     Q.    Okay.  All right.  Was it a list of people

9  who donated to one or more of those organizations and

10  they're members or just a list of the donors?

11     **A.    Both.**

12     Q.    Okay.  So is it fair to say that this was

13  a contact list that included members and donors?  Is

14  that a fair characterization?

15     **A.    Yes.**

16     Q.    Did this list include any data other than

17  just names?  Like did it include addresses?

18     **A.    Oh, yes.**

19     Q.    Did it include donation history?

20     **A.    Yes.**

21     Q.    Okay.  Did it include any other data

22  regarding the people on it?

23     **A.    Phone numbers.**

24     Q.    Okay.  Anything else?

1      **A.      Phone numbers, addresses.**

2      Q.      Was there a -- for instance, I don't know.

3  I'm just asking.  Was there a comment section or

4  something where notes can be made about various people

5  on it, like this person is dead or this person is a big

6  supporter or this person is rich, let's go after him for

7  lots of money?  Anything?

8      **A.      There was a "dear" field that would drive**

9  **me crazy, because JoAnn would say -- would say this**

10 **person is dead.  And then whenever I did the did January**

11 **mailing, it would say dear, this person is dead.  Okay.**

12 **No.**

13     Q.      So you mean -- when you say field, you

14 mean like a column?

15     **A.      Yes.  Uh-huh.  Yes.  Yes.**

16     Q.      She would put a commentary in that column,

17 this person is dead?

18     **A.      In the "dear" field, yes.**

19     Q.      Were, normally, their first or last name

20 would go?

21     **A.      It would be, yeah.**

22     Q.      And for most of your employment at the

23 State Street office, was this name list stored in the

24 Paradox software?

1       **A.    Yes.**

2       Q.    And were you the person primarily

3  responsible for maintaining that?

4       **A.    If it broke, I fixed it.  Yes.**

5       Q.    Who actually inputted the data into it?

6       **A.    JoAnn and/or Ann or -- well, before her,**

7  **it was Maryann Schmitzer.**

8       Q.    That's JoAnn Jouett?

9       **A.    Yes.  Yes.**

10      Q.    And this name -- you testified that this

11  name list included donation records; correct?

12      **A.    Correct.**

13      Q.    And these were donations that were made

14  not just to Eagle Forum; correct?

15      **A.    Correct.**

16      Q.    If there was a donation to EFELD, Eagle

17  Forum Education and Legal Defense Fund, that would also

18  be included in this name list; correct?

19      **A.    Correct.  But there's always a but.  If it**

20  **came in as Eagle Forum and it was a big amount, it would**

21  **be John that deciding factor who -- where it would go.**

22      Q.    Irrespective of who made the decision --

23      **A.    Okay.**

24      Q.    -- if money was donated for EFELD, that

1   donation was recorded in this name list that was stored

2   on Paradox; correct?

3        **A.     Yes.**

4        Q.     As of the beginning of October 2016, do --

5   can you give me a ballpark as to how many names were in

6   the name list?

7        **A.     I would say over -- well, I might be --**

8   **between 250- and 300,000, maybe.**

9        Q.     Okay.  And that name list changed over

10  time in terms of its content; is that correct?

11       **A.     Every day, yes.**

12       Q.     New names were added?

13       **A.     Or well -- marked D but never taken off,**

14  **yeah.**

15       Q.     Were sometimes names removed?

16       **A.     Well, I -- I don't remember if it was in**

17  **2016 or 2015, I persuaded John because the Paradox, it**

18  **runs by DOS, and it was getting so big, and the fields**

19  **were so big, I thought by removing the D's, which means**

20  **dead or they don't want to get our stuff anymore, once**

21  **one -- once did have a removal of names.**

22       Q.     Okay.  So sometimes were there occasions

23  when people who weren't dead but just didn't want to get

24  your mailings anymore, would they be removed?

1    **A.    Not on -- no.  They would just be marked**

2    **D.**

3    Q.    Was there a way to filter out the D

4    people --

5    **A.    Yes.**

6    Q.    -- when mailings were done?

7    **A.    Yes.**

8    Q.    Okay.  When did you first see this name

9    list?

10    **A.    Probably in 1990.**

11    Q.    So it existed before you began to work for

12    the organization?

13    **A.    I began in 1990.**

14    Q.    No.  You began to work there in 1990;

15    right?

16    **A.    I thought you said --**

17    Q.    Let me ask it again, if you didn't hear me

18    correctly or if I misspoke.  When you began to work for

19    the organization in 1990, the name list was already in

20    existence; correct?

21    **A.    Correct.**

22    Q.    Okay.  Do you know or do you have any

23    understanding as to when that list began?

24    **A.    I do not.  I don't know.**

1      Q.      Do you know when Eagle Forum was created?

2      **A.      Well, we've always had, you know, since**

3   **1972.  I don't know if that's true or not.**

4      Q.      Well, you just said we've always had since

5   1972, and I don't know what that means.

6      **A.      On our -- like on the web site or, I**

7   **guess, maybe on -- I don't know if it was on the**

8   **letterhead or not -- pro-life organization or pro-life**

9   **and family organization since 1972.**

10      Q.      Okay.

11      **A.      So I'm assuming 1972.**

12      Q.      But you don't really know?

13      **A.      No.  I don't know that for a fact.**

14      Q.      If I were to represent to you that Eagle

15   Forum was incorporated in 1975, you wouldn't a basis to

16   agree or disagree; correct?

17      **A.      Right.**

18      Q.      Do you know whether this -- you don't know

19   whether this name list began to be compiled before or

20   after Eagle Forum was created; correct?

21      **A.      Correct.**

22      Q.      Now, is it your belief that the name list,

23   as of September of 2016, was Eagle Forum property?

24      **A.      Yeah.  Yes.**

1       Q.     Why do you believe that?

2       **A.**     **Because how the -- in the way that they**

3 **were compiled and gathered, the names, Eagle Forum**

4 **always paid for the mailings, as far as I know -- as far**

5 **as I know.**

6       Q.     Do you know or do you assume?

7       **A.**     **Pretty sure I know.**

8       Q.     Based on what?

9       **A.**     **Based on what I heard throughout the**

10 **years.**

11      Q.     Okay.  What have you heard throughout the

12 years that informs your answer in this regard?

13      **A.**     **That Eagle Forum paid for the -- for the**

14 **mailings.**

15      Q.     Okay.  So you believe -- it's your

16 belief --

17      **A.**     **Uh-huh.**

18      Q.     -- that because Eagle Forum paid for the

19 mailing, this name list that you've already -- that

20 you've described today was Eagle Forum property?

21      **A.**     **Yes.**

22      Q.     Is there any other reason you believe this

23 name list was Eagle Forum property?

24      **A.**     **If you paid for an item, I think that's**

1 **yours.**

2      Q.      So is there any other reason?

3      **A.      I mean, whenever we presented ourself as**

4 **Eagle Forum, whenever I answered the phone for 26 years,**

5 **I answered it Eagle Forum.  Whenever the checks came in,**

6 **they were made out to Eagle Forum, sometimes another**

7 **entity, but majority Eagle Forum.  So that's why I think**

8 **that.**

9      Q.      Okay.  And when checks came in for

10 organizations or entities other than Eagle Forum, that

11 donation was listed in this name list; correct?

12      **A.      It would be coded in a different way.**

13      Q.      Okay.  So the name list served to record

14 information for entities other than Eagle Forum;

15 correct?

16      **A.      Yes.**

17      Q.      While you were working at State Street,

18 did you ever have any discussion with anyone as to

19 whether the name list was Eagle Forum property or

20 Phyllis Schlafly's property?

21      **A.      No, I did not.  No.**

22      Q.      Did anyone ever indicate to you in writing

23 or in spoken words that the name list was Phyllis

24 Schlafly's property?

1      **A.      While I was working at State Street?**

2      Q.      Yes.

3      **A.      No.  I don't think so.**

4      Q.      In fact, the subject never came up; is

5   that true?

6      **A.      True.**

7      Q.      Okay.  Let's talk about the mechanics of

8   maintaining that mailing list or the name list.  I'm

9   sorry.  As of the beginning of October 2016, where was

10  this name list stored?

11     **A.      It was stored -- the main one was stored**

12  **on JoAnn Jouett's computer, but there was also cloud**

13  **backup, and I had it on the computer.  I had two**

14  **computers in my room.  It sat on the computer -- it was**

15  **in the computer behind me, and I had a copy at home.**

16     Q.      Okay.  All right.  I've got to make some

17  notes to follow along here.  So when you say the main

18  copy was on JoAnn Jouett's computer --

19     **A.      Right, the most recent.**

20     Q.      -- was there a server that stored -- in

21  the office that stored the information on her computer?

22     **A.      It was just a desktop.**

23     Q.      So it was on the local drive?

24     **A.      Uh-huh.**

1    Q.    Is that a yes, uh-huh?

2    **A.    Yes.  Yes.**

3    Q.    But it was a backup to the cloud?

4    **A.    It was backed up to the cloud.**

5    Q.    How often was it backed up?

6    **A.    Immediately, I think.**

7    Q.    So it wasn't like a nightly backup?

8    **A.    Immediately.**

9    Q.    It was synced to the cloud?

10   **A.    Yes.**

11   Q.    In real time?

12   **A.    Yes.**

13   Q.    And let me go over your last answers.  You

14   had a copy on the computer in your personal office at

15   State Street?

16   **A.    Yes.**

17   Q.    On the local drive on that computer?

18   **A.    Yes.**

19   Q.    How often was that copy synced with what

20   was on JoAnn's computer in the cloud?

21   **A.    Oh, probably whenever we would do a**

22   **mailer, because I would do the AccuZIP maybe less.**

23   **AccuZIP is something that -- it's a mailing program that**

24   **adds or configures the postage, and then it sends it out**

Page 61

1   -- **the addresses out to USPS. And then they correct --**

2   **correct it with address corrections.**

3           Q.      Okay. So whenever -- you said whenever --

4   however you did a mailing, when you did a mailing, there

5   was some kind of syncing between your copy of the name

6   list and what was on the main computer?

7           A.      **Most times, yes.**

8           Q.      And was that monthly, weekly or did it

9   vary?

10          A.      **It varied, whenever -- whenever we did a**

11  **mailing.**

12          Q.      Now, how about the copy that was on your

13  home computer?

14          A.      **I had that for years, because whenever I**

15  **did Council, it -- there was IDs in the first field, and**

16  **I wanted to match them up precisely with the people that**

17  **were registering for Eagle Council.**

18          Q.      Regardless of why you did that, I'm not

19  asking you questions about that.

20          A.      **Okay.**

21          Q.      How did you sync what was on your home

22  computer with what was on your office computer with

23  respect to this name list?

24          A.      **Well, I didn't do it very often.**

1        Q.      Did you have to manually sync it?

2        **A.      Yes.  Yes.  Yeah.**

3        Q.      Okay.  And is your home computer a laptop

4    or a desktop?

5        **A.      Laptop.**

6        Q.      Okay.  Did you bring that laptop into the

7    office?

8        **A.      A few times.**

9        Q.      Okay.  But that wasn't a regular part of

10   what you did?

11       **A.      No.**

12       Q.      Okay.  So as of the beginning of October

13   2016, how current was the version of the name list that

14   was on your personal laptop?

15       **A.      Probably the end of September.**

16       Q.      So pretty current?

17       **A.      Yeah, pretty current.**

18       Q.      And same for the desktop in your office?

19       **A.      Yeah, pretty -- I would say pretty**

20   **current.  Yeah.**

21       Q.      Now, what type of -- how did you log in to

22   the name list?  What did you have to do?

23       **A.      You're taking me back to DOS now.**

24       Q.      Well, let me clarify the question.  I'm

1  not talking about when you first started working with it

2  whenever that was in the 1990s.  Let's go to the end of

3  your -- near the end of your tenure.  Let's say

4  September, October 2016.  How did you log in when you

5  were in your office?

6         **A.**     **Type in P dox and it would pop up.**

7         Q.     Did you have any credentials you had to

8  input?

9         **A.**     **No.**

10        Q.     No password?

11        **A.**     **No.**

12        Q.     Do you know -- and I don't want you to

13 speculate.  Do you know whether John Schlafly knew that

14 you had a copy of the name list on your personal laptop

15 that you kept generally at your house?

