UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PHYLLIS SCHLAFLY REVOCABLE
TRUST, ET AL.

      PLAINTIFFS

v.

ANNE CORI, ET AL.

      DEFENDANTS.

CIVIL ACTION NO. 4:16-CV-01631

## PLAINTIFFS' RESPONSE TO INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

Individual Defendants—Anne Cori, Eunie Smith, Cathie Adams, Carolyn McLarty, Rosina Kovar, and Shirley Curry—collectively moved to dismiss the Second Amended Complaint (Docs. 142 and 143). Plaintiffs, the Phyllis Schlafly Revocable Trust ("PSRT"), Eagle Trust Fund ("ETF"), and Eagle Forum Education and Legal Defense Fund ("Eagle Forum (c)(3)")(collectively, the "Trusts"), by counsel, respond in opposition:

## INTRODUCTION & BACKGROUND

Plaintiffs sued nearly four years ago. Defendants never answered and avoided giving substantive responses by argument of counsel and procedural artifice. Defendants also pursued a strategy of delay elsewhere, ultimately, to no avail. The Southern District of Illinois entered final judgment against the entity defendant Eagle Forum (c)(4) with prejudice (having already dismissed the Individual Defendants). For its part, the St. Louis Probate court dismissed Cori's claims against these Trusts (and related trustees)—also with prejudice.[1]

---

[1]   The St. Louis Probate dismissal stemmed from settlement, which has res judicata effect. *Murphy v. Jones*, 877 F.2d 682 (1989).

Most recently, EF suffered a critical defeat following a bench trial in the Madison County Action. Judge Dugan issued a directed verdict ruling that Eagle Forum (c)(4) did not own the Schlafly Database or much of the personal property for which it was seeking compensation or control. The motions to dismiss here are just the latest chapter in Defendants' dilatory efforts. All roads lead back here and this Court should mete out the same fate as the other courts, deny Defendants' motions to dismiss, and proceed quickly where the Trusts are confident they will prevail on the merits.

The Individual Defendants seek dismissal of the 2AC for failing to state a claim upon which relief may be granted. But their arguments are based on inappropriate factual arguments, misconstruction of the applicable pleading standards, and mischaracterization of the 2AC. Plaintiffs request that the Court deny the motion in its entirety. That said, if the Court holds that any portion of the 2AC is deficient, then Plaintiffs request a chance to amend.

Before this dispute began, the late Phyllis Schlafly owned several pieces of valuable intellectual and intangible property—either personally or through her Trusts, including a trademarked and copyrighted newsletter, trademarked eagle pin, and other important assets, like her Schlafly Database of contacts and donors. In the 2AC, Plaintiffs outlined how Phyllis Schlafly developed these assets used them as part of her Schlafly Network of nonprofit, educational, and political organizations, which for more than five decades acted harmoniously under her leadership.

ETF is the oldest of her entities—formed in the 1960s—and serves as the organizational hub of the Schlafly Network. (Doc. 138, 2AC at ¶2). ETF has served as the custodian of Mrs. Schlafly's proprietary "Schlafly Database," owned the copyright for and published *The Phyllis Schlafly Report*; and provided organizational support (such as mail and donation processing), and with its employees, provided coordination for the rest of the Schlafly Network that came later. *Id*.

PSRT was Phyllis Schlafly's revocable trust (now irrevocable) settled in 1997. *Id*. 2AC at ¶1. It owns her remaining personal property, including any unassigned intangible property, as well as her registered word mark for her name, "Phyllis Schlafly." *Id*. Eagle Forum (c)(3) serves as the "charitable arm" of the Schlafly Network, *Id*. at ¶3, which manages most the Schlafly Network's education and social outreach efforts. It is the largest entity and maintains its headquarters and archives at the Phyllis Schlafly Center in Clayton, Missouri. *Id.*

Individual Defendants' purported hostile takeover of Eagle Forum (c)(4) in April 2016 sparked this suit. Defendants had "gone rogue" and mistakenly thought that by controlling Eagle Forum (c)(4) that they could dictate terms and use of the IP and other assets to Mrs. Schlafly and the other members of the Network. But Eagle Forum (c)(4) was just one of many networked entities that Phyllis Schlafly had created over the course of her lifetime. It owns none of the disputed IP and its role was limited as the principal "lobbying arm" of the Schlafly Network, which managed some (but not all) of the Network's political lobbying and legislative efforts.

