**Gregg, Arthur**

| | |
|---|---|
| **From:** | Patrick Sweeney <psweeney@rhoadesmckee.com> |
| **Sent:** | Friday, July 8, 2022 10:07 PM |
| **To:** | Gregg, Arthur; Solverud, Erik; Sanders, James; ian@northonlaw.com |
| **Cc:** | Kathy Haisma |
| **Subject:** | [EXTERNAL] PSRT v Cori et al., Eastern District of Missouri - Plaintiffs' Expert Witness Disclosures |
| **Attachments:** | Attachments.html |

**[Warning] This E-mail came from an External sender. Please do not open links or attachments unless you are sure it is trusted.**

---

**Citrix Attachments**                          Expires January 4, 2023

Plaintiffs' Expert Witness Disclosures_3637730.PDF          7.7 MB

<div style="background:#1a73c9;color:white;padding:6px">Download Attachments</div>

Patrick Sweeney uses Citrix Files to share documents securely.

Counselors,
Please see the attached expert witness disclosures and CVs. Dr. Huntoon will be asserting the same opinions that he provided in the St. Louis County Probate matter. Mr. Buss will be provided damages analysis. He is still in the process of reviewing data and finalizing his opinions, I will be providing his full report and all supporting documentation as soon as possible. He expects to have it complete next week.

Sincerely,
Patrick Sweeney



**Patrick Sweeney | Attorney**

616-233-5262 | psweeney@rhoadesmckee.com

55 Campau Avenue NW, Suite 300, Grand Rapids, MI 49503

EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PHYLLIS SCHLAFLY REVOCABLE TRUST, et. al.,

       Plaintiffs,                       Case No. 4:16-cv-01631-JAR

v.

ANNE CORI, et. al.,

       Defendants.

_____/

## **PLAINTIFFS' DISCLOSURE OF EXPERT WITNESSES**

      Plaintiffs, through their counsel, hereby disclose the following expert witnesses upon whose testimony they may rely at the time of trial.

1. Brian Buss, CFA
   CBIZ Forensic Consulting Group
   401 B Street, Suite 2150
   San Diego, CA 92101

   Mr. Buss is expected to testify regarding the analysis and calculation of economic damages relating to the allegations in the Second Amended Complaint, including both the causation and amounts of such damages. Mr. Buss also anticipates reviewing and responding to any relevant expert reports or financial and economic analysis produced by other parties. Plaintiffs reserve the right to designation additional areas of testimony for Mr. Buss in rebuttal to Defendants' expert designations, if any.

2. Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.
   7008 Erie Road
   Derby, NY 14047

   Dr. Huntoon is a board certified neurologist, and is expected to testify regarding Phyllis Schlafly's testamentary capacity during the year 2016, in particular at the time she executed certain assignments of property. Dr. Huntoon also anticipates reviewing and responding to any relevant expert reports or analyses regarding Mrs. Schlafly's testamentary capacity produced by other parties. Plaintiffs reserve the right to designate additional areas of testimony for Dr. Huntoon in rebuttal to Defendants' expert designations, if any.

3. Plaintiffs reserve the right to name additional expert witnesses, including rebuttal expert witnesses.

1

Respectfully Submitted,

Dated: July 8, 2022

RHOADES MCKEE PC
Attorneys for Plaintiff

By:___/s/ Patrick E. Sweeney_____
    Patrick E. Sweeney (P79822 MI)
    55 Campau Ave., N.W., Ste. 300
    Grand Rapids, MI 49503
    Telephone:  (616) 235-3500
    psweeney@rhoadesmckee.com
    kjhaisma@rhoadesmckee.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of July, 2022, we served a true copy of this Plaintiffs' Disclosure of Expert Witnesses via email on all counsel of record at the addresses listed below.

| | |
|---|---|
| James P. Sanders, #58899MO | Erik O. Solverud, #44291MO |
| SMITHAMUNDSEN LLC | Arthur D. Gregg, #67098MO |
| 120 S. Central Avenue, Suite 700 | Spencer Fane LLP |
| St. Louis, MO 63105 | 1 N. Brentwood Blvd., Suite 1000 |
| Ph:  (314) 719-3700 | St. Louis, MO 63105 |
| jsanders@salawus.com | Ph:  (314) 863-7733 |
| | esolverud@spencerfane.com |
| | agregg@spencerfane.com |
| | |
| *Attorneys For Eagle Forum* | *Attorneys for* |
| | *Anne Schlafly Cori* |

/s/ Patrick E. Sweeney_____

2



**Brian Buss**, CFA
CBIZ Forensic Consulting Group, LLC
Brian.buss@cbiz.com
(619) 291 9508

**PROFILE**

Brian Buss is a Director with CBIZ Forensic Consulting Group. A Chartered Financial Analyst (CFA) with 25 years of experience in valuations, financial analysis, and corporate finance around the world. Mr. Buss provides strategic advice for owners of intellectual property portfolios, transaction support and due diligence for acquisitions, licensing, divestiture and partnership transactions, expert testimony regarding economic damages, valuation and IP asset apportionment in civil litigation, and valuations of trademarks, patents, copyrights, brand assets, trade secrets, technology assets, and intangibles.

Examples of recent engagements led by Mr. Buss include:

- Provided expert testimony in Federal Court, State Court, US Tax Court, US arbitration and international arbitration regarding economic damages, IP valuation, and business valuation.

- Expert opinions and testimony regarding economic damages and profit apportionment in cases involving copyright infringement, patent infringement, Lanham Act claims, business interruption, bankruptcy, breach of contract, defamation, taxation, and trade secret misappropriation.

- Strategic advisory services based on IP, brand, and business valuation for global clients, including:
    - Valuation of licensed properties to support transaction negotiations for theme park operator;
    - Development of valuation models to test revenue model and pricing strategies for a not-for-profit industry association;
    - Valuation of brands and trademarks for a consumer products company considering a name change;
    - Valuation of intellectual properties to evaluate exit strategies for investor groups in wireless communications, healthcare, and pharmaceutical companies;
    - Valuation of copyright, trademark and technology IP for restructuring, estate planning, and bankruptcy; and
    - Transaction due diligence and royalty analysis for licensors and licensees.

During his career Mr. Buss has provided valuation opinions and transaction advisory services for clients across the United States and overseas. Mr. Buss has provided advisory services and financial analyses for acquisitions, corporate lending, licensing and franchising, start-up financing, restructuring, tax and estate planning, price optimization, intellectual property infringement and economic damages claims.

**EXPERT WITNESS & TESTIMONY EXPERIENCE**

1724982 Alberta ULC v. Park Avenue Wholesale, Inc.; Expert report regarding economic damages due to **trademark infringement**; United States District Court Western District of New York; Case No.: 1:21-cv-00834-JLS-HKS; 2022

Planet Bingo LLC v. William Youngblood, William R. Youngblood Insurance Agency, Inc. and The Burlington Insurance Company; Expert report and deposition testimony regarding economic damages due to **reputational harm**; Superior Court of the State of

**Brian Buss**, CFA

California, County of Riverside' Case PSC 1600461; 2022

Delta T, LLC d/b/a Big Ass Fans v. <u>Kale Fans America S.A. de C.V.</u>, Expert report and deposition testimony regarding economic damages due to **trademark infringement**; United States District Court, Middle District of Florida; Case 6:20-cv-170-40EJK; 2022

Glam and Glits Nail Design, Inc. v. <u>iGel Beauty, LLC</u>, et. al, Expert report and deposition testimony regarding economic damages due to **design patent and trade dress infringement**; United States District Court, Central District of California; Case CV-20-00088-JVS-DFM; 2022

George & Company LLC v. <u>Spin Master Corp; Spin Master US Holdings, Inc.; Spin Master LTD; Spin Master, Inc</u>.; Cardinal Industries, Inc.; Walmart Inc.; and Joel Berger; Expert report regarding economic damages due to **trademark infringement**; United States District Court, Eastern District of New York; Case 1:19-cv-04391; 2022

<u>Lerch Bates, Inc</u>. v. Michael Blades & Associates, Ltd., Expert Report regarding economic damages due to **copyright infringement**, United States District Court, District of Columbia, Case 1:20-cv-02223-BAH, 2022

Nu Pagamentos S.A.– Instituição de Pagamento vs. <u>George Daniel Hudson Jr</u>., Expert report regarding economic damages due to **trademark infringement**, United States District Court, Northern District of Georgia, Case 2:21-cv-00069-RWS, 2022

<u>Zox LLC</u> v. John Zox, Daniel Zox, and Andrew Zox, Expert report, rebuttal report and deposition testimony regarding economic damages due to **trademark infringement**, United States District Court, Central District of California, Case 2:21-CV-01609, 2021

A Parent Media Co., Inc. v. <u>Genius Brands International, Inc</u>., Expert report regarding **trademark infringement via Google Ads**, United States District Court, Central District of California, Western Division, Case 2:21-cv-04897, 2021

Andrews International Government Securities, Inc. vs. <u>Andrews Global Security, Inc</u>., et. at., Expert report regarding **trademark infringement and profit apportionment**, United States District Court, Central District of California, Case 2:19-cv-02042-DSF-MRW; 2021

<u>Electronic Scripting Products, Inc</u>. vs. HTC America, Inc., Expert report regarding **patent infringement,** United States District Court, Northern District of California, Case 3:17-cv-05806; 2021

ADT LLC et al. v. <u>Vivint Smart Home, Inc</u>. et. al., Expert report regarding **trademark infringement** and corrective advertising, United States District Court, Southern District of Florida, Case 20-23391-CIV-COOKE/GOODMAN; 2021

CPI Security Systems, Inc. v. <u>Vivint Smart Home, Inc</u>. et. al., Deposition testimony and expert report regarding **trademark infringement** and corrective advertising, United States District Court, Western District of North Carolina, Case 3:20-CV-00504-FDW-DSC; 2021

Michael Gaffney v. <u>Muhammad Ali Enterprises LLC, Authentic Brands Group LLC</u>, Roots Of, Inc., Deposition testimony and expert report regarding economic damages due to **copyright infringement**; United States District Court Southern District of New York, Civil

**Brian Buss**, CFA

Actions No.: 18-CV-08770 and No. 1:20-cv-07113; 2021

Elasticsearch, Inc. and Elasticsearch B.V. v. <u>floragunn GmbH</u>, Expert report and deposition testimony regarding economic damages due to **copyright infringement**; United States District Court, Northern District of California, Case 3:20-cv-07514; 2021

<u>National Rifle Association of America</u> v. Ackerman McQueen, Inc., Mercury Group, Inc., Henry Martin, William Winkler, and Melanie Montgomery; Deposition testimony and expert report regarding **valuation and performance of online video platform**; United States District Court, Northern District of Texas; Case 3:19-cv-02074-G; 2021

<u>Estate of Shahraum Scott Sobhani</u>., v. Hooshang Kaen, Cloud Constellation Corporation, International Telecom Advisory Group LLC, Caravan Communications Corporation, et. al.; Deposition testimony regarding **valuation of corporations and patents**; Superior Court of California, Central District; Case 19STCV26119; 2021

Bruce Munro and Bruce Munro Ltd., v. <u>Fairchild Tropical Botanic Garden, Inc. Night Garden LLC, Kilburn Live LLC</u>, et. al.; Expert report regarding economic damages due to **copyright infringement**; United States District Court, Southern District of Florida, Case 1:20-cv-20079-ASH/Louis; 2021

Leah Bassett v. Monica Jensen d/b/a Nica Noelle; Jon Blitt; Mile High Media d/b/a Icon Male d/b/a Transsensual; <u>Mile High Distribution, Inc</u>., et. al.; Expert report regarding economic damages due to **copyright infringement**; United States District Court, Eastern District of Massachusetts, Case 18-cv-10576-PBS; 2021

Koppel Patrick Heybl & Philpott, P.C. v. Remington Designs, LLC, Bruce D. Burrows, and <u>David S. Hagen;</u> Expert declaration regarding **valuation of patent and trademark assets**; Superior Court for the State of California, County of Los Angeles; Case No. 19STCV41942; 2021

Furnituredealer.net, Inc. v. Amazon.com, Inc. and <u>COA, Inc</u>., Expert report and deposition testimony regarding economic damages due to **copyright infringement**; United States District Court, District of Minnesota; Case 0:18-cv-00232 (JRT/HB); 2021

Rousselot B.V. v. <u>St. Paul Brands, Inc</u>., Expert Reports regarding economic damages due to **trademark infringement**; United States District Court, Central District of California; Case 8:19 cv-00458; 2020

Intersal, Inc. v. <u>Susi H. Hamilton, North Carolina Department of Natural and Cultural Resources and State of North Carolina</u>, Expert Rebuttal Report and deposition testimony regarding economic damages due to **copyright infringement and breach of contract**; General Court of Justice Superior: Court Division of North Carolina, File No. 15-CvS-9995; 2020

<u>Camuto Consulting, Inc</u>. v. Fleet Street, Ltd., Expert Rebuttal Report and arbitration testimony regarding **economic damages due to breach of license agreement**; JAMS Ref No. 1425027816; 2020

Universal Life Church Monastery Storehouse, v. <u>American Marriage Ministries</u>, et al., Deposition Testimony regarding **access to website analytics data** and reports involving

**Brian Buss**, CFA

trademark infringement and defamation; Case 2:19-cv-00301-RSL; United States District Court, Western District of Washington; 2020

Gianni Versace S.R.L. v. Fashion Nova, Inc., Expert Report and deposition testimony regarding **economic damages and profit apportionment due to trademark, copyright, and trade dress infringement**; Case 2:19-cv-10074, filed in United States District Court, Central District of California; 2020

Kabushiki Kaisha Too Marker Products, Inc. v. Imagination International Incorporated, Expert Report regarding **lost profits in due to breach of contract and trademark infringement**; Case No. ICC 24464/MK; 2020

Envision Energy International Limited and GSR Electric Vehicle Partners L.P. Arbitration testimony and expert report regarding **lost profits, Wrotham Park damages and the value of claimed confidential information**; Arbitration under the Administered Arbitration Rules of the Hong Kong International Arbitration Centre; Case HKIAC / A18143; 2020

O'Neil Digital Solutions, LLC v. James Lucanish. Deposition testimony regarding **valuation of proprietary intangible assets and trade secrets**; Case BC657947; 2020

Seshadri Raju, M.D., P.A. v. Erin Murphy, M.D., Medtronic, Inc., Expert report regarding economic damages regarding **copyright infringement**; Case 3:17-cv-00357-CWR-LRA; 2019

Soos & Associates, Inc. v. Five Guys Enterprises, LLC. Deposition testimony and expert report regarding economic damages due to **infringement of architectural plan copyrights**; Case 1:17-cv-06577; 2019

Akamai Technologies v. Commissioner of Revenue. Deposition testimony regarding a **business investigation and operations classification** of Akamai Technologies; Docket # 33699; Commonwealth of Massachusetts Appellate Tax Board; 2019

Stockdale Investment Group, Inc. v. Stockdale Capital Partners LLC, et al. Deposition testimony and expert report regarding **likelihood of trademark confusion**; Case 4:18-cv-02949; 2019

Christopher Knowles v. Spin Master, Inc., Spin Master Studios, et al. Expert report regarding economic damages due to **copyright infringement**; Case 2:18-cv-05827; 2019

GearSource Holdings, LLC v. Google, LLC. Expert reports regarding economic damages due to **trademark infringement**; Case 3:18-cv-03812; 2019

Teeter-Totter, LLC v. Palm Bay International, Inc. et al. Expert report regarding economic damages and profit apportionment due to **trademark and copyright infringement** in the wine industry; Case 5:17-cv-06609-LHK; 2019

Platinum Logistics WY, Inc. v. Platinum Cargo Logistics, Inc. Expert rebuttal report regarding trademark valuation and economic damages due to **trademark infringement**; Case 3:13-cv-01819-CAB-KSC; 2019

KB International, LLC v. Acacia Research Group, LLC. Expert report, Arbitration

**Brian Buss**, CFA

CBIZ Forensic
Consulting Group, LLC

testimony, Deposition and Expert Report regarding economic damages due to **breach of contract and patent infringement**; American Arbitration Association; 2019

Mission Healthcare Services, Inc. v. Bridge Home Health & Hospice, et al. Deposition testimony regarding economic damages due to **trade secret misappropriation, unfair competition, breach of contract and defamation**; Case 37-2016-00044574-CU-BT-CTL; Superior Court of California; 2018

Netflix, Inc. v. Commissioner of Revenue. Expert consulting regarding **intellectual property and intangible asset valuation**; Docket # 329923; Commonwealth of Massachusetts Appellate Tax Board; 2018

Eagle Rock Resort Co. vs. Janet A. Carlin, et al. Expert report regarding impact of **disparaging and defamatory statements** and economic damages at a resort property development; Case 2013-CV-13756; Court of Common Pleas of Luzerne County, Pennsylvania; 2018

Rentokil North America, Inc. v. John K. Whitley as the Stockholders Representative, et al. Expert Report and Rebuttal Report regarding economic damages in **copyright infringement and indemnification** claims pursuant to a stock purchase agreement in the pest control and business services industries, Case 01-16-0004-3260; American Arbitration Association; 2018

Grumpy Cat Limited v. Grumpy Beverage LLC et al. Testimony in Federal Court and Expert Report regarding economic damages due to **copyright infringement, trademark infringement and breach of contract** in the beverages industry; Case 8:15-cv-02063-DOC-DFM; Central District of California; 2017

Anthony California, Inc. v. Fire Power Co. Ltd. New Bright Jet Lighting Co. Ltd. et al.; Testimony in Federal Court and Expert Report regarding economic damages due to **copyright infringement and trade secret misappropriation** in the home furnishings industry; Case 5:15-cv-00876-JGB-SP; Central District of California; 2017

Aardwolf Industries, LLC v. Abaco Machines USA, Inc. Ausavina Co. LTD, et al. Expert Report and Deposition Testimony regarding economic damages due to **trademark and copyright infringement** in the construction tools industry; Case 2:16-cv-01968-GW-JEM; Central District of California; 2017

Rosebank Road Medical Services Ltd., and Geeta Murali Ganesh v. Ramji Govindarajan. Testimony in California State Court, Deposition Testimony and Expert Report regarding impact of **defamatory statements**; Case CGC-16-549755; Superior Court of California; 2017

Intellicheck Mobilisa, Inc. v. Wizz Systems LLC. Expert Report and Deposition Testimony regarding economic damages in a **utility patent** infringement claim in the security software development industry; Case 2:15-cv-00366-JLR; Western District of Washington; 2017

Boiling Point Group, Inc. v. Fong Ware Co. Ltd., et al. Expert Report regarding economic damages in a **design patent** infringement claim in the restaurant industry; Case 2:16-cv-01672-RGK-JEM; Central District of California; 2017

Gold Value International Textile, Inc. v. Sanctuary Clothing LLC, Amazon.com,

**Brian Buss**, CFA

Bloomingdale's, Inc., Dillard's Inc., Macy's, Inc., Nordstrom, Inc., and Zappos IP, Inc. Expert Report regarding economic damages and profit apportionment in **copyright** infringement claim; Case 2:16-cv-00339-JAK-FFM; Central District of California; 2017

Blue Gentian LLC and National Express, Inc. v. Tristar Products, Inc. and Wal-Mart Stores, Inc. Expert Rebuttal Report and Deposition Testimony regarding economic damages in patent infringement claim (**utility and design patents**); Civil Action No. 13-cv-1758 (D.N.J.); District of New Jersey; 2017

EDI International, P.C. v. Crestwood Station Plaza LLC, et al. Expert Report regarding Economic Damages in **copyright infringement** claim involving architectural design plans; Case No. 15-cv-07281-KBF,USDC, Southern District of New York; 2016

James Ellis as Stockholders Agent for Gablit Holdings, Inc., v. Events.com, Inc. Testimony in Arbitration proceedings and Expert Report regarding **M&A due diligence, unpaid compensation and economic damages**; Case No. 01-15-0004-5736, American Arbitration Association; 2016

Massachusetts Department of Revenue – Litigation Bureau v. Anheuser-Busch INBEV Worldwide, Inc. Expert consulting regarding **transfer pricing and reasonable compensation** for inter-company financing; 2016

Solar Sun Rings, Inc., v. Secard Pools et al. Deposition Testimony and Expert Report regarding **economic damages in a Lanham Act Claim**; Case No. 5:14-cv-02417, USDC, Central District of California; 2015

Markwins Beauty Supply, Inc. v. Krystal Ball Productions, Inc., et al. Expert Report regarding **business valuation** of Markwins Beauty Supply, Inc.; 2015

Yucaipa Corporate Initiatives Fund vs. Hawaiian Airlines. Expert Consulting regarding **value of Airline brands and trademarks** and **use of trademarks in Internet Search and e-commerce**; Case No. CV13-09060, USDC, Central District of California; 2015

Block Developers, LLC et al. v. Commissioner of Internal Revenue. Expert Report and Testimony for US Tax Court regarding **reasonable royalty rate** for use of patents by potential franchisees and **valuation of construction materials patents**; Docket No. 3198-10; 2014

Azco Biotech, Inc. v. Intelligent Bio-Systems, Inc. Expert Report and Deposition Testimony regarding value of molecular diagnostics **patents and early-stage businesses**; Case No. 12CV2599 BEN DHB, USDC, Southern District of California; 2014

G-Unit Brands, Inc. against Sleek Audio, Inc. Arbitration Testimony, Deposition and Expert Report regarding value of **celebrity promotional and marketing activities and right of publicity**; JAMS Ref. No 1425010166; 2014

Amini Innovation Corporation vs. McFerran Home Furnishings, Inc. Expert Report regarding economic contribution of **trade dress and copyright** in the furniture industry; Case No. CV13-06496-RSWL(SSx), USDC, Central District of California; 2014

Star Fabrics v. Joyce Leslie, Inc. et al. Expert Report regarding economic impact of fabric design **copyright infringement** and incremental profits achieved by defendants; United States District Court, Central District of California; 2014

Cengage Learning, Inc., et al. United States Bankruptcy Court Eastern District of New

**Brian Buss**, CFA



York; Expert Opinion and Rebuttal Opinion regarding valuation of higher education textbook **copyrights** on behalf of the Second Lien Indenture Trustee in Chapter 11 bankruptcy; 2014

United Fabrics International v. G-III Apparel Group, Ltd; and McKlein Company, LLC. Export Report regarding economic impact of fabric design copyrights and defendants' profits due to **copyright infringement**; United States District Court, Central District of California; 2013

David Wolfe v. Sunfood LLC, et al. Deposition Testimony regarding lost profit damages as a result of **brand defamation**; Superior Court of the State of California for the County of San Diego; 2013

Rawlings Sporting Goods Company, Inc. v. Wilson Sporting Goods. Expert Opinion regarding economic impact of **trademark infringement**; United States District Court Eastern District of Missouri; 2013

Dahon North America, Inc. vs. Mobility Holdings Ltd, Mobility Holdings Ltd (Taiwan Branch), Stile Products, Inc., Dahon & Hon Industrial Labs, Ltd., et al. Expert Rebuttal Opinion regarding **copyright and patent infringement** damages; United States District Court, Central District of California; 2013

Syngenta Seeds, Inc. v. Bunge North America, Inc. Deposition Testimony and Expert Report regarding lost profit damages resulting from **brand disparagement**; United States District Court Northern District of Iowa Western Division; 2012

