UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PHYLLIS SCHLAFLY REVOCABLE TRUST,  )
et al.,                            )
                                   )
     Plaintiffs,                   )
                                   )
     v.                            )
                                   ) No 4:16-CV-1631 RWS
ANNE CORI, et al.,                 )
                                   )
     Defendants.                   )

STATUS HEARING
BEFORE THE HONORABLE RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE
MAY 3, 2023

APPEARANCES:
Special Master:        Mark D. Seigel, Esq.
                       US ARBITRATION & MEDIATION
                       500 N. Broadway, Suite 1800
                       St. Louis, MO  63102

For Plaintiffs:        Ian A. Northon, Esq.
                       NORTHON LAW PLLC
                       4850 Tamiami Trail N, Suite 301
                       Naples, Fl  34103

                       Kelley F. Farrell, Esq.
                       Andrew W. Blackwell, Esq.
                       CAPES SOKOL PC
                       8182 Maryland Avenue, 15th Floor
                       Clayton, MO  63105

For Defendants:        Arthur D. Gregg, Esq.
                       Erik O. Solverud, Esq.
                       SPENCER FANE LLP
                       1 N. Brentwood Boulevard, Suite 1200
                       Clayton, MO  63105

REPORTED BY:           SHANNON L. WHITE, RMR, CRR, CSR, CCR
                       Official Court Reporter
                       United States District Court
                       111 South Tenth Street, Third Floor
                       St. Louis, MO  63102
                       (314) 244-7966
        PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

1    **(PROCEEDINGS STARTED AT 11:21 AM.)**

2        THE COURT:  Good morning.  So we're here in the case

3    styled Phyllis Schlafly Revocable Trust, et al., against Cori,

4    et al., 4:16-CV-1631.

5        Would counsel make their appearances, please.

6        MR. NORTHON:  Thank you, Your Honor.  Ian Northon on

7    behalf of plaintiffs.

8        MS. FARRELL:  Kelley Farrell on behalf of the

9    plaintiffs.

10       MR. BLACKWELL:  And Andrew Blackwell on behalf of the

11   plaintiffs, Your Honor.

12       MR. SOLVERUD:  Erik Solverud and Arthur Gregg on

13   behalf of defendant.

14       THE COURT:  Very good.  So I'm the newest member of

15   the case.  Who's going to bring me up to speed?

16       Mr. Solverud, did you want to give it a shot?

17       MR. SOLVERUD:  I'll let Mr. Gregg do that.

18       THE COURT:  That's fine.  And then, obviously, if you

19   haven't been with me before, nobody leaves the room without

20   saying everything they wanted to say.  So if you don't like

21   what someone said, don't panic.  You'll get plenty of time for

22   rebuttal.

23       MR. GREGG:  Good morning, Your Honor.

24       THE COURT:  Morning.

25       MR. GREGG:  So I think if we're talking about getting

1    up to speed --

2         THE COURT:  And where to go from here.

3         MR. GREGG:  And where to go from here.  You know, I

4    think, as Your Honor is aware, Judge Ross appointed Judge

5    Seigel as Special Master to oversee certain discovery disputes

6    in these proceedings.

7         You know, as Your Honor is probably aware just from

8    the docket sheet, defendant filed motions to compel to get

9    document productions for Phase II discovery.  We filed motions

10   to strike regarding expert disclosures that were not timely

11   made.

12        There were, I think, a litany of noncompliance on

13   behalf of the plaintiffs where their discovery obligations led

14   us to the appointment of a Special Master.  And those

15   Special Master proceedings began in January of 2023, this

16   year.  It was a 60-day referral to Judge Seigel for

17   Special Master proceedings.  And, unfortunately, a lot of

18   these issues are still kind of -- they haven't moved forward

19   or resolved themselves.

20        I think the best way to talk about this from the

21   perspective of where we are is what defendant still feels she

22   needs to have this case be ready for trial.  And I think the

23   first thing that defendant needs is we need to fix the issues

24   with the data set that was prepared by plaintiffs in

25   responding to their Phase I and Phase II discovery.

1    A huge chunk of the data relied on by plaintiffs was

2    compiled by other lawyers in other lawsuits, and that creates

3    a problem because they can't say whether the data is fully

4    intact.  They can't say whether search terms were run on it.

5    They can't say whether it represents an actual collection of

6    the plaintiffs.

7    I mean, the two lawsuits that was the source for this

8    data was Madison County and the Southern District of Illinois.

9    Neither of those cases even had the Phyllis Schlafly Revocable

10   Trust as a party.

11   So there are three custodians that are that data:

12   Bruce Schlafly, John Schlafly, and Ed Martin.  And it's their

13   emails from January 2015 through December of 2017.  So I think

14   we need to fix that data because you can't build a discovery

15   collection on quicksand; there's no foundation, and the whole

16   thing is compromised.