16        **A.**     **I believe he did.**

17        Q.     Okay.  What's the basis for your belief?

18        **A.**     **Well, we chatted all the time, and he**

19 **would ask me whenever he would know I was at home, you**

20 **know, well, what is this person, did they donate.  Well,**

21 **how would I know that, unless I had that information**

22 **with me?**

23        Q.     Okay.  So there was -- there was nothing

24 secret on your part about it?

1      **A.**     **No.**

2      Q.     Now, did you have -- when you were working

3 at home, did you have the ability to log into this

4 computer system at the State Street office?

5      **A.**     **No.  I had access to -- I mean, I could**

6 **have logged into the -- oh, the cloud backup.**

7      Q.     Okay.  And was there -- what type of

8 credentials, if any, were required to do that?

9      **A.**     **Just a password.**

10     Q.     You had the password?

11     **A.**     **Uh-huh.**

12     Q.     Yes, uh-huh?

13     **A.**     **Yes.  Yes.**

14     Q.     Did anybody else in the office have that

15 password?

16     **A.**     **To my computer, no.  To JoAnn's computer,**

17 **I don't know if she had that or not.**

18     Q.     Well, you said you could log into the

19 cloud from your home.

20     **A.**     **Right.**

21     Q.     When you logged into the cloud, what did

22 that give you access to?

23     **A.**     **To my computer.**

24     Q.     To your desk computer at work?

1      A.      Right.

2      Q.      That was a desktop?

3      A.      Right.

4      Q.      Okay.

5      A.      Uh-huh.

6      Q.      Once you were on that computer, it's as if

7   you were sitting there; right?  Or were there some

8   things you couldn't get into?

9      A.      Well, you could get into -- like, it would

10   say, you know, like download, and you could download a

11   particular file.

12      Q.      For example, if you didn't have a copy of

13   the name list on your -- saved on your personal laptop

14   at home, could you remotely access your office desktop

15   from home and log into the name list that way?

16      A.      If I downloaded it and -- and --

17      Q.      And then opened it?

18      A.      Opened it, yes.  Yes.

19      Q.      Do you still have that laptop?

20      A.      Yes.

21      Q.      Okay.  Do you use it in your current

22   position at Eagle Forum?

23      A.      No.

24      Q.      Do you have access to the name list in

1  your current position at Eagle Forum?

2          MR. SANDERS:  I'm going to object to form.

3  I think it's vague and ambiguous.

4          Q.    (BY MR. SKIGEN)  You can answer.

5          MR. SANDERS:  Go ahead and answer, if you

6  can.

7          **A.    Okay.  Some parts of it.  Some parts of**

8  **it.**

9          Q.    (BY MR. SKIGEN)  Okay.  How is it that you

10  only have access to some parts of it but not all of it?

11          **A.    Because the Eagle Forum lawyers said what**

12  **we could have.  John would not --**

13          MR. SANDERS:  I'm going to stop you.

14  Okay?  So you can tell him what you have access to, but

15  you can't talk to him about what we spoke about, what me

16  or someone from my firm instructed you or told you to do

17  as an Eagle Forum employee.

18          **A.    Oh, okay.  Well, can I have that question**

19  **again?**

20          MR. SANDERS:  Do you mind if we take a

21  second?  I want to get you the information, Wayne, that

22  you need, but I probably need to instruct her as to

23  where that line is, right, about --

24          MR. GRADY:  What's the question?

Page 67

```
 1                    THE WITNESS:  I don't know either.

 2                    MR. SKIGEN:  Can you read the last

 3      question back, because I don't think it's --

 4                    MR. SANDERS:  It's a good point.  It's a

 5      good point.

 6                    (Wherein the reporter read back the

 7                    previous question.)

 8                    MR. SANDERS:  Okay.  What I'm going to

 9      tell you is talk to him mechanically about how it works.

10      You can talk to him and answer any questions about that.

11      Just don't talk to him about any communications that we

12      had with you.  Okay?  So explain to him how it works.

13           A.      I have the list that was -- that was

14      defined as our Eagle Forum members.

15           Q.      (BY MR. SKIGEN)  Do you still have the --

16      you testified a little earlier that the name list that

17      was on your personal laptop --

18           A.      Uh-huh.

19           Q.      -- was current as of about the end of

20      September; do I recall that correctly?

21           A.      Yes.

22           Q.      Okay.  Do you still have the list as it

23      then existed?

24           A.      Yes.
```

Page 68

1          Q.      Okay.  Do you use that list in your
2    position at Eagle Forum?

3          **A.      No.**

4          Q.      Why not?

5          **A.      I don't --**

6                  MR. SANDERS:  Go ahead and answer.  Just
7    make sure it doesn't involve attorney-client
8    communications.

9          **A.      I don't have Paradox.  I don't have the**
10   **capability of DOS, of working in a DOS environment at my**
11   **work.**

12         Q.      (BY MR. SKIGEN)  Have you or anyone else
13   moved any of the data that was in that file that was
14   stored on your personal laptop to any other computer?

15         **A.      No.**

16         Q.      When you say you have parts of the name
17   list that you work with now in your position at Eagle
18   Forum, can you identify or describe what parts of the
19   name list you have?

20         **A.      I have the name, the address, the phone**
21   **number of the Eagle Forum members.**

22         Q.      Do you have any donation records or
23   history?

24         **A.      Where I work now?**

1     Q.    Yes.

2     **A.    I don't think so.**

3     Q.    You don't know?

4     **A.    I don't think so.**

5     Q.    Okay.  To the extent you have what you've

6 described as the names and addresses and other data

7 relating to Eagle Forum members that you currently work

8 with now, where did that data come from?

9     **A.    The name database.**

10    Q.    And what computer do you work with -- on

11 what computer do you work with it now?

12    **A.    On my computer at my office.**

13    Q.    It's a desktop?

14    **A.    Yes.**

15    Q.    What kind?

16    **A.    I don't know.**

17    Q.    Okay.  How --

18    **A.    A Dell, I think.**

19    MR. SANDERS:  Now you're talking over her,

20 Wayne.  Let her answer the question.  Okay.  I know

21 you're trying to use your time.

22    Q.    (BY MR. SKIGEN)  Okay.  Whatever kind it

23 was, it doesn't matter.  How did the data get to be on

24 that compute?

1              MR. SANDERS:  Objection to the form.

2    Vague and ambiguous as to the data.

3         Q.    (BY MR. SKIGEN)  The data you've just

4    described, the Eagle Forum names.

5              MR. SANDERS:  Go ahead and answer.

6         Q.    (BY MR. SKIGEN)  Mr. Sanders isn't going

7    to answer the question for you.

8         **A.    No.  I'm just -- I mean --**

9              MR. SANDERS:  If you don't understand the

10   question, ask him to clarify.

11        **A.    Okay.  I don't understand -- I don't**

12   **understand how -- can we take a break.**

13        Q.    (BY MR. SKIGEN)  No, not while the

14   question is pending.  I'll clarify -- if you don't

15   understand the question, I'll clarify it.  Do you

16   understand the question?

17        **A.    Yeah.  I understand the question.  I don't**

18   **know if I can answer it.  That's what I don't**

19   **understand.**

20        Q.    I'm not asking you to tell me anything --

21             MR. SANDERS:  Now there's not a pending

22   question.  We're going to take a break for a second.  I

23   want to speak with my client.  You got an answer to your

24   question.  There's not a question pending, Wayne.

1          MR. SKIGEN:  She said she understands the

2     question, and she hasn't answered it.

3          MR. SANDERS:  She provided you an answer.

4     We're going to go off the record for a second.  If you

5     want to certify it and ask her the exact same question,

6     you certainly can.

7          MR. SKIGEN:  Okay.  We're off the record.

8          (Wherein a recess was taken.)

9          MR. SKIGEN:  Back on.

10     Q.    (BY MR. SKIGEN)  Can you read the last

11     question back -- or no, I'm going to ask it again.

12          How did what you've described as part of

13     the name list come to reside on the computer you used in

14     your current position at Eagle Forum?

15     **A.    I got it through the online backup.**

16     Q.    And that's in the cloud?

17     **A.    Right.**

18     Q.    How did you do that, mechanically?

19     **A.    With the assistance of SpearTip.**

20     Q.    What's SpearTip?

21     **A.    It's --**

22          MR. SANDERS:  Go ahead and answer.

23     **A.    It's like -- as I understand it, it's a**

24     **safe place to put important information, and that's how**

 1    **I got it.**

 2         Q.    (BY MR. SKIGEN)  So that's a program or

 3    a --

 4         **A.    It's a company.**

 5         Q.    Okay.  Did you work with any technicians

 6    from SpearTip or you just --

 7         **A.    I mean, I talked to a guy.**

 8         Q.    Okay.  And when you accessed the cloud to

 9    get this data was this the same cloud storage location

10    to which you saved things when you were working -- to

11    which data was saved when you were working at State

12    Street?

13         **A.    Yes.**

14         Q.    So did you need log-in credentials to get

15    into that cloud-based storage?

16         **A.    Yes.**

17         Q.    And is it -- were they the same

18    credentials that you used when you were at State Street?

19         **A.    Yes.**

20         Q.    And you used them to get into this

21    cloud-based storage when you were working at Third

22    Street?

23         **A.    Yes.**

24              MR. SANDERS:  Wayne, Third Street or State

1　Street?

2　　　　Q.　　(BY MR. SKIGEN)　Third Street.　That's

3　where you work now?

4　　　　**A.　　Yeah.　That's where I work now.**

5　　　　MR. SANDERS:　Okay.

6　　　　**A.　　That's what I thought.**

7　　　　Q.　　(BY MR. SKIGEN)　She's keeping up.

8　　　　MR. SANDERS:　You and I aren't, but she

9　is.

10　　　　**A.　　No, maybe I'm not.**

11　　　　Q.　　(BY MR. SKIGEN)　And the data that was

12　stored in the cloud that you've been able to access in

13　your current position using the credentials you used and

14　you had when you worked at State Street, does the data

15　include donation records or donation history?

16　　　　**A.　　For the Eagle Forum members, yes.**

17　　　　Q.　　Okay.　So you have that donation history.

18　You have access to it?

19　　　　**A.　　I don't think I have it.　I think it got**

20　**-- kind of like wept wacko.　I mean, I haven't been in**

21　**Paradox for three years.**

22　　　　Q.　　Well, let's clarify here.　I'm asking you

23　what you've -- what you're able to access in your

24　current position.

1    **A.    Oh, okay.  Names, addresses.**

2    Q.    You testified earlier that the name list,

3    in its entirety, was backed up to the cloud storage;

4    correct?

5    **A.    Right.**

6    Q.    Does that have a name or should I just

7    keep calling it cloud storage?

8    **A.    You know what?  I forgot it.  I mean, it**

9    **-- cloud --**

10   Q.    Well, if we refer to it as the cloud --

11   that's not CrashPlan, is it?

12   **A.    Yeah, but I think they don't provide it**

13   **anymore.**

14   Q.    Okay.  Let's just call --

15   **A.    CrashPlan, I think that's -- you're right.**

16   Q.    Regardless, this cloud storage that you

17   are able to access, wasn't the donation history that was

18   compiled when you worked at State Street stored and

19   backed up to that cloud storage?

20   **A.    Yes, it was, but it was in a different**

21   **table.**

22   Q.    Okay.  You don't have -- are you saying

23   you don't have access to that table now?

24   **A.    I -- I don't know if -- if -- I don't**

1  regularly look at it.  I don't know.

2       Q.     So you don't know one way or the other?

3       A.     Yeah.  I don't know.

4       Q.     Okay.  Do you know one way or the other

5  whether this cloud storage, to which you currently have

6  access, also includes the data such as names and

7  addresses for individuals who -- other than members of

8  Eagle Forum?

9            MR. SANDERS:  Objection to form.  I think

10  it misstates prior testimony.  I believe she testified

11  that she didn't know whether she currently has access to

12  it.  But to that extent, go ahead and answer his

13  question.

14       A.     Okay.  First of all, I don't have

15  currently have access to the cloud storage.

16       Q.     (BY MR. SKIGEN)  My understanding was you

17  testified that you have the credentials that you use at

18  -- in your capacity, your current capacity, working at

19  Third Street to access the cloud storage.

20       A.     In October.  Not now.

21            MR. SANDERS:  October of what year?

22       A.     October 2016.

23       Q.     (BY MR. SKIGEN)  Well, in October, you

24  weren't working in Third Street, were you?