As the 2AC makes clear, in the wake of the hostile takeover, Phyllis Schlafly revoked all licenses to use intellectual property belonging to her, PSRT, and ETF in July 2016. 2AC at ¶¶114-116. Defendants ignored the clear revocation and kept behaving as though they could use intellectual property with impunity, even though it has **never** belonged to any of them. By August 2016, through a series of assignments and devises, Mrs. Schlafly consolidated her assets to the Trusts controlled by her as trustee until her death—and now—by her oldest sons John and Bruce Schlafly as successor trustees. Individual Defendants' infringing activities prompted Plaintiffs to seek nationwide injunctions and obtain damages against the Defendants for their many chaos-inducing copy-cat events, false attributions, aping publications, and ultimate misdirection of donations meant for the Schlafly Network.

Individual Defendants also point to their failed lawsuit against Phyllis Schlafly's American Eagles ("PSAE") to obfuscate the core issues here. The Defendants here sued PSAE in the Southern District of Illinois, alleging that PSAE was infringing Eagle Forum (c)(4)'s marks and unfairly competing against it. But Judge Rosenstengel dismissed their entire case with prejudice. The order is attached as **Exhibit 1**. Further, Judge Dugan handed Defendants a significant defeat over the Database in the Madison County Action—See directed verdict, attached as **Exhibit 2**.

The Individual Defendants also seek to improperly bootstrap an earlier Southern District order by Judge Herndon improperly suggesting that Phyllis Schlafly died intestate or that Illinois law governed her post-mortem rights. But this is nonsense. Public records show that Mrs. Schlafly died with a will in Missouri, which was probated in St. Louis County Probate Court. Anne Cori challenged that will and the PSRT trust amendments already—specifically, individual defendant Cori alleged Mrs. Schlafly was incapacitated or that the successor trustees coerced their mother and exercised undue influence. The Probate Court dismissed Anne Cori's challenges **with prejudice**. That order is attached as **Exhibit 3**. Thus, Phyllis Schlafly's Missouri will remains valid and her assignments of her intellectual property to the Trusts are irrefutable. Mrs. Schlafly did not pass intestate as Cori contended before Judge Herndon. In short, Defendants are suffering repeated defeats in courts on either side of the Mississippi River. Their largely factual arguments here are not only inappropriate for dismissal at this stage of the litigation, but point to the need for an injunction and evidentiary hearing, not dismissal. To the extent that Individual Defendants make legal arguments in this 12(b)(6) motion, those too are baseless.

## ARGUMENT

## I. THE SECOND AMENDED COMPLAINT IS NOT A "SHOTGUN PLEADING," BUT BRINGS THE SAME CLAIMS AGAINST ALL DEFENDANTS BECAUSE THEY ACTED IN CONCERT WITH EACH OTHER

The standard of review for Defendants' 12(b)(6) motions is well understood. The Individual Defendants first argue that the 2AC fails to allege sufficient facts against them to support Plaintiffs' claims. Defendants argue that the 2AC is a "kitchen-sink" pleading that "lump[s] defendants together indiscriminately[.]" Doc. 143, page *5-6.

To be sure, courts have admonished the practice of "shotgun pleadings" when plaintiffs sue multiple defendants but do not distinguish the actions imparting liability to each defendant. For example, in *Neubauer v. FedEx Corp.*, 849 F.3d 400, 407 (8th Cir. 2017), the Court of Appeals explained that dismissal is proper where a complaint "does not come close to pleading the 'who, what, where, when, and how' of the alleged fraud." Yet it is permissible to incorporate all preceding factual allegations—rather than repeat all of the individual allegations for each claim. Courts in the Eighth Circuit follow this standard. *Campbell v. Lake Regional Medical Management, Inc.*, Case No. 2:19-cv-04124-NKL, 2019 WL 4228894 (W.D. Mo. Sept. 5, 2019) (collecting cases). The key consideration is whether defendants understand the claims.