VolumeCocomo Apparel, Inc. v. Guess?, Inc.; Dillard's, Inc., Bloomingdale's, Inc. and Macy's, Inc. Deposition Testimony and Expert Report regarding value of design **copyrights** and unjust enrichment damages from unauthorized use of copyright; 2012

David Dick, et al. v. First Citizens Bank and Trust Company, Inc., et al. Deposition Testimony and Expert Report regarding valuation of construction equipment **patents** in bankruptcy; 2012

United Fabrics International, Inc. v. Pat Rego, Inc., Lane Bryant, Inc., et al. Expert Report regarding value of design **copyrights** and contribution to additional profits achieved by garment retailers; 2011

L.A. Printex Industries, Inc. v. Macy's Retail Holdings, Inc., et al. Expert Report regarding value of design **copyrights** and additional profits achieved by garment retailers; 2011

Lilyan Hassaine and Salim Salahi v. Home Depot, U.S.A., Inc. et al. Expert Report regarding **personal injury** claims; 2010

Benjamin Gurfinkel v. Mike Riley, et al. Deposition Testimony regarding dispute over amount of **angel-level funding** received by a technology start-up; 2010

| | |
|---|---|
| **EDUCATION & CERTIFICATION** | San Diego State University; MBA, Executive Program, 2011 |
| | Claremont McKenna College; Bachelor of Arts, Biology & Economics; 1993 |
| | Chartered Financial Analyst (CFA); 1997 |
| | Certified Patent Valuation Analyst (CPVA); 2017 |
| **EMPLOYMENT EXPERIENCE** | **CBIZ Forensic Consulting Group, LLC;** San Diego CA, 2022 – present; Director; IP |

**Brian Buss**, CFA

valuation, analysis, and litigation consulting services

**Nevium Intellectual Property Consultants;** San Diego CA, Founding Principal; IP valuation, analysis, and litigation consulting services; 2012 - 2022

**CONSOR Intellectual Asset Management;** San Diego CA, IP valuation and litigation services, 2011 - 2012

**Brodshatzer, Wallace, Spoon & Yip LLP;** San Diego CA; Expert witness, litigation services, forensic accounting, and business valuation, 2007 - 2010

**Tech M3, Inc.**; San Diego CA; Co-founder and financial officer for a technology start-up, 2006 - 2007

**Westpac Institutional Bank**; Auckland, New Zealand; Commercial and Investment Banking, 2003 - 2005

**Deloitte & Touche**; Auckland, New Zealand and San Francisco CA; Business valuation, purchase price allocation analysis, and strategic consulting, 1998 - 2003

**Princeton Venture Research**; San Diego CA; Shareholder class-action litigation and business valuation consulting, 1993 - 1997

**PUBLICATIONS & PRESENTATIONS**

"Working with the ISO Standards, Brand Evaluation and Valuation" presentation at the International Trademark Association (INTA) 2022 Annual Meeting, April 2022

Chapters titled "Measuring What Matters: An Introduction to IP Valuation"; "Introduction to Copyright Valuation" and "Profit Apportionment for Intellectual Property Valuation" published in <u>Practical Guide to Successful Intellectual Property Valuation and Transactions</u>, Wolters Kluwer, 2022

"Brand Management and Valuation" presentation for Annual Meeting of Licensing Executives Society (LES), September 2021

"Valuing Brands in the Tech Sector Using an Apportionment Framework" published in The Value Examiner, May/June 2021

"Trademark and Brand Valuation" presentation for Confederation of Indian Industry (CII), March 2021

Chapters titled "Profit Apportionment in Intellectual Property Infringement Damages Calculations" and "The Use of Analytic Tools for Valuation and Damages Calculations in Internet IP Infringement and Defamation Cases" published in <u>The Comprehensive Guide to Economic Damages, 6th Edition</u> published by Business Valuation Resources (BVR), 2020

Two webinars for the Confederation of Indian Industry (CII) covering trademark valuation and trade secret valuation; 2020

"Brand Valuation" webinar for the Brand Establishment; 2020

"IP Valuation" Virtual seminar for San Diego patent attorney networking group, 2020

"How Your Product Portfolio Builds Valuable Brands" article for LES Insights, Licensing Executives Society; 2020

"Internet Tools for Intellectual Property Analysis" webinar for Certified Patent Valuation Analyst program and the Business Development Academy, 2019

"Corporate Valuations" presentation for Connect Frameworks series and San Diego

**Brian Buss**, CFA

Venture Group; 2019

"Investigating Online IP Infringement and Calculating Damages for Internet Related Disputes," presentation at University of San Diego School of Law, 2019

"Calculating the Value of Influencer Marketing and Impact of Infringement" in Attorney at Law Magazine, February 2019

"Valuing the Misuse of Intellectual Property Online," webinar hosted by Business Valuation Resources, December 2018

Chapters titled "Profit Apportionment in Intellectual Property Infringement Damages Calculations" and "The Use of Analytic Tools for Valuation and Damages Calculations in Internet IP Infringement and Defamation Cases" published in The Comprehensive Guide to Economic Damages, 5th Edition published by Business Valuation Resources (BVR), 2018

"Apportionment Models:  Valuing the Contribution of Intangible Property and Assets in Disputes" webinar hosted by Business Valuation Resources, October 2018

"Profit Apportionment - Determining the Contribution of Intellectual Properties in Valuations and Damages Calculations" presentation at NACVA Annual Consultants Conference, Las Vegas, June 2018

"Brand Contribution" Moderated a panel presentation and discussion on building, leveraging and valuing brand assets for Licensing Executives Society International (LESI) 2018 Annual Conference in San Diego, May 2018

"Brand Valuation – Valuing brands that aren't exchanged" Presentation to Provisors' Brand Licensing and Intellectual Property Affinity Group, Los Angeles, April 2018

"The Economics of Patent Litigation & Damages" Presentation at the IIPLA Annual Meeting in Silicon Valley, October 2017

 "Calculating Financial Damages and Valuations in U.S. Litigation:  A 2017 Outlook" Panellist for Webinar produced by The Knowledge Group, July 2017

"Non-Traditional Marks and the Traditional Practice" Luncheon Table Topic for the International Trademark Association (INTA), San Diego, CA, February 2017

"Brand Valuations:  Identifying Opportunities and Challenges" published in The Value Examiner, Special Issue, September/October 2016

"Misuses of IP Over the Internet:  Searching for Value" webinar presentation for Business Valuation Resources (BVR), July 2016

Chapter titled "Using Internet Analytic Tools for Valuation and Damages Calculations in Internet IP Infringement and Defamation Cases" published in The Comprehensive Guide to Lost Profits and Other Commercial Damages, 4th Edition; and Calculating Economic Damages in Intellectual Property Infringement Cases, 2nd Edition; both books published by Business Valuation Resources (BVR); 2016

"Employing Internet and Social Media Analytical Tools in Valuation and Damages Calculations;" Presented at the NACVA and the CTI's 2016 Annual Conference, San Diego, June 2016

**Brian Buss**, CFA



"Brand Due Diligence: Tools and Techniques for Supporting Successful Brand Driven Transactions" Luncheon Table Topic at the International Trademark Association (INTA) Annual Meeting, Orlando, FL, May 2016

"Brand Valuation" presentation at the University of New Hampshire School of Law Conference on Brand Valuation, Concord, NH, April 2016

"Valuing IP Using an Apportionment Model" webinar presentation for Business Valuation Resources (BVR), part of BVR's "Special Series on Intellectual Property", October 2015

"Valuation and Damages Calculations in Cases Involving Internet IP Infringement and Defamation" presented at the NACVA and the CTI's 2015 Annual Conference, June 2015

"IP Valuation & Damages" panel presentation for Provisors' Corporate Deal Professionals of San Diego, January 2015

"How to Calculate Damages for Internet and Social Media Infringement" presented to 36th Annual Brand Activation Association Marketing Law Conference, November 2014

"Damages and Valuation for Internet IP Infringement and Defamation" presented to Internet Law Leadership Summit, May 2014

"Increase the Value of Your IP Through Licensing" presented to the San Diego Chapter of the Licensing Executives Society, March 2014

"Estimating and Managing the Economic Impact of Brand Disparagement" published in World Trademark Review, Issue 47, February/March 2014

"SFIA Legal Task Force Series: Intellectual Property Litigation & Valuation" presented to the Sports & Fitness Industry Association members, 2013

"Copyright Valuation and Damages" Continuing Legal Education webinar for State Bar of California, Intellectual Property Law Section, March 2013

"Simplicity in Global IP Valuation" in les Nouvelles and China Intellectual Property, 2012

**MEMBERSHIPS & ASSOCIATIONS**

CFA Institute: CFA Charter holder, Chartered Financial Analysts Society of San Diego

International Trademark Association (INTA): IP Reporting Presidential Task Force; Commercialization of Brands Committee, Brand Valuation and Evaluation Subcommittee (Vice-Chair); IP Accounting & Brand Valuation Standards Project

Licensing Executives Society (LES), Valuation & Pricing Committee

IR Global, exclusive member for business and asset valuations in California

San Diego State University, Fowler College of Business, Management Department Advisory Board



# Professional Review and Analysis

## December 10, 2019

RE:  Anne Schlafly Cori vs. John F. Schlafly et al.
Circuit Court of St. Louis County
State Of Missouri Probate Division
Case No. 17SL-PR00926

## By

# L.R. Huntoon, M.D., Ph.D., F.A.A.N.

BSS 00422

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

## TABLE OF CONTENTS

                                                                        Pages

My Background and Expertise in Neurology…………………….. …………………………  4.

Scope of Analysis……………………………………………………………………………  4.

Declaration……………………………………………………………………………………  4.

List of Documents/Records Reviewed…………………………. ……………………........  4.

Summary of My Expert Opinions……………………………………………………………  7.

    Background Information on Testamentary Capacity and Undue Influence…….. 8.

      Testamentary Capacity and Undue Influence: The Medicolegal
      Standard…………………….......................................................................  8.

         Presumption of Competence………………………………………  10.

         The Bar for Testamentary Capacity is Set Quite Low………………  10.

         Levels of Testamentary Capacity Can Fluctuate Over Time and
         Are Modified by Other Factors…………………………………………  14.

         Difficulty Assessing Testamentary Capacity in Deceased Individuals….  15.

      Background Information On the Diagnosis of Dementia (Major
      Neurocognitive Disorder) and Mild Cognitive Impairment (Mild
      Neurocognitive Disorder)……………………………………………………  16.

      Threshold Considerations in Performing Mental Status Examinations………..  19.

  ANALYSIS………………………………………………………………………………  20.

    Methodological Flaws and Other Flaws in Dr. Finkel's Opinions……………  20.

      "Losing the Forest Through the Trees"………………………………….....  20.

      Methodological Flaws, Faulty Conclusions, Speculation, Confirmatory
      Bias, Misleading Inferences, False Statements, and Unsubstantiated
      Inferences/Assertions……………………………………………………….  21.

      Dr. Finkel Disregards/Dismisses the Most Relevant Information
      with Respect to Testamentary Capacity and Undue Influence…………..  42.

BSS 00423

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Appendix………………………………………………………………………….. 60.

    Exhibit 1……………………………………………………………………. 61.

-3-

BSS 00424

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

My Background and Expertise in Neurology:

My name is Dr. Lawrence R. Huntoon. I am a board-certified neurologist (American Board of Psychiatry and Neurology). I am a Fellow of the American Academy of Neurology. Fellow status in the American Academy of Neurology requires qualifications above and beyond that of simple board certification. I am licensed to practice medicine in the State of New York. I have been engaged in the clinical practice of neurology since 1986. As a neurologist, my expertise includes evaluating, diagnosing and treating patients who have dementia.

I am a past-president of the Association of American Physicians and Surgeons (AAPS). I have served six terms on the AAPS board of directors. I am the president of the American Health Legal Foundation. I am also editor-in-chief of the *Journal of American Physicians and Surgeons*.

I have taught medical students, medical residents, law students, physical therapists, occupational therapists and nurses.

My curriculum vitae is attached as Exhibit 1.

Scope of Analysis:

I have been retained by Defendants in the case of Anne Schlafly Cori vs. John F. Schlafly et al. Circuit Court of St. Louis County, State Of Missouri Probate Division, Case No. 17SL-PR00926, to provide analysis and opinion regarding the methodology used by Plaintiff's expert, Sanford I. Finkel, M.D., to arrive at opinions provided in his expert report, dated July 15, 2019 and updated expert report, dated November 25, 2019. My Analysis is focused on the question: Does the methodology used by Plaintiff's expert, John I. Finkel, M.D., comply with the accepted medicolegal standard for assessing testamentary capacity and undue influence?

Declaration:

I have not assessed the testatrix, Phyllis Schlafly, in person.

List of Documents/Records Reviewed:

1.) *Hugenel v. Estate of Keller*, 867 S.W.2d 298 (1993), Available at:
https://law.justia.com/cases/missouri/court-of-appeals/1993/18444-1.html
Accessed: October 27, 2019

2.) 2011 Missouri Revised Statutes Title XXXI Trusts and Estates of Decedents and Persons Under Disability, Chapter 456 Trusts and Trustees - - The Uniform Trust Code Section 456.6-601. Capacity of settlor of revocable trust. Universal Citation: MO Rev Stat § 456.6-601. Available at:
https://law.justia.com/codes/missouri/2011/titlexxxi/chapter456/section4566-601/
Accessed: October 27, 2019

-4-

BSS 00425

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

3.) Mart, E.G., Neuropsychological Assessment of Testamentary Capacity and Undue Influence, *Archives of Clinical Neuropsychology,* Vol. 31, Issue 6, September 2016, pp. 554-561, Available at: https://academic.oup.com/acn/article/31/6/554/1727213 Accessed: October 27, 2019

4.) Gutheil, T.G., Common Pitfalls in the Evaluation of Testamentary Capacity, *Journal of the American Academy of Psychiatry and the Law Online,* 35(4):514-517, December 2007, Available at: http://jaapl.org/content/35/4/514 Accessed October 27, 2019

5.) Roof, J.G., Testamentary Capacity and Guardianship Assessments, *Psychiatr Clin N Am* 35:915-927, 2012, Available at: https://www.flcourts.org/content/download/404573/3469742/Testamentary-Capacity-Guardianship-Assessments.pdf Accessed: October 27, 2019

6.) Voskou, P., Douzenis, A., Economou, A., Papageorgiou, S.G., Testamentary Capacity Assessment: Legal, Medical, and Neuropsychological Issues, *Journal of Geriatric Psychiatry and Neurology,* December 18, 2017, pp. 1-27. Available at: https://journals.sagepub.com/doi/full/10.1177/0891988717746508 Accessed: October 27, 2019

7.) Doris, A., Understanding Testamentary Capacity, *Casebook* January 2012, pp. 1-4. Available at: https://www.medicalprotection.org/newzealand/casebook/casebook-january-2012/understanding-testamentary-capcity Accessed: October 27, 2019

8.) Brenkel, M., Whaley, K., Herrmann, N., Crawford, K. Hazan, E., Cardiff, L. Owen, A.M., Shulman, K., A Case for the Standardized Assessment of Testamentary Capacity, *Can Geriatr J.* 2018;21(1):26-31, March 26, 2018. Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5864571/ Accessed: October 27, 2019

9.) An Introduction to Testamentary Capacity, *themedu.com,* June 6, 2018, pp. 1-6. Available at: https://www.themdu.com/guidance-and-advice/guides/medico-legal-guide-to-testamentary-capacity...introduction. Accessed: October 27, 2019

10.) Shulman, K.I., Cohen, C.A., Kirsh, F.C., Hull, I.M., Champine, P.R., Assessment of Testamentary Capacity and Vulnerability to Undue Influence. *Am J. Psychiatry* 2007;164:5, pp. 722-727. Available at: https://ajp.psychiatryonline.org/doi/pdf/10.1176/ajp.2007.164.5.722. Accessed: October 27, 2019

11.) Jovanovic, A.A., Jovoic, S. Milovanovic, S., Jasovic-Gasic, M., Medical Reasons for Retrospective Challenges of Testamentary Capacity. Available at: https://pdfs.semanticscholar.org/c8ed/e0776f025814ef6c7b8c64644b6356063a3a.pdf. Accessed: October 27, 2019

-5-

BSS 00426

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

12.) Redmond, F.C., Testamentary Capacity. *Bull Am Acade Psychiatry Law* 1987;15(3):247-256. Available at: http://jaapl.org/content/jaapl/15/3/247.full.pdf. Accessed: October 27, 2019.

13.) Sprehe, D.J., Kerr, A.L., Use of Legal Terms in Will Contests: Implications for Psychiatrists. *Bull Am Acad Psychiatry Law* 1996;24(2):255-265. Available at: https://pdfs.semanticscholar.org/d2c3/48a65fa9c019558377381e118b747602248e.pdf. Accessed: October 27, 2019.

14.) Hall, Ryan C.W., Hall, Richard C.W., Myers, W.C., Chapman, M.J., Testamentary Capacity: History, Physicians' Role, Requirements, and Why Wills are Challenged. *Clinical Geriatrics* 2009;17(6):18-24. Available at: http://www.cfmal.com/PDFs/Testamentary%20Capacity.pdf. Accessed: October 27, 2019.

15.) Preliminary Report, Sanford I. Finkel, M.D., S.C., July 15, 2019

16.) Curriculum vitae, Sanford I. Finkel, M.D.

17.) Evidence Video Deposition of Sanford I. Finkel, M.D., Anne Schlafly Cori v. John F. Schlafly et al., In the Circuit Court of St. Louis County Missouri, Probate Court Division, Case No. 17SL-PR00926, July 16, 2019

18.) Deposition of Melissa Nolan, Anne Schlafly Cori v. John F. Schlafly et al., In the Circuit Court of St. Louis County Missouri, Probate Court Division, Case No. 17SL-PR00926, 07/03/2019

19.) Deposition of Donald Paulie, Anne Schlafly Cori v. John F. Schlafly et al., In the Circuit Court of St. Louis County Missouri, Probate Court Division, Case No. 17SL-PR00926, 07/03/2019

20.) PCB Exhibits, Anne Schlafly Cori v. John F. Schlafly et al., In the Circuit Court of St. Louis County Missouri, Probate Court Division, Case No. 17SL-PR00926

21.) *Tobias v. Korman*, 141 S.W.3d 468 (Mo. Ct. App. 2004) (precedential case RE: definition of "undue influence" in Missouri), Available at: https://www.courtlistener.com/opinion/1486478/tobias-v-korman/. Accessed Nov 29, 2019

22.) Neurology Consultation, Mark J. Tullman, M.D., 10/24/2014

23.) MRI of cervical spine, William W. Baber, M.D., Missouri Baptist Medical Center, 09/03/2013

24.) Neurologic Consultation, J.M. Hatlied, M.D., 11/04/2013

25.) Updated Report of Sanford Finkel, M.D., 11/25/2019

BSS 00427

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

26.) Hugo J. and Ganguli M. Dementia and Cognitive Impairment: Epidemiology, Diagnosis, and Treatment, *Clin Geriatr Med.* 2014;30(3):421-442

27.) Knopman D.S., Peterson R.C. Mild Cognitive Impairment and Mild Dementia: A Clinical Perspective. *Mayo Clin Proc.* 2014;89(10):1452-1459

28.) Strub R.L., and Black F.W. The Mental Status Examination in Neurology. F.A. Davis Co., Philadelphia, 1977

29.) Missouri Baptist Medical Center Records, Phyllis Schlafly, Admission date 06/11/2014

<u>Summary of My Expert Opinions:</u>

1.  It is my opinion that the methodology Dr. Finkel used in his expert reports was flawed, and that his opinions were based on invalid extrapolation, invalid conclusions, false statements, and speculation.  As such, it is my opinion that the information Dr. Finkel presented and opinions derived therefrom do not sustain a conclusion that Phyllis Schlafly lacked testamentary capacity or was subject to undue influence on 05/26/2016 and 08/31/2016, the dates that Mrs. Schlafly executed testamentary documents.  The numerous flaws contained in Dr. Finkel's expert reports are discussed at length in the "Analysis" portion of my expert report.

2.  It is my opinion that lacking the necessary evidence to prove lack of testamentary capacity or undue influence, the opposite conclusion prevails – that Phyllis Schlafly had testamentary capacity and was not unduly influenced when she executed testamentary documents on 05/26/2016 and on 08/31/2016.

3.  It is my opinion that the relevant issue in this case is not whether Phyllis Schlafly had a diagnosis of dementia or had a cognitive deficit, disorders not diagnosed by multiple physicians who examined her during her life, but whether or not she met the core requirements of testamentary capacity at the specific times she executed testamentary documents and was not unduly influenced on those dates.  It is my opinion that there is overwhelming evidence, provided by the testimony of attorneys, Melissa Nolan and Donald Paule, that Phyllis Schlafly had testamentary capacity and was not unduly influenced on 05/26/2016 and 08/31/2016, the dates she executed testamentary documents.

4.  It is my opinion that the information presented by Dr. Finkel is insufficient to establish a diagnosis of dementia or cognitive deficit post-mortem.

BSS 00428

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                     Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Background Information on Testamentary Capacity and Undue Influence:

Testamentary Capacity and Undue Influence: The Medicolegal Standard:

Testamentary capacity and undue influence involve medical issues as well as basic legal concepts. A medical expert must understand both the medical issues and basic legal concepts in order to provide opinions and input that will assist the Court in making the ultimate determination about testamentary capacity and undue influence.[1]

In Missouri, the case of *Hugenel v. Estate of Keller* provides a definition of testamentary capacity.

> Testamentary capacity exists if, at the time the will was signed, the testator was of sound mind, understood the ordinary affairs of life, knew the nature and extent of his property, knew the persons who were the natural objects of his bounty, and appreciated his natural obligations to those persons. Lewis v. McCullough, 413 S.W.2d 499, 505 (Mo. 1967); Moyer v. Walker, 771 S.W.2d. at 367. The test is the testator's ability "to comprehend and understand the ordinary, as distinguished from the intricate and complicated affairs of life." Ahmann v. Elmore, 211 S.W.2d 480, 488-489 (Mo. 1948) (quoting from Berkemeier v. Reller, 317 Mo. 614, 643, 296 S.W. 739, 752 (1927)). The testator's condition before the execution of the will has no probative value, unless it raises a reasonable inference as to that person's mental condition when the will was signed. Glover v. Bruce, 265, S.W.2d 346, 352 (Mo. 1954).[2]

In Missouri, the capacity of a person to amend a will or trust is the same as that required to create a will or trust.

> [MO Rev Stat § 456.6-601] The capacity required to create, amend, revoke, or add property to a revocable trust, or to direct the actions of the trustee of a revocable trust, is the same as that required to make a will.[3]

In Missouri, the case of *Tobias v. Korman* provides a definition of undue influence.