17   And, Your Honor, that's the subject, in part, of

18   Document No. 257, which is our motion for discovery sanctions

19   pursuant to Rule 237(b)(2) of the Federal Rules of Civil

20   Procedure.

21   The second thing we need, Your Honor, is we need our

22   own search terms to be run on the complete data set.  So

23   plaintiffs, in response to Judge Ross's orders to finally get

24   this discovery out the door -- I mean, the first production we

25   had in Phase II was January 4 of 2023, and it was 219,000

1  pages.  If you look at the second amended scheduling order,

2  that production was more than a month after the discovery

3  cutoff in this case.

4       So in their rush to get that document dump out the

5  door and on us, they used their own search terms.  Now, we've

6  provided some additional search terms to supplement where we

7  think their search terms fell short, but now what we've

8  discovered through the proceedings with Judge Seigel is that

9  they used this technology-assisted review, TAR, program and

10  predictive coding that has all kinds of flaws in it and all

11  kinds of issues.  I mean, it's the subject of our motion for

12  sanctions that we presented to Judge Seigel last week that

13  information relating to the ESI and the TAR was being

14  withheld.

15       And the case law on this, Your Honor, is if a party

16  is going to impose an ESI protocol and is going to

17  unilaterally apply search terms, they need to be up-front and

18  transparent about that.  The burden is on them to show it was

19  done right.  And we only just now, last week, received

20  information showing that it appears to have been done all

21  wrong.

22       I mean, we're still consulting with our own kind of

23  experts on e-discovery and how a collection should have gone

24  and how technology-assisted review should be performed; but, I

25  mean, our initial reactions are this was done all wrong.  So

1  we need to get our own search terms that we propose and

2  negotiate to be used as kind of the crux to address those

3  issues.

4        The second thing we need is plaintiffs need to

5  provide a complete privilege log.  This is the subject of

6  Document 290, defendant's supplement to her motion for

7  sanctions.

8        So in response to Judge Ross's order to have

9  plaintiffs get the ball moving and get this going, we got, on

10  January 11, 2023, a privilege log with 15,148 entries.  And

11  just for an example of how that document was so flawed, 8,000

12  of those documents the "email to" or "email from" was blank;

13  so you couldn't assess the privilege because you wouldn't know

14  who was sending the document or who was receiving the

15  documents.

16        Judge Seigel gave plaintiffs two drop-dead dates in

17  March and April to fix these issues, and that's set forth more

18  fully in our supplement to motion for sanctions.  But, you

19  know, the most recent status is by that second drop-dead date,

20  April 19, we now have a 10,000-entry privilege log with more

21  than 4,000 blanks in it on "email to," "email from."  And then

22  the next day we got another privilege log with 1,900 entries.

23  More than 1,000 of them were blank.

24        So we need to figure out, create a single, unified

25  privilege log that says the information you need for a

1   privilege log.  After that, defendant needs to be able to

2   review the privilege log and challenge the assertions of

3   privilege, because all that's really happened with the

4   privilege log is about 5,000 documents were produced that

5   everybody agreed shouldn't have been on the privilege log in

6   the first place.  There was never any contested motion about

7   the 5,000 documents.  It was just these clearly have

8   nonparties turn them over.  So we're still dealing with these

9   blanks on this privilege log.

10          And, Your Honor, the account from plaintiffs' counsel

11  is that the privilege log is so flawed because that original

12  data set was corrupted.  The data set I talked about, they

13  couldn't extrapolate the "to" or "from" and generate it

14  themselves.

15          Next, Your Honor, defendant needs to complete a

16  deposition of plaintiffs' damages expert.  Now, we've taken

17  the deposition of plaintiffs' testamentary capacity expert,

18  and we've actually filed a motion to strike on that expert

19  witness.  That's Document No. -- this is two forty -- 282,

20  Your Honor.  That's our motion to strike plaintiffs'

21  testamentary capacity expert witness, Larry Huntoon.

22          We're completing tomorrow the deposition of

23  plaintiffs' damages expert, and we need time to file a motion

24  to strike for that expert as well.

25          Defendant needs to make her own Rule 26(a)(2)

1    disclosure of experts for initial and to rebut the testimony

2    that we've gotten from plaintiffs, you know, in the event it's

3    not stricken by this Court.  We need to make our experts

4    available for deposition.

5            THE COURT:  You don't think we're going to trial this

6    month?

7            MR. GREGG:  I have a slightly jaundiced view of the

8    current trial setting, Your Honor.

9            THE COURT:  All right.  Just checking.

10           MR. GREGG:  Just checking, I agree.

11           And I think, you know, finally, Your Honor, when we

12   get through the expert issues, the privilege log issues, and

13   the document issues, I think we need to take our Phase II

14   depositions of the corporate representatives of plaintiffs.

15           You know, Judge Ross set this up as a Phase II.

16   Plaintiffs have already taken my client and Cori's Phase II

17   deposition.  They've already conducted and gotten their

18   Phase II discovery responses from us.

19           I don't believe before Judge Seigel there's anything

20   pending that they've asked for from defendant that's

21   outstanding.  We have provided documents.  We've provided

22   logs.  We have reviewed deposition testimony and made rulings

23   on answers that have been provided and objections that were

24   made.