1      A.      Well, yeah.  Yes.

2      Q.      I thought you didn't start working until

3 November of 2016.

4      A.      Okay.  Okay.  Now I'm not keeping up with

5 you.  I'm talking about -- okay.  Your -- okay.  Re-ask

6 the question.

7      Q.      Okay.  In your current position working on

8 West Third Street for Eagle Forum, do you have access to

9 the cloud-based storage of the data that was previously

10 compiled when you worked at State Street?

11      A.      No.  I don't have access to all of the

12 that information, because they changed the password.

13 They meaning the State Street.

14      Q.      Okay.  Do you have access to any of that

15 data?

16              MR. SANDERS:  Via the cloud?  At all?

17      Q.      (BY MR. SKIGEN)  In any manner.

18      A.      Okay.  I would have access if I -- if my

19 computer still works, my DOS-based computer at home on

20 my laptop.  That's all I can say.  I don't know if it

21 works.

22      Q.      Has anybody made any effort to extract or

23 move or copy any of the information on that personal

24 laptop that pertains to the name list?

1      **A.      No.  I mean, everything was on the backup**

2  **in the cloud.**

3      Q.      Okay.  So the question -- the answer to my

4  question is no, nobody has made any effort to copy or

5  extract any of the name list data that's on your

6  personal laptop?

7      **A.      No.**

8      Q.      Okay.  So right now, as of now, as far as

9  you know, that data is still on your laptop, but no one

10  has taken it from there or copied it from there?

11      **A.      Right.  I have several laptops at home,**

12  **and this is a very, very old one.  It's like this big.**

13      Q.      And that -- but the data that we're

14  talking about, the name list is only stored on one of

15  those laptops; right?

16      **A.      Oh, right.  Right.**

17      Q.      So set aside the other laptops.  Now, at

18  any time since November, the beginning of November 2016,

19  or whenever it was you went to work for Eagle Forum on

20  Third Street in Alton, have you or anyone else made any

21  effort, to your knowledge, to extract any of the data

22  that was cloud stored that represented the name list?

23            MR. SANDERS:  Objection to form.  Calls

24  for speculation.  Go ahead and answer.

1      **A.      I don't -- I don't understand what you're**
2  **saying.  Are you saying from the cloud?**
3      Q.      (BY MR. SKIGEN)  Yes.
4              MR. SANDERS:  Same objection.
5      Q.      (BY MR. SKIGEN)  Have you tried to log
6  into that cloud-based storage to get the name list data?
7              MR. SANDERS:  That's a different question.
8      **A.      Okay.  I'm not -- I'm not understanding.**
9      Q.      (BY MR. SKIGEN)  Since you began to work
10  at Third Street in November of 2016, have you or anyone
11  else, to your knowledge, made any effort to log into
12  that cloud-based storage that contained the name list?
13              MR. SANDERS:  Same objection.
14      **A.      No.  They changed the password.**
15      Q.      (BY MR. SKIGEN)  Okay.  I'm just asking
16  yes or no, did you try to --
17      **A.      Okay.  No.**
18      Q.      Okay.  How do you know they changed the
19  password?
20      **A.      Because I -- hmmm.  I seen a note or**
21  **something.  I don't know.  I just think they did.  I**
22  **didn't do it.  I mean, I say no.**
23      Q.      So you didn't try to get in but found out
24  you were locked out because you didn't know the current

1  credentials?

2       **A.      SpearTip made, pulled it from the cloud in**

3  **probably -- I don't know -- October or -- I don't know**

4  **when -- when they tried.  I don't know when they tried.**

5  **And that's it.  I mean, and I got all my information**

6  **from SpearTip.**

7       Q.      So SpearTip pulled some data from this

8  cloud storage in what you believe was October of 2016?

9       **A.      I don't know if it was October or**

10  **November.  I don't know.**

11       Q.      For instance, do you know whether you had

12  started to work at Third Street when it --

13       **A.      Oh, no.  I hadn't.**

14       Q.      Okay.  Well, how did the data that

15  SpearTip pulled become available on any computer you

16  used at Third Street?

17       **A.      Because I know what is Eagle Forum**

18  **property, material.**

19       Q.      My question is:  Do you know how that --

20  like, how do you access that data now, that Eagle Forum

21  name list?  If you're at your desk in Third Street, how

22  do you access it?

23       **A.      With my computer.**

24       Q.      Okay.  What do you do to get to the name

Page 80

1  list?

2      **A.**    **I type in a password and it pops open.**

3      Q.    Okay.  And how many names are on that name

4  list now?

5      **A.**    **Probably about 20,000.**

6      Q.    Okay.  That includes addresses?

7      **A.**    **Right.**

8      Q.    And is that data available on your

9  computer because of something SpearTip did?  Is that

10  your belief?

11      **A.**    **There's a lot -- many new people that -- I**

12  **mean, that's not all from State Street.**

13      Q.    It's not all old data.  Some of it's new

14  data?

15      **A.**    **Huh-uh.  Yeah, it's new.  Yeah.**

16      Q.    But it includes some of the data from the

17  State Street days?

18      **A.**    **Sure.  Yes.**

19      Q.    Were you the person who dealt directly

20  with SpearTip?

21      **A.**    **Yes.**

22      Q.    On whose behalf were you communicating

23  with SpearTip?

24      **A.**    **What do you mean?  Eagle Forum, I guess.**

1    Q.    Were you still working at State Street?

2    **A.    Nope.**

3    Q.    Where were you working?

4    **A.    I wasn't working anywhere.**

5    Q.    So why were you communicating with

6    SpearTip?

7    **A.    Because I wanted to make sure that it got**

8    **into the proper hands.**

9    Q.    What's the proper hands?

10    **A.    Whether it be John, Ed, Anne, whoever.**

11    Q.    What did you tell them?

12    MR. SANDERS:  Objection.  Form.  Vague and

13    ambiguous as to "them."

14    Q.    (BY MR. SKIGEN)  SpearTip.

15    **A.    You know what?  I -- I don't know.**

16    Q.    Well, you were concerned that the data

17    wind up where it belonged; right?

18    **A.    Right, because of my conversation with**

19    **Roger Schlafly.**

20    Q.    And to try to ensure that the data wound

21    up in the proper place, did you give any instructions to

22    SpearTip?

23    **A.    I gave them my password.**

24    Q.    And did you tell them where to send the

1  data when they accessed it?

2      A.      No.  They kept it for a long time.

3      Q.      What's a long time?

4      A.      I don't know.  Probably for a month.

5      Q.      By the time way -- so they kept it until

6  you started to work on the Third Street side?

7      A.      No.  They didn't give me all of it.  I --

8  I know my directories.  I created all the directories,

9  and I knew what parts were Eagle Forum.

10     Q.      So when you looked at these directories,

11 what were you accessing?

12     A.      Like, okay, for instance, if you're

13 concerned about the addresses, ballot -- ballot the

14 Paradox ballot table.  That's -- I mean, that was Eagle

15 Forum members, ballot.

16     Q.      Okay.  And was -- is the data still stored

17 in Paradox?

18     A.      No.

19     Q.      Is there a particular person you dealt

20 with at SpearTip?

21     A.      I don't -- I don't know if there was more

22 than one person, but there was a guy, but I don't know

23 his name.

24     Q.      Did you communicate with him online --

1        **A.     By phone.**

2        Q.     -- or by phone?

3        **A.     By phone.  And then I drove over there.**

4        Q.     Where is there?

5        **A.     To wherever SpearTip's located in**

6 **St. Louis.**

7        Q.     So they have an office in St. Louis?

8        **A.     Uh-huh.  Yes.**

9        Q.     So is it your testimony now that you have

10 -- the name list which you have access is no more than

11 about 20,000 names?

12              MR. SANDERS:  Well, hold on.  Objection to

13 form.  Misstates prior testimony.

14        Q.     (BY MR. SKIGEN)  Setting aside the couple

15 hundred thousand names that are on your personal laptop.

16              MR. SANDERS:  Go ahead and answer.

17        **A.     I was just going to say, I mean, a lot of**

18 **them are new.**

19        Q.     (BY MR. SKIGEN)  I understand that.  But

20 in toto, it's only about 20,000 names now?

21        **A.     Yeah.  Yes.  Yes.**

22        Q.     Have you discussed with anyone, other than

23 counsel, making an effort to extract the information

24 that's on your personal laptop?

1      **A.**     **No.**

2      Q.     In or about October of 2016, did you have

3 any discussions with Ann Cori about your access to the

4 name list?

5      **A.**     **In what time frame?**

6      Q.     In or about October of 2016.

7      **A.**     **I would say yes.**

8      Q.     What did you discuss?

9      **A.**     **After the October 20th, whatever that was.**

10     Q.     The temporary restraining order?

11     **A.**     **Right.**

12     Q.     TRO?

13     **A.**     **Yeah.**

14     Q.     You had a discussion on that subject with

15 Ms. Cori?

16     **A.**     **Well, it wasn't much, but I said I --**

17 **yeah, I have access.**

18     Q.     Tell me, as best you can recall, what you

19 and Anne Cori said on that subject?

20     **A.**     **I just said I have access.  I mean, I**

21 **don't think it was any big discussion.**

22     Q.     How did the subject come up?

23     **A.**     **I think I brought it up.**

24     Q.     Why?

1    **A.    I mean, because they were in charge of**
2 **Eagle Forum then.**

3    Q.    They being?

4    **A.    They being Anne Cori, Eunie Smith and the**
5 **gang of six.**

6    Q.    So you wanted Anne Cori and the rest of
7 the gang of six to know that you had access to the name
8 list?

9    **A.    Yeah.  I was going to -- I mean, I wanted,**
10 **you know, some legal way where I wasn't going to get in**
11 **trouble for them to have access to that information.**

12    Q.    What, if anything, did you do to provide
13 them with access to that information?

14    MR. SANDERS:  Other than what she's
15 already testified to?

16    **A.    Yeah, SpearTip.**

17    Q.    (BY MR. SKIGEN)  Anything else?

18    **A.    No.**

19    Q.    Did you tell Anne Cori, Eunie Smith or any
20 of the other gang members that you had that information
21 stored on your personal laptop?

22    MR. GREGG:  I'm going to object to the
23 question and gang members.

24    **A.    Oh, come on.  What was the question again?**

1      Q.      (BY MR. SKIGEN)  Did you tell Anne Cori,

2  Eunie Smith or any of the other women you've referred to

3  as being part of the gang of six that you had access to

4  the name list on your personal laptop?

5      **A.      Yeah.  That's what -- I mean, I -- I said**

6  **it.  I mean, I'm sure somebody knew, because I said it**

7  **in my Affidavit.**

8      Q.      Okay.  Did Anne Cori or Eunie Smith or any

9  of the other women ask you to do anything with it?

10      **A.      No.**

11      Q.      Did you have any discussions in that same

12  time frame, approximately October of 2016, with anybody

13  associated with Spencer Fane regarding your possession

14  of that data?

15      **A.      Other than my Affidavit?**

16      Q.      Other than what you wrote in your

17  Affidavit.

18      **A.      No.**

19      Q.      Did anybody at Spencer Fane ask you for

20  that data?

21      **A.      The name table data?**

22      Q.      Yeah, the name list.

23      **A.      No.**

24      Q.      Okay.  Did anybody from Spencer Fane --

1 and let's broaden the time frame -- October or November

2 of 2016 have any discussions with you about how you

3 might get the data off your laptop, the name list data?

4          **A.       No.**

5          Q.       After you began to work in November at the

6 Third Street location in Alton, did you have any further

7 discussions with Anne Cori or Eunie Smith about the name

8 list data that you possessed?

9          **A.       You mean on my computer at home?**

10          Q.       Yes.

11          **A.       I -- I don't think so.**

12          Q.       To your knowledge, did you -- well, did

13 you discuss with either Eunie or Anne Cori the efforts

14 to obtain the data off the cloud storage using SpearTip?

15          **A.       Did I discuss it?  Probably with Ann.**

16          Q.       Okay.  Do you recall any of those

17 discussions?

18          **A.       No.  I mean, it was just like, you know,**

19 **doing it, and, I mean, it wasn't long, drawn out**

20 **discussion.**

21          Q.       Okay.  Changing gears.  In your capacity

22 in your job at State Street, were you the administrator

23 of email accounts?

24          **A.       Yeah.  Yes.**

1      Q.      Can you generally describe which email

2    accounts for which you were the administrator?