Individual Defendants should have no trouble understanding which claims Plaintiffs made against them—as all the claims are made against all the Defendants jointly because the Plaintiffs are alleging a concert of action. In other words, the Individual Defendants conspired and committed tortious conduct to misappropriate and infringe the Plaintiffs' intellectual property and to compete unfairly against the Plaintiffs. In Paragraph 117 of the 2AC, Plaintiffs allege:

> Beginning in 2016, Defendants began **conspiring** to use Plaintiffs' assets, without limitation, the Schlafly Database, the Eagle website, and the EAGLE, EAGLE LOGO, and PHYLLIS SCHLAFLY marks to further their own personal and political agendas instead of supporting Mrs. Schlafly or her designees.

Plaintiffs later state specific instances of infringing activity and unfair competition committed jointly by the Defendants (either by each defendant personally or with that defendant's knowledge and support). There is a litany of misappropriation alleged, *viz.*, that Anne Cori misappropriated the Schlafly Database to orchestrate a robocall to support Senator Ted Cruz in the 2016 Iowa presidential primary (which Defendants erroneously suggest is the only example of misappropriation). Doc. 138, ¶118. And the list goes on: that the Defendants, through former ETF employee Elizabeth Miller, covertly downloaded and hacked the encrypted Schlafly Database *Id*. at ¶¶122-128; that the Defendants "continue to use the full Schlafly Database to promote their activities, including fundraising activities and the promotion of a March 10, 2016 event in Naples, Florida." *Id*. at ¶130; that the Defendants have misappropriated or impersonated "Mrs. Schlafly's image, likeness, and 'legacy' in email letters and solicitations. *Id*. at ¶133(a); that the Defendants have intentionally "confus[ed] or misattribute[ed] Mrs. Schlafly's true endorsements or political positions [with] those of the defendants[.]" *Id*. at ¶133(b); that the Defendants established "a competing website called moeagleforum.org using Mrs. Schlafly's image and likeness." *Id*. at ¶133(e). Further, that this website misappropriates Mrs. Schlafly's name and likeness, and uses marks confusingly similar to Plaintiffs' marks. *Id*. at ¶133(f); 134(b); and that the Defendants used "Mrs. Schlafly's name and likeness in connection with an event hosted by Eagle Forum(c)(4) … on March 10, 2017 in Naples, Florida." *Id*. at ¶133(g). These but a handful of the many instances of tortious conduct described in the 2AC. These allegations must be taken as true. The Trusts have sufficiently alleged identifiable instances of infringement and unfair competition to put Individual Defendants on notice of their actionable behavior.

Defendants' overarching argument is that most allegations do not attribute the conduct to a single defendant, but to all. To recap, this is because Defendants engaged in a single conspiracy

6

and acting in concert. The Individual Defendants also are acting through Eagle Forum (c)(4) as its putative officers and directors (although control of this entity is still contested in Madison County). Without discovery, therefore, Plaintiffs have no feasible way to know which specific defendant authorized or perpetrated each instance of infringement or unfair competition—either to benefit personally—or on behalf of co-defendant Eagle Forum (c)(4). Pleading claims against "defendants" collectively is permissible in cases involving a concert of action. See, e.g., *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000):

> Defendants complain that the allegations are too general because they collectively accuse all the defendants of all of the acts. … The fact that defendants are accused collectively does not render the complaint deficient. The complaint can be fairly read to aver that all defendants are responsible for the alleged conduct.

**All** of Eagle Forum (c)(4)'s leaders are personally liable for the tortious acts that they commit on behalf of that entity. "By the great weight of authority it is recognized that officers of a corporation are personally liable, or are jointly liable with the corporation, to one whose money or property has been misappropriated by them to the uses of the corporation, although they derived no personal benefit therefrom and acted merely as agents of the corporation-the theory being that an agent cannot escape the consequences of his tort by the fact that he committed the tort as agent for his principal." *Matter of Transport Clearings-Midwest, Inc*., 16 B.R. 890, 895-896 (Bankr. W.D. Mo. 1979), quoting 152 A.L.R. 696, 705 (1944). See also *In re Wendt*, 355 B.R. 769, 772 (Bakr. W.D. Mo. 2006) (stating that "officers and directors of corporations are personally liable to the extent that their tortious acts result in harm to a third party (collecting cases)); *Boyd v. Wimes*, 664 S.W.2d 596, 598 (Mo. Ct. App. 1984) ("[T]he corporate office does not insulate against liability one who has actual or constructive knowledge of the actionable wrong and who participates therein.").