> Undue influence is that influence which by force, coercion, or overpersuasion destroys the free agency of the benefactor. *Smith v. Crites,* 781 S.W.2d 189 (/opinion/2395411/smith-v-crites/), 191 (Mo.App. 1989)....The burden is on the plaintiff to prove undue influence. *Ruestman, v. Ruestman,* 111 S.W.3d 464 (/opinion/1758813/ruestman-ruestman/), 478 (Mo.App. S.D.2003)....It is not undue influence for the beneficiary to exercise influence as long as it was not so coercive or importunate as to deprive the benefactor of his or her free agency.[4]

---

[1] #6, #13, #14 List of Documents/Records Reviewed
[2] #1 List of Documents/Records Reviewed
[3] #2 List of Documents/Records Reviewed
[4] #21 List of Documents/Records Reviewed

BSS 00429

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

The *Tobias v. Korman* case provided further information concerning the circumstance where the testator, Henry J. Tobias, amended his trust to provide more money to his friend and caretaker, Joseph Korman, and less to his nieces and nephews who rarely visited him.

> Here, the trial court found that Korman rebutted the presumption of undue influence....Henry did not lack the necessary mental capacity either to determine the distributions under the trust or to execute the trust documents. Korman did not cause Henry to amend his trust or to execute the trust documents. Henry executed the trust documents voluntarily. The reduction in some plaintiffs' shares as a result of the trust was reasonable in that Korman cared for Henry and was in constant contact with him. The Court noted that Korman had primary contact with Henry, while plaintiffs' relationships with Henry were "practically nonexistent." In addition, the court stated, "[Henry] Tobias' decision to reward his supportive friend Korman was a logical one.[5]

In addition to the ability to reward certain beneficiaries, the ability to "punish" certain heirs who may have done something the testator did not approve of, is likewise considered to be a reasonable choice and right of the testator. One article in the medical literature stated the following:

> The ability to punish and seek revenge on heirs for various reasons, justly and unjustly, is considered one of the great opportunities provided by a testament. In part for this reason, wide latitude should be given to the testator's competent choices or even competent whims.[6]

It is not the role or place of a medical expert to substitute the expert's judgement about what is reasonable and a "right choice" for the testator's choice with respect to "rewarding" some heirs and "punishing" others in trusts and wills and amendments thereto.

Another article in the medical literature stated:

> The intention of the individual, that is to whom he or she wants to dispose his or her property and to explain his or her choices and wishes in a rational way, is perhaps the most important component of the validity of the will.[7]

Another article in the medical literature stated:

> From the point of view of the law, a testator who is old and sick is still the owner of his assets and should be accorded the respect given any owner.[8]

---

[5] Ibid.
[6] #4 p. 6 List of Documents/Records Reviewed
[7] #6 p. 12 List of Documents/Records Reviewed
[8] #13 p. 255 List of Documents/Records Reviewed

-9-

BSS 00430

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Again, the fact that an expert may not have made the same choice as the testator does not mean the testator's choice was a result of dementia or shows lack of testamentary capacity.

The same article goes on to state:

> Courts have consistently held, in cases testing the validity of a will, that: "It is the policy of the law to hold wills good wherever it can be done. This, according to the authorities, is particularly true of old people. They are, no doubt, generally speaking, reasonably influenced [not unduly influenced] and are generally childish and forgetful and possibly, from the layman's viewpoint, not qualified to make a will. But the only weapon these old people have to enforce consideration and good treatment of themselves, and proper care, is the power to dispose of their estate by will.[9]

> The making of a will does not depend upon a sound body, but upon a sound mind. By 'sound mind' is meant the ability of the testator to mentally understand in a general way the nature and extent of the property to be disposed of, and the testator's relation to those who would naturally claim a substantial benefit from the will, as well as a general understanding of the practical effect of the will executed.[10]

Presumption of Competence:

Information from the medical literature provides the following information about the presumption of competence until proven otherwise, and the burden of proof in cases where a will is contested. Information from the medical literature is as follows:

> Individuals are assumed mentally competent to create a will unless it is proven that they are not competent to do so. As a result, those who contest a will bear the burden of proof that the testator lacked mental competency when the document was created.[11]

> Note that, as in other capacity determinations, the testator enjoys the presumption of competence until proven otherwise.[12]

The Bar for Testamentary Capacity is Set Quite Low:

Courts have set the bar for making determinations about testamentary capacity quite low. One article from the medical literature stated:

> Courts have traditionally "set the bar" quite low in making such determinations [referring to testamentary capacity].[13]

---

[9] #13 p. 256 List of Documents/Records Reviewed
[10] #13 p. 257 List of Documents/Records Reviewed
[11] #5 pp. 916-917 List of Documents/Records Reviewed
[12] #4 p. 515 List of Documents/Records Reviewed
[13] #3 p.(10) List of Documents/Records Reviewed

BSS 00431

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Another article from the medical literature stated:

> Unlike the most challenging and complex forensic evaluation, the determination of
> criminal responsibility, the criteria for possessing testamentary capacity are conceived of
> as lying at a low level, perhaps the lowest level, of demands on the subject. This low
> level may reflect concerns deriving from English law about preserving property through
> appropriate inheritance. Frolik specifically notes: "An examination of case law reveals
> how liberally the courts interpret these requirements [i.e., the three criteria described
> below] and how frequently a testator with conspicuously diminished capacity is
> nevertheless found to have possessed testamentary capacity.[14]

The medical literature indicates that an individual may have various degrees of cognitive deficits
and yet retain testamentary capacity.

One article stated:

> In fact, a person could lack the capacity to make medical decisions yet still retain
> testamentary capacity.[15]

Another article stated:

> "...the characterization of a person as incapable of making decisions for his or her life
> (negative positioning) because of episodic memory deficits can be misleading, since the
> patient's other cognitive abilities and intention may remain intact.[16]

The same article also stated:

> "...the evaluator of TC [testamentary capacity] should be aware that while a
> testator/testatrix may be incapable – due to advanced age – of some everyday activities
> such as driving or dressing, he or she may have preserved capacity to compose a valid
> will. According to the concept of "non-global capacity," capacity "is not a unitary
> concept or construct and there is not simply 'one' capacity." The individual has distinct
> and multiple competencies, such as the capacity to make a will, to consent to therapy, to
> manage financial affairs, and so on. Each of these includes a special combination of
> functions and skills, which distinguishes it from other types of competencies, whereas
> there is specificity regarding the context where each competency takes place, for
> example, the process of consent to treatment usually takes place in a hospital. Capacity is
> task-specific as well as situation-specific, and this cardinal concept should be taken into
> account by an expert involved in the evaluation of TC, be it a health professional or legal
> specialist. Also, impairment of cognitive functions is not by itself enough for the person
> to be considered incompetent in all the domains of functioning. The law recognizes that
> capacity is not an all-or-nothing phenomenon. Task-specificity has the meaning that the

---

[14] #4 p. (2) List of Documents/Records Reviewed
[15] #5 p. 920 List of Documents/Records Reviewed
[16] #6 p. (10) List of Documents/Records Reviewed

BSS 00432

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

incapacity to do one thing does not necessarily imply incapacity to do another.  In this way, thresholds between types of incompetency may vary.[17]...

Similarly, the functional approach of capacity is focused on the decision (issue) – and time-specific nature of legal capacity, and therefore, practitioners should not make "blanket" assessments of individuals' capacity....It is also pinpointed that TC is distinct from financial capacity, which includes a wide range of abilities and managing daily finances....Clinicians often have the experience of the moderately to severely demented patients who, despite clear neuropsychological evidence of impairment, is somehow able to make decisions about the disposal of his or her property.  Patients with dementia may be capable of answering questions about their preferences, personal involvement in life decisions, and sociodemographics with consistency.[18]

[A]n individual may be judged as incompetent just by having scored low on a screening test [like Mini-Cog], while the individual may be fully aware of the heirs to whom he or she is bequeathing his or her property.[19]

Cognitive instruments [like mental status screening tests] can be useful for the detection of subtle deficits and the possible changes over time.  Nonetheless, the TC [testamentary capacity] of patients is a complex capacity and cannot be solely related only on their performance in such tests that are inconsistent with the issue-specific nature of the functional approach on capacity....Although useful, the assessment instruments for decision-making capacity are not relevant to or specialized for evaluating TC.[20]

The presence of dementia or a psychiatric disorder should not lead automatically to the conclusion that the patient lacks TC.  Screening instruments [like the Mini-Cog] may be useful in identifying persons in need of more intensive evaluations, although clinical interview remains the core element of TC assessments.[21]

Another article stated:

The loss of capacity may be partial or temporary and it is possible for a person to have capacity to make one specific decision but not another.[22]

Yet another article stated:

All mental capacities are based on two underlying principles: the understanding of relevant facts and the appreciation of the reasonably foreseeable consequence of a decision.[23]

---

[17] #6 p. (8) List of Documents/Records Reviewed
[18] #6 p. (9) List of Documents/Records Reviewed
[19] #6 p. (11) List of Documents/Records Reviewed
[20] #6 p. (15) List of Documents/Records Reviewed
[21] #6 p. (18) List of Documents/Records Reviewed
[22] #7 p. 1 List of Documents/Records Reviewed

BSS 00433

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

The same article makes it clear that a diagnosis alone (e.g. dementia/major neurocognitive disorder) does not equate to lack of testamentary capacity.  The article comments on the decision of Chief Justice Cockburn (1870) in the *Banks v. Goodfellow* case, a case upon which many state laws defining testamentary capacity are based:

> The decision [Cockburn decision] was a turning point in the assessment of TC as it represented a shift away from the perspective that diagnosis of a mental disorder equates to incapacity to make a valid Will.  Instead, it determined that no assumption about capacity can be made from a diagnosis alone – capacity is state-dependent, not trait-dependent.[24]

Another article stated:

> Testamentary capacity is fundamentally a matter of functional ability and is thus largely independent of diagnosis alone; regardless of diagnosis, if the evidence indicates that the testator met criteria, the requirements of this capacity have been met.[25]

Another article stated:

> All mental capacities are determined by two fundamental components: an ability to understand the relevant facts and an appreciation of the consequences of taking or not taking specific actions….Testamentary capacity, like other capacities, is not only task specific but also situation specific.[26]

Another article stated:

> Testamentary capacity is the specific ability to make a will.  It is not necessary that someone is free from any mental difficulties or deterioration, and it is quite possible that someone may have testamentary capacity but not have capacity to do other things, such as manage their business affairs.[27]

Another article stated:

> Clinicians and legal experts must understand that cognitive tests [like Mini-Mental State Examination, Mini-Cog] are not diagnostic of dementia and cannot be used as a measure of capacity.[28]

---

[23] #8 p. (2) List of Documents/Records Reviewed
[24] #8 p. (3) List of Documents/Records Reviewed
[25] #4 p. (4) List of Documents/Records Reviewed
[26] #10 p. 723 List of Documents/Records Reviewed
[27] #7 p. (2) List of Documents/Records Reviewed
[28] #10 p. 726 List of Documents/Records Reviewed

BSS 00434

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

<u>Levels of Testamentary Capacity Can Fluctuate Over Time and are Modified by Other Factors:</u>

One article in the medical literature stated:

> There are times when people have an illness or condition during which they may lack testamentary capacity, but recover sufficiently (even if temporarily) to have capacity.[29] Another article stated:

> It is generally conceded by geriatric psychiatrists that individuals with advanced stages of Alzheimer's disease do *not* have the capacity for lucid intervals, whereas individuals with vascular dementias and early stages of Alzheimer's disease do have fluctuations in mental capacity.[30] [Dr. Finkel conceded in his deposition on July 16, 2019, "her [Mrs. Schlafly's] illness was not that severe."[31]

Another article stated:

> In addition, dementias such as the Alzheimer's type, usually result in fluctuating levels of capacity through the early and mid-stages of the disease.[32]

Another article stated:

> The level of functioning of patients with dementia at the time the will is executed is the critical question that must be addressed, because such patients may have symptoms related to dementia but still have the ability to meet the five criteria (Cockburn's rules) necessary to execute the will.[33]

Another article stated:

> Mental capacity to make a will is determined at the precise moment the will is executed.[34]

There are factors which can allow an individual to function well despite having symptoms of dementia. It is well-known that higher education and engaging in cognitively stimulating activities have both protective and enhancing effects on cognition. In addition, "overlearned" activities [like a lawyer "overlearning" basic legal concepts] may preserve testamentary capacity (which involves legal aspects of creating or amending a will), despite having other cognitive deficits.

---

[29] #12 p. 255 List of Documents/Records Reviewed
[30] #13 p. 260 List of Documents/Records Reviewed
[31] #17 p. 386 List of Documents/Records Reviewed
[32] #6 p. (10) List of Documents/Records Reviewed
[33] #14 p. (7) List of Documents/Records Reviewed
[34] #13 p. 257 List of Documents/Records Reviewed

BSS 00435

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

One article stated the following:

> The concept of "reserve" was proposed to explain why some individuals remain cognitively intact despite the presence of neuropathology typically associated with dementia. Brain reserve refers to structural capacity and integrity of the brain (e.g. brain mass, preserved large neurons), whereas cognitive reserve refers to its functional capacity, specifically the ability to utilize alternative neural networks and compensatory strategies.
>
> Where educational opportunities are universal, higher education may reflect innate reserve; the process of education may also promote the development of reserve through mechanisms such as increased dendritic branching….Regardless of mechanism, higher education is associated with lower prevalence of dementia….Cognitively stimulating activities [like writing and speaking] appear to have both protective and enhancing effects on cognition.[35]
>
> Overlearned, routine activities may be preserved.[36]

<u>Difficulty Assessing Testamentary Capacity in Deceased Individuals:</u>

Assessing testamentary capacity in deceased individuals is difficult at best and at worst may devolve into extrapolation and speculation.  Extrapolation and speculation are poor substitutes for the ability to examine a living patient and to perform whatever testing is needed in order to definitively answer questions about testamentary capacity.  Obviously, the mental status of a deceased individual can no longer be tested.  One can no longer ask the questions specifically directed at assessing testamentary capacity.

Collateral sources of history from family and friends can be very helpful in a living patient where no one is contesting a will or trust.  However, history provided by family and aligned friends in the circumstance where one family member is contesting a will/trust, must be put in context and given less weight than information from the records of examining physicians – especially those who have expertise in diagnosing and treating dementia (e.g. neurologists).

One article in the medical literature stated:

> The postmortem examination clearly presents the need to rely almost totally on collateral data that may not have been directed to the requisite criteria [for testamentary capacity] nor have been relevant to them; that may issue from highly biased and far-from-disinterested observers; and that may require inference, extrapolation, and cross-confirmation instead of the direct observation that is possible premortem.[37]

---

[35] #26 p. 5 List of Documents/Records Reviewed
[36] #26 p. 6 List of Documents/Records Reviewed
[37] #4 p. (4) List of Documents/Records Reviewed

BSS 00436

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Another article stated:

> The presence of dementia or a psychiatric disorder should not lead automatically to the conclusion that the patient lacks TC. Screening instruments [like the Mini-Cog] may be useful in identifying persons in need of more intensive evaluations, although clinical interview remains the core element of TC assessments.[38]

If nothing other than a screening test(s) has been done premortem, however, there is no opportunity postmortem to repeat the screening test to see if it was reliable (under circumstances where stress and distraction are not present – e.g. in a hospital with severe pain, awaiting surgery) or to perform more intensive evaluations or interviews specifically directed at the core elements of testamentary capacity.

Another article noted the inherent difficulty of making assessments of testamentary capacity postmortem. The article stated:

> Occasionally when the will of a deceased person is being contested, a doctor may be asked to give a retrospective opinion on testamentary capacity at the time the will was made, which can be very difficult.[39]

Another article stated:

> Again, capacity is much easier to establish (if it exists) with a living person rather than a deceased one.[40]

<u>Background Information On the Diagnosis of Dementia (Major Neurocognitive Disorder) and Mild Cognitive Impairment (Mild Neurocognitive Disorder):</u>

Although a diagnosis of dementia or mild cognitive impairment should not be automatically equated to lack of testamentary capacity, some background information about dementia and mild cognitive impairment may be helpful.

On article stated the following:

> "…some degree of cognitive slowing is typical of normal aging….Dementia is typically diagnosed when acquired cognitive impairment has become severe enough to compromise social and/or occupational functioning. Mild cognitive impairment (MCI) is a state intermediate between normal cognition and dementia, with essentially preserved functional abilities….[41]

---

[38] #6 p. (18) List of Documents/Records Reviewed
[39] #7 p. (2) List of Documents/Records Reviewed
[40] #12 p. 255 List of Documents/Records Reviewed
[41] #26 p. 1 List of Documents/Records Reviewed

-16-

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> [T]he DSM-5 diagnosis of Major Neurocognitive Disorder, which corresponds to dementia, requires substantial impairment to be present in one or (usually) more cognitive domains. The impairment must be sufficient to interfere with independence in everyday activities. The diagnosis of Mild Neurocognitive Disorder, corresponding to MCI, is made when there is modest impairment in one or more cognitive domains. The individual is still independent in everyday activities, albeit with greater effort. The impairment must represent a decline from a previously higher level and should be documented both by history and by objective assessment. Further, the cognitive deficits must not occur exclusively in the context of delirium or be better explained by another mental disorder.[42]

> **Subjective assessment** [bold font contained in article]

> Whenever possible, history should be obtained both from the patient and also from a family member, caregiver, or other reliable informant....Over-learned, routine activities may be preserved...Despite the value of systematic and disciplined clinical observations, clinicians' impressions can be clouded by personal expectations of what is normal for a given patient. Subjective concerns alone are therefore insufficient for a diagnosis.

> **Objective assessments** [bold font in article]

> The objective assessment requires the administration of one or more standardized tests. Neuropsychological assessment of specific cognitive domains is preferred both for detecting mild impairments and for differential diagnosis....If neuropsychological assessment is unavailable, objective testing can consist of a global screening scale, such as the well-known Mini-Mental State Examination (MMSE), the Montreal Cognitive Assessment (MoCA), or the Mini-Cog. Such tests are usually sensitive enough to detect dementia but not necessarily MCI....The diagnosis of Dementia (Major NCD) in Alzheimer's disease requires evidence of decline to the level of substantial impairment in at least two cognitive domains, one of which must be memory.[43]

[The circumstances under which screening tests are performed are also relevant to the interpretation of results – e.g. a patient in a hospital in severe pain awaiting surgery, and all of the stress and distraction associated with having surgery.].

Another article stated:

> The main distinctions between mild cognitive impairment and mild dementia are that in the latter, more than one cognitive domain is involved and substantial interference with daily life is evident....[44]

---

[42] #26 p. 2 List of Documents/Records Reviewed
[43] #26 p. 7 List of Documents/Records Reviewed
[44] #27 p. 1 List of Documents/Records Reviewed

-17-

BSS 00438

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Mild Cognitive impairment (MCI) is the term for individuals who fall between the cognitive changes of aging and early dementia.  They have objective evidence of cognitive impairment that represents a decline from the past, but they function independently or nearly so in their daily lives in a manner that is indistinguishable from the past....Mild dementia is also defined by cognitive impairment and poor performance on objective cognitive assessments that represents a decline from the past, but importantly, dementia requires evidence of significant difficulties in daily life that interfere with independence. [Note that certain physical conditions/disorders (e.g. terminal cancer) may also pose significant difficulties/limitations in daily life.]....Owing to the inherent variability in the clinical diagnosis of MCI, some persons diagnosed with MCI may later appear cognitively normal.[45]

**Nature Of Cognitive Impairment** [Bold font in article]

Cognitive functioning is typically characterized into one of 5 domains: 1) learning and memory, 2) language, 3) visuo-spatial, 4) executive and 5) psychomotor.  These domains have a rough correspondence with their cerebral localization.  For a diagnosis of MCI, only one of these areas must be impaired in order to make a diagnosis, whereas more than one domain must be impaired to make a diagnosis of dementia.  Evidence for involvement of individual domains can be obtained from the history, a brief mental status examination or neuropsychological testing.  Forgetting is intrinsically human and increases with aging.  It is part of normal experience to forget a name temporarily, or an appointment rarely....When there is dysfunction in more than one cognitive domain in persons with MCI, referred to as multidomain MCI, the risk for decline to dementia is much higher than when there are isolated memory problems or word finding problems.[46]

**Clinical Diagnosis of MCI and Mild Dementia** [Bold font in article]

A medical history and a mental status examination are the principal tools for making a diagnosis of MCI or mild dementia.  The medical history is the principal means by which the clinician establishes where or not the patient has impairment in daily functioning.  The mental status examination is the means by which the clinician establishes whether there is objective evidence of cognitive impairment.  Clinical judgment is required to integrate information from the two sources....A thorough history from both the patient and someone who knows the patient well is essential.... [However, when one or more family members are contesting the will, the reliability of information from family/friends may not be reliable.]  Several inventories of activities of daily living are available; for routine clinical use the 10-item Functional Activities Questionnaire is a valid tool for characterizing daily functioning....Understanding the patient's other medical conditions, if any, is highly relevant to placing cognitive symptoms in perspective....[B]edside examinations are known to be insensitive.  Thus, if the patient, family or care providers suspect cognitive impairment, referral for neuropsychological testing – a far more sensitive method – should be considered....When symptoms are mild or uncertain, or

---

[45] #27 p. 2 List of Documents/Records Reviewed
[46] #27 p. 3 List of Documents/Records Reviewed

BSS 00439

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

when major life decisions are at stake, neuropsychological testing can be invaluable.[47] [Neuropsychological testing obviously cannot be performed postmortem.].

Threshold Considerations in Performing Mental Status Examinations:

The core elements and concepts involved in mental status testing have not significantly changed over the years. Two threshold considerations in mental status testing, level of alertness and attention, must be recognized and assessed before any valid conclusions can be drawn from tests of higher cognitive function.

A person who has obstructive sleep apnea, for instance, may experience fluctuating excessive daytime sleepiness. There may be times when the person is alert enough to attend to tasks involved in mental status testing and other times when the person may not be able to sufficiently attend to mental status testing. The importance of a task, like making or amending a will, may also contribute to the ability of the person to attend to the task – the more important the task, the more incentive to focus on performing the task.

Likewise if a patient is in pain or taking certain medications that can interfere with alertness and attention, or is in a stressful environment (like in the hospital with acute severe pain, awaiting surgery), conclusions drawn from mental status screening exams would be of questionable validity.

A textbook on mental status examination in neurology stated the following:

> The initial step in a mental status examination is the determination of the patient's level of consciousness. This basic brain function determines the patient's ability to relate, both to himself and to his environment. Any disturbance of this elementary function will almost invariably effect [sic] the higher mental processes that constitute the major portion of the examination....

> There are many general terms used to describe the basic levels or states of consciousness. These levels represent points on a continuum from full alertness to deep coma. Most clinicians distinguish four principle levels: (1) alertness, (2) lethargy or somnolence, (3) stupor or semicoma, and (4) coma....

> Lethargy is a state in which the patient is not fully alert and tends to drift off to sleep when not specifically stimulated....It is difficult to assess memory calculations, and abstract thinking in these patients because of their inattention and wandering thought processes. If a full mental status examination is carried out in a lethargic patient, the results must be interpreted with some caution....