25           But we still need the corporate rep depo of each of

1 the plaintiffs, including -- and also John Schlafly in his

2 individual capacity.  He's a trustee of two of the trusts, of

3 two of the plaintiffs, and he's also a director and officer of

4 EFELDF.  That's the third plaintiff, Eagle Forum Education and

5 Legal Defense Fund.

6          We also want to take the deposition of JoAnne Jouett,

7 who's a trustee and employee of Eagle Trust Fund and, finally,

8 Bruce Schlafly, who is, I believe, a director of Eagle Forum

9 Education and Legal Defense Fund and a former trustee of Eagle

10 Trust Fund.

11          And then I think what's last is, you know, there are

12 certain pending motions before the Court that I think will

13 expedite and could substantially narrow things, but I think we

14 need some resolution on some of the pending motions that have

15 been on file since the fall of 2022.

16          And, Your Honor, I've prepared a binder, a courtesy

17 copy, of motions that are pending or that are resolved in part

18 that I'm happy to provide you and kind of talk you through, if

19 there's no objection.

20          THE COURT:  Any issue as to the plaintiffs?

21          MS. FARRELL:  Do you have a copy for us?

22          MR. GREGG:  I --

23          MS. FARRELL:  Thanks.

24          MR. GREGG:  Yeah.

25          THE COURT:  Make sure they know what you're handing

1   the Court.

2          MR. GREGG:  And, Your Honor, I'll read through it

3   really quick as well.

4          THE COURT:  Okay.

5          MR. GREGG:  So, Your Honor, in the binder I've handed

6   you is Document No. 255, which is our motion to compel

7   discovery and amend second amended scheduling order.

8   Plaintiffs never filed a response to this motion.  Judge Ross

9   granted it in part as to the motion to compel, but the motion

10  to amend the scheduling order is still outstanding.

11         The next document I draw your attention to is Doc

12  No. 257.  This is our motion for discovery sanctions pursuant

13  to Rule 237(b)(2) of the Federal Rules of Civil Procedure.

14  It's fully briefed, and the briefing is contained in that

15  binder.

16         This relates in part to the compromised data set and

17  Judge Ross's previous order that plaintiffs could not rely

18  solely on documents prepared by other lawyers in other

19  lawsuits to satisfy their own independent discovery

20  obligations in this lawsuit.

21         The next document I draw your attention to is

22  Document No. 280.  This is our motion to enforce compliance

23  with the Special Master Order No. 2.  That's pending before

24  Judge Seigel.  And, actually, subsequent orders have addressed

25  topics contained within that order, but because other motions

1  rely on it and cite it to, I've included it for Your Honor.

2  The next, Your Honor, is Document No. 282.  That is

3  defendants' motion to strike plaintiffs' testamentary capacity

4  expert witness, Dr. Lawrence Huntoon.  And, Your Honor, I've

5  included -- and plaintiffs have never filed a response to that

6  motion even though it was filed on March 22, 2023.

7  And, Your Honor, I've included in the binder Document

8  No. 248.  That's our related motion to strike plaintiffs'

9  expert witness disclosures.  That's back from August of 2022.

10  This motion is relied on and cited by our motion to strike

11  Dr. Huntoon.

12  The second motion, the expert disclosure's motion,

13  was denied as moot without prejudice by Judge Ross because it

14  related to certain proceedings in front of Judge Seigel, but

15  defendant, at the same time, was granted leave to refile that

16  motion at a later date if necessary.  And so I'm including it

17  because either in its current form, as relied on by other

18  motions, I think it's relevant, or it may be coming down the

19  pipeline in short order.

20  THE COURT:  I understand I need to deal with the

21  scheduling issues, but which of these have been argued to the

22  Special Master?

23  MR. GREGG:  So the only motions that have been argued

24  to the Special Master are our motion to enforce compliance

25  with Special Master Order No. 2 and then the last two items in

1  your binder, Document No. 289 and 290, which is our motion for

2  sanctions and our supplement to our motion for sanctions.

3       And both of those last two have been argued, heard,

4  and taken under submission per Special Master Order No. 7,

5  which was filed, I believe, yesterday.

6       THE COURT:  Okay.  Very good.

7       MR. GREGG:  So, Your Honor, that's a rundown of the

8  documents in the binder we just gave you.

9       I'd also note that we think there are still

10 dispositive issues in this case.  So if I were to put one last

11 thing on the laundry list of pretrial items that defendant

12 needs, I think it's time to file and brief dispositive motions

13 on issues relating to liability.

14      And because we got a damages expert in Phase II,

15 there may be some damages issues as well even though that was

16 a Phase I topic.  But I think that's what we need to get this

17 ready for trial.

18      THE COURT:  All right.  Very good.  Thank you.

19      MR. NORTHON:  Thank you, Your Honor.  Ian Northon

20 here again.

21      Just to orient the Court a bit further, I've been

22 plaintiffs' counsel for the entirety of the lawsuit, all seven

23 years or so of it.  And more recently, more recently about a

24 year, year and a half ago, I went in-house with a small

25 software company.  I'm no longer a trial lawyer full time.  I

1    spent the first 20 years doing that.