3           **A.      All of them for Eagle Forum.org, all of**

4    **them for rnclife.org.  I think that's the only two.**

5    **Yeah.  I think that's the only two that we had email**

6    **list -- I mean, email addresses, I think.**

7           Q.      So eagleforum.org was one of the domains

8    for which --

9           **A.      Uh-huh.**

10          Q.      -- which had a number of email addresses;

11   true?

12          **A.      Yes.**

13          Q.      That included all of the employees of

14   EFELD; correct?

15          **A.      Yes.**

16                  MR. GREGG:  Objection.  Calls for

17   speculation.

18          Q.      (BY MR. SKIGEN)  You're not speculating

19   about that.  You know that.  You were the administrator;

20   right?

21          **A.      Well, they worked over in the St. Louis**

22   **office.  I don't know.**

23          Q.      Okay.  Well, for instance, was -- did

24   you --

1      **A.      I don't know even know who I worked for,**

2   **so --**

3      Q.      Did was -- was Rebekah Gantner's email

4   account one over which you were the administrator?

5      **A.      Yes.**

6      Q.      Did you understand Rebekah Gantner was an

7   employee of EFELD?

8      **A.      She worked in the St. Louis office and**

9   **that was the education center.**

10      Q.      Okay.  So you were administrator for email

11   accounts for folks who worked in the St. Louis office?

12      **A.      Yes.**

13      Q.      That's the Clayton office on Bonhomme;

14   right?

15      **A.      Yes.**

16      Q.      Now, as the administrator, did you have

17   the ability to cut off or remove people's access to

18   email accounts?

19      **A.      Yes, but I never did.**

20      Q.      Never ever?

21      **A.      No.**

22      Q.      Okay.  How about after you stopped -- well

23   strike that.

24              How about after October 1, 2016, did you

1  ever eliminate anybody's access to their eagleforum.org

2  email account?

3    **A.    That was Roger Schlafly.**

4    Q.    I'm asking you whether you ever did it.

5    **A.    No.  I mean, I think there's proof that**

6  **Roger -- it was Roger Schlafly.**

7    Q.    I'm just asking you, ma'am, whether you

8  ever did it.

9    **A.    Okay.  No.**

10    Q.    Can you give me -- now, to exercise your

11  power as administrator of the email accounts for

12  eagleforum.org, did you have to have certain log-in

13  credentials?

14    **A.    Yes.**

15    Q.    Including a password?

16    **A.    Yes.**

17    Q.    Did anybody else, while you were still

18  working at State Street, have that password or those

19  passwords?

20    **A.    Nope.**

21    MR. SANDERS:  Objection to form.  Calls

22  for speculation.

23    Q.    (BY MR. SKIGEN)  As far as you know?

24    **A.    Not that I know of.**

1      Q.     Okay.

2             MR. SANDERS:  Slow down.

3      Q.     (BY MR. SKIGEN)  What other account

4  passwords did you have when you worked in that capacity?

5      **A.     I would say passwords for Cloudflare.**

6      Q.     Cloudflare?

7      **A.     Cloudflare.**

8      Q.     Okay.

9      **A.     Passwords for the web site to access the**

10  **web site, until Roger hacked into it.**

11     Q.     How about GoDaddy?

12     **A.     Go -- I don't think I was the only person,**

13  **but, yes, I -- I did have that, but I believe Ann**

14  **Bensman had GoDaddy, too, to pay the bills, I think.**

15     Q.     How HostMonster?

16     **A.     HostMonster, that's a web site.  Yes.**

17  **That's -- yeah.  I mean, I had a password.**

18     Q.     Do you think you were the only one?

19     **A.     Not on the -- the education side, the**

20  **St. Louis side.  I broke them in two and -- oh, wow.  I**

21  **don't even remember what I named it.  I mean, one was**

22  **eagleforum.info server, and then was a shared sharing**

23  **environment of web sites.  And that's what, like, Eagle**

24  **Forum collegians would be on.  I mean, I had the**

1  **password, but Ryan Hite did.  I don't know if anybody**

2  **else did or not.**

3        Q.    When you stopped working at State Street,

4  did you turn over any passwords to John or Ed or anybody

5  else?

6        **A.**    **No.**

7        Q.    Why not?

8        **A.**    **Because Roger already hacked into it and**

9  **locked me out.**

10       Q.    Well, when you say Roger hacked into it,

11 you mean the web site?

12       **A.**    **Roger Schlafly.  I mean, we're talking**

13 **about passwords, Cloudflare.  I don't know what else I**

14 **had.  I can't remember off the top of my head.  The**

15 **HostMonster.  There was a whole bunch of connections.**

16       Q.    But you didn't -- you didn't turn over any

17 passwords to anybody at the State Street office?

18       MR. SANDERS:  Objection.  Form.  Asked and

19 answered.

20       **A.**    **I turned over a password to Roger for**

21 **JoAnn Jouett's computer.**

22       Q.    (BY MR. SKIGEN)  Okay.  Is that the only

23 one you can recall turning over?

24       **A.**    **That's the only one I can recall.**

1     Q.    Did you think the passwords were your

2  personal property?

3     **A.    No.**

4          MR. SANDERS:  Objection to form.  Go

5  ahead.

6     **A.    No.  I did not.**

7     Q.    (BY MR. SKIGEN)  We'll talk a little bit

8  more about that in a bit.  Let me just ask you a side

9  question.  How did you prepare for this deposition, if

10  you prepared at all?  Did you meet with anybody other

11  than counsel?

12     **A.    No.  Didn't even meet.**

13     Q.    Did you -- is Mr. Sanders representing you

14  personally?

15          MR. SANDERS:  I am.

16     Q.    (BY MR. SKIGEN)  Did you talk to anybody

17  in anticipation of this deposition?

18     **A.    Only to say, hey, I'm going to be gone**

19  **today because I have to go to a deposition.  That's the**

20  **only thing I said.**

21     Q.    Did you review any documents?

22     **A.    No.**

23     Q.    Okay.  Did you look at anything online to

24  prepare for it?

1      **A.      No.**

2      Q.      Have you ever reviewed the transcript of

3   the deposition you gave in the St. Louis County probate

4   case?

5      **A.      Have I ever reviewed it?**

6      Q.      Yeah.

7      **A.      No.**

8      Q.      By review, read, looked at it?

9      **A.      Nope.  I mean, yeah, no.**

10     Q.      I mean, yeah, no.  I mean, is it --

11     **A.      No.  I mean --**

12     Q.      No?

13     **A.      -- I have not.**

14     Q.      Okay.  Is it fair to say that by October

15  -- by the end of October 2016, you allied yourself with

16  Anne Cori's side of this lawsuit?

17             MR. SANDERS:  Objection to form.  Vague.

18  Ambiguous.  Argumentative.

19             MR. GREGG:  I join.

20             MR. SANDERS:  Calls for speculation.

21     Q.      (BY MR. SKIGEN)  You can answer.

22     **A.      Okay.  Can I have the question again?**

23             MR. SKIGEN:  Sure.  Read it back.

24             (Wherein the reporter read back the

Page 95

1          previous question.)

2          MR. SANDERS:  Same objection.

3     **A.     Well, I mean, the lawsuit, as a whole, I**

4  **don't know much about it.  Yes, I -- I did go with Anne.**

5     Q.     (BY MR. SKIGEN)  Okay.  You talked -- you

6  spoke voluntarily with her attorneys at Spencer Fane;

7  correct?

8     **A.     Yes.**

9     Q.     You expressed hope to Anne Cori that

10 things were going well for her in the lawsuit; correct?

11    **A.     I don't know if I verbally said that or**

12 **not.**

13    Q.     Did you ever say it in writing?

14    **A.     I don't think so.**

15    Q.     Okay.

16    **A.     Are you going to pull out an email on me?**

17 **I don't know.**

18    Q.     So you may have?

19         MR. GRADY:  That's how attorneys handle

20 that.  Yes.

21    **A.     I don't know.**

22         MR. GRADY:  That's a normal operating

23 procedure.

24    Q.     (BY MR. SKIGEN)  Obviously, this isn't

1   your first rodeo.

2          MR. GREGG:  I'll object, after the fact,

3   that in October of 2016, I believe, the record reflects

4   that Ms. Miller was served with a subpoena by Spencer

5   Fane.

6          MR. SKIGEN:  I'm not sure what the point

7   of that is, but okay.

8          MR. GREGG:  Okay.  Misstates facts in

9   record.  Objection.

10          MR. SKIGEN:  Can you mark that as --

11          MR. SANDERS:  Also, there's no pending

12   question.

13          MR. SKIGEN:  Yeah.  There's no question.

14   We're marking an exhibit.

15          THE WITNESS:  Okay.  Does that mean I can

16   -- we can take a break?  No, I don't want to take a

17   break.  Let's get this over with.

18          MR. SKIGEN:  We'll be at breaking point in

19   about two seconds.

20          MR. SANDERS:  Well, we're there then.

21          MR. SKIGEN:  Well, Two minutes.  Two

22   minutes.  I hyperbolize.

23          (Defendants' Exhibit 134 was marked for

24          identification.)

1       Q.    (BY MR. SKIGEN)  Take a look at what we've

2  marked as 134, please, ma'am.

3       **A.    Well, I don't know what --**

4       Q.    I haven't asked you a question yet.  All

5  right?

6               Is one of your email addresses

7  diznut@gmail.com?

8       **A.    Yes, diznut.**

9       Q.    And is Exhibit 134 an email exchange

10  between Anne Cori and you on October 24, 2016?

11       **A.    Yes.**

12       Q.    And at 9:51, you got an email from Anne

13  saying, the more Roger writes, the better for our case?

14       **A.    Yes.**

15       Q.    And you responded, I hope so?

16       **A.    No.**

17       Q.    No, you didn't?

18       **A.    I don't -- well, I don't know.  Am I read**

19  **-- am I supposed to read it backwards?  I can't**

20  **remember.  But I don't know what the hope -- the I hope**

21  **so is.  That's from her and that's my response?**

22          MR. SANDERS:  Yeah.  That's how it works.

23       **A.    Okay.  Then yes, I did.**

24       Q.    (BY MR. SKIGEN)  So you were expressing

1  you hope things are better for her case; correct?

2  **A.    Yes.**

3  Q.    Okay.

4  **A.    Sorry.  I didn't remember this that I**

5  **wrote three years ago.**

6  Q.    That's okay.  We know now.

7  **A.    Yes.**

8  MR. SKIGEN:  Now, did you need to take a

9  break?

10  MR. SANDERS:  That's up to the witness.

11  THE WITNESS:  No.  That's okay.  I've got

12  it.

13  Q.    (BY MR. SKIGEN)  At some point, you

14  executed an Affidavit in connection with this lawsuit;

15  correct?

16  **A.    Uh-huh.**

17  Q.    Is that a "yes," uh-huh?

18  **A.    Yes.  Yes.**

19  Q.    Do you recall that you executed it on or

20  about October 4, 2016?

21  **A.    Yes.**

22  Q.    Is that about the right time frame?

23  **A.    I guess.  Yes.**

24  Q.    Okay.  You were still working at State

Page 99

1   Street; right?

2          **A.      Yes.**

3          Q.      Okay.  And you worked -- the Affidavit was

4   physically prepared by lawyers at Spencer Fane; correct?

5          **A.      In my words, yes.**

6          Q.      Okay.  But I mean, I'm talking about the

7   physical creation --

8          **A.      Yes.**

9          Q.      -- of it --

10         **A.      Yes.**

11         Q.      -- came from Spencer Fane; right?

12         **A.      Yes.**

13         Q.      Did anybody ask you to prepare an

14  Affidavit?

15         **A.      Well, I was subpoenaed.**

16         Q.      You were subpoenaed to give a deposition;

17  correct?

18         **A.      Right.**

19         Q.      So how did it come about that you gave

20  an --

21         **A.      An Affidavit.**

22         Q.      -- that you executed an Affidavit?

23         **A.      I believe that as myself and Anne Cori**

24  **were talking, she suggested maybe this was an easier way**

1   **around it.  She didn't pressure me at all or anything**

2   **like that.  I wanted it to be in my own words.**

3          Q.     You were -- you had been personally served

4   with a subpoena for deposition; is that right?

5          **A.     Yes, at my house.**

6          Q.     Uh-huh.  You understood that subpoena had

7   been issued by Anne Cori's lawyers?

8          **A.     I don't remember.**

9          Q.     Okay.  Then how did -- did you approach

10  Anne about the subpoena or did she approach you?

11         **A.     You know what?  I don't remember if I**

12  **brought it up.  I don't know.**

13         Q.     Okay.  But do you remember whether this

14  was a phone conversation or in-person conversation or

15  email correspondence?