The 2AC is not a "shotgun pleading," but asserts a conspiracy to misappropriate the Schlafly Database, infringe Plaintiffs' intellectual property, and to compete unfairly against

Plaintiffs in which all Defendants participated. The 2AC contains specific instances of infringement and unfair competition and the Defendants cannot assert that they do not understand what they are being accused of doing.

## II.   ILLINOIS NONPROFIT LAW DOES NOT SHIELD THE INDIVIDUAL DEFENDANTS FROM PERSONAL LIABILITY

Second, the Individual Defendants argue that the Plaintiffs have failed to state a claim against them because the Illinois Not for Profit Corporation Act protects them, specifically Ill. Comp. Stat. 105/108.70. See Doc. 143, p. 7-9. That statute provides that directors and officers "**serving without compensation**" of not for profit Illinois corporations cannot be held liable for damages resulting from their exercise of judgment or discretion "unless the act or omission involved **willful or wanton conduct**." (emphasis added). "Willful or wanton conduct" involves "actual or deliberate intention to cause harm" or "utter indifference to or conscious disregard for the safety of others or their property." 805 Ill. Comp. Stat. 105/108.70(d).

Defendants' argument is a straw man. For one, Plaintiffs dispute whether the Individual Defendants have been paid or otherwise compensated by Eagle Forum (c)(4).[2] Plaintiffs also alleged intentional torts and that Defendants acted with deliberate intent to cause harm. Defendants' infringing acts and instances of unfair competition confuse Plaintiffs' supporters into believing that Defendants are the "heirs" to Phyllis Schlafly's legacy and the owners of her IP.

Plaintiffs allege that the Defendants perpetrated a "conspir[acy] to use Plaintiffs' assets… to further their own personal and political agendas[.]" Doc. 138, ¶117. Plaintiffs laid out that in furtherance of the conspiracy, Defendants "covertly appropriated a full copy of the secret Schlafly

---

[2] Contrast Individual Defendants Brief, "Here, it is undisputed that Individual Defendants are not paid for their services to Eagle Forum." Doc. 143 at *8.

Database" using an ETF employee, who later began working for the Defendants. *Id*. at ¶¶122-128. Plaintiffs assert that the Defendants are "confusing or misattributing Mrs. Schlafly's true endorsements or political positions … in an intentional and willful attempt to undermine her reputation, image, likeness, legacy, and … effectiveness[.]" *Id*. at ¶133(b). Plaintiffs contend that the Defendants diverted ETF's mail to Eagle Forum (c)(4)'s new office location. *Id*. at ¶144. Plaintiffs also allege that "the referenced Defendants have already or will improperly acquire, disclose, and use Plaintiffs' trade secrets without consent of any kind for those Defendants' own financial gain." *Id*. at ¶169. Plaintiffs point out that Defendants purposefully accessed and disabled email accounts belonging to ETF employees. *Id*. at ¶314. Plaintiffs finally allege that each Individual Defendants has "willfully committed wrongful acts" within the Eastern District of Missouri. *Id*. at ¶¶5-10. In short, the 2AC is teeming with allegations describing willful and wanton conduct committed by the Individual Defendants.

### III.   PLAINTIFFS ALLEGED THAT THEY PROTECTED THEIR TRADE SECRETS, AND THAT DEFENDANTS WRONGFULLY ACQUIRED AND USED THEM

Third, Defendants argue that Plaintiffs' claims for trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA") (Count I) and the Missouri Uniform Trade Secrets Act ("MUTSA") (Count V) should fail because the 2AC lacks allegations establishing that the Plaintiffs took "adequate steps" to protect their trade secrets. Doc. 143, p. 9-11. Defendants further argue that the Plaintiffs have not alleged "that the Individual Defendants have improperly acquired or disclosed" the Plaintiffs' trade secrets. *Id*. at p. 10-11. At best, these are disputed factual questions.