> Each of the above mentioned terms is qualitative in nature and each general term encompasses a wide range of possible points on the continuum of consciousness. Such

---

[47] #27 pp. 3-4 List of Documents/Records Reviewed

-19-

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

terms lack the objectivity and reliability that can be achieved with a more complete assessment scheme....[48]

After a determination of the level of consciousness, a careful assessment of attention is the next step of the formal mental status examination. The patient's ability to sustain attention over time must be established before the more complex functions such as memory, language, and abstract thinking are evaluated. It is of no value to ask the patient to remember the details of a story if he is repeatedly distracted by the nurse passing in the hall, a noise in the next room, or cars in the street. When a patient is inattentive and distractable [sic], he is unable to assimilate the information to be tested. [This highlights the fact that a hospital, during an acute hospitalization, is a poor place to try and assess mental status function.]...Attention presupposes alertness, but alertness does not necessarily imply attentiveness.[49]

## ANALYSIS:

Methodological Flaws and Other Flaws in Dr. Finkel's Opinions:

"Losing the Forest Through the Trees:"

Dr. Finkel spends an inordinate amount of time in his expert reports, trying to establish a diagnosis of dementia postmortem, with the apparent inference that establishing a diagnosis of dementia would equate with lack of testamentary capacity. He admits in his deposition that cognitive impairment does not automatically mean the individual has lack of testamentary capacity.[50] Yet, that is the concept he repeatedly attempts to assert/imply in his expert reports.

Focusing almost entirely on trying to establish a diagnosis of dementia postmortem (noting that none of Phyllis Schlafly's treating physicians diagnosed her as having dementia during her life[51]) misses the relevant issues of testamentary capacity and undue influence. As reviewed in the medical literature in the introductory section of my expert report, even individuals who have a diagnosis of dementia can retain testamentary capacity. Moderately to severely demented patients are often able to make decisions about the disposal of their property.[52] Dr. Finkel testified that Phyllis's "illness was not that severe."[53]

The bar for establishing testamentary capacity is set quite low (See "The Bar for Testamentary Capacity is Set Quite Low" in the introductory section of my expert report.). An individual can have dementia/cognitive impairment and still know the general extent of their estate, who their

---

[48] #28 pp. 7-8 List of Documents/Records Reviewed
[49] #28 p. 17 List of Documents/Records Reviewed
[50] #17 p. 73 List of Documents/Records Reviewed
[51] #17 p. 207 List of Documents/Records Reviewed
[52] #6 p. (9) List of Documents/Records Reviewed
[53] #17 p. 386 List of Documents/Records Reviewed

-20-

BSS 00441

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

heirs are, and that a will/trust is the means by which an individual's assets are distributed after death.

So, the primary issue is not whether Phyllis Schlafly had or did not have dementia (in my opinion, Dr. Finkel does not make a valid diagnosis of dementia postmortem), but whether or not she was able to meet the low bar of testamentary capacity. The facts in evidence indicate Phyllis Schlafly did have testamentary capacity at the time that amendments were executed (May 26, 2016, August 31, 2016) and was not subject to undue influence – see section in my report, "Dr. Finkel Disregards/Dismisses the Most Relevant Information with Respect to Testamentary Capacity and Undue Influence.")

<u>Methodological Flaws, Faulty Conclusions, Speculation, Confirmatory Bias, Misleading Inferences, False Statements, and Unsubstantiated Inferences/Assertions:</u>

Numerous methodological flaws, faulty conclusions, speculation, evidence of confirmatory bias, misleading inferences, false statements, and unsubstantiated inferences/assertions were identified in the opinions provided by Dr. Finkel.

Dr. Finkel presents pure speculation as "evidence." Dr. Finkel's opinions are peppered with speculative adjectives like "could be," "likely," "unlikely," "possible," "more likely than not."

At times, Dr. Finkel appears to substitute his judgment for the judgment of Phyllis Schlafly – what he considers reasonable and logical as opposed to what Phyllis Schlafly considered to be a reasonable and logical action.

Failure to recognize the impact of performing mental status testing (e.g. Mini-Cog) when Phyllis Schlafly was admitted to a hospital with severe acute pain and was facing back surgery for an acute T8 vertebral fracture, is a severe methodological flaw in my opinion.

Failure to recognize the significant effects of sleep apnea on threshold issues of alertness and attention in mental status testing is a major methodological flaw in my opinion.

Equating or attempting to equate "cognitive deficit" or a diagnosis of dementia (which was not established during life) with lack of testamentary capacity is a serious methodological flaw in my opinion.

From Dr. Finkel's expert report dated 07/15/2019:

On page 10 of his expert report (07/15/2019), he describes a rational thought process by Phyllis Schlafly with regard to amending her trust:

> Anne's siblings assert that, although their mother was weak, she possessed sufficient capacity to execute both documents. Further, Mother was furious with Anne for being a "troublemaker" and bringing lawsuits against her family members. Phyllis did not want her other children to be financially penalized because of the lawsuits, which is why she

-21-

BSS 00442

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> executed documents mandating that Anne pay for any legal costs from her share of the inheritance.[54]

He gave this demonstration of rational thought by Mrs. Schlafly little weight, and instead speculates that Anne's siblings discriminated against her.[55]

He noted that in September of 2013, Mrs. Schlafly was advised not to drive.[56] The implication is that being advised not to drive is somehow indicative of cognitive impairment or dementia. It ignores the concept of non-global capacity (See page 11 of my expert report).

Dr. Finkel highlighted what he believed to be the importance of the Mini-Cog test, even though it was administered under highly adverse circumstances (acute severe pain awaiting surgery) and under those circumstances the results would not be valid in my opinion.[57]

It was clear in 2014, that Phyllis Schlafly disapproved of some of the executive decisions her daughter had made relative to Eagle Forum and Phyllis' own personal finances.[58]

Dr. Finkel noted that Phyllis had a diagnosis of moderate to severe obstructive sleep apnea, which was impacting her quality of life, but failed to appreciate the negative effects sleep apnea can have on alertness and attention, core threshold issues in mental status testing.[59]

Dr. Finkel noted that Anne tried to pressure her mother to sign a statement essentially disavowing any support for then presidential candidate Trump, but despite the fact that Anne was the last person she talked to at that time, Phyllis refused to sign the statement.[60] This contradicts Dr. Finkel's portrayal of Phyllis as typically doing whatever the last person she talked with asked her to do. It is noted that Dr. Finkel did not cite Anne's action to pressure her mother in to signing this statement as evidence of an attempt at "undue influence."

Dr. Finkel noted that one of Phyllis' physicians, Dr. Govindan, noted in 2016, that Phyllis "could very accurately recall recent political events."[61] However, that was not given much weight in Dr. Finkel's conclusions.

In the Discussion section of his expert report (07/15/2019), Dr. Finkel stated:

> Although there are multiple medical notes dated to 2014 that her cognitive deficits (especially her lack of attention) might be due to hypersomnolence from obstructive sleep

---

[54] #15 p. 10 List of Documents/Records Reviewed
[55] Ibid.
[56] #15 p. 15 List of Documents/Records Reviewed
[57] #15 p. 17 List of Documents/Records Reviewed
[58] Ibid.
[59] #15 p. 27 List of Documents/Records Reviewed
[60] #15 pp. 32-33 List of Documents/Records Reviewed
[61] #15 p. 33 List of Documents/Records Reviewed

BSS 00443

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

apnea, this condition does not explain her changes in executive function, memory and social cognition/personality.[62]

This totally contradicts what he stated on page 94 of his report, where he stated that obstructive sleep apnea can significantly decrease working memory, mental flexibility, planning, organization, behavioral inhibition and problem solving – latter issues being examples of executive function and social cognition/personality.[63]

He noted that:

> In the physician records, there are multiple notations that Phyllis was "oriented to time, place, person and situation…normal insight. Normal judgment." In fact, her records – right until the time of her death – describe Phyllis as being fully oriented.[64]

He then goes on to essentially disregard or dismiss evidence demonstrating orientation, insight and judgment on the part of Phyllis Schlafly[65] – i.e. confirmatory bias.

In the Discussion section of his report, Dr. Finkel even cited an embarrassing event that occurred in May of 2016 where Phyllis's skirt fell down (due to weight loss causing clothes to fit poorly?) exposing disposable underwear as evidence of learning and memory impairment.[66]

If a "wardrobe malfunction" were evidence of cognitive impairment/dementia, then Janet Jackson's "wardrobe malfunction" that occurred during the halftime show at Super Bowl XXXVIII (2004), would be sufficient to label her as being demented and lacking in testamentary capacity.

Dr. Finkel also created a biased narrative whereby he asserted "There Were Two Phyllis Schlaflys."[67] He goes on to apply his own bias to events that occurred. He stated:

> Phyllis #2 took actions to fracture and maybe even destroy Eagle Forum.[68]

This demonstrates confirmatory bias and presumes that there were no real efforts to take over control of Eagle Forum, taking away control from Phyllis Schlafly. He asserts that if Phyllis opposed the hostile takeover of the organization she built (Eagle Forum), that would translate to destroying Eagle Forum. Clearly, she was not delusional about a "coup" or "hostile takeover," as multiple other family members held the same viewpoint about what was happening. These are essentially political judgments by Dr. Finkel which have no place and no relevance with respect to testamentary capacity.

---

[62] #15 p. 84 List of Documents/Records Reviewed
[63] #15 p. 94 List of Documents/Records Reviewed
[64] #15 p. 95 List of Documents/Records Reviewed
[65] Ibid.
[66] #15 p. 92 List of Documents/Records Reviewed
[67] #15 p. 97 List of Documents/Records Reviewed
[68] #15 p. 98 List of Documents/Records Reviewed

BSS 00444

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Dr. Finkel stated:

> From the information available in this case, the Phyllis who existed on May 26, 2016, was Phyllis #2. The Phyllis who existed on August 31, 2016, was so severely physically and mentally impaired that she was moribund (approaching death). On August 31, 2016, Liza wrote that her mother had "end stage cancer" and had arranged for hospice services. Phyllis did not even leave her bedroom after September 2.[69]

Here, Dr. Finkel tried to infer that Phyllis' moribund state automatically meant that she lacked testamentary capacity. The so-called "mental impairment" has not been established, and severe physical impairment does not disqualify one from having testamentary capacity. Likewise, having "end stage cancer" or opting for hospice services does not equate to lack of testamentary capacity. And, not leaving her bed, while she was in the process of dying, also does not disqualify her from having testamentary capacity.

After artificially creating "two Phyllis Schlaflys," Dr. Finkel engages in pure speculation whereby he alleged underlying gender discrimination against Anne Schlafly Cori. He labels this section of his report as "The Gender Divide and the Disinheritance of Anne Schlafly Cori."[70] He mischaracterizes amendments executed by Phyllis Schlafly as "disinheriting" Anne Schlafly Cori. However, Anne Schlafly Cori was not disinherited. Her share of inheritance was merely reduced by the costs of litigation she had foisted on others. It was entirely Anne Schlafly Cori's choice to engage in litigation and thus "cause trouble" for other family members. He noted how some family members changed their views over time, though he stops short of labeling them "demented" for changing their views. This type of pure speculation and "spin," has no relevance with respect to making a determination about testamentary capacity.

Dr. Finkel alleged that there was a "male takeover:"

> Although this appears to be a "male takeover" of Phyllis's organizations, the intense publicity by the men made it appear that these senior women – and Anne – all of whom Phyllis handpicked to carry on her legacy, were the ones that were inappropriately taking over the Eagle Forum.[71]

This again represents nothing more than pure speculation and "spin," and it has no place in an expert report pertaining to testamentary capacity – it is not relevant.

Dr. Finkel goes on to insert his own judgement about the nature of events involving a power struggle that was impacting Eagle Forum. Dr. Finkel presented his view of the ongoing power struggle as follows:

> The thought that Anne was controlling five other senior women makes no sense at all [thereby dismissing the notion that all 6 may have agreed on the same agenda]. All five

---

[69] #15 p. 99 List of Documents/Records Reviewed
[70] #15 p. 100 List of Documents/Records Reviewed
[71] #15 p. 107 List of Documents/Records Reviewed

-24-

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> of these women had worked with Phyllis for decades. Of necessity, they had to be hard-nosed, dedicated, principled, hard-working and determined. It is extremely unlikely that Anne, by far the youngest, would be able to dominate these old-timers and get them to bend to her will. Rather, her "mistake" (in terms of her mother's testamentary choices) was to agree with those most respected leaders, whom her mother had praised and loved for decades.[72]

Again, this represents nothing more than pure speculation and "spin," and has no place in an expert report pertaining to testamentary capacity – it is not relevant.

In his report, Dr. Finkel also stated:

> On May 26, 2016, Phyllis no longer had sufficient memory or executive functional abilities to remember and understand the nature and extent of her property. She could immediately repeat the information, if someone told her. She could also say, "Yes," without really understanding the information. However it was unlikely that she could recall that she had revocable and irrevocable Trusts, as well as life insurance for C4. Further, given her deficiencies in executive function, her ability to process information in order to grasp and convey how her assets would be allocated, and how much she would need for her own needs, would be markedly limited.[73]

This again represents pure speculation. Dr. Finkel was not present at the execution of the amendment on May 26, 2016. There is no way he could know what Phyllis understood or did not understand on that date. Alleged deficiencies in executive function and ability to process information had not been proven. Dr. Finkel's pure speculation stands in stark contrast to the testimony of attorneys who were present on May 26, 2016 – see section of my expert report, "Dr. Finkel Disregards/Dismisses the Most Relevant Information with Respect to Testamentary Capacity and Undue Influence.").

Dr. Finkel also stated in his report:

> Regarding Phyllis's August 31, 2016, amendment, neither attorney even spoke with her about the preparation of these documents. The execution of four documents took about twenty minutes. It is highly unlikely that Phyllis, who was moribund and no longer able even to give a rudimentary history, would know the nature and extent of her property.[74]

Again, Dr. Finkel, who was not present at the signing of the amendment on August 31, 2016, engages in pure speculation. In addition, the testimony of attorney Melissa Nolan, demonstrates that Dr. Finkel's statement that neither attorney even spoke with Phyllis about those documents on August 31st, is blatantly false.[75] Dr. Finkel, who was not present at the execution of amendment documents on August 31st cannot know if Phyllis was or was not able to provide a

---

[72] #15 p. 109 List of Documents/Records Reviewed
[73] #15 p. 111 List of Documents/Records Reviewed
[74] Ibid.
[75] #18 p. 39 List of Documents/Records Reviewed

-25-

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

"rudimentary history" on that date. Moreover, even if there was difficulty providing a medical history, that would be totally irrelevant with respect to testamentary capacity. It is noted that Dr. Finkel again tries to equate a person being "moribund" as automatically equating to lack of testamentary capacity. That is a totally invalid conclusion. I have encountered patients throughout my career as a neurologist who were "poor historians" (difficulty providing a good medical history), who did not have dementia or any cognitive deficit.

Dr. Finkel's report stated:

> On May 26, 2016, it is possible that Phyllis could name her six children. It is also possible that, without prompting, she could not.[76]

Dr. Finkel, who was not present at the execution of the testamentary document on May 26, 2016, again engages in pure speculation. He presents no factual evidence to indicate that Phyllis had any difficulty naming her six children on that date.

Dr. Finkel's report also stated:

> Bruce, John and Liza that was about to penalize Anne so severely that a long drawn-out and expensive legal battle over the will appeared to be a distinct possibility. It is very unlikely that Phyllis, a diplomat and problem-solver par excellence, understood the consequences of her action and the resultant pain and fragmentation of her family that would occur as a result of her signing this testamentary document.[77]

Again, Dr. Finkel, who was not present at the execution of testamentary documents, engages in pure speculation and a narrative that indicates confirmatory bias. The legal action was not initiated by Bruce, John or Liza. It was the voluntary action of Phyllis, not Bruce, John or Liza that resulted in a reduction of Anne's share of the inheritance equal to the expense of litigation Anne would cause. Testimony of the attorneys who were present for execution of testamentary documents indicate that Phyllis knew exactly what she was doing and had a very good reason for doing it, which she explained to them – see "Dr. Finkel Disregards/Dismisses the Most Relevant Information with Respect to Testamentary Capacity and Undue Influence" in my expert report.).

Dr. Finkel, who was not present at the execution of testamentary documents, goes on to speculate:

> Regarding the August 31, 2016, amendment given Phyllis's condition, it is unlikely that any of the questions were asked and answered.[78]

Testimony of attorney Melissa Nolan indicated that the attorneys discussed the testamentary document with Phyllis on August 31st, and that their determination was that Phyllis had testamentary capacity and was not subject to any undue influence.[79]

---

[76] #15 p. 111 List of Documents/Records Reviewed
[77] #15 p. 112 List of Documents/Records Reviewed
[78] Ibid.

-26-

BSS 00447

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Dr. Finkel again attempted to draw an invalid link between physical illness and moribund state with lack of testamentary capacity.  Dr. Finkel stated in his report:

> She was severely physically ill on May 26, 2016, and moribund on August 31, 2016.[80]

Physical illness and moribund state are irrelevant with respect to testamentary capacity.  An individual can be frail, feeble, have difficulty walking, be unsteady on her feet, and even be moribund, all of which have no bearing whatsoever on testamentary capacity.

Dr. Finkel stated in his report:

> Since Fred's death [Phyllis's husband], Phyllis had executed testamentary documents on multiple occasions.  On each occasion, she provided for her beneficiaries (her six children, or in one case, one of the children's progeny), equally.  This was true even with her two updates in January and April 2016. It was only on May 26, 2016, that Phyllis, in effect, totally disinherited one of her children, Anne.  Anne was a 1/6 beneficiary of Phyllis's estate until then, so Phyllis's action was different than what would normally be expected. Everyone agreed that Phyllis loved all her children, and in her love and estate planning, overlooked any differences she may have had with them.  Thus, the May 26, 2016 amendment was indeed unnatural.
>
> The May 2016 and August 2016 amendments constituted a radical change in Phyllis's prior estate plans.  Never before had she penalized Anne to the point of exclusion.[81]

Dr. Finkel's conclusion is totally unfounded.  It fails to account for the fact that things changed in the spring of 2016, and Phyllis faced what she viewed as a direct "attack" on Eagle Forum and herself – something she had never faced before.  That caused Phyllis to deal with that "attack" in a logical and rational manner – by amending testamentary documents.  Dr. Finkel again "spins" the narrative by referring to Anne being "disinherited" and excluded.  Anne, however, was not disinherited or excluded.  Her share was merely reduced to account for the costs of litigation which Anne caused.  There is nothing "unnatural" or "radical" about that at all.  Wills and trusts can change based on changing circumstances.

In his Conclusion, Dr. Finkel relied on faulty methodology and invalid conclusions.  He also continued to "spin" the narrative and speculate about the true nature of events surrounding Eagle Forum and Anne Schlafly Cori. Dr. Finkel stated:

> However, Phyllis lived an additional three years.   During that time her cancer metastasized to multiple other organs.  By 2014, she was experiencing cognitive decline, exemplified by no longer being able to draw a clock or spell the word "world" backwards.[82]

---

[79] #18 pp. 39, 49-50 List of Documents/Records Reviewed
[80] #15 p. 115 List of Documents/Records Reviewed
[81] #15 p. 116 List of Documents/Records Reviewed
[82] #15 p. 128 List of Documents/Records Reviewed

BSS 00448

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> Phyllis died with the painful belief that several of her closest friends, as well as her daughter, had actually turned on her and were her enemies.[83]

Again, the fact that Phyllis had a terminal illness, metastatic cancer, has no relevancy or bearing on testamentary capacity or undue influence. Likewise, Dr. Finkel's attempt to substitute his belief about the nature of events vs. what Phyllis Schlafly perceived is totally irrelevant with respect to testamentary capacity and undue influence. It represents pure speculation on his part.

Dr. Finkel relies on a mental status screen (Mini-Cog) that was performed under conditions which would make the results unreliable and invalid. The Mini-Cog was administered to Phyllis in the Emergency Department of a hospital where she presented with severe (10/10) acute pain from a severe acute T8 compression fracture.[84]

Individuals who are suffering from very severe acute pain will necessarily be focused on their severe pain making it difficult if not impossible to attend to any mental status screen testing. Her pain was so severe that within a matter of minutes after the Mini-Cog was administered, she had to be given narcotic pain medicine (Dilaudid) intravenously in an attempt to relieve her suffering.[85] The narcotic pain medication was given intravenously two additional times while she was in the Emergency Department of the hospital.[86]

In his updated report, Dr. Finkel offered the spurious and misleading proposition that the attorneys who were involved in assisting Phyllis with testamentary documents erred because they failed to follow the questions a "psychiatric expert" should ask in determining testamentary capacity.[87] The attorneys are not psychiatrists and should not be expected to function as psychiatrists.

Dr. Finkel also sought to fault the attorneys who helped Phyllis with the testamentary documents for not following "guidelines" in cases where testamentary capacity is in question and a contested will may occur in the future.[88] Dr. Finkel's presumption is that the attorneys would necessarily have a question about Phyllis's testamentary capacity even though they saw no reason whatsoever to question it. They found she was of sound mind when she executed testamentary documents.

In the Discussion section of his updated report, Dr. Finkel again offered information that is totally irrelevant to testamentary capacity, including the "seriousness of her medical condition," the fact that Phyllis had a "terminal illness," and she "was returning home from the hospital in late August."[89]

---

[83] #15 p. 129 List of Documents/Records Reviewed
[84] #29 (MOBAP 753) (MOBAP 808) (MOBAP 818) (MOBAP 822) (MOBAP 840) (MOBAP 867) (MOBAP 868) List of Documents/Records Reviewed
[85] #15 p. 130-131; #29 (MOBAP 808) List of Documents/Records Reviewed
[86] #29 (MOBAP 808) List of Documents/Records Reviewed
[87] #25 p. 142 List of Documents/Records Reviewed
[88] #25 pp. 142-143 List of Documents/Records Reviewed
[89] #25 p. 143 List of Documents/Records Reviewed

BSS 00449

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Dr. Finkel stated:

> It does not appear that they [attorneys Paule and Nolan] asked Phyllis to name the natural objects of her bounty.[90]

However, the names of heirs listed in testamentary documents and review by Phyllis and discussion with her attorneys demonstrating her understanding of the documents, would certainly demonstrate that she fully understood the "natural objects of her bounty."

After omitting the favorable mental status findings of neurologists (one of which he added to his updated report,[91] after having been caught omitting it from his first report, which was revealed during his deposition[92]), and after disregarding favorable mental status findings by Phyllis's primary care physician, Dr. Finkel mischaracterized "the majority of medical evidence"...as pointing to "the conclusion that Phyllis did not understand the ordinary affairs of her life, did not understand the nature and extent of her property and was not able to weigh and appreciate her obligations toward the natural objects of her bounty."[93]   This represents the very essence of confirmatory bias.

In his deposition, 07/16/2019, Dr. Finkel admitted that a treating neurologist, Dr. Tullman, did not note anything else to support a conclusion of "cognitive deficiency" other than the fact Phyllis did not spell the word "world" backwards correctly.  Dr. Finkel further admitted that result could have been due to an attention problem or that she may have simply made a "mistake."[94]   Elevating a possible simple "mistake" to support a conclusion of "cognitive deficiency," is thus a totally invalid and unwarranted extrapolation.

Moreover, even if one accepted the flawed and faulty conclusions Dr. Finkel offers, poor performance on a clock test or inability to spell the word "world" backwards, does not automatically translate to lack of testamentary capacity or susceptibility to undue influence.