2          So as I transitioned away, I brought on additional

3    counsel, my old firm, Rhoades McGee, to pick up the slack and

4    take this the rest of the way to trial.  That is Patrick

5    Sweeney, who could not be here today because he's in trial in

6    the Western District of Michigan.  So he wasn't able to move

7    that on short notice to come here today.

8          But much of what defense has described has been

9    attributable to motions before Judge Ross and then, in our

10   view, kind of an overwhelming amount of potential discovery.

11         Phyllis Schlafly was engaged in public life for more

12   than 50 years.  In Clayton she's got an archive that's open to

13   the public by appointment that has 50 years' worth of

14   information, but they're in things like hard copies, and they

15   don't lend themselves well to litigation or to electronic

16   discovery.

17         You also heard counsel refer to other cases.  Those

18   other cases, the Madison County lawsuits -- there were many.

19   Phyllis Schlafly's estate, which was pending in St. Louis

20   County -- that's largely been resolved, at least as it relates

21   to the plaintiffs here, but there are a few ancillary issues

22   unaffected or unrelated.  And then there was the Southern

23   District of Illinois federal intellectual property lawsuit

24   involving just the name "Eagle Forum."

25         I mention those things because Judge Ross, in this

1  case, stayed this litigation pending the resolution of those

2  cases for over two years, I think, by calendar count.  So as

3  we look at that, to suggest that the documents produced or

4  that the defendants already have from those other cases aren't

5  relevant or important, I think is a bit of a distraction.

6       What we're really fighting over is the way or the

7  form in which those documents need to be delivered here.  And

8  so what we've tried to do in order to get our arms around

9  everything that was produced in all of the cases and give fair

10  responses was to get everything institutionalized,

11  standardized, scanned, uploaded, and then, unfortunately, you

12  know, given back to the defendants in a new form.

13       That process -- clearly, my old firm and my

14  involvement have fallen behind the eight ball.  We made

15  mistakes in hiring our vendors, and in doing so, that has put

16  us kind of in catch-up mode ever since.

17       With that said, when we went in to Judge Ross last

18  fall and said, We need these things.  We have motions to

19  compel pending as well.  Defendants had withheld privileged

20  documents.  We believed they were not privileged.  So we moved

21  to compel.  They had cross-motions to compel.  They had things

22  that they wanted.

23       And so that was when Judge Ross referred this to

24  Special Master.  Now, I will admit most of what needed to be

25  delivered was we had to give back to the defendants things

1   that they either already had or in one form or another or were

2   publicly available in the archives.  But we needed to do it.

3          And I believe we've endeavored in good faith,

4   especially Mr. Sweeney using these vendors, hiring additional

5   lawyers to beef up the team to try and give responsive

6   reports.

7          So in that process, we believe we've tried to comply.

8   We've done so in good faith.  But all of those pending motions

9   last fall were referred to the Special Master to the extent

10  they related to discovery.

11         So now defendants' suggesting that they're still out

12  there -- I guess I would disagree.  And as I'm leafing through

13  the binder, I don't believe these are pending.  I believe

14  these issues have either been resolved or should have been

15  resolved through the Special Master.

16         For example, just recently Judge Ross issued an order

17  that claimed this motion to strike Dr. Huntoon was moot

18  because it had been sent to the Special Master.

19         Now, we met with the Special Master many, many times,

20  and not once did this issue reemerge, so to speak.  And so

21  because of that, what Judge Ross did was denied the motion as

22  moot and said, "If you want to refile it, you can refile it.

23  But I would say give peace a chance.  And if that's an issue

24  that should be brought before the Special Master, let's

25  resolve it there, let's put a bookend on it, and be done with

1    it before we come back here to resolve trial." But to suggest

2    that all of those things are pending, again, I disagree with.

3         Likewise, this motion for sanctions -- it is under

4    submission. Judge Seigel -- I believe, you know, he's taken

5    it under advisement and will issue his recommendation in short

6    order. But until then, we were facing down the barrel of this

7    looming trial. You know, it was supposed to be heard later

8    this month. And now we've brought on additional resources to,

9    one, close the gap on anything left for discovery, which we

10   think is narrow, get ready for trial, and move forward.

11        And now I'm hearing that defendants want to in a

12   sense reopen discovery, take more depositions, things that I

13   don't believe were raised with the Special Master. I mean,

14   they've canceled deposition dates and all of these other kind

15   of gymnastics. And to suggest that you could not do anything

16   on your end and then just wait until it was done and then

17   start Phase II, I think, does some abuse to the two years that

18   discovery has been open, and they've done very little to

19   advance their case except to throw stones at us.

20        So, again, I'd like to say that to orient the Court

21   but also then to focus on the substance, to really drill down.

22   The very narrow issue left over the privilege log -- we've

23   issued privilege logs in the case. There's a gap over the

24   predictive coding and the ability to draw the information and

25   get metadata. We're solving it. We've got new counsel.

1  We've spoken with the vendor.  We're closing the gap.  The

2  number of documents that are in dispute are going from 14,000,

3  you heard from Mr. Gregg, to 10,000.  Now we believe the

4  actual number in dispute is about 1,500.  Again, it's getting

5  narrowed very quickly.