16         **A.     Phone.  I would say phone.**

17         Q.     Okay.  You understood that Ann was aware

18  you had been subpoenaed for deposition?

19                MR. GREGG:  Objection.  Calls for

20  speculation.

21         Q.     (BY MR. SKIGEN)  Strike that.

22                Did you understand that Ms. Cori was aware

23  you had been subpoenaed or you didn't know?

24         **A.     I don't -- I didn't know.**

1          Q.      But, ultimately, Ms. Cori suggested an

2     easier way may be for you to give an Affidavit?

3          **A.      That's not her exact words.  I'm sure I'm**

4     **butchering it but --**

5          Q.      That was the message?

6          **A.      That's the message I got.**

7          Q.      Did you do anything to determine whether

8     an Affidavit was an available option to you?  I mean,

9     just Anne said maybe you can give an Affidavit.  How did

10    you follow up on that?

11         **A.      I Googled it.**

12         Q.      What did you Google?

13         **A.      Affidavit.**

14         Q.      Okay.  What did Google inform you?

15         **A.      Well, I don't know precisely what it did,**

16    **but it said -- you know, I Googled subpoena, Affidavit**

17    **and deposition, and I thought it was just a better way**

18    **to say exactly what I wanted to say in an Affidavit.**

19         Q.      So what did you do next to make that

20    happen?

21         **A.      I called Ann back.**

22         Q.      What did you tell her?

23         **A.      I said, well, I guess, you know, if you**

24    **can set up an Affidavit -- I don't know exactly what I**

1  said.

2        Q.     To the best of your recollection, what

3  happened next?

4        A.     **I had a meeting with the people at Spencer**

5  **Fane.**

6        Q.     Who were those people?  Was it more than

7  one?

8        A.     **I mean, more than one person came in and**

9  **out of the room.**

10        Q.     Did you meet with Mr. --

11        A.     **Probably Arthur and Erik.  That's the only**

12  **two I remember precisely.**

13        Q.     Did you meet a woman attorney also?

14        A.     **I don't know.  I might have.**

15        Q.     All right.  And what did you discuss with

16  Arthur and/or Eric?

17        A.     **I just told them.**

18        Q.     Told them what?

19        A.     **Told what my Affidavit said.**

20        Q.     Did you bring in anything in writing to

21  them as like a draft of an Affidavit?

22        A.     **No.  We just, you know, just like talked**

23  **it over.**

24        Q.     So you relayed verbally what you thought

1  should be in it, and they had it transcribed in some

2  fashion?

3  **A.     Yes.  There was many changes.**

4  Q.     Oh, here were?  Do you have any of the

5  earlier drafts?

6  **A.     No.  It was just like -- well, if you know**

7  **me -- John does -- you know that I want -- I want it in**

8  **my words.**

9  Q.     Okay.  So mechanically or physically, how

10  was this done?  You told them what you thought it should

11  say and Arthur or Erik took notes and then prepared a

12  draft and gave it to for review?

13  **A.     Yes.  Yes.**

14  Q.     Would you make changes by editing them

15  physically with a pen or would you just tell them what

16  was -- what you wanted changed?

17  **A.     I would tell them verbally, yes.**

18  Q.     And then you'd get -- was this all done in

19  one day?

20  **A.     Yes.**

21  Q.     They would go prepare a draft, show it to

22  you and then you would make your comments on it?

23  **A.     Yeah.**

24  Q.     And did you sign it that very day?

1          **A.      Yes.**

2                   MR. SKIGEN:  Where are we at time-wise?

3                   MR. SANDERS:  Fifty minutes.

4                   MR. SKIGEN:  Fifty minutes left?

5                   MR. SANDERS:  Yeah.

6                   (Defendants' Exhibit 135 was marked for

7                   identification.)

8          Q.      (BY MR. SKIGEN)  What we've marked as

9   Exhibit 135 is a document entitled Affidavit of

10  Elizabeth A. Miller.  Do you need to look through it?

11         **A.      No.  I think I know what it says.**

12         Q.      Okay.  Well, the first question is:  If

13  you turn to Page 6, could you verify that that's your

14  signature at the -- after the -- after Paragraph 43?

15         **A.      Yes.  That's my signature.**

16         Q.      Is this the Affidavit that was prepared at

17  Spencer Fane's office on the occasion you just described

18  for me?

19         **A.      Yes.**

20         Q.      Was Anne Cori there during your meeting

21  with the Spencer Fane lawyers on the day -- on the day

22  this Affidavit was prepared?

23         **A.      Yes.**

24         Q.      Was anybody else besides Ann and the

Page 105

1   Spencer Fane lawyers and yourself present?

2        **A.      My husband.  I don't drive in St. Louis.**

3        Q.      I am aware of that.  Anybody else?

4        **A.      There was a lot of people in and out, so I**

5   **don't know.**

6        Q.      Okay.  Nobody else other than perhaps

7   Spencer Fane personnel that you can recall?

8        **A.      Right.  Right.**

9        Q.      Okay.  Did anybody else suggest any

10  language for inclusion in the Affidavit other than

11  yourself?

12       **A.      No.**

13       Q.      Did anybody suggest any changes to your

14  language?

15       **A.      No.**

16       Q.      You did not have a lawyer as of this time;

17  correct?

18       **A.      Correct.**

19       Q.      Okay.  Let's -- I have a question about a

20  few items in your Affidavit, so we'll go through

21  item-by-item.

22              MR. SANDERS:  Hey, Wayne, can we take a

23  break real quick to use the restroom?

24              MR. SKIGEN:  Sure.  Yeah.

1     (Wherein a recess was taken.)

2     Q.     (BY MR. SKIGEN)  Going back to the name

3   list and that subject, when -- I think you said

4   something to the effect that the preponderance of the

5   donation information you had collected while at State

6   Street pertained to Eagle Forum; did I remember that

7   correctly, as opposed to any other entity?

8     **A.     Yes.**

9     Q.     Okay.  Are you equating Eagle Forum with

10   Eagle Forum Education Legal Defense Fund?

11     **A.     No.**

12     Q.     Is it your testimony that more donations

13   came in for Eagle Forum than for EFELD, to your

14   knowledge?

15     **A.     Well, I didn't actually input the data,**

16   **but I sure seen a lot of checks that said Eagle Forum,**

17   **period.**

18     Q.     But you're -- you don't know whether any

19   of those were intended for Eagle Forum Education and

20   Legal Defense Fund based on other information that came

21   with the checks; correct?

22     **A.     Correct, but a bank would say you deposit**

23   **where it says, the check says.**

24     Q.     Okay.  You have Exhibit 135, the

1  Affidavit, in front of you?

2      **A.    Yes.  Uh-huh.**

3      Q.    At the time you went to Spencer -- at or

4  about the time you went to Spencer Fane to work on this

5  Affidavit, did you tell John Schlafly that you were

6  doing so?

7      **A.    No.**

8      Q.    Was he your boss at the time?

9      **A.    Yes.**

10     Q.    Okay.  Why didn't you tell him?

11     **A.    I, well, really didn't want to get in the**

12  **middle with it, and he was upset with me anyway.**

13     Q.    When you say you didn't want to get in the

14  middle of it, what do you mean by that?

15     **A.    I didn't want to do a confrontation.**

16     Q.    In Paragraph 3 of your Affidavit on Page

17  1, you state, I have been informed and understand that I

18  am under no obligation to provide this Affidavit and it

19  goes on.  Who were you so-informed by?

20         MR. SANDERS:  I'm going to object to the

21  form.  It assumes facts not in evidence that somebody

22  actually informed her.

23     Q.    (BY MR. SKIGEN)  Well, it says, I have

24  been informed, ma'am.  So did anybody --

1      A.      I don't know which person it was.

2      Q.      Is that your language?

3      A.      Probably, with some flare.

4      Q.      Well, did somebody give you some

5   suggestions for that?

6      A.      No.

7      Q.      Well, then where did the flare come from,

8   when you say it was your language?

9      A.      I mean -- I mean, I do say informed.  I'm

10   intelligent enough to say that.  Okay?

11      Q.      Okay.  Paragraph 7 says, I have not had

12   any communications with any lawyers regarding the

13   lawsuit and have been specifically requested not to

14   disclose any attorney-client communications of which I

15   may be aware or otherwise have knowledge of.

16              Was that your idea to include that

17   statement?

18              MR. GREGG:  Objection.  Vague.  Calls for

19   speculation.  It's confusing.

20              MR. SANDERS:  Join.

21      A.      Yeah.  I don't know.

22      Q.      (BY MR. SKIGEN)  Were you aware of

23   something called the attorney-client privilege at the

24   time you did this Affidavit?

1    **A.     I think -- I mean, I've worked around**
2  **lawyers for years, so, yes, I am aware of**
3  **attorney-client privilege.**
4    Q.    Well, it says you were specifically
5  requested not to disclose any attorney-client
6  communications.  Who specifically requested that of you?
7    **A.     I don't know who specifically.**
8    Q.    You don't remember or --
9    **A.     I don't remember.**
10    Q.    You knew at the time, I assume?
11    **A.     I knew at the time.**
12    Q.    Do you know whether it was an attorney for
13  Anne Cori or whether it was an attorney or Eagle Forum
14  or whether it was an attorney for John Schlafly?
15    **A.     Well, I mean, it was definitely not an**
16  **attorney for John Schlafly.**
17    Q.    Okay.  At the time you did this, did you
18  know that Eagle Forum had counsel?
19      MR. SANDERS:  I'm going to object to facts
20  not in evidence that Eagle Forum actually had counsel
21  sell at the time.
22    Q.    (BY MR. SKIGEN)  Did you understand at the
23  time that Eagle Forum had counsel?
24      MR. SANDERS:  Same objection.

1       Q.    (BY MR. SKIGEN)  You can answer.

2       **A.    Can I answer?**

3       MR. SANDERS:  Go ahead and answer.

4       **A.    No.  I did -- I did not know.**

5       Q.    (BY MR. SKIGEN)  Okay.  Had you ever heard

6 of Runnymede -- not ever heard.  At that time were you

7 aware of Runnymede Law Firm?

8       **A.    I don't think so.**

9       Q.    Were you aware of an attorney named Steve

10 Clark?

11      **A.    No.**

12      Q.    How about an attorney named Joel Rohlf?

13      **A.    No.**

14      Q.    Paragraph 9 reads, any actions that I've

15 taken with respect to Eagle Forum, Eagle Forum Education

16 and Legal Defense Fund, Eagle Trust Fund or any other

17 entity would have been undertaken at the express

18 direction, instruction and/or authorization of John

19 Schlafly, Ed Martin or Rebekah Gantner.  Did you write

20 that?

21      **A.    Not word for word but I said it.**

22      Q.    I don't know what that means.

23      **A.    Not -- not precisely but I said it in my**

24 **own way.**

1       Q.    Okay.  So you said something to that

2  effect and somebody helped edit it to say this?

3       **A.    Right.**

4       Q.    And the assistance came from Spencer Fane;

5  right?

6       **A.    Yes.**

7       Q.    What was your intent?  I mean, but this

8  conveys what you intended to convey?

9       **A.    Yes.**

10      Q.    What were you intending to convey by that

11  statement?

12     **A.    I didn't do anything, if it wasn't under**

13  **the authorization of John Schlafly, Ed Martin or Rebekah**

14  **Gantner.**

15      Q.    So you include Eagle Trust Fund in the

16  list of entities on whose behalf you may have undertaken

17  actions.  Do you see that?

18     **A.    Right.**

19      Q.    So, at this point, you understood Eagle

20  Trust Fund was something other than a bank?

21     **A.    Yeah.**

22      MR. SANDERS:  Objection.  Form.  Assumes

23  facts not in evidence.  Misstates prior testimony.

24     **A.    Yes.  But that was years ago.  Up to this**

1  **point right here, I was well-aware of whatever was going**

2  **on.  So I was aware of Eagle Trust Fund.**

3        Q.    (BY MR. SKIGEN)  Okay.  Had you never

4  taken direction from Phyllis Schlafly?

5        **A.**    **That meant -- yes.  I did take direction**

6  **from Phyllis Schlafly.  She was deceased at the time.**

7        Q.    Okay.

8        **A.**    **So that's what that meant.**

9        Q.    So this is referring to more recent

10  actions?