Both the DTSA and the MUTSA require that, for information to qualify as a protectable trade secret, the owner "has taken reasonable measures to keep such information secret[,]" 18 U.S.C. § 1839(3), or that the owner has exerted "efforts that are reasonable under the circumstances

to maintain its secrecy[,]" RSMo § 417.453(4). The "trade secret" here is the Schlafly Database, "a compilation of business contacts and specific information on some 400,000 plus individuals and organizations, including their donation records to many of the [Schlafly Network] entities, contact information, and other information collected by Mrs. Schlafly that have proven valuable for fundraising efforts over the past 50 years." Doc. 138, ¶153. In their 2AC, Plaintiffs allege: ETF maintained the Schlafly Database but never disclosed it to any of the other Schlafly Network entities. Instead the separate entities paid or reimbursed ETF for services and ETF used the Schlafly Database to facilitate communications and solicitations on behalf of the other entities. *Id.*; Mrs. Schlafly "never rented, sold, or disclosed the Schlafly Database to any third parties[,]" and "never allowed it to be electronically transferred to anyone." *Id*. at ¶52; before digitizing the Schlafly Database on the cloud, "hard-copy backups of the Schlafly Database were … locked in Mrs. Schlafly's personal safe deposit box." *Id*. at ¶53; and that "Full, interactive access to the current digital Schlafly Database is available on only one [ETF] computer … Two other computers at the same location have had limited access to the database. All three computers are—and have at all times been—kept in the locked offices of [ETF] with access granted only to several [ETF] employees, including [JoAnn] Jouett, Georgia Wolters, and Liz Miller." *Id*. at ¶54.

In other words, only select ETF employees and the ETF trustees could access the Schlafly Database. None of the Individual Defendants had this access, despite being members of the Eagle Forum (c)(4) board of directors. Apart from ETF, none of the Schlafly Network entities could access the Schlafly Database. The Database existed on a secure, cloud platform. Defendants only obtained access through Elizabeth Miller's subterfuge—at the direction of Individual Defendants—and the data that she stole had to be hacked by the SpearTip "cyber counterintelligence" firm.

In their brief, Defendants seek to distinguish *Lyn-Flex W., Inc. v. Dieckhaus*, 24 S.W.3d 693 (Mo. App. E.D. 1999), a case directly on point. In *Lyn-Flex*, the Missouri Court of Appeals found that the plaintiff had presented sufficient evidence of reasonable secrecy measures to withstand a motion for directed verdict. As for the purported trade secret—a price book containing customer information—the plaintiff produced evidence that: 1.) "the employees knew that the price book was confidential," 2.) "that access was limited," 3.) "it was locked in an office at night and old copies were shredded," 4.) "the price book was not taken from the office except during sales calls," and 5.) "the technical support engineer was the only person with the capability to print it." 24 S.W.3d at 699. The court explained "[w]hile the existence of a confidentiality or noncompete agreement may be further evidence of the book's confidentiality, the lack of such agreements is not conclusive[.]" *Id.* See also *Smart Team Glob., LLC v. HumbleTech LLC*, Case No. 19-CV-4873, 2020 WL 2836465, at *4 (S.D.N.Y. June 1, 2020) (finding that a complaint sufficiently pleaded reasonable efforts to maintain secrecy under the DTSA where the trade secret "is stored in a password-protected "Bitbucket," [and] that only employees with a need to access the Bitbucket are provided with the Bitbucket password").

ETF implemented protective measures at least as rigorous as Lyn-Flex: ETF restricted access to the Schlafly Database to only ETF employees who used or edited the Database, stored it on a password-protected cloud server, and encrypted the materials. Interactive access to the Database was available on only a single computer in ETF's office. In trying to distinguish *Lyn-Flex*, the Individual Defendants  suggest in their Brief that "the only persons permitted to access the price book … were the officers of the company and a technical support engineer employee." Doc. 143 at *10. That statement is unsupported by the opinion itself—the court specifically noted that "**employees**, even [defendant] Dick [Dieckhaus], who had worked for the company for many

11

years, referred to the book for reference when giving pricing and specific information." 24 S.W.3d at 699 (emphasis added). In other words, employees at Lyn-Flex could *access* the book, but only the tech support engineer could *print* it.