Dr. Finkel provided an updated report dated 11/25/2015.[95] His updated report contains the same faulty methodology and faulty conclusions contained in his report dated 07/15/2019.  Having been caught in deposition omitting a critical piece of evidence in his expert report (07/15/2019), a neurologist (Dr. Tullman) who found Phyllis to be alert and oriented x 3,[96] he apparently felt compelled to include that information in his updated report.  However, he failed to include in his updated report the findings of another neurologist, J.M. Hatlied, M.D., who reported that Phyllis was "alert and oriented x 3.  Speech is clear and fluent.  Memory, fund of knowledge, mood and affect are normal."[97]

---

[90] Ibid.
[91] #25 p. 24 List of Documents/Records Reviewed
[92] #17 p. 374 List of Documents/Records Reviewed
[93] Ibid.
[94] #17 pp. 372-373 List of Documents/Records Reviewed
[95] #25 List of Documents/Records Reviewed
[96] #17 p. 374 List of Documents/Records Reviewed
[97] #24 (BSS 97) List of Documents/Records Reviewed

BSS 00450

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Neurologists have expertise in diagnosing dementia and other cognitive disorders, and the selective omission of the findings of these neurologists with regard to mental function of Phyllis Schlafly, demonstrates strong evidence of confirmatory bias by Dr. Finkel in creating his reports.

In his updated report, 11/25/2019, Dr. Finkel *presumes* that Phyllis had dementia, and further infers that she had Alzheimer's disease. He stated: "The cause of Phyllis's dementia is not clear....Alzheimer's disease is characterized by:"[98]

In his report, Dr. Finkel offered the following:

> Dr. Hatfield [sic], her neurologist, suggested that Phyllis could have been suffering from paraneoplastic neuropathy (occurs when there is damage to the nerves that manage everyday body functions) as early as November 2013 (Dalmau and Rosenfield 2008). Her type and location of cancer is associated with paraneoplastic neuropathy (a condition seen in patients with lung cancer). She had many of the symptoms, which may include difficulty in walking or swallowing, loss of muscle tone, loss of fine motor coordination, fatigue, slurred speech, *memory loss,* sleep disturbances, *dementia*, sensory loss in the limbs, and vertigo or dizziness.[99]

This represents a recurring method in Dr. Finkel's reports – he cites things, that even if proven, have absolutely no bearing whatsoever on testamentary capacity or undue influence. He goes off on tangents, with narratives about what people with lung cancer *can* have, statistical information about dementia, with no credible evidence that Phyllis had any of the speculative conditions.

In this case, he offered the bizarre and false statement that symptoms of paraneoplastic neuropathy include such things as *memory loss* and *dementia*. This is either a deliberate attempt to mislead or if he truly believes that a neuropathy of any kind can cause dementia or that dementia is a symptom of a neuropathy, then it represents a rather shocking deficiency of basic knowledge in neurology. Memory loss and dementia are <u>not</u> symptoms of paraneoplastic neuropathy or any other neuropathy.

In his updated report, Dr. Finkel continued to engage in pure speculation. Again, his narratives involving pure speculation are riddled with phrases like "*could have been*" and "*more likely than not*," boldly inferring these things as facts – facts for which he has no substantial evidence to support. In his updated report, he stated:

> In addition, by 2016, Phyllis could have been suffering from metastasis to her brain....it is more likely than not these could be contributing to her cognitive decline.[100]

On the very same page as his speculative narrative above, he admitted:

> During her lifetime, Phyllis never had a diagnosis of dementia.[101]

---

[98] #25 p. 122 List of Documents/Records Reviewed
[99] Ibid.
[100] Ibid.

BSS 00451

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

No metastases to the brain were ever identified.

He goes on to offer pure speculation as to why Phyllis did not have a diagnosis of dementia during her lifetime, disregarding the obvious possibility that the reason she was not diagnosed with dementia during her lifetime is because she did not have dementia.

Dr. Finkel continued to make misleading inferences in his updated report. He stated:

> In fact, in 2014, both Dr. Tullman and Dr. Govindan were aware of cognitive deficits to the point that they recommended an MRI of the brain to rule out stroke or pressure on the brain.[102]

A review of Dr. Tullman's records, however, revealed that Dr. Finkel created this false narrative out of thin air. First, Dr. Tullman did not even list "cognitive deficit" or any similar condition in his assessment.[103]  Second, Dr. Tullman makes it clear in his consultation note that the reason he ordered an MRI of the brain was to further investigate a cause for Phyllis's complaint of excessive daytime sleepiness.  Dr. Tullman stated in his note:

> The etiology of Phyllis' excessive daytime sleepiness is not clear to me.  I am going to go ahead and obtain a brain MRI given her history of malignancies, but this would be an unusual presentation of brain metastases.[104]

There was no mention whatsoever in Dr. Tullman's note about ruling out stroke or pressure on the brain.  This was entirely made up by Dr. Finkel.

In his deposition on 07/16/2019, Dr. Finkel takes this complete fabrication that an MRI of the brain was ordered so as to investigate  "cognitive deficits" to further mislead by stating that Dr. Tullman was waiting for the MRI of the brain results before making his determination about "cognitive deficits" or dementia.[105]  Dr. Finkel also stated that he himself had tried to get the MRI so as to support what he viewed as "cognitive deficits."[106]  The determination of "cognitive deficit"/diagnosis of dementia/major neurocognitive disorder is a clinical diagnosis that does not require an MRI of the brain to diagnose.  Once a diagnosis of dementia/major neurocognitive disorder is made, neuroimaging (e.g. MRI), blood tests, possible lumbar puncture, possible EEG are ordered to investigate the *cause*.

In his updated report, Dr. Finkel further proposed that the attorneys who prepared the testamentary documents were not competent. He stated:

---

[101] Ibid.
[102] #25 p. 124 List of Documents/Records Reviewed
[103] #22 (Tullman 2) List of Documents/Records Reviewed
[104] Ibid.
[105] #17 p. 375 List of Documents/Records Reviewed
[106] #17 p. 374 List of Documents/Records Reviewed

BSS 00452

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> From their testimony [Don Paule, Melissa Nolan], it does not appear that either knew the Missouri criteria for testamentary capacity without being cued or having the criteria provided for them to read....The attorneys stated that all that mattered anyway was that "the documents made sense to Phyllis." It appears that if Phyllis was demented and/or delusional, this would not be relevant.[107]

This is after Dr. Finkel admitted that Phyllis was not diagnosed with dementia during her lifetime,[108] and in addition, there was no evidence that she was "delusional." And, suggesting that attorneys, duly authorized to practice law in Missouri, who have wills and trusts as a focus in their practice are somehow incompetent, without any credible evidence to support that opinion is rather shocking and outrageous.

In his updated report, Dr. Finkel went on to "spin" the testimonies of attorneys Paule and Nolan to make it sound as though there was some major disagreement between them with regard to the question of Phyllis's testamentary capacity – which there was not. Dr. Finkel stated:

> Don Paule testified that at all times Phyllis "absolutely" had testamentary capacity. In arriving at his conclusions, he testified that he does not consider it relevant whether his client is diagnosed with a cognitive disorder (Ms. Nolan disagrees with Don Paule), whether the family notes cognitive decline, whether his client is in hospice, or whether a doctor notes that a patient can no longer give a medical history. These are not considerations for him when he does his own evaluation of testamentary capacity. Nor did he see any evidence of undue influence. He believed that at all times, Phyllis was impervious to external influence.[109]

Note how Dr. Finkel's narrative *presumes* that Phyllis was diagnosed with a "cognitive disorder" during her lifetime, which clearly she was not. Ms. Nolan makes it clear in her testimony that she agreed with Mr. Paule that at the relevant times when trust amendments were executed, Phyllis had testamentary capacity and was not subject to undue influence.[110] Attorney Rossiter adopted the same tactic used by Dr. Finkel in creating his report, in posing a hypothetical question to Ms. Nolan – making it sound like Phyllis had been diagnosed as suffering from a "cognitive deficit."

> **Q. [Mr. Rossiter] And the time entries. Thank you. You ever aware of Phyllis ever having been diagnosed as suffering from a cognitive deficit in 2016?**
>
> A. [Ms. Nolan] No.
>
> **Q. [Mr. Rossiter] No one ever told you that?**
>
> A. [Ms. Nolan] No.

---

[107] #25 p. 143 List of Documents/Records Reviewed List of Documents/Records Reviewed
[108] #25 p. 122 List of Documents/Records Reviewed
[109] #25 p. 143 List of Documents/Records Reviewed
[110] #18 pp. 49-50 List of Documents/Records Reviewed

BSS 00453

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> **Q. [Mr. Rossiter] If she had received such a diagnosis, would you have liked to have heart about it?**
>
> A. [Ms. Nolan]  It would have been relevant, yes.[111]

This hypothetical question not only makes it sound like Phyllis was given a "diagnosis" of "cognitive deficit," but it also attempts to advance the flawed inference that if she had a "cognitive deficit," that would automatically mean that she lacked testamentary capacity or was subject to undue influence.  Dr. Finkel selectively leaves out of his updated report the question and answer exchange immediately following the exchange above.

> **Q. [Mr. Rossiter]  Did you ever observe any cognitive decline in Phyllis?**
> A. [Ms. Nolan]  No.[112]

In Dr. Finkel's deposition (07/16/2019), he essentially admitted to the flawed methodology and conclusions that were in his expert reports.  Although Dr. Finkel tried to make the inference that cognitive impairment equates to lack of testamentary capacity in his expert reports (a flawed inference), in his deposition, he testified to the contrary:

> Q. [Mr. Elster]  If someone is cognitively impaired, does that automatically mean they lack testamentary capacity?
>
> A. [Dr. Finkel] No.[113]

Dr. Finkel admitted that if an individual is distracted or can't pay attention to various tasks, that could affect the individual's cognitive abilities.[114]  Yet, he disregards that fact when a Mini-Cog screening test was administered to Phyllis under the distracting environment of an Emergency Department of a hospital at a time when she was dealing with severe pain from a severe acute T8 vertebral compression fracture.

Not surprisingly, Dr. Finkel also admitted in his deposition that attorneys sometimes edit his reports.[115]  Moreover, Dr. Finkel specifically admitted that attorney Rossiter reviewed drafts of his expert report and discussed the report with Dr. Finkel, and Dr. Finkel made changes based on that discussion with attorney Rossiter.[116]

Although Dr. Finkel promoted the narrative in his reports that the fact a patient has a terminal illness and/or is moribund, that somehow automatically translates to lack of testamentary

---

[111] #18 p. 77 List of Documents/Records Reviewed
[112] #18 p. 78 List of Documents/Records Reviewed
[113] #17 p. 73 List of Documents/Records Reviewed
[114] #17 pp. 73-75 List of Documents/Records Reviewed
[115] #17 p. 86 List of Documents/Records Reviewed
[116] #17 p. 92 List of Documents/Records Reviewed

BSS 00454

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

capacity, he admitted in his deposition that is not the case – just because a person is terminally ill does not automatically mean they lack testamentary capacity.[117]

This is a recurring theme revealed in Dr. Finkel's deposition – he proposes/infers certain things in his expert reports and then admits in deposition that those propositions/inferences are not true. Holding two contradictory beliefs simultaneously seems to suggest a certain level of cognitive dissonance or at the very least calls into question the validity of opinions expressed in his reports.

Dr. Finkel tried to make the case in his reports that Phyllis should not have been upset by Anne Cori filing a lawsuit related to Eagle Forum (which affected Phyllis) and that the amendments to the trusts that Phyllis made in response to what Anne had done represented an unreasonable act on the part of Phyllis. Yet, in his deposition (07/16/2019), Dr. Finkel admitted that Phyllis was upset about one family member (Anne) suing another family member and she was also upset about Anne filing the lawsuit against Eagle Forum in April of 2016.[118] In his deposition (07/16/2019), Dr. Finkel admitted that the decision made by Phyllis to reduce Anne's inheritance by the amount of legal costs she had caused, was not an outlandish decision of a cognitively intact individual.[119] He then goes on to offer an entirely illogical explanation – that because, in his view, she was not cognitively intact, it would be an outlandish decision.[120] Dr. Finkel advances circular logic when he opines that because, in his view, Phyllis lacked testamentary capacity, the otherwise reasonable (not outlandish) decision that a cognitively intact person would make was not reasonable because she lacked testamentary capacity.[121]

Dr. Finkel testified that if Don Paule and Melissa Nolan both testified that both the May 2016 and August 2016 amendments that there was no testamentary incapacity that he would "probably not" change his opinions.[122] And, indeed after he reviewed the testimony of attorneys Paule and Nolan, he did not change his opinions in his updated report.[123] In my opinion it is a fatal flaw to totally disregard/dismiss the assessment of legal professionals who are experienced with wills and trusts, who were present on the specific dates testamentary documents were executed. The bar is set so low with regard to testamentary capacity that experienced attorneys would be able to make this type of assessment.

When asked if it was reasonable for Phyllis to take it personally when the six directors of Eagle Forum (an organization built by Phyllis Schlafly) removed her authority to write checks, he answered:

> A. Phyllis in her usual state would have dealt with it. Phyllis in an impaired state was unable to deal with it.[124]

---

[117] #17 p. 145 List of Documents/Records Reviewed
[118] #17 p. 178 List of Documents/Records Reviewed
[119] #17 p. 181 List of Documents/Records Reviewed
[120] Ibid.
[121] #17 pp. 180-181 list
[122] #17 p. 193 List of Documents/Records Reviewed
[123] #25 List of Documents/Records Reviewed
[124] #17 p. 196 List of Documents/Records Reviewed

BSS 00455

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

However, Phyllis did deal with it in a very rational and logical manner in the amendment to her testamentary document, by reducing Anne's share of inheritance by the costs of litigation incurred and that would continue to be incurred into the future.

Dr. Finkel admitted in deposition testimony that nothing like that (Eagle Forum board members removing Phyllis from the ability to write checks on behalf of Eagle Forum) had ever happened before to his knowledge.[125] When asked again if it was reasonable for Phyllis to take that action personally, he offered an answer indicative of total denial.

> A. If she were in her usual state, I would believe she would take it personally.  In her current state, no, I don't.[126]

But, it is very clear that Phyllis did take the action of Anne and the board of directors very personally.   She took it very personally and sought to hold Anne accountable for her participation in what Phyllis viewed as a betrayal and "attack" against her.[127]

Dr. Finkel cited "mild forgetfulness" and makes reference to the Mini-Cog test performed under highly adverse conditions in an Emergency Department as evidence of "cognitive impairment."[128]   Mild forgetfulness increases with aging,[129] and is not automatically equivalent to "cognitive impairment."  The serious and fatal flaw in interpreting the results of a Mini-Cog test administered under highly adverse conditions has already been discussed at length in my expert report.

Dr. Finkel also testified that failure to use a call button in a hospital when so advised was evidence of cognitive impairment.[130]   However, there are perfectly understandable reasons why some patients disregard advice to use a call button that have nothing to do with cognitive impairment.   Some patients, for example, experience the situation whereby they push the call button and no one responds in a timely manner.   The patient, not wanting to urinate or defecate in the bed, may, under those circumstances, decide to risk getting out of bed so as not to make a mess.  The circumstances of "not using the call button" are not known.

Dr. Finkel again admitted in his deposition that none of Phyllis's treating physicians diagnosed dementia.[131]   He then engaged in pure speculation yet again as to why her treating physicians failed to make the diagnosis of dementia.[132]   Incredibly, he then tried to make the case that an individual who cannot recall all of the medications they are taking must have cognitive impairment.[133]   This is a totally absurd and invalid conclusion.  Physicians, including myself, routinely encounter patients who cannot recall all of their medications that are not cognitively

---

[125] #17 p. 197 List of Documents/Records Reviewed
[126] Ibid.
[127] #19 p. 60 List of Documents/Records Reviewed
[128] #17 p. 203 List of Documents/Records Reviewed
[129] #27 p. 3 List of Documents/Records Reviewed
[130] #17 p. 204 List of Documents/Records Reviewed
[131] #17 p. 207 List of Documents/Records Reviewed
[132] #17 pp. 207-208 List of Documents/Records Reviewed
[133] #17 p. 208 List of Documents/Records Reviewed

BSS 00456

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

impaired, which is why hospitals often advise patients to bring their medication bottles with them to the hospital when they are scheduled for an elective admission.

Dr. Finkel testified (07/16/2019), that pain can temporarily worsen someone's cognitive impairment.[134] Yet, he totally dismisses the effects of severe, acute pain (10/10) on alertness and attention, two core elements needed to proceed with a valid evaluation of higher cognitive functions. Phyllis had severe pain (10/10) in the Emergency Department of a hospital where a Mini-Cog test was administered in the Emergency Department while she was suffering pain.[135]

In his reports, Dr. Finkel advances the concept that Phyllis did not have testamentary capacity based substantially on her failure to perform well on the Mini-Cog test while she was in severe pain with an acute T8 vertebral compression fracture. He was asked:

> Q. [Mr. Elster] If someone fails a Mini-Cog test, is it your belief that all periods of time after the test is failed they lack testamentary capacity?
>
> A. [Dr. Finkel] Not necessarily.[136]

Dr. Finkel testified that he disagreed with Dr. Corder's (primary care physician) assessment that Phyllis had a "great mind."[137] Although many people as they age can no longer do all of the physical things they could do when they were younger, Dr. Finkel testified that he believed the statement of her primary care physician to the effect that she was expecting a great deal more than she could do at her age, was evidence of poor judgment and poor insight.[138] That is an absurd and totally faulty conclusion – i.e. that Phyllis could not possibly have had a "great mind," because she had expectations or hope that she could continue to function at a high energy level despite her age.

Dr. Finkel goes on to criticize Dr. Corder's opinion that Phyllis was noted to have good judgment on 02/23/2015, based on what he believed was the length of time Dr. Corder spent making his assessment. Yet, he sees no problem with arriving at his conclusion after having spent zero minutes in an in-person meeting with Phyllis Schlafly. Dr. Finkel testified:

> Q. [Mr. Elster] You don't think Dr. Corder is credible with respect to his February 2015 visit?
>
> A. [Dr. Finkel] My belief is that he didn't check this based on his deposition where he arrives at opinions like this in less than a minute, no. I - - you can't do this in less than a minute. He does this in less than a minute. He does maybe at most in a minute.
>
> Q. [Mr. Elster] And you've done it in meeting with Phyllis for zero minutes.

---

[134] #17 p. 211 List of Documents/Records Reviewed
[135] #15 pp. 130-131; #29 (MOBAP 808) List of Documents/Records Reviewed
[136] #17 p. 211 List of Documents/Records Reviewed
[137] #17 pp. 215-217 List of Documents/Records Reviewed
[138] #17 p. 216 List of Documents/Records Reviewed

-36-

BSS 00457

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

      A. [Dr. Finkel] Absolutely.[139]

Dr. Finkel repeatedly engaged in a pattern of disregarding evidence in the medical records when it did not fit the narrative he was trying to advance. Although one can learn a lot about a patient's mental status, judgement and insight by just listening to the patient and listening how they respond, Dr. Finkel disregards that possibility and states his certainty (speculation) about what questions Dr. Corder didn't ask during the encounter even though Dr. Finkel was not present during the encounter.

      Q. [Mr. Elster]  It says, "pyche," and this is from Dr. Corder's notes.

      A. [Dr. Finkel]  Yes.

      Q. [Mr. Elster]  Medical records as well.

      A. [Dr. Finkel]  Yeah.

      Q. [Mr. Elster] It says, "Normal insight and normal judgment."  Is Dr. Corder wrong?

      A. [Dr. Finkel]  Well, I –

      Q. [Mr. Elster] –that on July 14 of 2015 she didn't have normal insight and judgment?

      A. [Dr. Finkel]  I'm not saying it's wrong or right. What I'm saying is he doesn't have time to do that evaluation that's less than a minute.  Can't be done.

      …

      Q. [Mr. Elster] How are you certain that he asked certain questions?

      A. [Dr. Finkel]  I'm certain he didn't ask certain questions.[140]

Dr. Finkel goes on in his deposition to testify that Phyllis's unwillingness to wear a CPAP mask was indicative of "cognitive impairment."[141]  He then engaged in pure speculation that she did not know how to use the mask, even though he could not cite any specific evidence to support that belief.[142]  Dr. Finkel finally admitted that it's possible Phyllis just wasn't comfortable using the mask.[143]

It is not at all uncommon to encounter cognitively intact patients who simply don't like wearing a CPAP mask and being tethered to a CPAP machine while they sleep.  Even though they may

---

[139] #17 p. 218 List of Documents/Records Reviewed
[140] #17 pp. 219-220 List of Documents/Records Reviewed
[141] #17 p. 227 List of Documents/Records Reviewed
[142] #17 pp. 227-228 List of Documents/Records Reviewed
[143] #17 p. 228 List of Documents/Records Reviewed

BSS 00458

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

be told that it is important to treat sleep apnea, they may choose not to do so because of the discomfort and inconvenience of wearing a mask with an attached hose, and being tethered to a CPAP machine while trying to sleep.

Dr. Finkel again criticized Dr. Corder's assessment that Phyllis was oriented times three, stating he simply checked boxes (i.e. speculation) and did the assessment of orientation in less than a minute.[144]

It takes very little time to assess orientation. Questions of date, time and place take a matter of seconds to ask and get answered.

Dr. Finkel testified that Phyllis was able to write letters, talk politics and write nice notes in 2016.[145] He even testified that she was able to do these things in August of 2016.[146] He testified that these activities reflected positively on her cognitive capacity.[147] He attributes her ability to perform these higher cognitive functions well in 2016 to functioning on "automatic pilot."[148] However, Dr. Finkel failed to appreciate the possibility that as an attorney, Phyllis would also be capable of operating on "automatic pilot" with respect to basic legal concepts involved in creating or amending a will/trust.

Dr. Finkel engaged in pure speculation again when he testified:

> My testimony is that in 2013, she had – she had tumors in her lungs and nearby areas but not in her liver, not in her adrenal glands, not in her bone; and that over a period of three years, the metastasis had gone quite considerably elsewhere. Lung metas – lung cancer commonly goes to the brain. So what I'm saying here is given the fact that her cancer was spreading all over her body, the chances of it spreading to the brain are more likely than not, and it could result in cognitive impairment or a contributing factor in cognitive impairment.[149]

There was no evidence cited to substantiate a claim of metastases involving the brain. It was all just pure speculation on the part of Dr. Finkel, speculation which he further embellished upon to make it sound like these unproven brain lesions were the cause of or contributed to "cognitive impairment."

Dr. Finkel again acted to substitute his judgment for that of Phyllis Schlafly, when he testified that he did not think Phyllis needed to vigorously defend the lawsuit that was filed in April of 2016.[150] He testified that he believed her decision to vigorously defend the lawsuit was evidence of cognitive impairment.[151]   Irrespective of the fact that Dr. Finkel has no valid basis for

---

[144] #17 p. 232 List of Documents/Records Reviewed
[145] #17 pp. 262-263 List of Documents/Records Reviewed
[146] #17 p. 263 List of Documents/Records Reviewed
[147] #17 p. 262 List of Documents/Records Reviewed
[148] Ibid.
[149] #17 p. 269 List of Documents/Records Reviewed
[150] #17 p. 321 List of Documents/Records Reviewed
[151] #17 p. 322 List of Documents/Records Reviewed

BSS 00459

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

substituting his judgment for that of Phyllis Schlafly, whether or not Phyllis chose to vigorously defend the lawsuit has no bearing or relevance on her testamentary capacity. Moreover, the proposition that a person is cognitively impaired because they decide to vigorously defend a lawsuit which affected the person adversely, seems quite absurd.