6         We would anticipate that we could be done with that

7  with the Special Master within probably a week or so, but in

8  any event before the end of the month.  That leaves, in our

9  mind, very little to do except get ready for trial.

10         Now, I say that to orient the Court to say, look

11  they're entitled to a complete privilege log.  But to suggest

12  that this was kind of unequally yoked or we went into the

13  Special Master without having our own issues, there were a

14  tranche of documents that we just got from them that had been

15  withheld on the basis of privilege.  Judge Seigel ruled that

16  they were not privileged, and they were turned over.

17         So, again, as we work through this, I don't want to

18  give the impression that -- look, the parties have been

19  fighting for over seven years for a reason.  And so we're

20  doing our best as counsel to manage those efforts and put

21  forth a triable case to Your Honor and narrow the issues the

22  best we can.

23         I do think more time would be necessary.  And I also

24  think it would take at least the semblance of any perceived

25  prejudice that the defendants feel they're having if we give

1    them more time.  I don't want to turn this into an eight- or

2    nine-year case, but if we gave them a bit more time, a month

3    or two, then I think any concerns over privilege could be

4    obviated that way and we can get back to the merits.

5          In addition to that, I would say this idea that a

6    huge chunk of data from the other lawsuits and all of those

7    other things are somehow instrumental to the case -- again, I

8    would just use every opportunity I have to breathe, hopefully,

9    a breath of proportionality to Your Honor.

10         We brought what we thought was a fairly focused case

11   on the intellectual property of Phyllis Schlafly, the ability

12   to use her name and likeness and a few trademarks.  And the

13   idea that we have to just kind of carte blanche through every

14   other lawsuit and the archives and somehow, if we don't do

15   that, we can't maintain a case -- as a plaintiff, I would just

16   ask the Court to exercise some discretion and caution against

17   that.

18         With respect to the specific requests to fix the data

19   set, it's being fixed.  We believe we have straight answers.

20   And we also think in some ways it's moot.

21         Defendants asked for additional search terms.

22   They're right.  Over the holidays, Christmas and New Year, we

23   worked tirelessly to get the production timely produced.  We

24   did that unilaterally because we could not come to terms

25   through cooperative agreements on what the search terms would

1  be.  So we charged ahead.

2       But since then, Your Honor, with the Special Master,

3  they gave us search terms.  We ran those searches, and we gave

4  them the documents.  The only documents we withheld were those

5  that we claimed were privileged.  In other words, we don't

6  have to get into the technology-assisted review and the TAR

7  and these rates and their rates because we're not looking at a

8  percentage of documents withheld or trying to look at those

9  things.  We gave them all to them.  And we did that except for

10 the privileged items.

11      So if we solve that problem, I believe there are no

12 issues left with how the vendors previously did it because

13 it's irrelevant.  They've now got the documents.  Again, it's

14 a big stack, you know, 300,000 plus documents.

15      But at some point, when they've had their search

16 terms responded to, what else is there to do?  Again, we've

17 offered them to go into the archives if they wanted.  They've

18 declined.  They just want us to do it for them.  And at some

19 point we understand we have obligations as plaintiffs, but we

20 believe we're doing those in good faith.  So I think that

21 takes that "fix the data set" issue off the table.

22      Second, they asked for the complete privilege log.  I

23 agree.  There were some gaps.  These gaps are filled in by the

24 computers.  They're extensive spreadsheets.  They show what

25 the document is, what it isn't.

1    Every time we've showed documents to the

2  Special Master, he's agreed with us over privilege.  In other

3  words, to the extent that they were withholding documents,

4  they were forced to produce them.  To the extent we withheld

5  documents, they stayed withheld because they were privileged.

6  So on substance we think we're doing it the right way.

7    The procedure of what the Excel spreadsheet looks

8  like -- they still have issues with it.  We can address it.

9  We're working to address it.  Again, that's the issue that I

10  believe can be completed in very short order.

11    And it was just a -- it was the problem of taking a

12  document that -- in hard copy form and scanning it in and then

13  trying to use a computer to aggregate it.  This is

14  complicated, but it happens.  But we're fixing it.

15    And to the extent that I'm trying to fall on the

16  sword or say I'm sorry, I am, but the reality is, is the

17  substance of privilege documents hasn't changed.

18    You know, to say that the "to" and "from" field is

19  incomplete when it cc's the lawyer and it is described as an

20  email, we think that's fair.  It's enough to at least raise

21  the issue and say, Your Honor, can you take a look at that

22  document to see if it's really privileged?

23    But to say just because their "to" and "from" field

24  is empty, well, that's a defect in the software.  I can't fix

25  that today, but we can fix it the old-fashioned way, which is

1  to review every document and turn over what's not privileged.

2          With respect --

3          THE COURT:  And cc'ing a lawyer doesn't make

4  attorney-client privilege.  You know that.

5          MR. NORTHON:  No, no.  I understand, Your Honor.  But

6  when you cc a lawyer for the prospect of seeking legal advice

7  and go through the standard, those -- it identifies enough of

8  the document that, if they have an issue with it, we can

9  review it in camera or we can take issue.