11        **A.**    **More recent.**

12        Q.    Okay.  Paragraphs 14, 15, 16 and 17 refer

13  to a 14,000 member list.  Do you see that?

14        **A.**    **Yes.**

15        Q.    Is that 14,000 names?  It's 14,000 names;

16  right?

17        **A.**    **Yes.**

18        Q.    Is that a subset of the 2- to 300,000

19  names that was stored on Paradox that's on your personal

20  laptop?

21        **A.**    **Yes.**

22        Q.    And that was a list that John Schlafly

23  created and you assisted him mechanically back in, what,

24  April of 2016; is that right?

1    A.    Are you talking about the list of 14,000?

2    Q.    Yes.  Yes.

3    A.    Yes.

4    Q.    Yeah.  Thank you.  Through any of your

5  computers, do you have access right now to that list?

6    A.    Yes.

7    Q.    Okay.  Which computers?

8    A.    The one where I currently work.

9    Q.    Okay.  How has that list migrated to that

10  computer?

11    A.    It was through SpearTip.

12    Q.    Okay.  And was that part of that effort

13  that you described earlier when you dealt with SpearTip

14  in October 2016?

15    A.    Yes, from the cloud.  Yes.

16    Q.    Did SpearTip do this for free or were they

17  paid?

18    A.    I have no idea.

19    Q.    You don't know who paid them?

20    A.    I didn't pay them.

21    Q.    Okay.  Who recommended SpearTip to you?

22        MR. SANDERS:  I'm going to object to form.

23  Assumes facts not in evidence, that somebody recommended

24  SpearTip to her.

1    Q.    (BY MR. SKIGEN)  Well, let me rephrase the

2  question.  How did you find out about SpearTip?

3    **A.    I -- I don't know.  It was -- it was**

4  **probably through Anne, probably.**

5              MR. GRADY:  Anne Cori?

6    **A.    Anne Cori, yeah.**

7    Q.    (BY MR. SKIGEN)  Thank you.  Not Ann

8  Bensman.

9    **A.    There's a lot of Anns, yeah.**

10    Q.    Well, did you -- who initiated the effort

11  to get somebody's help in getting the data that's

12  SpearTip ultimately got?

13              MR. SANDERS:  Other than what she's

14  already testified to?

15    Q.    (BY MR. SKIGEN)  Yeah.  How did that

16  process start?

17              MR. GREGG:  Objection.  Calls for

18  speculation.

19              MR. SANDERS:  Join.

20    **A.    I honestly don't remember.**

21    Q.    (BY MR. SKIGEN)  Do you recall whether you

22  were the person who initiated or someone else did or

23  someone asked you to?

24              MR. SANDERS:  Objection to form.  It's a

1  compound question.  Answer, if you can.

2       **A.       No one asked me.  I don't believe anyone**

3  **asked me.**

4       Q.       (BY MR. SKIGEN)  So you think --

5       **A.       It might have been -- am I overtalking**

6  **you?**

7       Q.       No.  Go ahead.

8       **A.       It might have been suggested, because I**

9  **wasn't doing anything with it.  Okay?  I wasn't doing**

10 **anything with it.  But I wanted to get it to the proper**

11 **people, and if there was a proper way to do it --**

12      Q.       But you don't recall who may have

13 suggested that you contact --

14      **A.       It would -- if anybody, it would have been**

15 **Anne.**

16      Q.       Because you had told Anne that you wanted

17 to get this data into the correct hands?

18      **A.       Right.  And -- and -- and she didn't**

19 **respond immediately at that time, but I think it would**

20 **have been Anne, but I don't want to --**

21           MR. SANDERS:  Don't speculate.

22      **A.       Okay.  I don't know.**

23           MR. SANDERS:  It's okay to say that.

24      Q.       (BY MR. SKIGEN)  So I may have asked you

1  this, and I apologize if I did.  This 14,000-person list

2  that's referenced here in your Affidavit, that's within

3  the data that SpearTip acquired for you or for Eagle

4  Forum in or about October of 2016; correct?

5          MR. SANDERS:  Objection to form.  Asked

6  and answered.  Go ahead and answer.

7      **A.    It was one file.  I could identify it**

8  **easily, because it was called ballot.**

9      Q.    (BY MR. SKIGEN)  So it was a discrete

10  file?

11      **A.    Yes.**

12      Q.    But there was other data that SpearTip

13  pulled --

14      **A.    Pulled.**

15      Q.    -- other than just that?

16      **A.    Uh-huh.  Yes.**

17      Q.    Okay.  And you've had continuous access to

18  that file, that ballot file, ever since you started on

19  Third Street in November of 2016; correct?

20      **A.    No.  I mean, I -- I didn't have access to**

21  **it at the beginning.**

22      Q.    I thought SpearTip got it in October?

23      **A.    Correct, but I didn't -- I don't think I**

24  **had access to it until later.  I don't know what the**

1  **holdup was.**

2  Q.  At some point, you got it?

3  **A.  Right.**

4  Q.  Can you approximate when you got access to

5  it?

6  **A.  Probably -- I want to say at the end of**

7  **November or maybe December.**

8  Q.  2016?

9  **A.  '16, yeah.**

10  Q.  So you've had continuous access since

11  then?

12  **A.  Yes.**

13  Q.  To that 14,000-person file?

14  **A.  Yes.**

15  Q.  If you wanted to access that 14,000-person

16  file at any time since December of 2016, you didn't need

17  John Schlafly to give it to you; correct?

18  **A.  Correct.**

19  Q.  Turn to Paragraph 24, please, ma'am.  All

20  right.  And this may overlap with some questions I

21  previously asked you, but the last sentence -- or in the

22  last two sentences in Paragraph 24 read, recently, I

23  told Roger Schlafly that I had downloaded the Paradox

24  tables to my personal computer.  I have never shared or

1 disseminated these tables with anyone and have never

2 used them for anything other than Eagle Forum business.

3 Do you see that?

4     **A.**    **Yes.**

5     Q.    Now, are these the tables -- when you

6 refer to the Paradox tables, is this the data that still

7 resides on your personal laptop?

8     **A.**    **Yes.**

9     Q.    You haven't -- you haven't used those

10 tables for Eagle Forum business since the beginning of

11 November 2016?

12     **A.**    **I don't think so.**

13     Q.    The passwords that you maintained at the

14 time you left your employment at State Street --

15     **A.**    **Yes.**

16     Q.    -- have you given those passwords to

17 anybody since then?

18     MR. SANDERS: Objection. Form. I think

19 it's asked and answered.

20     Q.    (BY MR. SKIGEN) You can answer.

21     **A.**    **No.**

22     Q.    Is there like a master password to the

23 gmail-based email accounts that you have as

24 administrator?

```
 1          A.    The gmail?

 2          Q.    Yeah.

 3          A.    Yeah.  Yes, there is.

 4          Q.    You were the sole --

 5          A.    Yes.

 6          Q.    -- holder of that password; right?

 7          A.    Uh-huh.

 8          Q.    Yes?

 9          A.    Yes.  Yes.

10          Q.    Okay.  Do you know, one way or the other,

11   whether you can access those email accounts now if you

12   use those credentials?

13          A.    Yes, I can.

14          Q.    When is the last time you've done so?

15          A.    I don't know.

16          Q.    Has it been since you started to work at

17   Third Street?

18          A.    Yes.

19          Q.    Okay.  For what purpose?

20          A.    Because it's Eagle Forum email.

21          Q.    Okay.  So you're still the administrator?

22          A.    Yes.

23          Q.    Is that one of the passwords you refuse to

24   provide to John Schlafly?
```

1          MR. SANDERS:  Objection.

2          MR. GREGG:  Mischaracterizes testimony.

3   Assumes facts not in evidence.

4          MR. SANDERS:  Join.

5      Q.   (BY MR. SKIGEN)  You can answer.

6      **A.   I don't think I ever was asked for it, and**

7   **I didn't even think about it at the time.  So he didn't**

8   **demand it.**

9      Q.   Did you say in your Affidavit that you

10  would provide John with the passwords after you gave

11  your deposition?

12     **A.   Yes.**

13     Q.   Okay.  Why -- what was -- why was that

14  your position?

15     **A.   Because I wanted to make sure everything**

16  **went accordingly.**

17     Q.   And instead of giving your deposition, you

18  executed this Affidavit; right?

19     **A.   Yes.**

20     Q.   Did you give John -- but you didn't give

21  John the passwords after you executed this Affidavit?

22     **A.   They already were changed, I believe.**

23     Q.   Is that why you didn't give it to him?

24     **A.   He didn't need them.  Crazy Roger had**

1 **them.**

2 　　　Q.　　Does that include the passwords to the

3 email accounts?

4 　　　**A.　　I -- I really did not even think about**

5 **it.　　I did not even get into the email address --**

6 **email accounts.**

7 　　　Q.　　I want to ask you a couple questions about

8 the web site, and then I'm going to let others ask a few

9 questions.　You, for lack of a better word, were in

10 charge of the Eagle Forum web site when you worked at

11 State Street; is that right?

12 　　　**A.　　Yes.**

13 　　　Q.　　At least from the technical side of it;

14 correct?

15 　　　**A.　　Yes.**

16 　　　Q.　　All right.　The content of that web site

17 included Phyllis Schlafly Columns; is that right?

18 　　　**A.　　Yes.**

19 　　　Q.　　And the Phyllis Schlafly Reports?

20 　　　**A.　　Yes.**

21 　　　Q.　　And the Education Reporter?

22 　　　**A.　　At some point, yes.**

23 　　　Q.　　And there were audio files reflecting

24 Phyllis's radio?

1    **A.      Those were on a different server --**

2    Q.      They were --

3    **A.      -- the audio.**

4    Q.      They were not available through the web

5    site?

6    **A.      They were available through the web site,**

7    **but they weren't on the same server.**

8    Q.      Okay.  And were there materials from Turbo

9    Reader on the web site or First Reader?

10   **A.      Probably for sale and that's it.**

11   Q.      With respect to this -- did you, in your

12   -- when you were working at State Street, have an

13   understanding as to which of this these materials, if

14   any, were owned or were the property of an entity other

15   than Eagle Forum?

16   **A.      No.**

17   Q.      For instance, did you have an

18   understanding that some of this content is the property

19   of EFELD as opposed to Eagle Forum?

20   **A.      No.**

21   Q.      Do you know where that content is stored

22   now, the content that was on the web site as of the time

23   you left your State Street job?

24   **A.      Do you mean the web site that's currently**

1   **eagleforum.org?**

2        Q.    The content that was available through

3   that web site as of the end of October 2016, do you know

4   where that is stored right now?

5              MR. GREGG:  Objection.  Vague as to

6   content.  Are you talking about writings?

7   Infrastructure?

8        Q.    (BY MR. SKIGEN)  Writings, audio files,

9   content, not --

10       **A.    I have no idea where the audio files are.**

11  **We get many calls a day that -- or sometimes that their**

12  **audio is not working.  The Phyllis Schlafly Report, the**

13  **Columns, the Eagle Forum Report are all located on**

14  **eagleforum.org.  The Education Reporter is no longer on**

15  **eagleforum.org.**

16       Q.    Okay.  That content, the PS Columns, the

17  PS Reports, the Education Reporter, the ones that

18  existed as of October 2016, not anything that's been

19  created since then --

20       **A.    Right.**

21       Q.    -- where are they?

22       **A.    At eagleforum.org.**

23       Q.    Okay.  Are they stored on some server

24  somewhere or in the cloud?

1        **A.**     **They're on a web site.**

2        Q.     Okay.  They're web site but where --

3        **A.**     **Where is the web site?**

4        Q.     Yeah.

5        **A.**     **HostGator.**

6        Q.     Who is the host?

7        **A.**     **HostGator.**

8        Q.     Gator, okay.  G-A-T --

9        **A.**     **O-R.  What, are you going to try to hack**

10  **into it?  Oh, that's Roger's job.**

11        MR. SKIGEN:  Move to strike the

12  commentary.  I may have a few more, but I'll pass right

13  now.  Is it Randy or Andy?

14        MR. GRADY:  Andy.  Andy, wake up.

15        MR. SANDERS:  Andy, wake up.

16        MR. SCHLAFLY:  Okay.  Very good.  This is

17  Andrew Schlafly.  I'm going ask you some questions,

18  Ms. Miller.

19                 EXAMINATION

20  QUESTIONS BY MR. SCHLAFLY:

21        Q.     Is there a category of membership in Eagle

22  Forum that is lifetime?

23        **A.**     **No.**

24        Q.     Is there anyone who is not permitted to be

1  a member of Eagle Forum?