Individual Defendants further argue that Plaintiffs have not alleged that the Defendants "misappropriated" the Schlafly Database. Doc. 143, p. *10-11. Misappropriation exists where there has been either "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or "use of a trade secret of another [without consent] by a person who … used improper means to acquire knowledge of the trade secret [or] knew or had reason to know that the … trade secret was … derived from a person who had used improper means to acquire the trade secret[.]" 18 U.S.C. § 1839(5). Here, the Plaintiffs have alleged improper acquisition and use of the Schlafly Database. Plaintiffs alleged that the Defendants improperly acquired the Database from ETF employee Liz Miller, who stole it from ETF's computer and delivered it to SpearTip for decryption. Doc. 138 at ¶¶120-129. Plaintiffs allege that the Defendants then used the Schlafly Database to "promote their activities, including fundraising activities and the promotion of a March 10, 2016 event in Naples, Florida." *Id*. at ¶130. Plaintiffs have therefore alleged both improper acquisition and unlawful use of the Database.

## IV.    PLAINTIFFS ALLEGED INFRINGEMENT OF THEIR MARKS

Fourth, Individual Defendants argue that the 2AC does not have allegations of "any actual use or infringement by Individual Defendants or Plaintiffs' purported trademarks." Doc. 143, p. 11-12. This contention is baseless. Plaintiffs have alleged, for example, that the Individual Defendants: started a competing website using a logo much like the Plaintiffs' Eagle Logo, Doc. 138, ¶133(a); used the Plaintiffs' Eagle, Eagle Logo, and Phyllis Schlafly marks to defame Mrs. Schlafly and diminish the value of Plaintiffs' marks and intellectual property, *Id*. at ¶133(e), (f);

12

used ETF's Eagle Logo mark to advertise the Defendants' event on March 10, 2017 in Naples, Florida, *Id*. at ¶133(i); have created and used a mark that is substantially indistinguishable from ETF's Eagle Logo, *Id*. at ¶212; and published a newsletter in direct competition with ETF's *The Phyllis Schlafly Report* and falsely states that it is the "successor to *The Phyllis Schlafly Report*"— even though ETF still publishes *The Phyllis Schlafly Report*, *Id*. at ¶¶332-339; 346-347. Plaintiffs have alleged many instances of trademark dilution and misappropriation.

## V.   FEDERAL COURTS HAVE RECOGNIZED A POST-MORTEM RIGHT TO PUBLICITY, CONSISTENT WITH NATIONWIDE TREND EVEN WHEN THE DECEDENT'S HOME STATE HAS NOT YET RECOGNIZED SUCH A RIGHT

Fifth, the Individual Defendants argue that Plaintiffs' claim for violating publicity rights (Count VI) fails because Missouri has not yet recognized a postmortem right of publicity. Doc. 143, p. 12-14. The Defendants rely on a Sixth Circuit decision, *Memphis Dev. Found. v. Factors Etc*., Inc., 616 F.2d 956, 958-960 (6th Cir. 1980) for the proposition that a federal court should not recognize a postmortem right if the decedent's home state has not yet recognized that right. But the overwhelming national trend favors protection of postmortem rights of publicity, with twenty-three states recognizing this right and only two rejecting it. The Sixth Circuit noted that the holding in *Memphis Development* "was subsequently undermined when the Tennessee Court of Appeals rejected its reasoning and declared the right of publicity was descendible under Tennessee." *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc*., 270 F.3d 298, 324 (6th Cir. 2001). The *Herman Miller* Court then reached the **exact opposite** conclusion of *Memphis Development*— although Michigan had not yet recognized a postmortem right of publicity, the Sixth Circuit opined "that Michigan courts would recognize" that right and ruled that "the district court did no err in recognizing a post-mortem right of publicity under Michigan common law." *Id*. at 324, 326.

At least one court in the Eighth Circuit has followed suit. The District Court for the District of Minnesota held that the national trend was for federal courts to recognize a postmortem right of publicity arising in states that had not yet determined whether the right exists. In *Paisley Park Enterprises, Inc. v. Boxill*, 299 F. Supp. 3d 1074, 1082 (D. Minn. 2017) (involving postmortem publicity for the late musician Prince), the district court explained that "[t]he clear weight of authority from jurisdictions that have addressed this issue supports a conclusion that the right of publicity is a property right that is enforceable by the decedent's estate." (collecting cases and authorities). The district court again emphasized that the Eighth Circuit had concluded before that a right of publicity exists as a matter of Minnesota common law. *Id.* at 1083. The district court held such a right exists in Minnesota given the overwhelming national trend supporting the existence of a descendible, postmortem publicity right.