Dr. Finkel again testified that Phyllis was able to function in areas that had been "overlearned."[152] But, again, he fails to apply this "overlearning" concept to the idea that as a lawyer Phyllis would have "overlearned" certain basic legal concepts pertaining to wills/trusts.

Dr. Finkel goes on to testify that the May 26, 2016 amendment, assessing litigation costs against Anne Cori, was uncharacteristic of Phyllis's methodology for dealing with conflicts.[153] However, he admitted in testimony that the amendment was an effort to deal with the conflict that had arisen, and that Phyllis had never faced such a conflict like that before.[154] So, he had no basis for concluding that her way of dealing with the unique, never before seen conflict was "uncharacteristic."

Dr. Finkel continued to promote the idea that because Phyllis was "feeble," had to use a walker, needed assistance with dressing and bathing because of poor balance, that somehow that translated to cognitive impairment and lack of testamentary capacity.[155] None of that, however, had anything whatsoever to do with alleged cognitive impairment or lack of testamentary capacity.

Dr. Finkel admitted in testimony that the single occurrence of not being able to spell the word "world" backwards correctly could have simply been a "mistake."[156] A "mistake," of course, is not evidence of cognitive impairment, dementia or lack of testamentary capacity. In a live testatrix, re-testing can confirm whether or not it was a simple "mistake." It is obviously not possible in a deceased testatrix to do retesting to determine the reliability of the result.

Dr. Finkel's testimony about Dr. Tullman's (neurologist) records is illustrative of a pattern of confirmatory bias and a willingness to falsely state the reason Dr. Tullman sought to obtain an MRI of the brain.

> Q. [Mr. Glazer] Okay. And you read Dr. Tullman's medical records; correct?
>
> A. [Dr. Finkel] Yes.
>
> Q. [Mr. Glazer] Why did you not reference anywhere that he stated that she was alert and oriented times three?

---

[152] #17 p. 349 List of Documents/Records Reviewed
[153] #17 p. 351 List of Documents/Records Reviewed
[154] #17 pp. 338-339 List of Documents/Records Reviewed
[155] #17 pp. 362-362 List of Documents/Records Reviewed
[156] #17 p. 373 List of Documents/Records Reviewed

BSS 00460

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

A. [Dr. Finkel]  I'm surprised if I didn't.  Might certainly rec – I certainly noted that in many, many situations.  If I didn't with his, then that was an omission.

Q. [Mr. Glazer]  Well, it – it matters; right?

A. [Dr. Finkel]  Well, it matters some, yes.

Q. [Mr. Glazer]  Do you take Dr. Tullman's medical evaluation more seriously than – as a – neurologist than a primary care physician?

A. [Dr. Finkel]  Yes.  That's why I've been trying throughout this case to get his MRI.  Obviously he thought there was something going on in her brain and he wanted to get another MRI.  Whether he thought there was metastases or some other anatomical problem, he wanted an MRI and advocated for it.  I don't know what happened to it or whether it occurred, but he certainly – you don't recommend that unless you think something's going on of a cognitive nature.

Q. [Mr. Glazer]  You are not aware that Dr. Tullman ever made any conclusion that there was a cognitive deficiency; is that correct?

A. [Dr. Finkel]  I think he was waiting for the MRI results to make his determination.  That was my reading of the record.

Q. [Mr. Glazer]  But you can't tell me anywhere in the record where he made a conclusion that there was a cognitive deficiency with respect to Phyllis Schlafly; correct?

A. [Dr. Finkel]  Other than she made the mistake with world, he was obtaining an MRI before he came up with his conclusion; and I never saw a conclusion because I never saw the result of the MRI.  But he was going to talk with Phyllis and Liza I guess after the MRI at which point he would come up with a conclusion.  But again I don't have that information.[157]

The idea that Dr. Tullman had ordered an MRI of the brain to investigate for "cognitive impairment" or that he "would not have ordered an MRI of the brain unless he thought something was going on of a cognitive nature," is entirely false and entirely made up by Dr. Finkel.  It was very clear in Dr. Tullman's note that his ordering an MRI of the brain had nothing to do with any cognitive impairment, and that Dr. Tullman never made any determination of "cognitive impairment."

---

[157] #17 pp. 374-375 List of Documents/Records Reviewed

-40-

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Dr. Tullman stated in his note:

> The etiology of Phyllis' excessive daytime sleepiness is not clear to me. I am going to go ahead and obtain a brain MRI given her history of malignancies, but this would be an unusual presentation of brain metastases.[158]

Excessive daytime sleepiness was the reason Dr. Tullman sought to obtain an MRI of the brain. There was no mention of any "cognitive impairment" in his assessment.[159]

In a rather stark admission of confirmatory bias, Dr. Finkel testified that the focus of his report was documenting abnormalities.[160] When he is caught excluding favorable findings about Phyllis's mental status in his report, he brushes it off as a mere "omission."[161]

And, in yet another demonstration of a totally false conclusion, Dr. Finkel testified that incontinence is evidence of an "advanced dementing illness."[162] Later in his testimony he admitted that he could not say that incontinence was not specifically due to a dementing illness.[163] He also testified that Phyllis's alleged illness "was not that severe."[164]

Dr. Finkel also testified that failure to take a bath unless a caregiver was there to assist to make sure she could do it safely, was evidence of poor judgment and poor insight. To the contrary, as was the case with Phyllis, if a person is unsteady on her feet, weak and susceptible to falls, waiting until a caregiver could provide assistance demonstrates good judgment and good insight. Dr. Finkel testified:

> Q. [Mr. Glazer] Bathing, is that a factor that you would consider?
>
> A. [Dr. Finkel] I would consider, yes. I would consider that in a certain context.
>
> …
>
> A. [Dr. Finkel] If you have somebody who – for example, let's – let's take Phyllis, for example. If she's not bathing unless a caregiver was there and she is refusing additional caregiving so that she could bathe more often, then that would show a problem with her decision-making ability. So that's an example of – you know, that's an example of showing more decision-making. She doesn't bathe unless there's a caregiver there, and a caregiver isn't there all the time so she just doesn't bathe. Liza and Bruce and [sic] wanted to get more caregiving presumably because that's one of the things they wanted

---

[158] Ibid.
[159] Ibid.
[160] #17 pp. 381-382 List of Documents/Records Reviewed
[161] #17 p. 374 List of Documents/Records Reviewed
[162] #17 p. 385 List of Documents/Records Reviewed
[163] #17 p. 386 List of Documents/Records Reviewed
[164] Ibid.

BSS 00462

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

to take care of. If she doesn't want to do it or doesn't do it, that shows poor judgment, poor insight.[165]

## Dr. Finkel Disregards/Dismisses the Most Relevant Information with Respect to Testamentary Capacity and Undue Influence:

The relevant questions in this case are:

1. Did Phyllis Schlafly have testamentary capacity on the specific dates testamentary documents were executed (May 26, 2016. August 31, 2016)?

2. Was Phyllis Schlafly subject to undue influence on the dates testamentary documents were executed (May 26, 2016, August 31, 2016)?

As there were no neurologic, psychiatric or neuropsychological examinations performed on May 26, 2016 or August 31, 2016, information pertaining to the two relevant questions comes from attorneys who are experienced in estate planning.

As discussed above in my expert report, Phyllis's medical records, as cited by Dr. Finkel, do not establish cognitive impairment or a diagnosis of dementia prior to May 26, 2016 and August 31, 2016. Even Dr. Finkel agrees that none of Phyllis's treating physicians, including neurologists, made a diagnosis of dementia during her life.

Evidence provided by attorneys Melissa Nolan and Donald Paule, overwhelmingly demonstrate that Phyllis Schlafly understood exactly what she was doing on the actual dates that testamentary documents were executed (May 26, 2016, August 31, 2016) and that she had testamentary capacity and was not subject to undue influence on those dates. Dr. Finkel's proposition that attorneys Nolan and Paule erred or acted in an incompetent fashion with regard to assessing testamentary capacity/undue influence, is not sustained by the facts/testimony.

In her deposition on July 3, 2019, Ms. Melissa Nolan testified that estate planning is her area of law practice, and estate planning occupies 50% of her practice time.[166]

Ms. Nolan testified that she never observed any of Phyllis's children pressure Phyllis, coerce her, threaten her, deprive her of her free will, destroy her free choice or in any way unduly influence her.[167]

Ms. Nolan testified that during the encounters she had with Phyllis, she never had any concerns about Phyllis's testamentary capacity and Phyllis never exhibited any confusion regarding the testamentary documents that had been prepared for her.[168]

---

[165] #17 pp. 387-388 List of Documents/Records Reviewed
[166] #18 p. 8 List of Documents/Records Reviewed
[167] #18 pp. 11-12 List of Documents/Records Reviewed
[168] #18 p. 12 List of Documents/Records Reviewed

BSS 00463

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Ms. Nolan testified that Phyllis explained precisely why she was upset with Anne Cori filing a lawsuit, and how Phyllis viewed that as Anne trying to take control of Eagle Forum away from Phyllis.[169]

Ms. Nolan testified that in May of 2016 Phyllis Schlafly expressed familiarity with and an understanding of Eagle Forum and its related entities.[170]

In fact, Ms. Nolan testified that Phyllis understood what was going on so well that she would actually correct the attorneys when they got something wrong. Ms. Nolan testified:

> Yes. So there are several entities that Mrs. Schlafly was connected to and created. And I don't know what all of those are. There are several of them, 501(c)(3), 501(c)(4) organizations and we referenced those in our documents, in the trust amendment, a few occasions. And Mrs. Schlafly would point out when I had those wrong and she would – she would correct us if we didn't have all of them listed in the documents appropriately.[171]

> Q. [Mr. Elster]   Based on your communications with her, did she understand the distinction between those entities?

> A. [Ms. Nolan]  Yes.  And she was able to explain those to us.[172]

Phyllis understood the ordinary affairs of her life, including the growing costs of litigation. Ms. Nolan testified:

> Q. [Mr. Elster]   Paragraph No. 7, it says, Mrs. Schlafly indicated that the cost of the litigation were continuing to grow.  Did she ever express how much those costs were?

> A. [Ms. Nolan]  She did.  And she had a list of the amounts that were paid.  I don't recall what those were, exactly what she said about them but she did state the costs were growing out of control, was going to continue to increase.[173]

Ms. Nolan further testified that at the August 2016 meeting with Mrs. Schlafly, Phyllis was fully engaged, asking questions, reading through the documents.[174]

Ms. Nolan testified that Mrs. Schlafly reviewed who the beneficiaries were in each of the testamentary documents.[175]

---

[169] #18 pp. 15-16 List of Documents/Records Reviewed
[170] #18 p. 16 List of Documents/Records Reviewed
[171] Ibid.
[172] #18 p. 17 List of Documents/Records Reviewed
[173] Ibid.
[174] #18 p. 18 List of Documents/Records Reviewed
[175] #18 p. 20 List of Documents/Records Reviewed

BSS 00464

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Ms. Nolan testified that Phyllis clearly understood who her beneficiaries were, and that she wanted to provide for five of her six children with regard to the 2016 irrevocable trust, and that Phyllis clearly understood the effects of the documents she was signing. Ms. Nolan testified:

> Q [Mr. Elster]  And then you later say, in that same paragraph, She understood the effects of each document.  How to you know that?
>
> A [Ms. Nolan]  She – we were talking about the irrevocable trust, the 2016 irrevocable trust that provided for five beneficiaries, five of her six children were the beneficiaries of that, so the question Liza had asked beforehand was can we provide – are the descendants of children also beneficiaries?  And so, when Phyllis asked that question to be repeated, she confirmed that, yes, I only want to provide for five – for the five of six children, that Anne is not to be a beneficiary of that trust. And she confirmed that she understood how what's called annual exclusions work with respect to the children and the descendants of children.
>
> Q [Mr. Elster]  Jumping to Paragraph 12, there's a sentence that says, Mrs. Schlafly also demonstrated a recognition of her other relatives.
>
> A [Ms. Nolan]  Yes.[176]

Ms. Nolan testified that Phyllis told her that Anne's litigation was contrary to her wishes and Phyllis did not want her children to suffer the costs caused by the litigation, and how Phyllis did not want her likeness being captured by others (right of publicity); she wanted that type of property to belong to Phyllis's trust.[177]

Ms. Nolan testified that she had discussed the Eagle Trust Fund with Phyllis, a non-profit organization Phyllis built during her lifetime, and Phyllis did not demonstrate any confusion in explaining the Eagle Trust Fund to her attorneys. Ms. Nolan testified:

> Q [Mr. Elster]  Okay.  Did Phyllis seem at all confused in explaining what Eagle Trust Fund was?
>
> A [Ms. Nolan]  No.[178]

In discussing testamentary documents with her attorneys, Phyllis explained her rational thought process for what she was doing, and why she was understandably upset at Anne's actions. Ms. Nolan testified:

> Q  You said you spoke with her in-depth, what do you remember about what was discussed?

---

[176] #18 pp. 20-21 List of Documents/Records Reviewed
[177] #18 pp. 22-24 List of Documents/Records Reviewed
[178] #18 pp. 32-33 List of Documents/Records Reviewed

BSS 00465

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> A [Ms. Nolan] She – well, she discussed what she wanted to do about the expense. She was explaining how it was adding up. It was getting very expensive and it did not look like it was going to end any time soon, so she wanted to make sure the other children were not negatively affected from a financial standpoint, because of her using her personal funds to pay for this litigation defense.

> Q [Mr. Elster] In the second paragraph, it says She – relating to Phyllis – was visibly upset at the actions that her daughter, Anne, had been taking?

> A [Ms. Nolan] Yes.

> …

> Q [Mr. Elster] The last sentence in that paragraph starts, Phyllis said that she had spent her entire life building the organizations and is heartbroken that Anne is trying to take that away and, as a result, the funds will be depleted. Did Phyllis actually say that?

> A [Ms. Nolan] I believe so.[179]

Ms. Nolan further testified that Phyllis was following what all of the redlined changes meant in the testamentary document.[180]

With regard to documents Phyllis signed on August 31, 2016, Ms. Nolan testified that Phyllis did not seem confused at all about what the documents meant. Ms. Nolan testified:

> Q Okay. Did Phyllis seem confused at all about what any of these documents meant?

> A [Ms. Nolan] No.[181]

Ms. Nolan testified that Mrs. Schlafly had testamentary capacity and was not subject to undue influence on the dates that amendments to testamentary documents were signed – May 24, 2016, August 31, 2016. Ms. Nolan testified:

> Q [Mr. Elster] So Anne Cori's filed a lawsuit claiming the May 24th, 2016, trust amendment [corrected to May 26, 2016, Ms. Nolan's answer unchanged[182]] is invalid because of the lack of testamentary capacity. Do you believe that to be the case?

> A [Ms. Nolan] No.

> …

---

[179] #18 pp. 34-35 List of Documents/Records Reviewed
[180] #18 p. 37 List of Documents/Records Reviewed
[181] #18 p. 43 List of Documents/Records Reviewed
[182] #18 p. 50 List of Documents/Records Reviewed

BSS 00466

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> Q [Mr. Elster] All right. And, then, Anne Cori's also challenged the August 31st, 2016 amendment on the basis of lack of testamentary capacity. Do you believe Phyllis had testamentary capacity?
>
> A [Ms. Nolan] Yes.
>
> Q [Mr. Elster] Ms. Cori's also alleged that there was undue influence in relation to the August 31st, 2016 amendment. Do you believe that to be true at all?
>
> A [Ms. Nolan] No, I do not believe she was unduly influenced.[183]

Ms. Nolan testified that with respect to the May 26, 2016 trust amendment, Mrs. Schlafly actively participated in the discussion, asking questions about the amendment, and making it clear that she understood the issue of deducting the cost of litigation from Anne's share. Ms. Nolan testified:

> Q [Mr. Glazer] Okay. And in that memo dated May 27th, 2016, you specifically reference a conversation in which Phyllis Schlafly asked Don Paule to explain to her what the amendment was doing and how it was different than the prior version that you had sent to them and prepared for execution, is that correct?
>
> A [Ms. Nolan] Yes.
>
> Q [Mr. Glazer] Did Phyllis specifically ask Don Paule questions about the trust amendment?
>
> A [Ms. Nolan] Yes.
>
> Q [Mr. Glazer] Did Liza tell Phyllis Schlafly what questions to ask?
>
> A [Ms. Nolan] No.
>
> Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly wanted to make sure she understood the issue of deducting litigation cost from Anne's share?
>
> A [Ms. Nolan] Yes.
>
> Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly understood Don Paule's explanation of how the amendment worked and how it was different than previous versions?
>
> A [Ms. Nolan] Yes.

---

[183] #18 pp. 49-50 List of Documents/Records Reviewed

BSS 00467

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> Q [Mr. Glazer]  Was Phyllis actively participating in the conversation regarding this May 26th, 2016 trust amendment in her conversation with Don?
>
> A [Ms. Nolan] Yes.
>
> …
>
> Q [Mr. Glazer] Did Phyllis Schlafly confirm that Paragraph E accurately set forth her reasons for enacting this May 26th, 2016, trust amendment?
>
> A [Ms. Nolan] Yes.
>
> Q [Mr. Glazer]  Did Phyllis Schlafly appear to understand her motivations for enacting the trust amendment?
>
> A [Ms. Nolan]  Yes.
>
> Q [Mr. Glazer]  Did Phyllis Schlafly have any difficulty in understanding how this May 26th, 2016, trust amendment worked?
>
> A [Ms. Nolan] No.[184]

Ms. Nolan's testimony addressed the core elements of testamentary capacity and undue influence, and testified that Phyllis Schlafly met the requirements for testamentary capacity and there was no evidence that Phyllis had been unduly influenced by anyone.  Ms. Nolan testified:

> Q [Mr. Glazer]  Ms. Nolan, at the time Phyllis Schlafly executed the May 26th, 2016, trust amendment, did you observe anything that suggested to you that there was anything deficient about her mental state?
>
> A [Ms. Nolan]  No.
>
> Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly understood the ordinary affairs of her life?
>
> A [Ms. Nolan]  Yes.
>
> Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly understood the nature and extent of her property?
>
> A [Ms. Nolan]  Yes.

---

[184] #18 pp. 51-54 List of Documents/Records Reviewed

BSS 00468

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Q [Mr. Glazer] Did Phyllis Schlafly know the persons who were the natural objects of her bounty?

A [Ms. Nolan] Yes.

…

Q [Mr. Glazer]  Did Phyllis Schlafly appear to know who Anne Cori was?

A [Ms. Nolan] Yes.

Q [Mr. Glazer] Did Phyllis Schlafly understand who each of her children were when they were discussed?

A [Ms. Nolan] Yes.

Q [Mr. Glazer] (by Mr. Glazer) Let me clarify.  Were the children of Phyllis Schlafly discussed at this meeting?

A [Ms. Nolan] Perhaps not all of the children, but at least a few of her children were specifically discussed.

Q [Mr. Glazer] And with those who were discussed, did Phyllis Schlafly appear to you to understand who each of her children were when they were discussed?

A [Ms. Nolan] She appeared to yes.

Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly knew that she was giving her property to each of those persons referenced in her May 26th, 2016, trust amendment?

A [Ms. Nolan]  Yes.

Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly was able to comprehend and understand the ordinary affairs of life as distinguished from the intricate and complicated affairs of life?

A [Ms. Nolan] Yes.

Q [Mr. Glazer] Was Phyllis Schlafly confused about any aspect of the trust amendment at the time she signed it on May 26, 2016?

A [Ms. Nolan] No.

Q [Mr. Glazer]  At that meeting on May 26th, 2016, did Phyllis Schlafly ask coherent questions about the trust amendment?

BSS 00469

RE: Anne Schlafly Cori vs. John F. Schlafly et al.　　　　　　Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> A [Ms. Nolan] Yes.
>
> Q [Mr. Glazer] Did it appear to you, Ms. Nolan, that on May 26th, 2016, Phyllis Schlafly was of sound mind at the time she signed the trust amendment?
>
> A [Ms. Nolan] Yes.
>
> …
>
> Q [Mr. Glazer] Did you observe anything at the May 26th, 2016, trust amendment signing suggesting that anyone attempted to force, coerce, or overpersuade Phyllis Schlafly to execute this trust amendment?
>
> A [Ms. Nolan] No.
>
> Q [Mr. Glazer] Did you observe anything at the May 26th, 2016, signing suggesting that anyone attempted to impact Phyllis Schlafly's free agency or free will?
>
> A [Ms. Nolan] No.
>
> Q [Mr. Glazer] Did it appear that Phyllis Schlafly was being manipulated by anyone on May 26th, 2016?
>
> A [Ms. Nolan] No.
>
> Q [Mr. Glazer] Did it appear to you Phyllis Schlafly was the one making final decisions about the trust amendment on May 26th, 2016?
>
> A [Ms. Nolan] Yes.
>
> Q [Mr. Glazer]  At the trust amendment signing on May 26th, 2016, was Phyllis Schlafly alert and aware of her surroundings?
>
> A [Ms. Nolan] Yes.
>
> …
>
> Q [Mr. Glazer]  Did it appear to you that at the May 26th, 2016, signing that Phyllis Schlafly was aware of the effects the changes would have on her family, including Anne?
>
> A [Ms. Nolan] Yes.[185]

Despite Dr. Finkel's repeated mischaracterization that Phyllis wanted to "disinherit" Anne altogether, Ms. Nolan testified that was not the case at all – Phyllis merely wanted to charge the litigation expense, which Anne had caused, to Anne's share. Ms. Nolan testified:

---

[185] #18 pp. 54-60 List of Documents/Records Reviewed

BSS 00470

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> Q [Mr. Slaby] In this memo on May 11[th] regarding the May 10[th] meeting, you state that Phyllis Schlafly said that as a result of the litigation and what Anne had done to the relationship, Phyllis does not want to cut Anne out of her trust, but she does want to charge the litigation expenses to Anne's share, is that correct?
>
> A [Ms. Nolan]  Correct.
>
> Q [Mr. Slaby]  Did Phyllis specifically discuss the distinction between cutting Anne out of her trust and charging the litigation expenses to Anne's share on May 10[th], 2016?
>
> A [Ms. Nolan] Yes, I believe so.
>
> Q [Mr. Slaby] Did it appear – did Phyllis Schlafly appear to understand the distinction between cutting Anne's share out of the trust versus charging the litigation expense to Anne's share?
>
> A [Ms. Nolan] Yes.[186]

Mr. Donald Paule, the other attorney who was involved in assisting Phyllis with testamentary documents, like Ms. Nolan testified that he did not have any concerns about Phyllis's testamentary capacity and found no evidence to suggest any undue influence.  Mr. Paule testified that his practice areas include estate planning, trust administration and estate administration.[187]

Mr. Paule testified:

> Q [Mr. Elster]  In any of those meetings that you recall, did you ever see any of her children lie to her?
>
> A [Mr. Paule] Never.
>
> Q [Mr. Elster] What about pressure her?
>
> A [Mr. Paule] Not at all.
>
> Q [Mr. Elster] Coerce her?
>
> A [Mr. Paule] No.
>
> Q [Mr. Elster] Threaten her?
>
> A [Mr. Paule] No.