10          It's not as if there's just some completely redacted

11  or blank that, yeah, the "to" and "from" fields might be

12  blank, but the other six fields or other ten fields are filled

13  in.  So there's enough there to have a meaningful discussion

14  over whether privilege really applies.

15          With respect to the motion to strike the testamentary

16  expert, Dr. Huntoon, again, that was, I believe, pending at

17  the time Judge Ross referred all discovery matters to the

18  Special Master.  It's not been brought up again.  I believe,

19  fairly, if they want to bring it up, they should file a

20  motion, either a motion now or a motion in limine, and it can

21  be addressed on the merits.

22          But to kind of say it's pending and they want a

23  ruling on it, Judge Ross already denied it.  He denied it

24  without prejudice.  I'll have to check the docket number to

25  see what order he denied it with, but it's already been

1  denied.

2  So, again, to say, "Here you go, Your Honor. Here's

3  a binder of pending motions," well, it's not pending. It's

4  been denied, albeit without prejudice.

5  The next one, the idea that, you know, our damages

6  expert, Brian Buss -- they've taken five and a half hours of

7  his deposition already. They continued it or asked for it to

8  be continued because they thought they were entitled to more

9  documents -- what they thought were privileged were

10  non-privileged documents -- to ask him about.

11  That has been taken to Judge Seigel. Judge Seigel

12  issued his ruling. And we've set dates. It's been moved a

13  few times at their request, but it's going to be finished

14  tomorrow. Hour, hour and a half left to finish it. So I

15  don't think that needs to take any more of the Court's

16  attention.

17  But the idea that they now need time to file a motion

18  to strike, well, I suppose, but I don't know that we need to

19  cook it into the scheduling order or the calendar. Just make

20  it a motion in limine. We need to narrow the disputes, not

21  invite more of them.

22  Lastly, the idea that they need time to take, for the

23  first time in seven years, the depositions of a couple of

24  individuals who have been known to them the entire time --

25  that gives me a bit of heartburn. And to say they couldn't

1   take these depositions when, again, they're sitting on a

2   tranche of documents, of responsive documents -- that strikes

3   me more as to not preparing defenses in a meaningful way but

4   perhaps to harass plaintiffs and their representatives.  But,

5   again, the Court will have to exercise some discretion there.

6           But to say that they need Dr. Schlafly, who we've

7   offered to them but had a busy schedule -- he's a practicing

8   surgeon.  He has his own practice.  We've offered his -- to

9   them many times.  They've canceled repeatedly.  And now I'm

10  hearing that they want him again.

11          Well, could have mentioned it to Judge Seigel when we

12  were negotiating all these things and working through the

13  discovery.  But, again, we'll have to work through that.

14          JoAnne Jouett -- she's worked for the Eagle Trust

15  Fund for over 20 years.  She is a trustee currently.  She was

16  not when the case began but is now of the Eagle Trust Fund.

17  But she's been known to them.  So to say that, "Oh, we want

18  her deposition now," again, fine, I suppose.  But, again, this

19  strikes me as not narrowing the issues getting ready for trial

20  but expanding them, which I'd like to work against.

21          Lastly, the idea that they need additional time to

22  file dispositive motions, Phase I was focused on liability.

23  Phase I they filed motions for summary judgment.  They were

24  denied.  And Phase II has largely been focused on damages.

25          And now we sit here on the eve of trial, or what was

```
 1   going to be the trial, and they say, "Oh, let's reopen things
 2   for several months so the Court can rule on dispositive
 3   motions."  Well, you know, those deadlines have long gone.  If
 4   we move the scheduling order so that it kind of captures that
 5   and opens up the opportunity to do that, I would just ask that
 6   they do it quickly.
 7         Nothing new here, Your Honor, respectfully.  Those
 8   motions could have been brought and should have been brought.
 9   And, you know, the risk is that filing new motions in three or
10   four months then -- realistically, then, that this pushes our
11   ability to have the trial off until -- to another calendar
12   year, which I'd like to really resist and work against.
13         So I've tried to summarize the points without getting
14   too acrimonious.  And I would just say, look, we've brought on
15   additional counsel to make up for the lack of resources, which
16   I regret.  We are working in earnest to resolve what I think
17   are very narrow issues at this point, and we would ask that
18   Your Honor perhaps allow for trial maybe in the, I would say,
19   early fall, possibly October or late September, and do so.
20         I think that give enough time for them to avoid any
21   perceived prejudice, which I don't believe there is any actual
22   prejudice, and to resolve any outstanding issues in earnest so
23   that we can get this lengthy case resolved on the merits.
24         THE COURT:  Anything further?
25         MR. GREGG:  Your Honor, can I?  I'll keep this as
```

1    brief as possible.  I think --

2           THE COURT:  Don't make promises you can't keep.

3           MR. GREGG:  I said "as possible," Your Honor.  That's

4    just a big asterisk for me.