2       **A.**     **That is a decision of the board members if**

3  **somebody is rejected.**

4       Q.     I'm asking you --

5       MR. SANDERS:  Hey, Andy --

6       Q.     (BY MR. SCHLAFLY)  I'm asking you about

7  your understanding.

8       MR. SANDERS:  Andy, let's make sure we

9  don't talk over each other.

10       MR. SCHLAFLY:  That's fine.

11       Q.     (BY MR. SCHLAFLY)  Please answer the

12  question, Ms. Miller.  Is there anyone who is not

13  permitted to be a member of Eagle Forum?

14       MR. GREGG:  Objection.  Calls for

15  speculation.

16       MR. SANDERS:  Join.

17       Q.     (BY MR. SCHLAFLY)  You can answer.

18       MR. SANDERS:  Answer to the extent that

19  you know.

20       **A.**     **I know of two people that are not -- they**

21  **tried to join and they're not members.**

22       Q.     (BY MR. SCHLAFLY)  What are their names?

23       **A.**     **Andy Schlafly and David Usher.**

24       Q.     And how do you know that?

1    **A.    Because I was told that the board rejected**

2  **them.**

3    Q.    And who told you that?

4    **A.    Probably Anne.**

5        MR. SKIGEN:  Cori?

6    **A.    Anne Cori.**

7    Q.    (BY MR. SCHLAFLY)  Do you know?  You said

8  probably.  Do you know who told you that?

9    **A.    It would have had to have been Anne Cori.**

10    Q.    And how would she have told you that?

11        MR. SANDERS:  Objection.  Form.  Vague and

12  ambiguous.

13    **A.    I don't know if it was in person or by the**

14  **phone.  And, actually, I was the one who flagged.**

15    Q.    (BY MR. SCHLAFLY)  What does that mean?

16    **A.    Flagged as do we really want these people**

17  **as a member.**

18    Q.    You're saying you raised that issue with

19  Anne Cori?

20    **A.    Yep.  Yes.**

21    Q.    Did you call her or did you email her?

22    **A.    I don't know.**

23    Q.    Why did you contact Anne Cori about those

24  people?

```
 1        A.       Because I don't didn't think they were

 2   friendly to Eagle Forum, because, Andy, you are trying

 3   to destroy us, so --

 4        Q.       Who told you that I was trying to destroy

 5   us?

 6        A.       I think I read it somewhere.

 7        Q.       Do you remember where you read that?

 8        A.       I don't know.

 9        Q.       As part of your job, did you review

10   Phyllis Schlafly's political positions?

11        A.       No.

12        Q.       Did you review what she wrote about

13   politics?

14        A.       Well, I read the columns and the Phyllis

15   Schlafly Report, because, many times, I was laying it

16   out.

17        Q.       Did you disagree with any of it?

18        A.       No.  I'm pretty conservative.

19        Q.       You're saying you agreed with a hundred

20   percent of what Phyllis Schlafly wrote?

21        A.       No.

22               MR. SANDERS:  Objection to form.

23   Misstates prior testimony.

24               MR. GREGG:  And calls for speculation.
```

1       Q.      (BY MR. SCHLAFLY)  Answer the question.

2               MR. SANDERS:  Well, no.  Andy, hold on.

3       Hold on.

4       Q.      (BY MR. SCHLAFLY)  Answer the question.

5               MR. SANDERS:  We get to make the

6       objection.  And unless you just want to chew up time,

7       there is a proper way.

8               MR. SCHLAFLY:  Okay.  Well --

9               MR. SANDERS:  Hold on, Andy.  Unless you

10      just want to chew up time, that's how the rules in

11      Illinois work.

12      Q.      (BY MR. SCHLAFLY)  Did you agree with a

13      hundred percent of what Phyllis Schlafly wrote?

14      **A.      No.**

15      Q.      What did you disagree with?

16      **A.      The part on -- how is this relevant?**

17              MR. SANDERS:  That's a great question,

18      Andy.

19      **A.      Can't I -- I mean, I don't get it.  I was**

20      **always --**

21      Q.      (BY MR. SCHLAFLY)  Ms. Miller, what did

22      you disagree with?

23      **A.      Probably whenever I would get hate emails**

24      **about whenever she wrote about feminists, and that does**

1  not mean I'm a feminist.  On the contrary.  But that

2  mothers cannot be battered.  I know for a fact they can.

3  My experience.  Life experience.

4      Q.    Did you express your disagreement to

5  Phyllis Schlafly?

6      A.    I did to John.

7      Q.    Did you express your disagreement to

8  Phyllis Schlafly?

9      A.    About the feminists, yes.  I said, oh, no,

10  not another feminist column, please, you're killing me,

11  Phyllis.

12      Q.    Did you say to Phyllis Schlafly you

13  disagreed with her views about feminism?

14      A.    No.  I did not say that now.  Partially.

15  You never agree with somebody 100 percent.  Never.

16      Q.    Did the issue of Phyllis Schlafly's

17  endorsement of Trump become a topic of discussion there

18  at the State Street office?

19      A.    You mean, like, did people call in angry

20  or happy or -- I don't know what -- what the question

21  is.  I don't know.

22      Q.    Did you hear others at the office discuss

23  Phyllis Schlafly's endorsement of Donald Trump?

24      A.    Not discuss, no.

1   Q.  Did you hear anyone at the office at State

2 Street say anything about Phyllis Schlafly's endorsement

3 of Donald Trump?

4   **A.  No, not really.  I told your mom.**

5   Q.  Your testimony -- Ms. Miller, is your

6 testimony you did not hear Ann Bensman say anything

7 about Phyllis Schlafly's endorsement of Donald Trump?

8     MR. SANDERS:  Objection to form.

9 Mischaracterizes prior testimony.  It's improper

10 impeachment, Andy.  Go ahead and answer, if you can.

11   Q.  (BY MR. SCHLAFLY)  You can answer the

12 question.  Ms. Miller, please answer the question.

13     MR. SANDERS:  Go ahead and re-ask it,

14 Andy, because I don't --

15   Q.  (BY MR. SCHLAFLY)  Do you understand the

16 question, Ms. Miller?

17     MR. SANDERS:  Actually, let's have it read

18 back.

19   Q.  (BY MR. SCHLAFLY)  Ms. Miller, you don't

20 understand the question?

21     MR. SANDERS:  We're having the question

22 read back, Andy.

23     (Wherein the reporter read back the

24     previous question.)

1          MR. SANDERS:  Subject to the same

2   objection.

3          **A.      First of all, it's Mrs. Miller.  I --**

4   **probably Ann was disgruntled.  I cannot recite back to**

5   **you exactly what she said.  She was probably upset about**

6   **it.  I don't know.**

7          Q.    (BY MR. SCHLAFLY)  I'm not asking you to

8   recite exactly what she said.  Did Ann Bensman say

9   anything about Phyllis Schlafly's endorsement of Donald

10  Trump in the office at State Street?

11         **A.      She -- I said she was probably unhappy.**

12  **That's --**

13         Q.    Did she say anything?

14         **A.      -- that -- that your -- or Phyllis**

15  **Schlafly endorsed Trump.**

16         MR. SANDERS:  He's asking you what you

17  recall.

18         Q.    (BY MR. SCHLAFLY)  Did she say anything in

19  the office?

20         MR. SANDERS:  If you don't recall

21  anything, just tell him that.

22         **A.      I don't know.**

23         MR. SANDERS:  Objection to coaching of the

24  witness.

1        **A.      She --**

2                MR. SANDERS:  I don't know that that's a

3    proper objection.

4        **A.      She probably did, but I don't know.**

5        Q.      (BY MR. SCHLAFLY)  Did you say anything?

6        **A.      Yes, I did.  I said bravo.**

7        Q.      Did you say anything to Ann?

8        **A.      I said bravo.**

9        Q.      Did you say that to Ann Bensman?

10       **A.      Yeah.**

11       Q.      Did you say that to Ann Bensman?

12       **A.      Yes.**

13       Q.      You did?

14       **A.      Yes.**

15       Q.      Your testimony is you said that to Ann

16   Bensman?

17       **A.      Oh, yes.  Those were the good times.  We**

18   **got in a heck of a fight.**

19       Q.      You're saying you got into a fight with

20   Ann Bensman about this issue?

21       **A.      Yes.  Well, it's the truth is the truth.**

22       Q.      And that was in the office?

23       **A.      Well, I mean, not a fistfight, but we**

24   **didn't speak for a while.  I mean, --**

1          MR. SANDERS:  Just keep telling.

2      Q.    (BY MR. SCHLAFLY)  This was about Phyllis

3  Schlafly's endorsement of Donald Trump?

4      **A.    Yeah, more or less.**

5      Q.    In your Third Street office, did you have

6  any supervision in the office?

7          MR. SANDERS:  Objection.  Form.  It's

8  vague and ambiguous as to what supervision means in this

9  context.

10      Q.    (BY MR. SCHLAFLY)  Supervisor --

11          MR. SANDERS:  No, Andy.  See, that's where

12  you keep jumping in.  I get to finish my objection.

13  It's also vague and ambiguous.  It's not limited in time

14  or scope.  So go ahead and answer now.

15      Q.    (BY MR. SCHLAFLY)  Okay.  Does the

16  supervisor ever visit you in the Third Street office?

17      **A.    Yes.**

18      Q.    Who is that?

19      **A.    Anne Cori.**

20      Q.    And how often does she visit you?

21      **A.    At least once a week.**

22      Q.    When was the last time she visited you

23  there?

24      **A.    Probably Tuesday of this week.**

Page 134

1      Q.      You can't remember for sure?

2              THE WITNESS:  What is today?

3              MR. SANDERS:  Today is Wednesday.

4      **A.      She probably came Monday then, because --**

5      **okay.  Okay.  It's Monday.  She came.**

6      Q.      (BY MR. SCHLAFLY)  Are you in the -- are

7      you in the office all day on Monday?

8      **A.      Yes.**

9      Q.      What are your work hours in the office?

10     **A.      Probably from nine until three or four,**

11     **and then if I don't get any work from anybody else, I go**

12     **home, and to save Eagle Forum money, I work from home**

13     **whenever they do get the said material to me.**

14     Q.      Is that authorized for you to work at

15     home?

16     **A.      Yes.**

17     Q.      Do you handle cash donations to Eagle

18     Forum?

19     **A.      No.**

20     Q.      Who handles that?

21     **A.      Sarah Wheeler.**

22     Q.      Have you done anything in your job without

23     the authorization of Anne Cori?

24              MR. SANDERS:  Objection to form.  It also

1   calls for speculation and/or a legal conclusion.  Go

2   ahead and answer, if you can.

3       **A.**     **Have I done any -- well, sure.  I do.  I**

4   **do stuff for Eunie.  I do stuff for Anne.  I do stuff**

5   **for Julia Wharton.  I do many things for many people.**

6       Q.     Have you done anything without the

7   authorization of Anne Cori?

8            MR. SANDERS:  Objection.  Asked and

9   answered.

10           MR. GREGG:  Also same objection.  Vague.

11   Legal conclusion.

12       **A.**     **Do you still want me to answer?**

13          MR. SANDERS:  Yeah.  Go ahead and answer.

14       Q.     (BY MR. SCHLAFLY)  Yeah.

15       **A.**     **It's the same answer.  Yes, I have,**

16   **because Eunie asks me to do stuff.  I take Eunie's stuff**

17   **as important and do what she says.**

18       Q.     Has Eunie ever visited you in your office

19   at Third Street?

20       **A.**     **Not in the office, no.**

21       Q.     Are you aware that ballots were sent out

22   in or about November of 2017 on behalf of Eagle Forum?

23       **A.**     **Yes.**

24       Q.     About how many ballots were sent out?

1      **A.      I don't know.**

2      Q.      About how many ballots were received?

3      **A.      I don't know.  Ann Bensman was the one who**

4  **was the official counter, not me.**

5      Q.      Is your testimony -- it's your testimony

6  you have no idea how many ballots were received?

7      **A.      I have no idea.**

8      Q.      Was it more than a thousand?

9      **A.      I have no idea.**

10      Q.      Did the ballots come in to the office

11  there at Third Street?

12      **A.      Excuse me?**

13      Q.      Were the ballots received at the office

14  there on Third Street?