Missouri already recognizes a right of publicity and actions for false endorsement. *Bear Foot, Inc. v. Chandler*, 965 S.W.2d 386, 389 (Mo. Ct. App. 1998). There is no basis for Missouri to buck the overwhelming nationwide trend and find that the right of publicity does not extend postmortem.[3] Absent a statute to the contrary, this court should follow the Eighth Circuit guidance and apply Missouri common law recognizing postmortem publicity rights.

The Individual Defendants also argue that the SDIL Court has already ruled that Anne Cori possesses an ownership interest in Phyllis Schlafly's right of publicity under Illinois law. *Eagle Forum v. Phyllis Schlafly's American Eagles*, Case No. 3:16-cv-00946 (S.D. Ill. October 16, 2017) (Memorandum and Order, Doc. 95). This argument is a red herring for three reasons. First, none of the Plaintiffs here were parties to SDIL (including PSRT, the owner of the right of publicity),

---

[3]    Defendants argue that dicta in *Bear Foot* suggests Missouri would not recognize a postmortem right. But *Bear Foot* involved whether a **corporation** had a right of publicity, not a public figure.

and PSAE never alleged that it owned Mrs. Schlafly's right of publicity. Second, the SDIL order ignores the assignment by Mrs. Schlafly of her right of publicity to PSRT as well as the pour-over provision in her will. See Doc. 57 at ¶¶20-21. Third, Anne Cori petitioned in the St. Louis County Probate Court challenging that same amendment, which is now dismissed with prejudice. This validates of Mrs. Schlafly's assignment to PSRT and her last will and testament.

## VI.     PLAINTIFFS' TORTIOUS INTERFERENCE CLAIM IS NOT BASED ON THE MADISON COUNTY LAWSUIT

Finally, Individual Defendants argue that Plaintiffs' tortious interference claim (Count IX) should be dismissed because the Defendants' "conduct was authorized by the" Madison County Action. Doc. 143, p. 14-16. This argument is a misrepresentation of Plaintiffs' claim. Plaintiffs do not seek to impose liability on the Defendants for filing a lawsuit in Madison County or complying with orders elsewhere. The bases for this claim involve actions unrelated to that lawsuit. The Plaintiffs allege that the Defendants: "[A]ccessed and 'shut down' email accounts for Eagle Forum (c)(3) employees[;]" Doc. 138, ¶314; Prevented ETF from servicing websites unrelated to Eagle Forum (c)(4); *Id*., ¶¶318-319; and "[I]nterfere[d] with the receipt of Plaintiffs' mail" and caused a mail dispute with the Postal Service causing Plaintiffs being denied their mail and donations for nearly two months; *Id*., ¶¶320-321. None of these allegations relate to the filing of the Madison County lawsuit, but are willful and malicious instances of the Defendants' conduct.

## CONCLUSION

For the reasons described above, the Plaintiffs have sufficiently pleaded all of their claims. The Court should therefore deny this motion in its entirety. If, however, the Court determines that any aspect of Plaintiffs' 2AC is deficient, Plaintiffs request the opportunity to amend and cure any pleading deficiency.

Respectfully submitted,

RHOADES MCKEE PC

Date: September 8, 2020                    /s/Ian A. Northon
                                           Ian A. Northon
                                           Attorneys for Plaintiffs


**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September, 2020, we served a true copy of the foregoing through the Court's Electronic Filing System on all counsel of record.

                                           /s/ Ian A. Northon


**CERTIFICATE OF COMPLIANCE**

I herby certify that we used a 12-point font and doubled-space formatting under Local Rule 2.01 and otherwise conformed this brief under Local Rule 4.01(d) at fewer than 15 total pages, exclusive of the signature block and attachments.

                                           /s/ Ian A. Northon

                                           Ian A. Northon
                                           Michigan Bar P65082
                                           Florida Bar 101522
                                           Pennsylvania Bar 207733
                                           ian@rhoadesmckee.com
                                           smd@rhoadesmckee.com
                                           55 Campau Ave., N.W., Ste. 300
                                           Grand Rapids, MI 49503
                                           *Attorneys for Plaintiffs*