---

[186] #18 pp. 61-62 List of Documents/Records Reviewed
[187] #19 p. 7 List of Documents/Records Reviewed

BSS 00471

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Q [Mr. Elster] Deprive her of her free will?

A [Mr. Paule] Never.

Q [Mr. Elster] Destroy her free choice?

A [Mr. Paule] No.

Q [Mr. Elster] In any way unduly influence her?

A [Mr. Paule] Never saw anything like that at all.

Q [Mr. Elster]  Based upon those meetings with her in 2016, did you have any concerns, whatsoever, about Phyllis's testamentary capacity?

A [Mr. Paule] I have never had any concerns, whatsoever, about Phyllis's testamentary capacity.[188]

Mr. Paule further testified about a meeting he and Ms. Nolan had with Phyllis Schlafly on May 10, 2016.  Mr. Paule testified:

A [Mr. Paule] ...Phyllis had come in to see us, she told us in advance that she needed to make changes to her trust as a result of litigation that Anne had initiated.  And this memo is talking about the May 10 meeting, says, Phyllis was visibly upset at the actions Anne had taken in trying to take control of Eagle Forum away from her.  Phyllis said she spent her entire life building that organization and building its financial position and was heartbroken that Anne was trying to take that away from her.  We talked in that meeting on May 10th at length about this.  And Phyllis indicated that Anne had said to her that she was not suing her mother but Phyllis absolutely took that as a lawsuit against her, even though it was naming Eagle Forum, and she was very troubled by that.

...

Q [Mr. Elster] Did Phyllis seem at all confused during this May 10th meeting?

A [Mr. Paule] Not confused at all.  Upset with what Anne had done, but not confused at all.

Q [Mr. Elster] And what Anne had done, does that refer to a lawsuit?

A [Mr. Paule]  Filing a lawsuit, trying to take control of Eagle Forum.[189]

---

[188] #19 p. 12 List of Documents/Records Reviewed
[189] #19 pp. 20-21 List of Documents/Records Reviewed

-51-

BSS 00472

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Mr. Paule testified that in discussing some very complicated issues at a May 24, 2016 meeting, Phyllis was able to follow and understand the complex issues he reviewed with her in detail. Mr. Paule testified:

Q [Mr. Elster]  In the second paragraph, second sentence, it said, Phyllis then said that she wanted to make sure she understood exactly what this trust instrument was doing and we therefore went through the document in detail. Did you go through the document in detail with her?

A [Mr. Paule] Yes, I did.   And this was complicated because we were trying to summarize the consequences or effect of legal expenses that were being incurred and were anticipated yet to be incurred. She wanted those charged against Anne's share. She specifically did not want Anne to be deleted from the trust or eliminated as a beneficiary, but wanted all of the costs of this litigation to be charged against Anne's share.   There were some technical issues in the drafting about if you charge dollars of expense against somebody's share, then who benefits?   And we also had a provision in the trust that said that if Anne pre-deceased Phyllis, then who would get what was left of Anne's share? And, Phyllis in prior drafts of her documents, had made the distinction between her children who had descendants and her children that did not have descendants.  So, as we were talking in this meeting about what would happen to the funds that were taken from Anne's share, we had drafted that to, in effect, increase the share of four of the six children being the four of the six children who had descendants, and when Phyllis reviewed that, she commented that she thought that was unfair to John because he was the one that was the target of much of the litigation and she wanted to be sure that those funds that were charged against Anne's share were then divided into five shares and then to be distributed to all five of their children or for their benefit.  So it was complicated, as we talked about not only what we wrote about defining litigation costs, but what happened if Anne died and  there was some share yet to come, who got those funds, and that's what we talked about, and ultimately, at Phyllis's direction, revised, before it was ever signed.

Q [Mr. Elster] Did it appear to you that Phyllis was able to follow your conversation with her?

A [Mr. Paule] She was absolutely able to follow.  She knew everything we were talking about.

Q [Mr. Elster] (By Mr. Elster) Did she appear at all confused on this May 24th?

A [Mr. Paule] Not at all.[190]

Mr. Paule made it clear in his testimony that the issues discussed on May 10, 2016, with Phyllis, and  which  she  followed  and  understood,  included  power  struggles  related  to  the

---

[190] #19 pp. 22-24 List of Documents/Records Reviewed

BSS 00473

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

succession/governance of Eagle Forum, presidential politics and the directors of Eagle Forum seeking compensation.  Mrs. Schlafly even demonstrated that she knew the approximate dollar amount in Eagle Forum accounts.  Mr. Paule testified:

> A [Mr. Paule]  This is when – this is when we were talking about the costs that were being incurred in defense of or in response to the lawsuit filed by Anne Cori and what – what Phyllis said was that, as we were talking about the attorney's fees that she wanted to be charged against Anne's share, that at that point in time there had been some payment made by Eagle Forum that she considered something that should be charged against Anne's share.  She said there was, also, then – Anne, through some court action, had either taken control or frozen the Eagle Forum account and so Phyllis and then Eagle Trust made payments of attorneys' fees and she wanted all of those to be treated as litigation expenses charged against Anne's share.

> …

> A [Mr. Paule]  Well, as I said, Phyllis was very upset about the lawsuit that was filed and about Anne's efforts to take away – take Eagle Forum away from her, and we did not get into the detail of the litigation in terms of looking at any pleadings or dealing with specific allegations, but I wanted to understand, in general, what the lawsuit was about and how Phyllis perceived that.  And what she said was exactly that; that she though that Anne was upset because Anne thought she was going to be Phyllis's successor at Eagle Forum and was really an issue about Ed Martin's role and Phyllis being comfortable and Anne apparently not liking him at all and things to that nature.  I didn't put it here, but I was trying to figure out exactly what the issue was that brought this all about.  And, in Phyllis's mind, I think it was clearly this – that Anne saw herself losing the role as successor to Phyllis and this issue with Ed Martin, it also had something to do with Phyllis and Ed Martin together, I think, being supportive of Trump and Anne not wanting that to happen.

> Q [Mr. Elster]  Below that, there is a note that says, Some directors want compensation – and you wrote four million. Do you see that?

> A [Mr. Paule]  The reference to the four million, I think, was to the dollars that were on hand in Eagle Forum accounts at that point in time. I don't think that was that the directors wanted compensation to that extent.

> …

> Q [Mr. Elster]  Do you know if the four million was what Eagle Forum had in its accounts?

> A [Mr. Paule]  I think, when she said something to me about concern about directors wanting compensation, I would have asked the question about, well, what is in Eagle

-53-

BSS 00474

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> Forum what does it have? And I think that's what her answer was; was the four million dollars.[191]

Mr. Paule made it abundantly clear in his testimony that Phyllis Schlafly had testamentary capacity and that there was no undue influence at the time testamentary documents were signed by Phyllis on May 26, 2016 and on August 31, 2016. Mr. Paule testified:

> Q [Mr. Glazer] Anne Cori is claiming in this lawsuit that the May 26th, 2016, amendment is invalid because of testamentary capacity. Do you believe that's true?
>
> A [Mr. Paule] That is absolutely untrue. Phyllis was completely competent and knew exactly what she wanted and she directed us on not only what that should say, but explained to us why.
>
> Q [Mr. Glazer] In addition to incapacity, she's claiming that amendment was the product of undue influence by one or more of her children. Do you believe that's true?
>
> A [Mr. Paule] I believe that's absolutely untrue. Nobody unduly influenced Phyllis.
> Q [Mr. Glazer] And, then, the same questions in relation to the August amendment, Anne Cori's claiming that the August 31st, 2016, amendment we went over is the – Phyllis lacked testamentary capacity at the time, do you believe that's true?
>
> A [Mr. Paule] That's absolutely untrue. She knew exactly what she was doing and what she wanted to do.
>
> Q [Mr. Glazer] She's also claiming that there was undue influence in relation to the August 31st amendment. Do you believe that's true?
>
> A [Mr. Paule] I do not. Do not believe that's true at all.
>
> ...
>
> Q [Mr. Glazer] At the time Phyllis Schlafly executed the May 26th, 2016, trust amendment, did you observe anything that suggested to you that there was anything deficient about her mental state?
>
> A [Mr. Paule] I did not observe any indication of that at all. None whatsoever.
>
> Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly understood the ordinary affairs of her life?
>
> A [Mr. Paule] She absolutely understood the ordinary affairs of her life.

---

[191] #19 pp. 33-36 List of Documents/Records Reviewed

BSS 00475

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly understood the nature and extent of her property?

A [Mr. Paule] She absolutely did.

Q [Mr. Glazer] Did Phyllis Schlafly know who her family members were?

A [Mr. Paule] Yes, completely.

Q [Mr. Glazer] And she discussed those family members at this May 26th meeting?

A [Mr. Paule] Yes.[192]

Mr. Paule further testified:

Q [Mr. Glazer] (By Mr. Glazer) Did it appear to you that Phyllis Schlafly knew that she was giving her property – her property to each of those persons referenced in her may 26th, 2016, trust amendment?

A [Mr. Paule] She clearly understood that and intended that.

Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly was able to comprehend and understand the ordinary affairs of life as distinguished from the intricate and complicated affairs of life?

A [Mr. Paule] I fully believe that.

Q [Mr. Glazer] Was Phyllis Schlafly, on May 26th, 2016, confused about any aspect of the trust amendment at the time she signed it?

A [Mr. Paule]  Not that I observed at all.

Q [Mr. Glazer] And you may have answered this and discussed this, but did Phyllis Schlafly, at that May 26th, 2016, meeting, ask coherent questions about the trust amendment?

A [Mr. Paule] Certainly.

Q [Mr. Glazer]  And did it appear to you that Phyllis Schlafly was of sound mind at the time she signed that trust amendment?

A [Mr. Paule] Yes, she was.

---

[192] #19 pp. 41-42, 46-47 List of Documents/Records Reviewed

BSS 00476

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly knew what she wanted to accomplish with the trust amendment signed on May 26th, 2016?

A [Mr. Paule] Absolutely knew, yes.

Q [Mr. Glazer] Did you observe anything at the May 26th, 2016, trust amendment signing suggesting that anyone attempted to force, coerce, or overpersuade Phyllis Schlafly to execute that trust amendment?

A [Mr. Paule] Nothing to indicate that whatsoever.

Q [Mr. Glazer] Did you observe anything at the May 26th, 2016, signing suggesting that anyone attempted to impact Phyllis Schlafly's free agency or free will?

A [Mr. Paule] Saw nothing like that at all.

Q [Mr. Glazer] Did it appear to you that Phyllis Schlafly was being manipulated by anyone on May 26, 2016?

A [Mr. Paule] It not only did not appear to me that anyone was manipulating her, but it appeared to me that no one would be able to manipulate her.

Q [Mr. Glazer] Why do you say that?

A [Mr. Paule] Because she was very clear with us about what she wanted and made sure we made changes if it didn't say exactly what she wanted it to say.

Q [Mr. Glazer] At the May 26th, 2016, signing, was Phyllis Schlafly alert and aware of her surroundings?

A [Mr. Paule] Yes.

Q [Mr. Glazer] Was it explained to Phyllis Schlafly at this May 26, 2016, meeting that Anne Cori could receive less of an inheritance as a result of this trust amendment?

A [Mr. Paule] It was not only explained. That was what Phyllis wanted to accomplish.

Q [Mr. Glazer] And did it appear to you that Phyllis Schlafly then understood that Anne Cori could receive less of an inheritance as a result of the trust amendment?

A [Mr. Paule] Yes, to the extent of the litigation expenses.

Q [Mr. Glazer] So, was Phyllis Schlafly aware of the effects that these changes would have on her family, including Anne Cori?

-56-

BSS 00477

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> A [Mr. Paule]  She was – I'm sure she was aware of the effects.  She was very upset about the effect that all of this was having.  When I say "all of this," I mean the litigation initiated by Anne, very upset by all of this, the effect that all of this was having on her family.[193]

Again, contrary to Dr. Finkel's mischaracterization that Phyllis "disinherited" Anne Cori, Mr. Paule makes it clear that was never Phyllis's intention and was not the effect of the testamentary document.  In discussing changes she wished to make, Phyllis explained to Mr. Paule that she viewed the lawsuit initiated by Anne Cori against Eagle Forum as an "attack" on her (Phyllis Schlafly).  Mr. Paule testified:

> Q [Mr. Glazer]  Did Phyllis Schlafly then specifically discuss the distinction between cutting Anne out of her trust versus charging litigation expenses to Anne's share?
>
> A [Mr. Paule]  When we first discussed the type of amendment to make, then I discussed with her if she was that upset by the action that Anne had taken in filing this lawsuit and then trying to seize control or taking control of Eagle Forum, did she want to simply delete Anne as one of the beneficiaries and divide her trust, her revocable trust, with the five shares rather than six?  She said she did not want to do that but she wanted to make sure that to the extent that there were expenses that were incurred, either directly by Phyllis or by these other organizations as a result of the action taken by Anne, she wanted Anne and Anne's share to pay for that.[194]
>
> …
>
> And Phyllis made the point with us that Anne says I'm not suing you.  And what I understood from that first meeting was that Phyllis was not a named defendant in a lawsuit, so she was not directly being sued, but she viewed – Phyllis viewed those people who are being sued as an attack on her.[195]

In questioning Mr. Paule, plaintiff attorney, Mr. Rossiter, adopted the same flawed methodology that Dr. Finkel used to infer "cognitive deficit" as automatically translating to testamentary incapacity.  Mr. Rossiter also attempted to infer that a diagnosis of "cognitive deficit" was actually made, which it was not.  In responding to Mr. Rossiter's questions, attorney Paule addresses the crux of the issue – did Phyllis Schlafly understand the core elements required for testamentary capacity on the dates amendments were signed?  The relevant issue is not whether a "cognitive deficit" existed or did not exist, but rather did the testatrix understand the core issues required for testamentary capacity?  Mr. Paule testified:

> Q [Mr. Rossiter]  So if a doctor diagnosed her as suffering from cognitive deficits, that wouldn't matter to you?

---

[193] #19 pp. 49-52 List of Documents/Records Reviewed
[194] #19 p. 54 List of Documents/Records Reviewed
[195] #19 p. 60 List of Documents/Records Reviewed

BSS 00478

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

A [Mr. Paule] When I'm communicating with a client, I don't talk with a client about what some doctor has said to her about anything that she may have seen a doctor about. I'm communicating with the client and trying to understand does she know what she's talking with me about? Is it clear what she wants? And there was no question, whatsoever, about that in talking with Phyllis. And, in fact, in particular, with respect to the May meeting, it wasn't just one May meeting, it was a number of May meetings all dealing with the same thing and a clear understanding on her part of exactly what we were talking about.

Q [Mr. Rossiter] And you're aware that Liza and John had contact with your office in May, correct?

A [Mr. Paule] I am.

Q [Mr. Rossiter] Okay. And, then they – they took part in this process whereby this May amendment was executed?

A [Mr. Paule] They took part in that process but in no different way than Anne Cori took part in that process in 2013 and '14. It was exactly the same process.

Q [Mr. Rossiter] (By Mr. Rossiter) If they knew that Phyllis had been diagnosed as suffering from cognitive deficit, you wouldn't have wanted to know about that?

A [Mr. Paule] You know, I know the point you're trying to get, Mr. Rossiter, but I don't understand the significance of that. If there was something that were of a form that was going to affect whether somebody clearly understood what they were communicating to me, whether they understood their assets, whether or not they understood what they wanted to occur, to happen, yes, I'd like to know that, but there was nothing that was to that extent that I saw whatsoever.

…

Q [Mr. Rossiter] Had you ever observed in Phyllis a cognitive decline?

A [Mr. Paule] Never observed any cognitive decline at all.[196]

Mr. Paule also testified that Phyllis was very much family-oriented and valued and trusted her children, including Anne in the past, in choosing to do what was best for her family. Mr. Paule testified:

Q [Mr. Rossiter]  Why did you never meet with Phyllis alone?

---

[196] #19 pp. 71-74 List of Documents/Records Reviewed

BSS 00479

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

> A [Mr. Paule]  I think the principle reason for that is that Phyllis was very much family oriented and viewed whatever she was doing as something that was the function of the family together.  I don't believe, in 2013 and '14, when we were dealing with the changes for Roger, that we ever met with Phyllis alone.  It was always with Anne and Phyllis. She trusted her children to help her in communicating to me and making sure that she communicated accurately and she wanted to do what was best for her family.[197]

> Mr. Pauley testified that Phyllis's mental acuity and mental ability was appropriate On August 31, 2016:

> Q [Mr. Slaby]  As far as her mental acuity or her mental ability to discuss issues with you on August 31st, was she appropriate?

> A [Mr. Paule] Yes.

> Q [Mr. Slaby] Any question in your mind at all about her ability to understand what was occurring on August 31st, 2016?

> A [Mr. Paule] None whatsoever.[198]

I declare that the information contained in this document was prepared by the undersigned and is the work of the undersigned.  It is true to the best of my knowledge and information and has not been modified by anyone other than the undersigned.

The opinions I have expressed in this Professional Review are based upon a reasonable degree of medical certainty and are totally independent of the requesting agent.  My analysis and opinions are based upon the information contained in the records as listed in "**List of Documents/Records Reviewed.**"

I did not examine Mrs. Schlafly.

My opinions are also subject to revision based on additional information provided to me.

I affirm that I am a board-certified neurologist, licensed to practice medicine in the State of New York.  I further affirm that the contents of this report are true to the best of my knowledge under the penalties of perjury.

Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.
Board-Certified Neurologist

---

[197] #19 p. 85 List of Documents/Records Reviewed
[198] #19 pp. 100-101 List of Documents/Records Reviewed

BSS 00480

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

# Curriculum Vitae

**Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.**

BSS 00483

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

# Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

## Professional Licensure:

New York   Lic. No. 155291
Louisiana  Lic. No. 016636 (expired/inactive)
Indiana    Lic. No. 01035133 (expired/inactive)

## Hospital Affiliations:

Staff neurologist, W.C.A. Hospital, Jamestown, NY 1988 – 2003
Director of Neurology (functional title), Goshen General Hospital, Goshen, Indiana
1986 – 1988

## Office-Based Practice:

Private Neurology (new third-party-free practice) established 2005, Derby, New York
www.PrivateNeurology.com

## Board Certification:

American Board of Psychiatry and Neurology (Neurology) - 1989 (lifetime
certification)
Fellow American Academy of Neurology – 1997 (lifetime)

## Education:

B.A. Grinnell College, Grinnell, Iowa - 1974
(Double Major – Biology and Psychology)

## Medical Education:

M.D.  Louisiana State University Medical Center New Orleans – 1982
(Medical Scientist (M.D., Ph.D.) Training Program 1976 – 1982)

## Post-Graduate Education and Research Experience:

Ph.D.  Louisiana State University Medical Center New Orleans – 1980

Major:  Physiology (Neurophysiology and electrophysiology)
Minor:  Biochemistry (Neurochemistry)

Dissertation:  *A Study of Single-Unit Activity in the Substantia Nigra Of
               Awake Rats During Conditioned Forelimb Movements* – 1980

BSS 00484

RE: Anne Schlafly Cori vs. John F. Schlafly et al.               Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Includes:  a.) Development of a technique for studying single-unit activity
in awake rats during conditioned forelimb movements using
intracranial self-stimulation depth electrodes.

b.) Development of a new type of concentric microelectrode to
improve signal-to-noise ratio.

c.) Construction of a special stereotaxic atlas of the brain with
online statistical probabilities for assessing in vivo location
of microelectrode tip.

**Medical Post-Graduate Training:**

Chief Resident in Neurology - Dent Neurologic Institute, Buffalo,
New York – 1985 – 1986

Neurology Resident - Dent Neurologic Institute, Buffalo, New York
1983 – 1985

Medical Intern - Millard Fillmore Hospital, Buffalo, New York
1982 – 1983

**Teaching Experience:**

Clinical Assistant Instructor Medicine/Neurology, State University of
New York At Buffalo – 1982 – 1986

Lecturer and Lab Instructor Neuroanatomy For Medical Students
State University of Buffalo At New York  - 1985

Graduate Instructor:  Positions as listed below in
Louisiana State University Medical Center New Orleans
Physiology Department

Lecturer and Lab Instructor – General Physiology Course For Occupational
and Physical Therapists

Lab Instructor  -  General Physiology Course for Medical Students

Lecturer and Lab Instructor  -  Neuroscience Course For Medical Students
Neuroanatomy Lab Instructor

Medical School Tutor -  Neurosciences – for Medical Students

-64-

BSS 00485

RE: Anne Schlafly Cori vs. John F. Schlafly et al.            Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

Lecturer - Pathophysiology Course for Graduate Nurses – Neurology Section
Daemen College, Buffalo, New York 1985 – 1986

## Special Honors and Awards:

Chancellor's Award for Scholarship, Leadership and Professional Excellence,
Louisiana State University Medical Center New Orleans - 1980
Herbert Hoover High School Hall Of Fame - 2001

## Professional Organizations:

American Academy of Neurology (Fellow)
Association of American Physicians and Surgeons (AAPS)
American Medical Association (AMA)
Medical Society State of New York
Medical Society County of Erie
Cleveland Clinic CompreCare Affiliate Program (past)

## Professional Offices Held:

President of Association of American Physicians and Surgeons – 1999 – 2000
Immediate Past President (Officer) AAPS – 2000 – 2001
Member Board of Directors AAPS - 1996 – 1999
Member Board of Directors AAPS – 2002 – 2005
Member Board of Directors AAPS - 2006 – 2009
Member Board of Directors AAPS - 2010 – 2012
Member Board of Directors AAPS – 2013 – 2016
Member Board of Directors AAPS – 2016 – 2019
Member Editorial Board of the *Medical Sentinel* – 1998 – 2002
Editor-in-Chief of the *Journal Of American Physicians and Surgeons* – 2003 to present
Chairman AAPS Committee to Combat Sham Peer Review 2004 – present
Member Board of Directors of American Health Legal Foundation 2009 – 2017
President of American Health Legal Foundation – 2017 – present
Co-Chairman Practice Management Committee of Medical Society County of Erie –
   2012-2013
Member of Executive Board of Medical Society County of Erie – 2012-2013
Member AAPS CME Certification Committee – 2012 to present
Secretary of AAPS 2012 – 2013
Chairman of the AAPS Committee to Combat Sham Peer Review – 2004 to present

## Publications:

**A Comparison of the CNS Depressant Effect of a Lipid-Soluble and Water
Soluble Beta-Blocker,** F. Gengo, Pharm. D., J. Ermer, B.S., L. Huntoon, M.D., Ph.D.
W. McHugh, M.D., Ph.D., American Academy of Neurology Annual Meeting, 1985

-65-

BSS 00486

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**Lipid-Soluble and Water-Soluble B-Blockers: Comparison of the central nervous system depressant effect,** Francis M. Gengo, Pharm.D., Larry Huntoon, M.D., Ph.D., William B. McHugh, M.D., Ph.D., *Arch Intern Med.* 1987;147(1):39-43

**My Other Foot**, L.R. Huntoon, M.D., Ph.D., Association of American Physicians and Surgeons, Pamphlet No. 1043, 1995

**A Window Of Opportunity**, L.R. Huntoon, M.D., Ph.D., Association of American Physicians and Surgeons, Pamphlet No. 1048, April 1996