5           So, Your Honor, this issue of fixing the data set,

6    Mr. Northon, respectfully, is conflating two separate ideas.

7    The problem here with the data set is that it was collected by

8    other lawyers in other lawsuits.  That has nothing to do with

9    plaintiffs' own use of predictive coding.  It has to do with

10   the collection.  It has to do with what they have to search

11   for when they make -- when they use their TAR, when they use

12   their predictive coding.

13          So the metaphor I keep going back to is they've tried

14   to build a house on quicksand.  If you don't have a foundation

15   of an accurate collection of all parties, then it doesn't

16   matter how good your collection is or how bad or good your

17   predictive coding is or your AI-assisted reviews if all the

18   stuff isn't there to be searched.

19          And here what we know is that arguably the two most

20   important individuals in this case, Ed Martin and

21   John Schlafly, their emails from a three-year period beginning

22   January of 2015 through December 31, 2017, which is when

23   plaintiffs say all the bad stuff happened -- those emails were

24   relied on by, were collected from other law firms for other

25   litigation.  And plaintiffs' counsel can't say whether the

1  data was fully intact or whether search terms were run,

2  whether it was filtered, whether it's complete at all.

3          And my frustration, Your Honor, is the most

4  knowledgeable person about all the discovery and all of the

5  inner working we've been doing with Judge Seigel is

6  Patrick Sweeney.  He's in trial today.  The second most

7  knowledgeable person was Laura Kane, and Laura Kane is no

8  longer with the Rhoades McKee firm and is no longer with this

9  case.

10          So Mr. Northon has not been involved in the

11  e-discovery issues, has not been involved in working through

12  the privilege logs.  I mean, I think that's my problem -- is

13  he's here talking about whether or not, you know, the

14  privilege log being complete even matters.  And Judge Seigel's

15  already found that it mattered.

16          It already matters that there were missing -- that's

17  why he gave them an initial drop-dead date to fix this issue

18  on March 24.  And then when they didn't do that, he gave them

19  an additional drop-dead date of April 19.  And now we're here

20  to you, saying, well, we don't really think it matters that

21  the privilege log have "to" or "from."

22          I mean, that's -- that's bewildering to me because we

23  can't see who sent it.  We can't see who the direct recipient

24  was.  And it affects more than 4,000 of their 10,000 entries.

25          And, Your Honor, talking about delays for seeking

1    depositions, we needed documents to do a corporate rep

2    deposition.  We needed full and complete disclosure discovery.

3    When we got a document dump in this matter on January 4, 2023,

4    more than a month after discovery cutoff was supposed to have

5    happened, there were 219,000 pages of documents produced,

6    composing about, I think, 22- or 23,000 separate documents.

7         We have a 22,000-document production and a

8    15,000-entry privilege log.  They're withholding -- they're

9    withholding more than 50 percent of what they produced under

10   the basis of privilege, and we can't even examine the

11   privilege log.

12        And when we asked them and they were required to

13   supplement who was asserting the privilege, they said names

14   like Bruce Schlafly's asserting the privilege even though

15   Bruce isn't a party to this case or represented by these

16   attorneys in this case.

17        And that's why we're having an issue where we're

18   asking for discovery and depositions to occur after we

19   actually get the documents.

20        There have been 17 volumes of production since

21   January 4, 2023, as Judge Seigel has picked off and asked them

22   to provide more.  They had all of their expert communications

23   on their privilege log.  Those had to be produced.  Emails

24   with Roger Schlafly, a third party, littered the privilege

25   log -- more than 700 entries.  They were asked to produce

1  those by Judge Seigel.  They produced 2,300 documents.  They

2  were the wrong documents because there were still 400

3  documents that weren't produced.

4         This has been, I think, problematically flawed from

5  the get-go, and it's been affected by this bad data set.  And

6  when Mr. Northon talks about fixing the data set, he's

7  ignoring the issue that his firm had no involvement in

8  collecting the core custodians for the core period of time.

9         Dr. Huntoon -- our motion to strike Dr. Huntoon as an

10  expert was filed on March 22, 2023, after his deposition,

11  during the Special Master proceedings.

12         And, Your Honor, I don't think I did -- and I

13  endeavored not to misrepresent to this Court why we had the

14  motion to strike expert disclosures in your binder.  That was

15  denied by Judge Ross as moot with leave to refile.

16         Why I included it in the binder is because it's cited

17  and relied upon on our more recently filed motion to strike,

18  and I wanted Your Honor to have the full amount of information

19  in front of you.

20         But he's blurring and confusing the different motions

21  to strike the expert disclosures versus the motion to strike

22  Dr. Huntoon, which was filed on March --

23         THE COURT:  Slow down so you get a record.

24         MR. GREGG:  Sorry, Your Honor.  Which was filed on

25  March 22 and has not been responded to at all by plaintiffs.

1    Even the phases -- Phase I, in this case, was focused

2 on, I believe, ongoing use, ownership, standing, and damages.

3 Phase I was not limited to the issue of liability, as

4 Mr. Northon just represented.  In fact, I think the remaining

5 motions for summary judgment in Phase II relate almost

6 primarily to liability.  So even the phases are mixed up

7 because the lawyers who know the most about plaintiffs' case

8 aren't here today to talk to you.