15      **A.      Yes.**

16              MR. SKIGEN:  Hey, Andy.  It's Wayne.  Just

17  as --

18      Q.      (BY MR. SCHLAFLY)  Were any --

19              MR. SKIGEN:  Go ahead.  Sorry.

20              MR. SCHLAFLY:  Yeah.

21      Q.      (BY MR. SCHLAFLY)  Were any names removed

22  from the list that the ballots were sent to?

23              MR. SANDERS:  Objection to form.  It's not

24  limited in scope or time.  It's also vague and

1  ambiguous.

2       **A.**    **I don't know.  I don't know what you mean.**

3       Q.    (BY MR. SCHLAFLY)  Were any names removed

4  from the list that the ballots were sent to?

5            MR. SANDERS:  Same objection.

6       **A.**    **You mean, if we received them, did we**

7  **throw them away?  Is that what you're saying?**

8       Q.    No.  I'll say it again.  Were any names

9  removed from the list that the ballots were sent to?

10            MR. SANDERS:  Same objection.

11            MR. GREGG:  Objection.  Vague.  I'm not --

12            MR. SANDERS:  Calls for speculation.  I'll

13  add that.  If you don't know --

14       **A.**    **I don't know.**

15       Q.    (BY MR. SCHLAFLY)  Are you aware of

16  anything that was incorrect on any W-2 tax form that you

17  received from John?

18            MR. SANDERS:  Objection.  Form.  Vague and

19  ambiguous.  Not limited in scope or time period.

20            MR. GREGG:  I'll join in those and also --

21            MR. SANDERS:  Calls for speculation.

22            MR. GREGG:  -- that it calls for a legal

23  conclusion and speculation.

24            MR. GRADY:  Don't talk over James's

1  objections.

2          MR. SANDERS:  Go ahead and answer.

3      **A.      To my knowledge, I think they were**

4  **correct.  I don't know.**

5          MR. SCHLAFLY:  No further questions.

6          MR. SKIGEN:  I've got a few follow-ups.

7                    EXAMINATION

8  QUESTIONS BY MR. SKIGEN:

9      Q.      Do you prefer --

10     **A.      Mrs.**

11     Q.      Okay.

12     **A.      Liz.  Hey you.  I don't like "Ms."  Did**

13  **Phyllis Schlafly like "Ms."?  No.**

14     Q.      The women in my life would shoot me for

15  saying Mrs. but okay.

16     **A.      Oh, really?**

17     Q.      All right, Mrs. Miller.  Have you been

18  advised of any topics or subject matters on which you

19  have been identified as a trial witness in this case?

20     **A.      No.**

21     Q.      Okay.  So you haven't seen the list of

22  topics on which defendant -- or plaintiff Eagle Forum

23  has disclosed you're going to be a witness at trial?

24     **A.      No.**

1          Q.     Okay.  Let me -- did you ever make a

2     recording of a meeting with John Schlafly and others

3     that occurred in October of 2016?

4          **A.     Yeah.**

5          Q.     Okay.

6          **A.     Yes.**

7               MR. SKIGEN:  Mark this as the next in

8     order.

9               (Defendants' Exhibit 136 was marked for

10               identification.)

11          Q.     (BY MR. SCHLAFLY)  You can look through

12     it.  For the record, 136 appears to be an email from

13     Anne Cori to Mrs. Miller dated November 4, 2016, with an

14     email from Mrs. Miller to, apparently, Anne Cori as

15     well.

16               MR. GREGG:  Wayne, do you know how this

17     was produced?  Again, it's another one without Bates

18     labeling.

19               MR. SKIGEN:  From your side of the V.

20               MR. SANDERS:  There you go.

21               MR. GREGG:  I'm not sure that we've

22     produced anything that wasn't Bates labeled, but okay.

23          **A.     Okay.**

24          Q.     (BY MR. SKIGEN)  Is this an email exchange

1  between you and Anne Cori that occurred in November of

2  2016?

3      **A.    Yes.**

4      Q.    Okay.  You refer to a recording of what

5  was said at the Clayton office on October 31st.  That's

6  your statement; correct, in the top there?

7      **A.    Yes.  Yeah.  Right here.**

8      MR. SANDERS:  No.  Well, it's mentioned --

9      **A.    Oh, okay.**

10     Q.    (BY MR. SKIGEN)  Do you still have that

11  recording?

12     **A.    Probably on my phone.**

13     Q.    Okay.  Did anybody ask you to make a

14  recording of that meeting?

15     **A.    They didn't ask --**

16     Q.    Who is they?

17     MR. SANDERS:  I'm going to instruct you

18  that you can tell him about everything, unless counsel

19  communicated something to you.  Okay?

20     MR. SKIGEN:  Not any counsel.  Your

21  counsel.  Not counsel for Ms. Cori.

22     MR. SANDERS:  That's fair, but, you know.

23     MR. GRADY:  Like if Spencer Fane told you

24  something, you don't have to tell us.

```
 1              MR. SANDERS:  Hold on.  Both of you guys
 2    don't get to instruct my witness, as much as you may
 3    try.  What I'm going to tell you is you can't talk about
 4    anything that either -- let's see.  Look at this time
 5    period -- that either my law firm or Russ Riggan's told
 6    you to do or not to do.  Okay?  But other than that, you
 7    have to tell them about everything else.
 8         A.    Okay.  I can't answer the question then.
 9         Q.    (BY MR. SKIGEN)  Okay.
10              MR. GRADY:  There you go.
11         Q.    (BY MR. SKIGEN)  Have you shared that
12    recording -- have you let anybody else listen to that
13    recording other -- including counsel?
14              MR. SANDERS:  You can answer that.
15         A.    Yeah.  Yes.
16         Q.    (BY MR. SKIGEN)  Who?
17         A.    Probably --
18              MR. SANDERS:  Don't speculate.  Tell him
19    what you know.
20         A.    Anne Cori.  And I don't know who else.
21         Q.    (BY MR. SKIGEN)  Do you know if that
22    recording has ever been produced in discovery in any of
23    the litigations?
24         A.    I don't -- I don't know.
```

1      Q.      Does anybody else have a copy of it

2  besides you?

3      **A.      Well, Ann does.**

4      Q.      How did she get it?

5      **A.      I sent it to her.**

6      Q.      Okay.  Like, by email?

7      **A.      Yeah.  Yes.**

8      Q.      Okay.  Did you -- at the time of this

9  meeting, did you believe it was lawful for you to make a

10 recording of a conversation without all of the

11 participants being aware of it?

12     **A.      Yes.**

13          MR. SANDERS:  Object.  Go ahead.

14     **A.      Yes.  In the State of Missouri.**

15     Q.      (BY MR. SKIGEN)  Oh, it was in the Clayton

16 office.  Okay.

17     **A.      That's in Missouri, yeah.**

18     Q.      All right.  Not in Illinois.

19          MR. SANDERS:  Yeah.

20     **A.      Right, not in Illinois.**

21          MR. SANDERS:  We'll stipulate that Clayton

22 is in Missouri.

23     Q.      (BY MR. SKIGEN)  All right.  One more.

24 I've got time for maybe one more, unless somebody else

1  wants to jump in.  I have one more document I can ask

2  the witness about.

3              (Defendants' Exhibit 137 was marked for

4              identification.)

5              MR. SANDERS:  Same answer, Wayne?

6              MR. SKIGEN:  Same answer.

7              MR. SANDERS:  Well, just so the record is

8  clear, while she's reading, as to how this was produced?

9              MR. SKIGEN:  My understanding is it came

10  from someone other than my clients.

11              MR. SANDERS:  Okay.  Ready?

12              THE WITNESS:  Uh-huh.  Yes.

13      Q.      (BY MR. SKIGEN)  Are you a member of Eagle

14  Forum?

15      **A.      I once gave money there.**

16      Q.      Is your name on the membership list as far

17  as you know?

18      **A.      Currently, no.**

19      Q.      Okay.  Is this Exhibit 137 an email

20  exchange between you and Ann Bensman and Anne Cori?

21      **A.      Yes.**

22      Q.      Okay.  It refers to, generally, to getting

23  together for a meeting at Ann Bensman's house; is that

24  right?

1     **A.     Yes.**

2     Q.     Did that meeting occur?

3     **A.     Yes.**

4     Q.     And this discussion began with an email to

5  Anne Cori that appears to be from you -- and it appears

6  to be written by Ann Bensman.  It says, Liz and I have

7  been talking.  We are very anxious to move ahead and

8  have feelings that maybe we are not being told the whole

9  story.  Was she speaking accurately on behalf of you and

10 her?

11    **A.     No, her.**

12    Q.     Well, it says, Liz and I have been

13 talking.

14    **A.     But I didn't --**

15    Q.     It's signed Ann and Liz at the bottom.  My

16 question is now:  Did you play any role in drafting this

17 particular message?

18    **A.     No.**

19    Q.     Did you disagree with it in any respect?

20    **A.     Well, it -- I don't know what she meant**

21 **by, we are not being told the whole story.  I don't**

22 **know.  It was her idea to have the meeting at her house.**

23    Q.     Okay.  So you didn't feel, at that time,

24 that you hadn't been told the whole story?

1          **A.      No.  Ann felt -- I guess Ann felt that**

2     **way, because it says, anndbensman55@gmail.com.**

3          Q.      Right.  It says Liz and I.  If it was from

4     you, it wouldn't have said Liz and I.

5          **A.      Right.**

6          Q.      Unless your other personality was writing

7     it, but --

8          **A.      Yeah.**

9          MR. SANDERS:  Move to strike the

10    argumentative portion of that.

11         Q.      (BY MR. SKIGEN)  We are very anxious to

12    move ahead.  Do you know what Ann Bensman meant by that?

13         **A.      You know what, I just wanted to cut the**

14    **cord and draw unemployment, and that's what I think that**

15    **she meant.**

16         MR. SKIGEN:  I've got 30 seconds on mine.

17         MR. SANDERS:  Were you done with your

18    response there?

19         **A.      I don't know what she meant.**

20         Q.      (BY MR. SKIGEN)  You don't know what move

21    ahead meant?

22         **A.      I don't know what she meant.  I know what**

23    **I felt.**

24         Q.      At this point, were you planning to go

Page 146

1    work for Anne Cori's organization instead of -- as your

2    next position?

3              **A.      I -- I don't think that she had asked yet.**

4              MR. SKIGEN:  All right.  I guess we're out

5    of time.  I will reserve -- we'll reserve customarily as

6    we have in other depositions.  And I assume everybody

7    else is still reserving?

8              MR. GRADY:  Yes, indeed.

9              MR. SKIGEN:  I so assumed.

10             MR. SANDERS:  We'll read and sign.

11             (Wherein the deposition concluded at

12             12:27 p.m., with the signature reserved.)

13

14

15

16

17

18

19

20

21

22

23

24

1                    CERTIFICATE OF REPORTER

2

3             I, VALERIE LEHR, Certified Shorthand

4    Reporter, Notary Public within and for the State of

5    Illinois, the officer before whom the foregoing

6    deposition was taken, do hereby certify that the witness

7    whose testimony appears in the foregoing deposition was

8    duly sworn by me; that the testimony of said witness was

9    taken by me to the best of my ability and thereafter

10   reduced to typewriting under my direction; that I am

11   neither counsel for, related to, nor employed by any of

12   the parties to the action in which this deposition was

13   taken, and further that I am not a relative or employee

14   or any attorney or counsel employed by the parties

15   thereto, nor financially or otherwise interested in the

16   outcome of the action.

17

18                              *Valerie A. Lehr*

19                         VALERIE A. LEHR, CSR (IL)

20                         Notary Public in and for

21                         The State of Illinois

22

23   My commission expires:  March 23, 2020

24

1        COMES NOW THE WITNESS, ELIZABETH MILLER, and

2   having read the foregoing transcript of the deposition

3   taken on the 11th day of December, 2019, acknowledges by

4   signature hereto that it is a true and accurate

5   transcript of the testimony given on the date

6   hereinabove mentioned.

7

8

9                          _____

10                         ELIZABETH MILLER

11

12        Subscribed to before me this _____ day of

13   _____, 2020.

14

15

16                          _____

17                         NOTARY PUBLIC

18   My Commission Expires:  _____

19

20

21   Anne Schlafly Cori, et al. Vs. Edward R. Martin, Jr.,
     et al.

22   Reporter:  Valerie Lehr, CCR, CSR

23   Date Taken:  December 11, 2019

24