**Meningitis And Managed Care**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel* Vol. 1 No. 2, P 24, Summer 1996

**Central Planning and Outcomes Based Research**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 1 No. 3, P 20, Fall 1996

**Excitotoxins: The Taste That Kills (Book Review)**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 1 No. 3 pp 33-34, Fall 1996

**Standing By Managed Care Inefficiency?**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 1 No. 4, pp 29-31, Winter 1996

**Little Red Doc**, L.R. Huntoon, M.D., Ph.D., Association of American Physicians and Surgeons, Pamphlet No. 1053, March 1997

**Managed Care, Capitation and Where We are Headed**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel,* Vol. 2 No. 3, pp 112-114, Summer 1997

**Isn't Government Interfering in the Practice of Medicine?**, L.R. Huntoon, M.D., Ph.D., *Today's Internist,* Vol. 38 No. 3, May/June 1997

**The High Cost of Innocence**, L.R. Huntoon, M.D., Ph.D., *Today's Internist*, Vol. 38 No. 5, September/October 1997

**Sutton's Law (Book Review)**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 2 No. 4, p 148, Fall 1997

**Pseudoscience and the Oracle of Delphi**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel,* Vol. 2 No. 4, p 147, Fall 1997

**Managed Care, Medical Ethics and the Killing of Patients for Profit**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel,* Vol. 3 No. 1, pp 32-33, January/February 1998

**Stanley and the Mammogram**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 3 No. 2, p 67, March/April 1998

BSS 00487

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**Medicare Cake Walk**, L.R. Huntoon, M.D., Ph.D., Association of American
Physicians and Surgeons, Pamphlet No. 1059, April 1998

**Americans Deserve Freedom in Medicine**, L.R. Huntoon, M.D., Ph.D., *The
Post-Journal* (Jamestown, NY), March 30, 1998

**Report on the Robert Wood Johnson Foundation Turning Point Project**, L.R.
Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 3 No. 3, pp 96-98, May/June 1998

**Medical Sentinel News and Analysis:**

1.) **New Medicare E&M Service Documentation Requirements**
2.) **Physician Apathy Leads to Erosion of Medical Staff Self Governance**
3.) **Cognitive Dissonance**
4.) **Lack of Physician Wealth – A New Criteria for Exclusion from Medicare**
5.) **AMA Caduceus Speaks with "Forked Tongue"**
6.) **Government Fear and Oppression is Profitable**
7.) **Shakedown**
8.) **More Skullduggery by "Organized Medicine"**
9.) **HMOs Hemorrhaging Red Ink**
10.) **HMO Executives Choking on "Free Market" Rhetoric**
11.) **Lose Your Constitutional Rights – How Bad Can it Really Be?**
12.) **HCFA Violated FACA in Drafting E&M Guidelines**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 3 No. 4, pp 114-117,
July/August, 1998

**Medical Necessity Under Kassebaum-Kennedy**, L.R. Huntoon, M.D., Ph.D.,
M*edical Sentinel*, Vol. 3 No. 4, pp 147-148, July/August 1998

**Reports From the States: Letters to My (New York) State Senator**, L.R. Huntoon,
M.D., Ph.D., *Medical Sentinel*, Vol. 3 No. 5, p 189, September/October 1998

**Medical Sentinel News and Analysis:**

1.) **Grim Reaper Seeks Legal Status**
2.) **More on Private Contracting**
3.) **Managed Care – It's All in the Numbers**
4.) **Less Privacy Equals Better Care?**
5.) **Computerized Medicine – A Bureaucratic Disaster?**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 3 No. 5, pp 164-165,
September/October 1998

BSS 00488

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**Medical Sentinel News and Analysis:**

    **1.)** **AMA Membership Opposes "Leadership" On E&M Guidelines**
    **2.)** **Government Looking For Fraud in All The Wrong Places**
    **3.)** **Crime Pays If You're An HMO**
    **4.)** **Taxes Are Voluntary**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 3 No. 6, pp 201-202,
November/December 1998

**The Exit Interview**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 4 No. 1
pp 38-39, Jan/Feb 1999

**Medical Sentinel News and Analysis:**

    **1.)** **More Government Tracking and Guidelines**
    **2.)** **AMA Accreditation: AMAP**
    **3.)** **Obesity Guidelines**
    **4.)** **New York State Public Health Law 2165**
    **5.)** **Dr. Jekyll Had Better Hide – The Seniors Are Coming**
    **6.)** **Large HMOs Welcome More Government Regulation**
    **7.)** **How Much For A Life?**
    **8.)** **Medical Privacy About to be Lost…. Forever**
    **9.)** **Anxiety Over Falling Income?**
    **11.)** **RWJF – Changing the "Culture of Death"**
    **12.)** **Dropping out of Medicare For the Millenium**
    **13.)** **Physicians Ready To Go To War Over HCFA's Proposed "User Fees"**
    **14.)** **AMA House Of Delegates Acts to Squelch AMA Gag Rule Policy on Free Speech**
    **15.)** **Even the AMA is Starting to be Concerned About the Medical Police**
    **16.)** **AMA Federal Fraud Enforcement Physician Compliance Brochure**
    **17.)** **Indemnity Insurance Cheaper Than HMO Coverage?**
    **18.)** **Home Health Care Authorization**
    **19.)** **Not Quite What Dr. Matthews Said**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 4 No. 1, pp 11-16,
January/February 1999

**Medical Sentinel News and Analysis:**

    **1.)** **Tie a Yellow Ribbon Round the Old Oak Tree**
    **2.)** **HHS OIG 1999 Work Plan**
    **3.)** **Guns and Logos**
    **4.)** **Medicare is Running Out of Money**
    **5.)** **More Medicare Mischief**

BSS 00489

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**6.) Quantitative Medicare Guidelines for Determining Terminal Status**
**7.) AMAP Favors Large Group Practices**
**8.) HCFA Announces Indefinite Delay for E&M Guidelines is Over!**
**9.) AMA – Don't Ask…Don't Tell**
**10.) AMA Tiptoeing Back to Individual Coverage**
**11.) HCFA Seeks To Gag Physician Communication With Patients**
**12.) AMA Comes Clean, Admits Guilt**
**13.) Government's Computers Tracking Physician Economic Profiles**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel,* Vol. 4 No. 2, pp 47-50, March/April 1999

**Clinical Pathways**, L.R. Huntoon, M.D., Ph.D., Association of American Physicians And Surgeons, Pamphlet No. 1067, May 1999

**Medical Sentinel News and Analysis:**

**1.) Monkey Medicine and Clinical Pathways**
**2.) Market Disconnect and Schizophrenia**
**3.) Cryptic Medicare Violations**
**4.) Code A0999**
**5.) Organ Donation State Imperative**
**6.) Government Waging War on Privacy**
**7.) The Criminalization of Medicine Intensifies**
**8.) Medicare's Imminent Rationing and Quality-Adjusted Life Years (QUALY)**
**9.) Ms. Nancy-Ann Min DeParle on Private Contracting**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel,* Vol. 4 No. 3, May/June 1999

**A Kinder, Gentler HCFA?**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 4 No. 4, pp 138-139, July/August 1999

**Medical Sentinel News and Analysis:**

**1.) Robbery: "It All Depends How You Define It"**
**2.) Canadian Doctors and Patients Migrating South**
**3.) Poor Penmanship – New Medicare Scheme to Recoup More Money From Doctors**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*,  Vol. 4 No. 4, p 123, July/August 1999

**Stop Thief!**, L.R. Huntoon, M.D., Ph.D.,  Association of American Physicians and Surgeons Pamphlet No. 1068, October 1999

BSS 00490

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**Health Care and the "Distributive Ethic:" "Natural Rights" vs. Socialism**,
L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 4 No. 5, pp 177-178, September/
October 1999

**The ClinicMaster 2000**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 4 No. 5,
P 187, September/October 1999

**Futility of Care Guidelines and The Killing Fields of the Future**, L.R. Huntoon,
M.D., Ph.D., *Medical Sentinel*, Vol. 4 No. 6, pp 226-227, November/December 1999

**Medical Sentinel News and Analysis:**

1.) **Inflammatory HCFA Notices**
2.) **HCFA Bureaucracy Unable to Keep Up**
3.) **HCFA Errs… Again**
4.) **New Jersey Physicians Reject Clinical Pathways**
5.) **Medicare HMOs Breaking the Law**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 4 No. 6, p 206,
November/December 1999

Reviewed and contributed to Chapter 26 **The Neurologic Examination** in
Sapira's **Art & Science of Bedside Diagnosis**, Edited by Dr. Jane M. Orient,
2nd Edition, Lippincott Williams & Wilkins, 1999

**Managed Care Psychosis**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 5
No. 1, January/February 2000

**Medical Sentinel News and Analysis:**

1.) **Privacy Matters**
2.) **Medical Necessity Fraud**
3.) **AMA Supports Public-Private Partnerships**
4.) **Is The Oath of Hippocrates Outdated?**
5.) **HMO Meets RICO**
6.) **The Cat and Mouse Game in Medicare Fraud**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 5 No. 1, pp 8-9, January/February
2000

**Medical Sentinel PRESIDENT'S PAGE**
**Recruit, Recruit, Recruit!!!,** L. R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 5
No. 1, p 10, January/February 2000

BSS 00491

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**The Evil of Socialized Medicine**, L.R. Huntoon, M.D., Ph.D., *The Post-Journal*
(Jamestown, NY), p 7, January 2, 2000

**Medical Sentinel PRESIDENT'S PAGE**
**FIGHT BACK!**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 5 No. 2, pp 42-
43, March/April 2000

**Medical Sentinel News Capsules:**

**1.) Health Care Police Raid Private Home**

L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*,  Vol. 5 No. 2, p 39, March/April 2000

**Fraud, Abuse and the Medicare Industrial Complex: A Practicing Physician's
View**, Speech given at Heritage Foundation March 1, 2000;  L.R. Huntoon, M.D.,
Ph.D., Association of American Physicians and Surgeons  Pamphlet No. 1073, May
2000

**Medical Sentinel PRESIDENT'S PAGE**
**What Price Freedom?**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 5 No. 3,
P 87, May/June 2000

**Universal Health Coverage – Call It Socialized Medicine** (Feature Article),
L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 5 No. 4, pp 134-136,
July/August 2000

**Medical Sentinel PRESIDENT'S PAGE**
**Abuse, Lies and Audio Tape**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 5
No. 4, p 121, July/August 2000

**Neomorts (Book Review)**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 5
No. 4, pp 147-148, July/August 2000

**Medical Sentinel PRESIDENT'S PAGE**
**Faith, Hope, and Action**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*, Vol. 5
No. 5, p 158, September/October 2000

**Medical Sentinel PRESIDENT'S PAGE**
**Orthodox Constitutionalism**, L.R. Huntoon, M.D., Ph.D., *Medical Sentinel*,
Vol. 5 No. 6, p 195, November/December 2000

**DUCK (Doctors for Universal Coverage and Kindness)**, L.R. Huntoon, M.D.,
Ph.D., Association of American Physicians and Surgeons Pamphlet No. 1080,
January 2001

BSS 00492

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**In Praise of Crows**, L.R. Huntoon, M.D., Ph.D., Association of American Physicians and Surgeons  Pamphlet No. 1081, March 2001

**Local Health Plan May Be More Costly In the Long Run**, L.R. Huntoon, M.D., Ph.D., *The Post-Journal* (Jamestown, NY), p 7, July 22, 2001

**Medicare Myths And Facts:  What the Government Doesn't Want You To Know,** L.R. Huntoon, M.D., Ph.D., Association of American Physicians and Surgeons Pamphlet No. 1092, August 2002

**Racing Against HIPAA's Deadline on Electronic Records** (Cover Story, Featured Lead Article), L.R. Huntoon, M.D., Ph.D., *Practical Neurology*, Vol. 1 No. 8 pp 19-23, August 2002

**The Medicare Crisis: A Communications Exercise** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons*, Vol. 8 No. 1, p 4, Spring 2003

**Opt Out of Medicare and Thrive!**, L.R. Huntoon, M.D., Ph.D., *Practical Neurology,* Vol. 2 No. 5, pp 46 – 50, May 2003

**Time For Atlas To Shrug** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons*, Vol. 8 No. 2, p 34, Summer 2003

**Medical Herdology** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons,* Vol. 8 No. 3, p 73, Fall 2003

**The Gazelle** (a poem about sham peer review), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons*, Vol. 8 No. 3, p. 86, Fall 2003

**The Four Cs of Physician Slavery** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons*, Vol. 8 No. 4, p. 101 Winter 2003

**Pets Have More Privacy Than People Under HIPAA Guidelines**, L.R. Huntoon, M.D., Ph.D., Tri-County Sunday News (Dubois, PA), Dec. 12, 2003

**MATRIX: A Threat To Medical Privacy?** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons,* Vol. 9 No. 2, p. 36 Summer 2004

Reviewed and contributed to Chapter 26 **The Neurologic Examination** and **Diagnostic Carotid Ultrasound** information in: **Sapira's Art & Science of Bedside Diagnosis,** 3rd edition, edited by Jane Orient, M.D., Lippincott Williams & Wilkins, 2004

**Abuse of the "Disruptive Physician Clause"** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons,* Vol. 9 No. 3, p. 68,  Fall 2004

BSS 00493

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**Memo to the "Disruptive Physician"** (Poem), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons,* Vol. 9 No. 3, p. 68, Fall 2004

**Sham Peer Review**, L.R. Huntoon, M.D., Ph.D., *AzMed* (Arizona Medical Association); September/October 2004, Vol. 15, No. 5, pp. 15 – 24

**Medicare: Incompetence-Based Bureaucracy** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons,* Vol. 9 No. 4, pp. 102-103, Winter 2004

**The Medicaid Penny** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons,* Vol. 10 No. 1, pp. 3-4, Spring 2005

**The Perilous Vegetative State** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons,* Vol. 10 No. 2, pp. 35-36, Summer 2005

**Down The Slippery Slope** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons,* Vol. 10 No. 3, p. 67, Fall 2005

**"Modern" Bioethics** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons,* Vol. 10 No. 4, pp. 101-102, Winter 2005

**The Problem with 'Third Party Care'** (Viewpoints), L.R. Huntoon, M.D., Ph.D., *Neurology Today* 2006;6(1):4-5

**Sham Peer Review and the Courts** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 11 No. 1, pp. 4-5, 2006

**Sham Peer Review: The Poliner Verdict** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 11 No. 2, pp. 37-38, 2006

**Pearls From the Third-Party Patient** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 11 No. 3 p. 66, 2006

**Banking On Reform Or Opting Out?** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 11 No. 4 p. 98, 2006

**The Psychology of Sham Peer Review** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American.Physicians and Surgeons* Vol. 12 No. 1 pp. 3-4, 2007

**I Think, Therefore I'm Well: The Amazing Brain** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 12 No. 2 pp. 34-35, 2007

**Conflicts of Interest and Quality Care** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 12 No. 3 pp. 68-69, 2007

BSS 00494

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**Sham Peer Review: The Unjust "Objective Test"** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 12 No. 4 pp. 100-101, 2007

**The Insulting Physician "Code of Conduct"** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 13 No. 1 pp. 2-4, 2008

**Is Being On Call Driving You Crazy and Making You Sick?** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 13 No. 2 pp. 35-36, 2008

**Sham Peer Review: A National Epidemic** (Guest Column), Machias Valley News Observer, August 27, 2008

**Pie Pans, Radio Waves and Cancer** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 13 No. 3 p. 67, 2008

**Sham Peer Review: The Fifth Circuit Poliner Decision** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 13 No. 4 pp. 98-99, 2008

Reviewed Questions/Answers – Chapter on **The Neurologic Examination** in: **Sapira's Art & Science of Bedside Diagnosis,** 4th edition, edited by Jane Orient, M.D., Lippincott Williams & Wilkins, 2009

**Physicians Beware: Medicare RAC Attacks Coming** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 14 No. 1 pp. 2-3, 2009

**The Feast Of Barhusobam** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 14 No. 2 p. 35, 2009

**Tactics Characteristic of Sham Peer Review** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 14 No. 3 pp. 64-66, 2009

**Freedom and DEATH in Medicine** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 14 No. 4 pp. 98-99, 2009

**Global Bundling** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 15 No. 1 pp. 2-3, 2010

**ObamaCare: Putting Tyrants in Control of Health Care** (Op Ed), L.R. Huntoon, M.D., Ph.D., Press Release Distribution, multiple news media outlets, March 8, 2010

BSS 00495

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**ObamaCare: Advancing the Destruction of America** (Op Ed), L.R. Huntoon, M.D., Ph.D., Press Release Distribution, multiple news media outlets, March 29, 2010

**Canadian Power Play** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 15 No. 2 pp. 35-36, 2010

**MOB: Maintenance Of Bureaucracy** (Editorial), L. R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 15 No. 3 pp. 66-67, 2010

**The Road Ahead In Medicine** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 15 No. 4 pp. 98-99, 2010

**Sham Peer Review: Disaster Preparedness and Defense** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 16 No. 1 pp. 2-6, 2011

**What Have They Done To My HDHP?** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 16 No. 2 pp. 34-35, 2011

**Sham Peer Review: Recognizing Possible Early Warning Signs** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 16 No. 3 pp. 67-68, 2011

**The Debacle of the National Practitioner Data Bank** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 16 No. 4 pp. 99-100, 2011

**Medicare Payment Options and You,** *The Bulletin (for Medical Society, Counties of Erie and Chautauqua,* Winter 2011, pp. 12-17

**Former Texas Medical Board Member's Lawsuit Dismissed** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 17 No. 1 pp. 3-5, 2012

**CPT Coding: Practice of Medicine or Insurance Function?** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 17 No. 2 pp. 34-36, 2012

**Sham Peer Review: Abuse of the P.U.L.S.E. Survey** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 17 No. 3 pp. 67-68, 2012

**New York Insurance Exchange** L.R. Huntoon, M.D., Ph.D., *The Medical Society Bulletin* p. 10, Fall, 2012

BSS 00496

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**Fraud, Waste and Abuse in Government-Run Medical Programs,**
L.R. Huntoon, M.D., Ph.D., Op-Ed sent out by press release, Oct 8, 2012, picked
up by multiple media outlets

**Sham Peer Review: The Psychology of Obedience and Social Influence** (Editorial),
L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 17 No.
4 pp. 98-101, 2012

**Time to Stop Tyranny in Medicine** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of
American Physicians and Surgeons* Vol. 18 No. 1 pp. 2-4, 2013

**Retaliation Against Physician Whistleblower: the Shocking Case of Dr. Michael
Fitzgibbons** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians
and Surgeons* Vol. 18 No. 2 pp. 34-39, 2013

**The Complete Lives System: Socialism in Medicine** (Editorial), L.R. Huntoon, M.D.,
Ph.D., *Journal of American Physicians and Surgeons* Vol. 18 No. 3 pp. 66-67, 2013

**Government Incompetence: Nightmare of the Living Dead,**
L.R. Huntoon, M.D., Ph.D., Op-Ed sent out by press release Nov 18, 2013, picked up
by multiple media outlets

**The Affordable Care Act: a Planned Transition to Socialized Medicine** (Editorial), L.R.
Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 18 No. 4 pp. 98-99,
2013

**Obama Wonderland: Independent Physicians Excluded** (Editorial), L.R. Huntoon, M.D.,
Ph.D., *Journal of American Physicians and Surgeons* Vol. 19 No. 1 pp. 2-3, 2014

**ObamaCare's High-Priced Illusion of Coverage** (Editorial) , L.R. Huntoon, M.D., Ph.D.,
*Journal of American Physicians and Surgeons* Vol. 19 No. 2 pp. 34-35, 2014

**ObamaCare: Fraud, Incompetence, Confusion, and Higher Costs** (Editorial), L.R. Huntoon,
M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 19 No. 3 pp. 66-69, 2014

**The Albatross Award** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American
Physicians and Surgeons* Vol. 19 No. 4 pp. 98-99, 2014

**Sham Peer Review: New Tactics and Pitfalls for Employed/Exclusively Contracted
Physicians** (Editorial),  Lawrence R. Huntoon, M.D., Ph.D., *Journal of American
Physicians and Surgeons* Vol. 20 No. 1 pp. 2-5, 2015

**Sham Peer Review: the Shocking Story of Raymond A. Long, M.D.** (Editorial),
Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons*
Vol. 20 No. 2  pp. 34-39, 2015

BSS 00497

RE: Anne Schlafly Cori vs. John F. Schlafly et al.          Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**Sham Peer Review: Outrageous and Unjustified Immunity** (Editorial), Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 20 No. 4 pp. 98-101, 2015

**Opting Out of Medicare** (Editorial), Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 21 No. 1 pp. 2-6, 2016

**The Disaster of Electronic Health Records** (Editorial), Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 21 No. 2 pp. 35-37, 2016

**MACRA, Stress, Brain Atrophy and the End of Fee-For-Service Medicine** (Editorial), Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 21 No. 3 pp. 66-67, 2016

**Physician-Assisted Suicide and Euthanasia: The Destruction of Morals, Ethics, and Medicine** (Editorial), Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 21 No. 4 pp. 98-101, 2016

**Laws on Surprise Medical Bills: Gateway to Single Payer** (Editorial), Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 22 No. 1 pp. 2-4, 2017

**Une Solution Liberticide qui n'a Rien Solutionne,** Lawrence R. Huntoon, M.D., Ph.D. *Courrier du Medecin Vaudois* (Switzerland) , May 2017, pp. 5-7

**The Bitter Fruit of Socialism – Health Crisis in Venezuela** (Editorial)**,** Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 22 No. 2 pp. 34-35, 2017

**Sham Peer Review and the National Practitioner Data Bank** (Editorial)**,** Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 22 No. 3 pp. 66-71, 2017

**The Perils of Opioid Prescribing** (Editorial), Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 22 No. 4 pp. 98-100, 2017

**Risk Factors for Sham Peer Review** (Editorial), Lawrence R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 23 No. 1 pp.4-5, 2018

**Hospitals and Insurance Companies: Government-Protected and Favored Businesses** (Editorial), L.R. Huntoon, M.D., Ph.D., Journal of American Physicians and Surgeons Vol. 23 No. 2, pp. 34-35, 2018

**Sham Peer Review: Violations of Due Process and Fundamental Fairness** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 23 No. 3, pp 66-68, 2018

BSS 00498

RE: Anne Schlafly Cori vs. John F. Schlafly et al.                    Date: 12/10/2019

By: Lawrence R. Huntoon, M.D., Ph.D., F.A.A.N.

**The National Practitioner Data Bank Guidebook,** (Editorial),  L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 23 No. 4 pp. 99-101, 2018

**The "Purge"** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 24 No. 1 pp. 2-5, 2019

**Capitation: What Was Old Is New Again,** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 24 No. 2 pp. 34-36, 2019

**The End of Medicare Price Discrimination?,** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 24 No. 3 pp. 66-67, 2019

**Sham Peer Review: the Destruction of Medical Careers,** (Editorial), L.R. Huntoon, M.D., Ph.D., *Journal of American Physicians and Surgeons* Vol. 24 No. 4 pp. 99-100, 2019

BSS 00499