9    Well, that's my four topics, Your Honor.

10    THE COURT:  All right.  So we have certainly a motion

11 for sanctions under submission to the Special Master.  Which

12 of these other discovery motions would be ripe for the

13 Special Master's consideration, and which are left for me?

14    The easy one is I'm vacating the CMO today until we

15 figure out where we are.

16    MR. NORTHON:  I would just suggest, Your Honor, that

17 although the original referral -- oh, my apologies.

18    Thank you, Your Honor.  I would suggest that the

19 original --

20    THE COURT:  Come up.  You can share the podium.

21    MR. GREGG:  Okay.

22    MR. NORTHON:  I don't bite.

23    THE COURT:  If you can't share the podium, we'll

24 never get anywhere.

25    MR. NORTHON:  So I would suggest that, while the

1  original order of referral to the Special Master was cabined,

2  I think it was, 60 days, I think if we just simply extended

3  that, then all pending discovery disputes could still be

4  resolved by Judge Seigel and that --

5          THE COURT:  I don't want to waste his knowledge of

6  the case at this point.  It would be fruitless for us to start

7  over.

8          MR. NORTHON:  I agree.  And that's why --

9          THE COURT:  While you were all talking, I went back

10 to my Rules of Civil Procedure.  And the one nobody reads is

11 Rule 1.

12         MR. NORTHON:  The just, speedy, and inexpensive --

13         THE COURT:  Yeah.  The just, speedy -- and all the

14 rules have to be read for the just, speedy, and inexpensive

15 determination of every action.  We've probably passed that

16 threshold, but we don't need to make it worse.

17         MR. GREGG:  I mean, Your Honor, I'd agree that I

18 think the motion to strike Dr. Huntoon as an expert -- I think

19 that can be referred to Judge Seigel.

20         I think our original motion for sanctions that was

21 filed -- I think it's Document 257.  That's fully briefed.  It

22 can be referred to Judge Seigel.

23         I would say, Your Honor, though, I think for the

24 motion to strike Dr. Huntoon that was filed on March -- I

25 mean, I'm fine referring that to Judge Seigel and we can have

1  a hearing on it, but there was never any response from

2  plaintiffs on that motion.  And it was filed on the 22nd.

3       I mean, what I don't want is to have this motion be

4  converted into something that we talk to Judge Seigel about

5  and then we suddenly get a huge opposition to it when it's

6  been on file since the end of March.

7       SPECIAL MASTER SEIGEL:  Your Honor?

8       THE COURT:  Yes, sir.

9       SPECIAL MASTER SEIGEL:  If I might, I'm just now

10  hearing about the motions to strike experts.

11      My thought, my initial thought was, well, I wasn't

12  sure I had the authority to hear those motions because they

13  were talking about striking experts for trial.  I wasn't sure

14  if the Court would want me to address those or not.

15      THE COURT:  I think striking experts stays with me,

16  and discovery disputes should be -- all of them within your

17  cabin as part of the Special Master.

18      SPECIAL MASTER SEIGEL:  Okay.

19      THE COURT:  But let's deal with the discovery issue

20  before we start making decisions about experts, unless you

21  feel you're in a position at this point to rule.  I mean, all

22  of them, of course, are reports and recommendations.  So I

23  could benefit from your insight if you feel like you want to

24  take it on.

25      MR. GREGG:  Your Honor, if I'm hearing you

1  correctly -- and I agree with Your Honor -- I think then our

2  motion for discovery sanctions, Document 257, which is fully

3  briefed, we'd referred to Judge Seigel because it's a

4  discovery dispute even though it predates the referral of the

5  case to the Special Master.  But then the motion to strike the

6  testamentary capacity expert, Larry Huntoon, that was filed in

7  March -- that will stay with you?

8            THE COURT:  I mean, I'm at a little bit of a loss

9  because I don't know how intertwined these things are.

10           SPECIAL MASTER SEIGEL:  Right.  And, Your Honor, I

11 have no problem hearing the motion to strike that expert and

12 make a recommendation to the Court.

13           THE COURT:  Let's proceed on that basis.

14           Obviously, you'll each get an opportunity to object

15 to the report, and I'll make a ruling, but that will package

16 it up better.

17           MR. NORTHON:  Thank you.  I think that helps

18 procedurally too because, you know, defense counsel is

19 suggesting that they're intertwined and related, and so this

20 gives us a chance to make the argument first to Judge Seigel

21 and then address anything that's left over.

22           THE COURT:  Okay.  So the CMO is vacated.  These

23 motions are referred to the Special Master.  He will file his

24 report and recommendation.  You will have ten days to respond.

25 And then I will set a status conference after that, perhaps

1   for argument, or I will rule and we'll get back together again

2   and chart our path forward.

3           MR. NORTHON:  Thank you, Your Honor.

4           THE COURT:  Anything else while we're together?

5           MR. GREGG:  No.

6           THE COURT:  All right.  Very good.  Thank you all for

7   your time.

8                   **(PROCEEDINGS CONCLUDED AT 12:05 PM.)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 34 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 21st day of August, 2023.

/s/Shannon L White
_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter